2023-1877

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

MARMEN INC., MARMEN ENERGIE INC., MARMEN ENERGY CO.,

Plaintiffs-Appellants

v.

UNITED STATES, WIND TOWER TRADE COALITION,

Defendants-Appellees

---

Appeal from the United States Court of International Trade
in Consol. Case No. 1:20-CV-00169
Judge Jennifer Choe-Groves

---

## BRIEF OF PLAINTIFFS-APPELLANTS
## MARMEN INC., MARMEN ENERGIE INC., MARMEN ENERGY CO.

### NON-CONFIDENTIAL VERSION

Jay C. Campbell
Ron Kendler
Allison J.G. Kepkay
WHITE & CASE LLP
701 Thirteenth  Street, NW
Washington, DC 20005
(202) 626-3600

July 10, 2023

Counsel to Plaintiffs-Appellants Marmen Inc., Marmen Energie Inc., Marmen Energy Co.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---:|:---|
| **Case Number** | 2023-1877 |
| **Short Case Caption** | Marmen Inc. v. US |
| **Filing Party/Entity** | Appellants Marmen Inc., Marmen Energie Inc., Marmen Energy Co. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/10/2023

Signature: /s/ Jay C. Campbell

Name: Jay C. Campbell

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Marmen Inc., Marmen Energie Inc., Marmen Energy Co. | N/A | Gestion Marmen Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable            ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable            ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted on pages 13, 37, 38, 48 identifies Marmen's pricing information. The material omitted on pages 14, 15, 39, 44, 45 and 49 identifies cost of production information. The material omitted on page 45 identifies one of Marmen's suppliers. The material omitted on page 48 identifies Marmen's conversion rates. The material omitted in footnote 1 on page 39 identifies one of Marmen's CONNUM numbers.

## TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ......................................................2

STATEMENT OF THE ISSUES...........................................................3

STATEMENT OF THE CASE..............................................................3

I.    PROCEDURAL OVERVIEW .......................................................3

II.   COMMERCE'S DECISION TO AVERAGE MARMEN'S REPORTED PLATE COSTS ACROSS CONNUMS ("COST-SMOOTHING") ...........................................................................4

      A.    Commerce's Identification of the Physical Characteristics of Wind Towers that Affect Costs of Manufacture ...................................5

      B.    Petitioner's "Cost-Smoothing" Argument and Commerce's Preliminary AD Determination ............................................6

      C.    Marmen's Case Brief and Commerce's Final AD Determination.......8

      D.    The CIT's Opinion in *Marmen I* ..........................................9

III.  COMMERCE'S DECISION TO REJECT A MINOR CORRECTION TO A COST RECONCILIATION WORKSHEET .......................................10

A.    The Basic Structure of a Cost Reconciliation in AD Proceedings .........................................................10

B.    The Minor Correction to Marmen Inc.'s Cost Reconciliation Worksheet ...............................................12

C.    Commerce's Rejection of the Minor Correction During the AD Investigation as "Untimely Filed New Factual Information" .............19

D.    The CIT's Opinion in *Marmen I* and Commerce's Remand Proceeding ...............................................20

E.    The CIT's Opinion in *Marmen II* .........................................21

IV.    COMMERCE'S DECISION TO USE THE AVERAGE-TO-TRANSACTION COMPARISON METHOD BASED ON PRICE DIFFERENCES OF LESS THAN ONE PERCENT .................................21

A.    Commerce's Application of the Cohen's *d* Test in the AD Investigation .............................................21

B.    The CIT's Opinion in *Marmen I* .........................................23

C.    DOC's Remand Proceeding ...............................................24

D.    CIT's Opinion in *Marmen II* .........................................25

SUMMARY OF THE ARGUMENT .....................................................25

ARGUMENT ...............................................................................28

I.    STANDARD OF REVIEW ......................................................28

II.    COMMERCE'S DECISION TO MODIFY MARMEN'S REPORTED PRODUCT-SPECIFC PLATE COSTS SHOULD NOT BE AFFIRMED ......................................................................29

A.    Legal Background ............................................................29

B.    Commerce Arbitrarily Disregarded Its Consistent Practice for Determining Whether to Average or "Smooth" a Respondent's Product-Specific Costs .......................................................33

C.    Commerce's Factual Findings Are Unsupported by Substantial Evidence ........................................................................... 36

    1.    The record evidence disproves Commerce's finding that prices only differed for high-thickness plates ........................... 36

    2.    Commerce's assumption that timing explained differences in plate costs is unsupported by substantial evidence ................................................................................ 39

D.    Conclusion ........................................................................... 42

III.    COMMERCE'S DECISION TO REJECT A MINOR CORRECTION TO ONE LINE OF A COST RECONCILIATION WORKSHEET IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ................................. 42

A.    Commerce Wrongly Concluded that Acceptance of the Correction to Marmen Inc.'s Cost Reconciliation Worksheet Would "Double Count" an Exchange Rate Adjustment .................... 43

B.    Commerce Unreasonably Rejected Marmen Inc.'s Support for the Correction to Marmen Inc.'s Cost Reconciliation Worksheet ...... 47

IV.    COMMERCE'S USE OF THE AVERAGE-TO-TRANSACTION COMPARISON METHOD SHOULD NOT BE AFFIRMED .................... 49

A.    Commerce's Premise – that the Assumptions Underlying the Cohen's *d* Test Do Not Apply When the Data Sets To Be Compared Are Populations, as Opposed to Samples – Is Unsupported by Substantial Evidence ................................. 50

B.    Commerce Unreasonably Determined Based on Rigid Application of the Cohen's *d* Test that Less-than-One-Percent Differences in Price Are Significant ................................... 56

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............................. 61

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

## CASES

*Am. Silicon Techs. v. United States*,
261 F.3d 1371 (Fed. Cir. 2001) .........................................................30

*Am. Silicon Techs. v. United States*,
334 F.3d 1033 (Fed. Cir. 2003) .........................................................28

*Atlantic Sugar Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) ....................................................37, 56

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962).........................................................................41

*Chr. Bjelland Seafoods*,
19 C.I.T. 35 (1995) .........................................................................40

*Consol. Bearings Co. v. United States*,
348 F.3d 997 (Fed. Cir. 2003) ..........................................................35

*Dillinger France S.A. v. United States*,
981 F.3d 1318 (Fed. Cir. 2020) .........................................................60

*Dong-A Steel Co. v. United States*,
337 F. Supp. 3d 1356 (Ct. Int'l Trade 2018) .......................................33

*Fagersta Stainless AB v. United States*,
577 F. Supp. 2d 1270 (Ct. Int'l Trade 2008) .......................................29

*FCC v. Fox Television Stations, Inc.*,
129 S. Ct. 1800 (2009).....................................................................36

*Huayin Foreign Trade Corp. v. United States*,
322 F.3d 1369 (Fed. Cir. 2003) ..............................................37, 39, 56

*J.D. Irving, Ltd., v. United States*,
615 F. Supp. 3d 1323 (Ct. Int'l Trade 2023) .........................................2

*JTEKT Corp. v. United States*,
642 F.3d 1378 (Fed. Cir. 2011) .........................................................28

*Marmen Inc. v. United States,*
545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021)................................................passim

*Marmen Inc. v. United States,*
627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023)....................................................2, 24

*Mid Continent Steel & Wire, Inc. v. United States,*
940 F.3d 662 (Fed. Cir. 2019) ..............................................................................60

*Pastificio Lucio Garofalo, S.p.A. v. United States,*
783 F. Supp. 2d 1230 (Ct. Int'l Trade 2011) ......................................................30

*Seah Steel Vina Corp. v. United States,*
182 F. Supp. 3d 1316 (Ct. Int'l Trade 2016) ......................................................35

*Stupp Corp. v. United States,*
5 F.4th 1341 (Fed. Cir. 2021) ......................................................................passim

*Thai Plastic Bags Indus. Co. v. United States,*
746 F.3d 1358 (Fed. Cir. 2014) .....................................................................31, 33

*United States v. Nixon,*
418 U.S. 683 (1974)...............................................................................................36

*Universal Camera Corp. v. NLRB,*
340 U.S. 474 (1951)........................................................................................38, 43

*Viraj Forgings, LTD. v. United States,*
350 F. Supp. 2d 1316 (Ct. Int'l Trade 2004) ......................................................59

*Viraj Group v. United States,*
476 F.3d 1349 (Fed. Cir. 2007) ............................................................................29

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
716 F.3d 1370 (Fed. Cir. 2013) ............................................................................40

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2)(A)................................................................................................29

19 U.S.C. § 1677b(f)(1)(A).............................................................26, 30, 31, 33

19 U.S.C. § 1677f-1(d)(1)(B) ........................................................................passim

19 U.S.C. § 1677f-1(d)(1)(B)(i) ........................................................57

19 U.S.C. § 1677f-l(d)(l)(A) ............................................................21

28 U.S.C. § 1295(a)(5) ......................................................................2

28 U.S.C. § 1581(c) ..........................................................................2

19 C.F.R. § 351.301(c) ....................................................................19

19 C.F.R. § 351.414(b)(1) ................................................................21

19 C.F.R. § 351.414(c)(1) ................................................................21

19 C.F.R. § 351.414(c)(3) ................................................................22

## ADMINISTRATIVE DETERMINATIONS

*Antidumping Duties; Countervailing Duties*,
   61 Fed. Reg. 7308, 7339 (Feb. 27, 1996) ...........................30

*Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy*,
   85 Fed. Reg. 3026 (Dep't Commerce Jan. 17, 2020),
   and accompanying Issues & Decision Memorandum ......................32

*Certain Pasta from Italy*,
   83 Fed. Reg. 63627 (Dep't Commerce Dec. 11, 2018),
   and accompanying Issues & Decision Memorandum ......................32

*Heavy Walled Rectangular Pipes and Tubes from Korea*,
   84 Fed. Reg. 24471 (Dep't Commerce May 28, 2019),
   and accompanying Issues & Decision Memorandum ......................32

*Large Diameter Welded Pipe from the Republic of Korea*,
   87 Fed. Reg. 68675 (Dep't Commerce Nov. 16, 2022) (final results
   2020-2021 review),
   and accompanying Issues & Decision Memorandum ......................31

*Utility Scale Wind Towers from Canada*,
   85 Fed. Reg. 8562 (Feb. 14, 2020),
   and accompanying Preliminary Decision Memorandum ...............4, 7, 8, 22

*Utility Scale Wind Towers from Canada*,
   85 Fed. Reg. 40239 (Dep't Commerce July 6, 2020),
   and accompanying Issues & Decision Memorandum ................................passim

*Welded Line Pipe from the Republic of Korea*,
   80 Fed. Reg. 61366 (Dep't Commerce Oct. 13, 2015),
   and accompanying Issues & Decision Memorandum .......................................32

## MISCELLANEOUS

Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences*
   (2d ed. 1988) ................................................................................51, 52

James Algina et al.,
   *An Alternative to Cohen's Standardized Mean Difference Effect
   Size: A Robust Parameter and Confidence Interval in the Two
   Independent Groups Case*,
   10 PSYCHOLOGICAL METHODS ....................................................51, 54

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1159 (11th ed. 2003) .................60

Robert J. Grissom & John J. Kim,
   *Effect Sizes for Research: Univariate and Multivariate* 66 (2d ed.
   2012) ...........................................................................................53, 54

# **STATEMENT OF RELATED CASES**

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiffs-Appellants, Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co., make the following statement:

1.     No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.     No other action pending before the United States Court of International Trade ("CIT") may be directly affected by the Court's disposition of this appeal.

While counsel for Plaintiffs-Appellants is aware of other appeals before the CIT and the Federal Circuit that involve certain of the same general legal issues, counsel understands that such cases "are not 'related' within the meaning of" the Court's rules.  *See* Practice Note to Fed. Cir. R. 47.5.

# JURISDICTIONAL STATEMENT

The action filed by Plaintiffs-Appellants Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, "Marmen" or "Appellants") before the CIT, *Marmen Inc. et al. v. United States*, Consol. Court No. 20-00169, which resulted in this appeal, contested certain aspects of the U.S. Department of Commerce's ("Commerce") final antidumping ("AD") duty determination in *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40239 (Dep't Commerce July 6, 2020) (final LTFV determ.) ("*Final AD Determination*"), Appx3893-3895.   The CIT had exclusive jurisdiction over Marmen's complaint under 28 U.S.C. § 1581(c).   This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

On March 20, 2023, the CIT issued the final decision from which this appeal was taken.   *See Marmen Inc. v. United States*, 627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023) ("*Marmen II*"), Appx21-28.   Marmen timely filed a notice of appeal on May 4, 2023.

## STATEMENT OF THE ISSUES

1.    Was Commerce's decision to modify Marmen's reported product-specific raw material costs arbitrary and unsupported by substantial evidence, given that Commerce failed to apply its longstanding practice and relied on assumptions and factual findings belied by the record evidence?

2.    Was Commerce's decision to reject a minor correction to one line of a cost reconciliation worksheet unsupported by substantial evidence, given that Commerce's decision was illogical and contrary to the record evidence?

3.    Was Commerce's decision to apply the average-to-transaction comparison method based on a finding of "significant" price differences unreasonable and unsupported by substantial evidence, given that Commerce blindly relied on the results of a Cohen's $d$ test that falsely attributed significance to price differences of less than one percent?

## STATEMENT OF THE CASE

## I.    PROCEDURAL OVERVIEW

In response to an AD petition filed by the Wind Tower Trade Coalition ("Petitioner"), Commerce initiated an AD investigation of wind towers from Canada on July 29, 2019.  Appx51-57.  The period of investigation ("POI") was July 1, 2018 – June 30, 2019.

Commerce selected Marmen Inc. and Marmen Énergie Inc. as mandatory respondents for Canada.  *See* Appx58-64.  During the investigation, Marmen

submitted complete responses to all Commerce requests for information, including the initial AD questionnaire and multiple supplemental questionnaires.

On December 13, 2019, Marmen submitted "restated" audited year-2018 financial statements for Marmen Inc., which were amended by the auditor due to a misstatement in the presentation of the company's net foreign exchange gains and losses. *See* Appx2345, Appx2369-2389. Commerce accepted Marmen Inc.'s restated year-2018 financial statements as made in accordance with Canadian Generally Accepted Accounting Principles. *See* Appx3859.

Commerce issued an affirmative preliminary AD determination on February 4, 2020, assigning Marmen a dumping margin of 5.04%. *See Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 8562 (Feb. 14, 2020) (prelim. LTFV determ.) ("*Preliminary AD Determination*"), Appx2457-2460, and accompanying Preliminary Decision Memorandum, Appx2461-2468. Commerce issued an affirmative final AD determination on June 29, 2020, assigning Marmen a dumping margin of 4.94%. *See* Appx3893.

## II. COMMERCE'S DECISION TO AVERAGE MARMEN'S REPORTED PLATE COSTS ACROSS CONNUMS ("COST-SMOOTHING")

Wind towers "are a component of utility scale wind turbine electrical power generating units used to convert the energy from wind to electrical energy." Appx49. The wind tower is a tubular steel structure supporting the other

components of a wind turbine, the nacelle (which houses the primary electrical generating components) and the rotor blades. *See id.* Wind towers have three types of sections: the base section, one or more mid-sections, and the top section. *See* Appx74. As detailed below, although Commerce determined that type (tower or section), weight, and height are the three most important physical characteristics of a wind tower model, Commerce rejected Marmen's reporting of direct materials (*i.e.*, steel plate) costs in a manner that accounted for these characteristics.

## A. Commerce's Identification of the Physical Characteristics of Wind Towers that Affect Costs of Manufacture

During the early phase of an AD investigation, Commerce accepts comments to help it establish control numbers (or "CONNUMs") for assignment to each product under investigation based on a hierarchy of the physical characteristics deemed commercially significant. In its comments, Petitioner explained that "steel plate is the primary input for wind towers" and that "the quantity and thickness of steel plate consumed in a particular tower can vary significantly depending on the specification." Appx78. For example, Petitioner noted, "the bottom section of a wind tower may include wider and thicker {high strength low allow ('HSLA')} structural steel plate as compared to the middle or top sections." *See* Appx78-79. Because of "the overwhelming role played by steel plate{,}" Petitioner argued that "section weight" and "section height" are "the most significant factors associated with wind tower sections . . . ." Appx77-78.

On September 17, 2019, Commerce determined the physical characteristics to be used for purposes of matching U.S. sales to home-market sales of identical or the most similar merchandise (as reflected in CONNUMs).  *See* Appx787-796. Commerce selected Type (*i.e.*, complete wind tower or section of a wind tower), Weight of the Tower/Section, and Height of the Tower/Section as the three "physical characteristics that are the most significant in differentiating the costs between products."  Appx3857; Appx789-796.

### B.     Petitioner's "Cost-Smoothing" Argument and Commerce's Preliminary AD Determination

On January 15, 2020, less than three weeks before the deadline for Commerce's preliminary AD determination, Petitioner argued for the first time that Marmen's reported product-specific costs for steel plate should be equalized (or "smoothed") across Marmen's reported costs for all wind tower products (defined by CONNUM).  *See* Appx2438-2441.  Questioning the integrity of Marmen's reported plate costs, Petitioner claimed that the CONNUMs sold in the U.S. market had significantly lower per-unit plate costs than the CONNUMs sold in the home market ("HM").  *See* Appx2438-2439.  As support, Petitioner provided a chart listing seven "US" CONNUMs and twelve "HM" CONNUMs, and the corresponding per-ton plate costs reported for each.  *See* Appx2451-2452. Petitioner's chart, however, mislabeled five US CONNUMs as "HM" CONNUMs. *See* Appx3762-3763.  In fact, the reported per-ton plate costs for these five US

CONNUMs were in line with the per-ton plate costs reported for the seven HM CONNUMs. *See* Appx3763. Consequently, Petitioner's claim was false.

On January 31, 2020, Commerce issued Marmen a Second Supplemental Section D Questionnaire inquiring about Marmen's reported plate costs.

On February 4, 2020, Commerce issued the *Preliminary AD Determination*. Accepting Petitioner's "cost-smoothing" argument, Commerce "weight-averaged {Marmen's} reported plate costs across all reported CONNUMs." Appx2468. According to Commerce, "Marmen reported steel plate cost differences between CONNUMs that appear to be unrelated to the physical characteristics of the products." Appx2469. As support for this finding, Commerce relied on Petitioner's chart – which had mislabeled five US CONNUMs as "HM" CONNUMs. *See* Appx2472.

On February 7, 2020, Marmen submitted a timely response to Commerce's Second Supplemental Section D Questionnaire. *See* Appx3590. In response to Commerce's questions regarding differences in the types of plate used to produce wind towers, Marmen explained that it produces wind towers pursuant to the customer's (*i.e.*, the wind turbine manufacturer's) specifications, and that the customer provides a "plate list" specifying each of the numerous types of plates (each varying by dimension, *i.e.*, thickness, width, and length) to be used in production of the tower. *See* Appx3592. Marmen also provided sample plate lists,

one of which included prices and showed significantly different prices per short ton for plates of varying dimensions. *See* Appx3606-3608. In addition, Marmen explained that the width and thickness of steel plate consumed vary based on section – top, middle, or base – of the wind tower, with the base section using the strongest and thickest plate and the top section using the thinnest plate. *See* Appx3594-3596. Consequently, the per-ton plate costs for a top section could not reasonably be compared to the per-ton plate costs for a base section or a complete tower.

### C.     Marmen's Case Brief and Commerce's Final AD Determination

In its case brief, Marmen noted that Commerce's consistent test for determining whether to average a respondent's reported product-specific costs across multiple CONNUMs was to examine: (1) whether the respondent reported significantly different costs for "nearly identical" or "similar" CONNUMs and, if so, (2) whether such differences in cost were unrelated to the products' physical characteristics. *See* Appx3760. Marmen also demonstrated that the first prong of the test was not satisfied: Marmen did ***not*** incur significantly different plate costs for the most similar CONNUMs (defined by Type (tower or section), Weight, and Height). *See* Appx3761-3763. Furthermore, Marmen demonstrated that differences in reported plate costs for ***dissimilar*** CONNUMs related to the products' physical characteristics. *See* Appx3763-3765.

In the *Final AD Determination*, Commerce continued to average Marmen's reported CONNUM-specific plate costs across CONNUMs. *See* Appx3857. In doing so, Commerce did not examine whether the reported per-unit plate costs differed significantly among nearly identical or similar CONNUMs. Instead, Commerce compared the reported per-ton plate costs for ***all*** CONNUMs (save one) – regardless of Type, Weight, or Height, despite having determined that these "physical characteristics . . . are the most significant in differentiating the costs between products." Appx3857; *see also* Appx3874, Appx3878. Moreover, Commerce assumed that the observed differences in CONNUM-specific, per-ton plate costs related to timing disparities – rather than to differences in the physical characteristics of the products. *See* Appx3874, Appx3879-3880; Appx3858.

### D.    The CIT's Opinion in *Marmen I*

On appeal, the CIT "sustain{ed} Commerce's determination to weight-average Marmen's steel plate costs." *Marmen Inc. v. United States*, 545 F. Supp. 3d 1305, 1315 (Ct. Int'l Trade 2021) ("*Marmen I*"), Appx11. In doing so, the trade court (1) concluded that Commerce followed its "cost-smoothing" practice without addressing Marmen's argument that Commerce had not done so; (2) affirmed Commerce's finding that "Marmen's suppliers did not charge different prices for plates of varying physical characteristics" without addressing contradictory evidence cited by Marmen; and (3) affirmed Commerce's determination that

"differences in plate prices were related to timing of production" without addressing Marmen's demonstration that the record lacked substantial evidentiary support for Commerce's conclusion. Appx10-11.

## III. COMMERCE'S DECISION TO REJECT A MINOR CORRECTION TO A COST RECONCILIATION WORKSHEET

Commerce rejected a minor correction to one line of Marmen Inc.'s cost reconciliation worksheet, which was necessary to convert the value of certain purchases from U.S. dollars ("USD") to Canadian dollars ("CAD"). Initially, during the AD investigation, Commerce rejected the correction as "untimely filed new factual information." Later, after the CIT directed Commerce to accept and reconsider the correction on remand, Commerce again rejected the correction, this time claiming it was unnecessary and unsupported. To appreciate why Commerce was wrong, it is important to understand the structure of a cost reconciliation and Marmen's treatment of USD purchases in its normal accounting records during the POI.

### A. The Basic Structure of a Cost Reconciliation in AD Proceedings

Section D (Cost of Production and Constructed Value) of Commerce's AD Questionnaire instructs the respondent to provide worksheets reconciling the company's cost of goods sold ("COGS") from its audited financial statements to the cost of production reported for the subject merchandise. *See* Appx838-839. In basic terms, this means the respondent typically must (1) reconcile its ***audited***

**COGS for the fiscal year** to its **COGS for the POI**; (2) reconcile its **COGS for the POI** to its **cost of manufacture ("COM") for all products during the POI**; (3) subtract **nonsubject COM items** (*i.e.*, costs of manufacture for nonsubject merchandise); (4) subtract or add other differences between the audited COGS and the total COM (*i.e.*, reconciling items); and (5) compare the resulting amount (*i.e.*, POI COM for the subject merchandise from the respondent's financial records) to its total COM for the subject merchandise reported to Commerce. *See id.* The table below illustrates the basic structure of a cost reconciliation worksheet (using the POI of the underlying AD investigation).

| Sample Cost Reconciliation | | | | |
|---|---|---|---|---|
| **Steps** | | **Item** | **Reference** | **Amount** |
| | | Audited COGS for 2018 | **A** | 1,000,000 |
| **Step (1):** Reconcile audited COGS for fiscal year to COGS for POI. | *Less:* | COGS Jan.-June 2018 | **B** | 600,000 |
| | *Plus:* | COGS Jan.-June 2019 | **C** | 550,000 |
| | *Equals:* | COGS for POI (July 2018 - June 2019) | **D=A-B+C** | 950,000 |
| **Step (2):** Reconcile COGS for POI to total COM for all products during POI. | *Less:* | Beginning Inventory (July 1, 2018) | **E** | 30,000 |
| | *Plus:* | Ending Inventory (July 1, 2019) | **F** | 20,000 |
| | *Equals:* | Total COM for All Products (POI) | **G=D-E+F** | 940,000 |
| **Step (3):** Subtract Nonsubject COM. | *Less:* | Total COM for Nonsubject Products (POI) | **H** | 500,000 |
| **Step (4):** Subtract other differences between audited COGS and COM. | *Less:* | Reconciling Items (i.e., other differences between audited COGS and total COM) | **I** | 40,000 |
| **Step (5):** Compare the total COM for subject merchandise from financial records to total reported COM for subject merchandise. | *Equals:* | Total COM for Subject Merchandise (POI) from Financial Records | **J=G-H-I** | 400,000 |
| | | Reported Total COM for Subject Merchandise (POI) | **K** | 400,100 |
| | | Difference | **L=J-K** | (100) |
| | | Percentage Difference (%) | **M=L/J** | -0.03% |

**B.    The Minor Correction to Marmen Inc.'s Cost Reconciliation Worksheet**

Marmen reported costs of production in response to Section D of the AD Questionnaire for both Marmen Inc. and Marmen Énergie Inc., the two affiliated producers of subject merchandise.  *See* Appx827.  Accordingly, Marmen submitted two cost reconciliations:  one tying Marmen Inc.'s reported cost of production to Marmen Inc.'s audited financial statements, and the other tying Marmen Énergie Inc.'s cost of production to Marmen Énergie Inc.'s audited financial statements. *See id.* at Appx854-942; Appx1022-1383.

As a Canadian company, Marmen's audited financial statements (including COGS) are presented in CAD, and Marmen reported its costs of production to Commerce in CAD.   *See* Appx672, Appx678; Appx2378-2379; Appx843-848 (Cost of Production Database Summary showing all costs reported in CAD). Accordingly, Marmen's cost reconciliations tie Marmen Inc.'s and Marmen Énergie Inc.'s audited COGS expressed in CAD to their reported costs expressed in CAD.

The POI in the underlying AD investigation was July 1, 2018, through June 30, 2019.  In its questionnaire responses, Marmen explained that, "{d}uring *the 2018 fiscal year*, Marmen recorded its USD-denominated purchases" at a rate of 1:1 (*i.e.*, one USD equal to one CAD).  Appx3601.  In other words, *in 2018* Marmen did not convert USD purchases to CAD in its normal accounting records.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Consequently, "{a}t year-end, Marmen's auditor, . . . ma{de} an adjusting entry to convert these purchases to the CAD equivalent values" for presentation in Marmen Inc.'s year-2018 financial statements." *Id.*; *see also* Appx829, Appx835; Appx1006-1007 (explaining the auditor's exchange rate adjustment for purposes of presentation in Marmen's financial statements).    Subsequently, *in 2019* (which overlaps with the second half of the POI), Marmen's accounting practice changed. During that year, "Marmen's system converted USD purchases to CAD at a conversion rate of [ $_{rate}$  ]" (*i.e.*, one USD equal to [ $_{rate}$ ] CAD). *See* Appx829.

During the POI, Marmen Inc. purchased and resold wind tower sections manufactured by its affiliate, Marmen Énergie Inc.  *See* Appx1003, Appx1005. "Marmen Inc.'s cost to purchase the sections is included in COGS, but {was} not included in ***Marmen Inc.'s*** reported costs (because Marmen Inc. did not manufacture the sections).  Consequently, to tie Marmen Inc.'s audited COGS to the {company's} reported costs of manufacture, it was necessary to deduct Marmen Inc.'s purchases of wind tower sections from Marmen Énergie." Appx1005 (emphasis added).  Referring to the "**Sample Cost Reconciliation**" provided above, this was an adjustment in **Step (4)** (reconciling item) to account for a difference between Marmen Inc.'s COGS (which includes the value of its purchases of wind tower sections from Marmen Énergie Inc.) and Marmen Inc.'s

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

reported cost of production (which does ***not*** include the value of its purchases of wind tower sections from Marmen Énergie Inc.).

Originally, Marmen reported [ cost figure ] at **Item L** ("Affiliate purchase of wind sections from Marmen Énergie") of the cost reconciliation worksheet as the value for Marmen Inc.'s purchases of wind tower sections from Marmen Énergie Inc. during the POI.  *See* Appx1022 (Marmen Inc. cost reconciliation).  Marmen also provided a schedule listing all of Marmen Énergie Inc.'s invoices to Marmen Inc. building to the [ cost figure ] total amount, which also showed that each invoice was issued in USD.  *See* Appx1042-1049 (Marmen Inc. cost reconciliation, Item L support).  The [ cost figure ] referred to [ cost figure ] U.S. dollars. Inadvertently, however, in preparing Marmen Inc.'s cost reconciliation worksheet, Marmen had omitted to convert the company's purchases from Marmen Énergie during the first half of the POI (July 1, 2018, through December 31, 2018) – which were denominated and booked in Marmen Inc.'s accounting records in USD – to CAD.  *See* Appx3604-3605, Appx3641.  Marmen's omission created a discrepancy in Marmen Inc.'s cost reconciliation worksheet, because all other values in the worksheet (including the audited COGS at **Item A** and the reported COM at **Item T**) were expressed in CAD.

To correct this error, Marmen added **Item L1** ("Exchange Rate Variance on July to Dec 2018 Affiliated Purchases of Wind Sections from Energie") in a

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

revised version of Marmen Inc.'s cost reconciliation worksheet to convert the value of Marmen Inc.'s purchases of wind tower sections from Marmen Énergie Inc. during the first half of the POI from USD to CAD (an adjustment of CAD [ cost figure ]).  *See* Appx3641.  Marmen included the correction as part of its response to the Second Supplemental D Questionnaire, which Marmen submitted on February 7, 2020.  To support the correction (**Item L1**), Marmen resubmitted the schedule of invoices issued by Marmen Énergie Inc. to Marmen Inc. during the POI for wind tower sections, this time with <mark>green</mark> highlighting to identify the invoices issued in 2018, and a calculation to show the conversion of the year-2018 USD invoice value to CAD.  *See* 3644-3650 ("Marmen Energie Sales to Marmen Inc – Tab L1").  As shown in the schedule, the USD sales value of Marmen Inc.'s purchases during July 1, 2018, through December 31, 2018, was USD [ cost figure ].  Marmen multiplied this amount by [ rate ], the actual exchange gain or loss received by Marmen (based on its exchange rate contracts in place during the POI) – *see* Appx829, Appx835, Appx949, Appx988 (CONNUM buildup worksheets using the [ rate ] conversion rate), Appx1207-1218 – yielding the [ cost figure ] reconciling item Marmen added in **Item L1** of the revised version of Marmen Inc.'s cost reconciliation worksheet.

Again, the [ cost figure ] adjustment reported in **Item L1** of Marmen Inc.'s corrected cost reconciliation worksheet was necessary to reconcile Marmen Inc.'s

year-2018 COGS expressed in CAD (**Item A** in the reconciliation worksheet) to

Marmen Inc.'s total cost of manufacture reported in the cost database (**Item T** in

the reconciliation worksheet), which was also expressed in CAD.  Building on the

"**Sample Cost Reconciliation**" provided above, the two worksheets shown below

illustrate the revision using simplified figures (*i.e.*, not actual figures).

Marmen Inc.'s **original** cost reconciliation worksheet appeared as follows,

with all values expressed in CAD ***except for*** Item L (*i.e.*, Marmen Inc.'s purchases

of wind tower sections from Marmen Énergie Inc.), the value of which Marmen

inadvertently left unconverted in USD.

| Sample Cost Reconciliation (Original Version) | | | | |
|---|---|---|---|---|
| **Steps** | | **Item** | **Reference** | **Amount (CAD)** |
| **Step (1):** Reconcile audited COGS for fiscal year to COGS for POI. | | Audited COGS for 2018 | **A** | 1,000,000 |
| | *Less:* | COGS Jan.-June 2018 | **B** | 600,000 |
| | *Plus:* | COGS Jan.-June 2019 | **C** | 550,000 |
| | *Equals:* | COGS for POI (July 2018 - June 2019) | **D=A-B+C** | 950,000 |
| **Step (2):** Reconcile COGS for POI to total COM for all products during POI. | *Less:* | Beginning Inventory (July 1, 2018) | **E** | 30,000 |
| | *Plus:* | Ending Inventory (July 1, 2019) | **F** | 20,000 |
| | *Equals:* | Total COM for All Products (POI) | **G=D-E+F** | 940,000 |
| **Step (3):** Subtract Nonsubject COM. | *Less:* | Total COM for Nonsubject Products (POI) | **H** | 500,000 |
| **Step (4):** Subtract other differences between audited COGS and COM. | *Less:* | Marmen Inc.'s purchases of wind tower sections from Marmen Énergie during the POI **(USD)** | **L** | 35,000 |
| **Step (5):** Compare the total COM for subject merchandise from financial records to total reported COM for subject merchandise. | *Equals:* | Total COM for Subject Merchandise (POI) from Financial Records | **J=G-H-L** | 405,000 |
| | | Reported Total COM for Subject Merchandise (POI) | **K** | 400,100 |
| | | Difference | **N=J-K** | 4,900 |
| | | Percentage Difference (%) | **M=N/J** | 1.21% |

Because Marmen Inc.'s purchase amount from Marmen Énergie Inc. (**Item L**) is undervalued in USD (relative to all other amounts in the worksheet valued in CAD), the unreconciled difference between Marmen Inc.'s "**Total COM for Subject Merchandise from Financial Records**" (**Item J**) and its "**Reported Total COM for Subject Merchandise (POI)**" (**Item K**) is overstated at 1.21% (**Item M**).

Consequently, Marmen submitted a revised cost reconciliation worksheet with an adjustment (**Item L1**), as shown below in purple font.

| Sample Cost Reconciliation (Revised Version) | | | |
|---|---|---|---|
| **Steps** | **Item** | **Reference** | **Amount (CAD)** |
| **Step (1):** Reconcile audited COGS for fiscal year to COGS for POI. | Audited COGS for 2018 | **A** | 1,000,000 |
| | *Less:* COGS Jan.-June 2018 | **B** | 600,000 |
| | *Plus:* COGS Jan.-June 2019 | **C** | 550,000 |
| | *Equals:* COGS for POI (July 2018 - June 2019) | **D=A-B+C** | 950,000 |
| **Step (2):** Reconcile COGS for POI to total COM for all products during POI. | *Less:* Beginning Inventory (July 1, 2018) | **E** | 30,000 |
| | *Plus:* Ending Inventory (July 1, 2019) | **F** | 20,000 |
| | *Equals:* Total COM for All Products (POI) | **G=D-E+F** | 940,000 |
| **Step (3):** Subtract Nonsubject COM. | *Less:* Total COM for Nonsubject Products (POI) | **H** | 500,000 |
| **Step (4):** Subtract other differences between audited COGS and COM. | *Less:* Marmen Inc.'s purchases of wind tower sections from Marmen Énergie during the POI (USD) | **L** | 35,000 |
| | *Less:* Adjustment to convert Marmen Inc.'s purchases of wind tower sections from Marmen Énergie from July to December 2018 from USD to CAD | **L1** | 5,000 |
| **Step (5):** Compare the total COM for subject merchandise from financial records to total reported COM for subject merchandise. | *Equals:* Total COM for Subject Merchandise (POI) from Financial Records | **J=G-H-L-L1** | 400,000 |
| | Reported Total COM for Subject Merchandise (POI) | **K** | 400,100 |
| | Difference | **N=J-K** | (100) |
| | Percentage Difference (%) | **M=N/J** | -0.03% |

As explained, the adjustment in **Item L1** converts Marmen Inc.'s purchases from Marmen Énergie Inc. during the first half of the POI (July 2018 through December 2018) – the period during which Marmen left USD purchases unconverted in its accounting system – from USD to CAD.   With the revision, the unreconciled difference is corrected to 0.03% (**Item M**).   Again, the worksheets provided above use simplified figures to illustrate the correction.

### C.    Commerce's Rejection of the Minor Correction During the AD Investigation as "Untimely Filed New Factual Information"

On February 25, 2020, Commerce notified Marmen that it considered the correction (**Item L1**) to Marmen Inc.'s cost reconciliation to be "untimely filed new factual information" under 19 C.F.R. § 351.301(c).  *See* Appx3706-3707. Consequently, Commerce rejected Marmen's original response to the Second Supplemental Section D Questionnaire, and instructed Marmen to refile the response without the correction and accompanying support.  *See* Appx3707.  After eliminating the correction (as required by Commerce), the percentage difference between the total cost of manufacturing for subject merchandise from Marmen Inc.'s accounting system ("**COM for subject merchandise**") and Marmen Inc.'s total cost of manufacturing reported to Commerce ("**COM reported to DOC in cost database**") increased to above three percent, *falsely* indicating that Marmen Inc. had under-reported its costs.  *See* Appx3752-3754.

In the *Final AD Determination*, Commerce continued to reject the correction to one line of Marmen Inc.'s cost reconciliation worksheet, and also increased Marmen Inc.'s reported cost of manufacturing by the amount of the ***false*** unreconciled difference, distorting the dumping margin calculation.  *See* Appx3861.

**D.    The CIT's Opinion in *Marmen I* and Commerce's Remand Proceeding**

On appeal, the CIT held that "Commerce abused its discretion by failing to consider Marmen's corrective submission." Appx13.  The trade court "observe{d} that record documents . . . indicate that, prior to Marmen's supplemental submission, Marmen had not converted one line of the cost reconciliation worksheet to properly list prices in Canadian dollars." Appx13.  "In light of record evidence that supports Marmen's corrective submission and its explanation, and absent evidence questioning the veracity of the submission, the Court conclude{d} that Commerce has not supported with substantial evidence its determination that Marmen's supplemental cost reconciliation is inaccurate . . . ." Appx13.  Consequently, the CIT remanded the issue to Commerce "for further explanation or consideration in accordance with this opinion." Appx13.

On remand, Commerce instructed Marmen to resubmit Marmen Inc.'s corrected cost reconciliation worksheet and support, *see* Appx3896-3898, which Marmen did on December 8, 2021, *see* Appx3902-3913 ("Marmen Inc.'s Revised Cost Reconciliation").  In its final remand decision, however, Commerce again declined to accept the correction, this time claiming that the correction in **Item L1** of Marmen Inc.'s cost reconciliation worksheet would double count an exchange rate adjustment already reflected in the company's audited COGS and reported costs. *See* Appx4820, Appx4825, Appx4827, Appx4857.

E.    The CIT's Opinion in *Marmen II*

In its second opinion, the CIT accepted Commerce's decision on remand to reject the correction to Marmen Inc.'s cost reconciliation worksheet as reasonable and supported by substantial evidence.  *See* Appx25-26.  In doing so, the trade court did not address Marmen's detailed explanation and supporting exhibits, which demonstrated that, contrary to Commerce's claim, the **Item L1** correction to Marmen Inc.'s cost reconciliation worksheet was accurate and would not double count adjustments already reflected in Marmen's COGS or reported costs.

## IV.  COMMERCE'S DECISION TO USE THE AVERAGE-TO-TRANSACTION COMPARISON METHOD BASED ON PRICE DIFFERENCES OF LESS THAN ONE PERCENT

### A.    Commerce's Application of the Cohen's *d* Test in the AD Investigation

The statute and regulation prioritize Commerce's use of an average-to-average ("A-A") price comparison method to calculate a dumping margin, which involves a comparison of "the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise    .    .    .    ."    19   U.S.C.   §   1677f-l(d)(l)(A); 19 C.F.R. § 351.414(b)(1), (c)(1).  If, however, "there is a pattern of export prices (or constructed export prices) for comparable merchandise *that differ significantly* among purchasers, regions, or periods of time," Commerce may use an average-to-transaction ("A-T") price comparison method, which involves a comparison of

"the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise . . . ."  19 U.S.C. § 1677f-l(d)(l)(B) (emphasis added); 19 C.F.R. § 351.414(b)(3).

Applying its so-called "differential pricing" analysis, Commerce used the "Cohen's *d*" test to determine whether there was a pattern of "significant" price differences.  *See* Appx2463.  Based on this test, Commerce preliminarily concluded that Marmen's U.S. sales corresponding with seven tower products (defined by CONNUMs) had prices that "differ{ed} significantly" among periods of time (defined by quarter).  *See* Appx2465; Appx2475-2506 ("*Marmen Margin Output*").  Consequently, Commerce used the A-T method to calculate Marmen's preliminary dumping margin.  *See* Appx2465.

In its case brief to Commerce, Marmen argued that application of the A-T method to U.S. sales of five of the CONNUMs passing the Cohen's *d* test was unwarranted, because the price differences found for these CONNUMs across time periods amounted to ***less than one percent***.  *See* Appx3777-3779.  Nevertheless, Commerce continued to apply the A-T comparison method to U.S. sales of the five CONNUMs in the *Final AD Determination*.  *See* Appx3862-3863.  In doing so, Commerce explained, "we continue to find use of the A-T method to be warranted because, notwithstanding the experience associated with several U.S. CONNUMs, on an overall basis, 68.29 percent of the Marmen Group's U.S. sales passed the

Cohen's *d* test." Appx3863. Commerce did not address Marmen's argument that a difference in price of less than one percent is not "significant" on its face.

### B.    The CIT's Opinion in *Marmen I*

On appeal, the CIT reviewed the issue in light of this court's decision in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), which was issued after parties had submitted briefs in the CIT proceeding. The trade court noted the *Stupp* Court's observation that the "Cohen's *d* test relies on assumptions that the data groups being compared are normal, have equal variability, and are equally numerous{,}" as well as the *Stupp* Court's concern that "{a}pplying the Cohen's *d* test to data that do not meet these assumptions can result in 'serious flaws in interpreting the resulting parameter.'" Appx15 (citing *Stupp*, 5 F.4th at 1357-58). Because the record indicated that the price differences in Marmen's case (less than 1%) "were not large in absolute terms," the CIT "question{ed} whether the data Commerce used in its differential pricing analysis violated the assumptions of normality and roughly equal variances associated with the Cohen's *d* test." Appx16. Consequently, the Court "remand{ed} the issue of Commerce's use of the Cohen's *d* test for Commerce to explain further whether the limits on the use of the Cohen's *d* test were satisfied in this case in the context of the *Stupp* case." Appx16.

23

### C.     DOC's Remand Proceeding

On remand, Commerce contended that the assumptions underlying the Cohen's *d* test are not relevant in the context of its differential pricing analysis, because the U.S. price data sets compared by Commerce consist of entire populations – as opposed to samples.   *See* Appx4837-4839. Appx4842-4843, Appx4863-4864.   Commerce maintained this position even though the *Stupp* Court had questioned the same argument.   *See Stupp*, 5 F.4[th] at 1360.

In addition, Commerce rejected portions of Marmen's comments on the agency's draft remand decision, which Marmen had submitted to demonstrate that the Cohen's *d* assumptions were ***not*** satisfied with respect to Marmen's U.S. sales data.   *See* Appx3987-3988, Appx3989-4663 ("*Marmen's Comments*").   Commerce rejected Marmen's comments as "untimely filed new, factual information," *see* Appx4664-4665, even though the information was relevant to the question the CIT instructed Commerce to reconsider on remand:   *i.e.*, whether the assumptions of normality and equal variances associated with the Cohen's *d* test were satisfied in this case.   In the end, Commerce continued to apply the A-T method to Marmen's U.S. sales of CONNUMs with price differences less than 1%.

Marmen filed comments in opposition to Commerce's remand decision with the CIT.   *See* Appx4867-4897.

### D.    CIT's Opinion in *Marmen II*

The CIT accepted Commerce's position that "use of a population, rather than a sample, in the application of the Cohen's *d* test sufficiently negates the questionable assumptions about thresholds that were raised in <u>Stupp</u>."  Appx27. Consequently, the CIT held "that Commerce's application of the Cohen's *d* test to determine whether there was a significant pattern of differences was reasonable because Commerce applied the Cohen's *d* test to a population rather than a sample."  Appx27-28.  In affirming Commerce's remand decision, the CIT did not address Marmen's argument that Commerce's position lacked any support in the academic literature, or any other argument raised by Marmen in its comments on Commerce's remand decision.  *See* Appx26-28.

### SUMMARY OF THE ARGUMENT

**Issue 1:   Commerce's decision to modify Marmen's product-specific plate costs derived from the company's normal accounting records was arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law.**

The statute requires Commerce to rely on the respondent's reported costs of production if:  (1) such costs are based on records kept in accordance with the home country's generally accepted accounting principles ("GAAP"); and (2) such costs reasonably reflect the costs associated with the production and sale of the merchandise.  19 U.S.C. § 1677b(f)(1)(A).  Marmen conducted its accounting in accordance with Canadian GAAP, and used its normal cost accounting system to

derive the product-specific costs reported to Commerce. In determining that Marmen's reported product-specific plate costs did not "reasonably reflect the costs associated with the production and sale" of wind towers, Commerce arbitrarily disregarded its standard "cost-smoothing" practice without explanation, failing to examine whether Marmen's reported plate costs differed significantly among nearly identical or similar products. In addition, Commerce made findings belied by the record evidence, as well as its own identification of "the physical characteristics that are the most significant in differentiating the costs between products." Therefore, Commerce's decision to average or "smooth" Marmen's reported product-specific plate costs was arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law.

**Issue 2: Commerce's decision to reject a minor correction to one line of a cost reconciliation worksheet was unsupported by substantial evidence.**

Commerce rejected a minor correction to one line of a cost reconciliation worksheet for specious reasons and without evidentiary support. The purpose of the cost reconciliation worksheet was to reconcile Marmen Inc.'s audited COGS to the company's total cost of manufacturing ("COM") for subject merchandise during the POI (as reported to Commerce). Both the COGS and reported total COM were expressed in CAD in the reconciliation worksheet. Consequently, for the reconciliation to work, all adjustments to reconcile the COGS to the reported total COM also needed to be valued in CAD. Inadvertently, however, Marmen had

reported one item in Marmen Inc.'s cost reconciliation worksheet in USD instead of CAD. To correct this currency error, Marmen submitted a revised Marmen Inc. reconciliation worksheet, adding a line to adjust the USD value for this item to CAD. On remand, Commerce rejected the correction, reasoning that it was unnecessary because the COGS and total COM included in the reconciliation worksheet were already expressed in CAD. Contrary to Commerce's illogical reasoning, however, it was necessary to convert the USD item to CAD precisely because all other figures in the reconciliation worksheet were expressed in CAD. Furthermore, Commerce unreasonably disregarded documentation Marmen submitted to support the correction.

**Issue 3: Commerce's decision to apply the average-to-transaction comparison method based on price differences of less than one percent was unreasonable and unsupported by substantial evidence.**

The statute permits Commerce to use an average-to-transaction comparison method only if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time . . . ." 19 U.S.C. § 1677f-1(d)(1)(B). Here, Commerce relied on the Cohen's *d* test to find that Marmen's U.S. sales of tower products (defined by CONNUMs) had prices that "differ{ed} significantly" among periods of time (defined by quarter). In doing so, Commerce unreasonably concluded – contrary to the academic literature – that the Cohen's *d* test remained meaningful even if the

assumptions underlying the test (*e.g.*, the data sets to be compared exhibit normal distributions and equivalent variances) were unsatisfied. Moreover, Commerce ignored that, with respect to Marmen's U.S. sales of five CONNUMs, the Cohen's *d* test falsely attributed significance to price differences of less than one percent. For these reasons, Commerce's application of the average-to-transaction method to Marmen's U.S. sales of the five CONNUMs was unreasonable and unsupported by substantial evidence.

## **ARGUMENT**

## I.     **STANDARD OF REVIEW**

This Court reviews the CIT's rulings *de novo*, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted). Because it does so "without affording any deference to the Court of International Trade, this court must review the entire record for substantial evidence and compliance with law." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed. Cir. 2003) (citation and internal quotation marks omitted). Therefore, this Court "must reverse a determination that is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Viraj Group v. United States*, 476 F.3d 1349, 1354 (Fed. Cir. 2007) (citation and internal quotation marks omitted). Moreover, the Administrative Procedure Act prohibits an agency from acting in a manner that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## II.    COMMERCE'S DECISION TO MODIFY MARMEN'S REPORTED PRODUCT-SPECIFC PLATE COSTS SHOULD NOT BE AFFIRMED

In determining that Marmen's reported CONNUM-specific plate costs did not "reasonably reflect the costs associated with the production and sale" of wind towers, Commerce disregarded its standard practice without explanation and made findings belied by the record evidence, as well as its own identification of "the physical characteristics that are the most significant in differentiating the costs between products." Therefore, Commerce's decision to average or "smooth" Marmen's reported plate costs across multiple CONNUMs was arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law.

### A.    Legal Background

During the early phase of an AD investigation, Commerce identifies the "commercially significant" physical characteristics of the subject merchandise, and establishes control numbers (or "CONNUMs") for assignment to each product based on "a hierarchy of {the} commercially significant characteristics." *Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1278 (Ct. Int'l Trade 2008). A physical characteristic is "commercially significant" if it affects the costs and prices of the merchandise under investigation. *See*, *e.g.*, *Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1243 (Ct. Int'l Trade 2011). Further,

"{t}he Department's practice is to calculate costs consistent with the model matching criteria {(defined by CONNUMs)} it develops {at the outset} of an investigation or review, after having received the views of the parties." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7339 (Feb. 27, 1996) (proposed rules).

Under the statute, "{c}osts shall ***normally*** be calculated based on the records of the exporter or producer of the merchandise, ***if*** such costs are kept in accordance with the generally accepted accounting principles of the exporting country . . . ***and*** reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A) (emphasis added). The statute thus prescribes a general rule (*i.e.*, use of the respondent's reported costs where consistent with home-market GAAP) and an exception to that rule where the respondent's costs do not reasonably reflect the costs to produce and sell the merchandise. *See Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1377 (Fed. Cir. 2001) ("{T}he statute provides that as a general rule, an agency may either accept financial records kept according to generally accepted accounting principles in the country of exportation, or reject the records if accepting them would distort the company's true costs.").

Invoking the exception to 19 U.S.C. § 1677b(f)(1)(A), Commerce has rejected or modified the costs recorded in a respondent's GAAP-consistent

accounting records where such costs fail to reasonably reflect the physical characteristics used by Commerce to define identical or similar products.  *See Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1368 (Fed. Cir. 2014) ("{I}t is customary for Commerce to 'adjust a company's reported allocation methodology to reflect costs based solely on physical characteristics.'") (citation omitted).  Under this practice, Commerce has averaged or "smoothed" certain of the respondent's reported CONNUM-specific costs across multiple CONNUMs, ***but only where*** (1) the reported costs are significantly different for "***nearly identical***" or "***similar***" CONNUMs, and (2) the difference in cost was unrelated to the product's physical characteristics (as defined by the CONNUM structure).  *See, e.g.*, *Large Diameter Welded Pipe from the Republic of Korea*, 87 Fed. Reg. 68675 (Dep't Commerce Nov. 16, 2022) (final results 2020-2021 review), accompanying Issues & Decision Memo at 5 ("To mitigate the direct material cost differences that are unrelated to the product's physical characteristics, . . . we have continued to weight average Hyundai RB's reported direct material costs for the CONNUMs that have identical product characteristics associated with raw materials (*i.e.*, steel chemistry, chromium content, nickel content, molybdenum content, product type, and wall thickness)."); *Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy*, 85 Fed. Reg. 3026 (Dep't Commerce Jan. 17, 2020), accompanying Issues & Decision Memo at 25 (declining to average the respondent's reported material

costs because "the cost differences between similar CONNUMs {were} minor");
*Heavy Walled Rectangular Pipes and Tubes from Korea*, 84 Fed. Reg. 24471
(Dep't Commerce May 28, 2019) (final results 2016-2017 review), accompanying
Issues & Decision Memo at 42 ("{W}e adjusted the reported CONNUMs that are
*identical* in all of Commerce's physical characteristics except for painting (i.e.,
steel input type, quality, metallic coating, perimeter, wall thickness, scarfing, and,
shape) to reflect the same HRC cost."); *Certain Pasta from Italy*, 83 Fed. Reg.
63627 (Dep't Commerce Dec. 11, 2018) (final results 2016-2017 review),
accompanying Issues & Decision Memo at 8 ("{W}e continue to find that
{respondent} incurred significantly different semolina costs, resulting in large
material cost differences between pasta CONNUMs that are identical except for
vitamin enrichment and additives, and that the differences in semolina costs
between the nearly identical CONNUMs were due to reasons unrelated to the
products' physical characteristics."); *Welded Line Pipe from the Republic of
Korea*, 80 Fed. Reg. 61366 (Dep't Commerce Oct. 13, 2015) (final LTFV determ.),
accompanying Issues & Decision Memo at 39-40 ("In past cases, the Department
has revised reported CONNUM-specific costs which were based on normal books
and records, in order to smooth out large cost differences among products that have
minor differences in physical characteristics.").

This court has sustained Commerce's consistent practice. *Thai Plastic Bags*, 746 F.3d at 1366 (affirming Commerce's determination that the respondent's costs did not "reasonably reflect the costs associated with the production and sale of the merchandise" where "nine CONNUM pairs were 'very similar in terms of physical characteristics' but had substantial differences in costs") (quoting 19 U.S.C. § 1677b(f)(1)(A)); *see also Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1369-71 (Ct. Int'l Trade 2018) (affirming Commerce's decision to smooth the respondent's "reported raw material costs for product control numbers that were identical in all physical characteristics except painting").

## B.  Commerce Arbitrarily Disregarded Its Consistent Practice for Determining Whether to Average or "Smooth" a Respondent's Product-Specific Costs

Disregarding its longstanding practice, Commerce averaged Marmen's reported CONNUM-specific plate costs without examining whether plate costs differed significantly among nearly identical or similar CONNUMs, as defined by Commerce.  Commerce's arbitrary decision to modify Marmen's reported CONNUM-specific plate costs should not be sustained.

In the underlying investigation, "Commerce identified the physical characteristics that are the most significant in differentiating the costs between products{,}" and used these physical characteristics to "define the unique products, *i.e.*, the CONNUMs . . . ." Appx3857.  "Generally, Commerce attempts to list the

most important physical characteristics first and the least important characteristics last." Appx53. Here, Commerce selected **Type** (*i.e.*, complete wind tower or section of a wind tower), **Weight** of the Tower/Section, and **Height** of the Tower/Section as the three most important physical characteristics for the merchandise under investigation. *See* Appx789-796.

In accordance with Commerce's instruction, Marmen reported its costs of production – including the costs of steel plate – on a CONNUM-specific basis, accounting for Type, Weight, and Height of the wind tower (or wind tower section). *See* Appx832, Appx834. In doing so, Marmen relied on the costs derived from its normal accounting books and records, which were maintained in accordance with Canadian GAAP. *See* Appx3857.

Nevertheless, Commerce disregarded the CONNUM-specific costs reported by Marmen and averaged the company's "reported steel plate costs for all reported CONNUMs" (save one). Appx3857-3858. Commerce explained that this modification to Marmen's reported costs was necessary "to mitigate the significant plate cost differences between CONNUMs that are unrelated to the product physical characteristics . . . ." Appx3857. Yet, in reaching this decision, Commerce failed to follow its consistent practice regarding "cost smoothing." As detailed above, Commerce considers averaging a respondent's reported CONNUM-specific costs across multiple CONNUMs ***only if*** the reported costs are

significantly different for "*nearly identical*" or "*similar*" CONNUMs.  Here,

however, Commerce neglected to examine whether Marmen's reported

CONNUM-specific plate costs differed significantly among nearly identical or

similar CONNUMs – even though Marmen had demonstrated in its case brief that

the company did ***not*** incur significantly different plate costs for the most similar

CONNUMs (defined by Type, Weight, and Height).  *See* Appx3761-3763.

Instead, Commerce compared the reported per-ton plate costs for ***all*** 18

CONNUMs produced by Marmen (with the exception of one CONNUM for which

only "high thickness plate was used") – without taking into account the products'

physical characteristics.  *See* Appx3874, Appx 3878.

"Commerce acts arbitrarily and violates the law when it 'consistently

followed a contrary practice in similar circumstances and provided no reasonable

explanation for the change in practice.'"  *Seah Steel Vina Corp. v. United States*,

182 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2016) (quoting *Consol. Bearings Co.

v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003)).  Here, Commerce not only

failed to explain its departure from past practice; the agency misrepresented that it

had followed its "normal practice" for cost smoothing.  It is impermissible for

Commerce to change a practice without acknowledgement or explanation.  *FCC v.

Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009) ("An agency may not,

for example, depart from a prior policy *sub silentio* or simply disregard rules that

are still on the books.") (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)). On appeal, the CIT repeated Commerce's error by neglecting to address Commerce's failure to take product characteristics (reflected in the CONNUMs defined by Commerce) into account. *See* Appx10-11. For these reasons, Commerce's arbitrary decision to modify Marmen's reported CONNUM-specific plate costs should not be sustained.

## C. Commerce's Factual Findings Are Unsupported by Substantial Evidence

In addition to its arbitrary failure to follow past practice, Commerce made two key factual findings that are unsupported by substantial evidence. First, Commerce wrongly concluded that "Marmen Group's steel suppliers do not charge different prices for plates of different grade, thickness, width, or length{,}" except for "high thickness range plates" (*i.e.*, greater than 50.8mm). Appx3857-3858; Appx3874. Second, Commerce assumed, contrary to the record evidence and its own findings, that differences in timing explained observed differences in Marmen's reported CONNUM-specific plate costs. *See* Appx3858; Appx3874.

### 1. The record evidence disproves Commerce's finding that prices only differed for high-thickness plates

The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huayin Foreign Trade Corp. v.*

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

*United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atlantic Sugar Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  Here, both Commerce and the CIT failed to consider evidence that disproved Commerce's finding that prices differed only for high-thickness plates (*i.e.*, greater than 50.8mm).

During the investigation, Marmen submitted documents demonstrating that steel suppliers' plate prices varied by dimension.  *See* Appx3592-3593, Appx3606-3623.  A single tower is composed of numerous steel plates of varied dimensions; for example, thicker plates are used for the base section and thinner plates used for the middle and top sections.  *See* Appx3592, Appx3594, Appx3606-3608; Appx78-79.  As an example, Marmen submitted the plate list for the wind tower model sold in the home market, which showed prices ranging as follows based on different thicknesses, lengths, and widths:

| Thickness | | Length | | Width | | CAD per short ton |
|---|---|---|---|---|---|---|
| [    ]mm – [    ]mm | | [    ]mm – [    ]mm | | [    ]mm – [    ]mm | | $[    ] - $[    ] |
| [    ]mm –[    ]mm | | [    ]mm –[    ]mm | | [    ]mm – [    ]mm | | $[    ] |
| [    ]mm – [    ]mm | | [    ]mm – [    ]mm | | [    ]mm – [    ]mm | | $[    ] |
| [    ]mm – [    ]mm | | [    ]mm – [    ]mm | | [    ]mm – [    ]mm | | $[    ] |
| [    ]mm – [    ]mm | | [    ]mm – [    ]mm | | [    ]mm – [    ]mm | | $[    ] |
| (Appx3606-3608) | | | | | | |

*Thickness, length, and width figures* — *Price figures*

Overall, this plate list showed prices "varying by as much as CAD [ price ] per ton based on dimension (thickness, length, width){,}" as highlighted by Marmen in its case brief.  Appx3764.  Marmen also submitted purchase agreements showing that several other steel plate suppliers charged more per ton for thicknesses exceeding 50.8mm or 52mm.  *See* Appx3592-3593, Appx3606-3623.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Contrary to the record evidence cited above, Commerce claimed "{t}he only {price} exception demonstrated on the record is for high thickness range plates (*e.g.*, greater than 50.8 mm in thickness for one supplier) for which the supplier charges a surcharge." Appx3857-3858; Appx3874. Commerce was wrong. The plate list for the wind tower sold in the home market (summarized in the table above) showed significant price differences among plates with varying dimensions (thickness, length, and width), including price differences for plates with thicknesses *less than* 50.8 mm. Commerce ignored this contradictory evidence even though Marmen flagged it in the company's case brief. *See* Appx3764 ("For example, Vestas's plate list for the Henvey Project tower sections shows Canadian dollar ('CAD') per ton prices varying by as much as CAD [ price ] per ton based on dimension (thickness, length, width)."). On appeal, the CIT also ignored this evidence. *See* Appx10-11.

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion{,}" *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), based on the record as a whole, *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003). Here, a reasonable mind considering all the relevant evidence would not have found, as did Commerce, that per-unit plate prices differ only for high thickness plates.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

### 2. Commerce's assumption that timing explained differences in plate costs is unsupported by substantial evidence

Commerce **assumed** that timing – not differences in physical characteristics – explained the observed differences in Marmen's CONNUM-specific plate costs based on a purported "pattern where most of the CONNUMs with higher plate costs were sold early in the POI, whereas CONNUMs with lower plate costs were sold later in the POI." Appx3858; Appx3874. Commerce's assumption was both unreasonable – there was no such pattern – and inconsistent with its own determination that costs of production differ significantly based on the type, weight, and height of the wind tower product. *See* Appx3857.

Contrary to Commerce's finding, the record evidence **disproves** the notion that timing caused differences in Marmen's CONNUM-specific plate costs. Of the CONNUMs "with higher plate cost" identified by Commerce, **six** (with per-ton plate costs ranging from CAD [ cost ] to CAD [ cost ]) were sold in the first half of the POI, and **five** (with per-ton plate costs ranging from CAD [ cost ] to CAD [ cost ]) were sold in the second half of the POI.[1] *See* Appx3879-3880. These facts prove that timing was **not** the reason for any significant differences in CONNUM-specific plate costs. Contrary to Commerce's conclusion, ***there was no***

---

[1] This comparison omits the one CONNUM Commerce excluded from its "plate smoothing" calculation, CONNUM [ CONNUM Number ].

***time-based pattern at all:*** CONNUMs with high plate costs were sold throughout the POI.

Moreover, Commerce's observation that CONNUMs "with ***lower*** plate costs were sold later in the POI" does not mean those CONNUMs had lower plate costs ***because*** they were sold later in the POI (*i.e.*, the first half of 2019). All it means is that those particular CONNUMs were only sold during the second half of the POI. A determination based on inadequate reasoning or conjecture cannot survive the "substantial evidence" standard of review. *See Chr. Bjelland Seafoods*, 19 C.I.T. 35, 37 (1995) (citation omitted); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (stating that Commerce's determination cannot be made "on the basis of mere conjecture or supposition"). Here, Commerce's conclusion that timing explained significant differences in CONNUM-specific plate costs was based on mere assumption – and a faulty one at that.

In assuming that timing explained differences in CONNUM-specific plate costs, Commerce also ignored its own identification of the most significant physical characteristics differentiating production costs between products. *See* Appx3857. Commerce selected ***Type*** (*i.e.*, complete wind tower or section of a wind tower), ***Weight*** of the Tower/Section, and ***Height*** of the Tower/Section as the three "physical characteristics that are the most significant in differentiating the

costs between products." Appx3857; Appx789-796. Despite making this finding, Commerce did not examine whether the differences in Marmen's reported CONNUM-specific plate costs were unrelated to the physical characteristics of the wind towers (as reflected in the CONNUMs). In this regard, Commerce failed to consider the obvious: that differences in type, weight, and height explained the observed differences in CONNUM-specific costs. Commerce failed to make this connection even though it claimed to have used "the physical characteristics as {its} guidepost" for comparing CONNUM-specific plate costs. Appx3858.

For a determination to be supported by substantial evidence, there must be a rational connection between the facts on the record and the choice made by Commerce. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962). Here, Commerce's conclusion that timing explained differences in CONNUM-specific plate costs is unsupported by the record evidence and irrational in light of Commerce's determination that Type, Weight, and Height "are the most significant {physical characteristics} in differentiating the costs between products." Appx3857. Furthermore, on appeal, the CIT simply accepted Commerce's determination that differences in timing – not physical characteristics – explained the differences in Marmen's reported CONNUM-specific plate costs without addressing Marmen's arguments.

## D.     Conclusion

For the reasons discussed above, in invoking the exception to 19 U.S.C. § 1677b(f)(1)(A) and modifying Marmen's CONNUM-specific plate costs recorded in the normal course of business, Commerce rendered a decision that was arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law.  Commerce arbitrarily avoided the examination of identical and similar CONNUMs required under its longstanding practice and made conclusions that were based on assumptions and unsupported by substantial evidence.

## III.  COMMERCE'S DECISION TO REJECT A MINOR CORRECTION TO ONE LINE OF A COST RECONCILIATION WORKSHEET IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce unreasonably – and without substantial evidentiary support – rejected a minor correction to one line of a cost reconciliation worksheet. Commerce illogically concluded that acceptance of the correction – which was necessary to ensure that all values in the reconciliation were expressed in the same currency, CAD – would result in double counting, and unreasonably disregarded documentation supporting the correction.  The CIT, meanwhile, simply accepted Commerce's explanation without addressing Marmen's arguments or supporting exhibits.  Commerce's decision to reject the correction to Marmen Inc.'s cost reconciliation is unreasonable and cannot be sustained as supported by substantial evidence.  *See*, *e.g.*, *Universal Camera*, 340 U.S. at 477 (holding that substantial

evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

**A.    Commerce Wrongly Concluded that Acceptance of the Correction to Marmen Inc.'s Cost Reconciliation Worksheet Would "Double Count" an Exchange Rate Adjustment**

Commerce unreasonably rejected the minor correction to one line of Marmen Inc.'s cost reconciliation worksheet for specious reasons – none of which is supported by record evidence, let alone substantial evidence.    In particular, Commerce mistakenly concluded that the correction Marmen reported at **Item L1** of Marmen Inc.'s revised cost reconciliation worksheet would double count an exchange rate adjustment already reflected in the company's audited COGS and reported costs.    In doing so, Commerce employed faulty logic and refused to accept the simple explanation certified as accurate by Marmen and its counsel: that Marmen inadvertently had misreported one line in a reconciliation worksheet in USD instead of in CAD.

According to Commerce, "Marmen's proposed additional reconciling item would duplicate an adjustment amount that was already reflected in its revised audited financial statements," as well as in Marmen Inc.'s "reported costs, including those of the sections purchased from Marmen Energie . . . ." Appx4827; *see also id.* at Appx4820, Appx4825, Appx4857.    Commerce's reasoning is flawed.    While Marmen Inc.'s revised audited financial statements for 2018 (*i.e.,*

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

COGS) include the value of Marmen Inc.'s purchases of wind tower sections from Marmen Énergie Inc. expressed in CAD, and Marmen Inc.'s cost of production was also reported in CAD, this does not mean that acceptance of the reconciling item reported at **Item L1** in Marmen Inc.'s revised cost reconciliation worksheet would be double counting.

As detailed above in **Section III.B** of the **Statement of the Case**, in the original cost reconciliation worksheet, Marmen inadvertently omitted to convert the value of Marmen Inc.'s purchases of wind tower sections from Marmen Énergie during July-December 2018 (which amounted to USD [ cost figure ] of the USD [ cost figure ] reported in **Item L**) from USD to CAD. Contrary to Commerce's flawed reasoning, it is necessary to deduct Marmen Inc.'s July-December 2018 purchases from Marmen Énergie *in CAD* precisely because Marmen Inc.'s year-2018 audited COGS and reported costs were also expressed *in CAD*. *Compare* "Sample Cost Reconciliation (Original Version)," *supra* at 16, to "Sample Cost Reconciliation (Revised Version)," *supra* at 18. For a reconciliation worksheet to function properly, each value in the reconciliation must be expressed in the same currency. This is why Marmen reported the correction to Commerce.

Commerce also wrongly claimed that "Marmen did not further explain how, if at all, this error and correction related to {Marmen Inc.'s} *restated* financial statements, or whether it was one of the adjustments brought up by the external

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

auditor, Deloitte." Appx4823 (emphasis added). To the contrary, Marmen reported that the change to Marmen Inc.'s cost reconciliation worksheet was "***unrelated*** to the financial statement amendments." *See* Appx3604-3605 (emphasis added). Marmen also documented and explained the auditor's revisions to Marmen Inc.'s year-2018 financial statements. *See* Appx3601-3602, Appx3624-3639. As Marmen explained, whereas the auditor made an amendment of CAD [ cost figure ] to Marmen Inc.'s year-2018 financial statements to account for USD purchases that were not converted to CAD in the original year-2018 financial statements, Marmen demonstrated that virtually the full amount related to a single purchase of steel plate from a foreign supplier, [ Company ]. *See* Appx3602, Appx3624-3639 (including general ledger listing and a copy of [ Company ] invoice). In any event, the auditor's amendment to Marmen Inc.'s financial statements is beside the point. The correction addresses an inadvertent currency error in one line of a cost reconciliation worksheet prepared for the AD investigation. Marmen's auditor had nothing to do with this.

In addition, Commerce mistakenly concluded that the **Item L1** correction to Marmen Inc.'s cost reconciliation worksheet was already reflected in **Items P**, **Q**, and **R** of the worksheet (Excel Lines 41-43), stating: "The amount related to adjusting costs of Marmen's purchases during the year was already included, as shown by the cost reconciliation worksheet, and was adjusted as one part of the

many changes in the restated financial statements, including Excel lines 41-43."
Appx4826.  Commerce's assertion is incorrect.  In **Item P** (Excel Line 41) of the
cost reconciliation worksheet, Marmen deducted the auditor's USD-CAD
exchange rate adjustment applicable to Marmen Inc.'s USD purchases during the
period January-June 2018 (*i.e.*, **before** the POI).  *See* Appx3905.  In contrast, in
**Item L1** Marmen deducted the exchange rate adjustment with respect to Marmen
Inc.'s USD purchases from Marmen Énergie Inc. during the period July-December
2018 (*i.e.*, **during** the POI).  *See* Appx3904.  Consequently, the correction made in
**Item L1** does not double count an adjustment already made in **Item P**.
Meanwhile, the adjustments at **Items Q** and **R** (Excel lines 42 and 43) relate to
USD-CAD exchange rate adjustments applicable to Marmen Inc.'s purchases of
steel plate, flanges, and paint during the period January-June 2018 (also before the
POI) – **not** its purchases of wind tower sections from Marmen Énergie during the
POI.  *See* Appx3905 (defining **Item Q** as "Exchange Rate Variance for plate &
flange purchased in H1 2018 and consumed in POI" and **Item R** as "Exchange
Rate Variance for paint purchased in H1 2018 and consumed in POI").

Importantly, Marmen explained all this to Commerce during the remand
proceeding, *see* Appx4678-4682, and also in comments submitted to the CIT, *see*
Appx4879-4883.  Yet Commerce refused to accept the correction or the simple
explanation – that Marmen inadvertently had misreported one line in a

reconciliation worksheet in USD instead of in CAD. The CIT meanwhile, merely reiterated and sustained Commerce's erroneous justification for rejecting the correction without addressing Marmen's arguments or supporting record evidence. *See* Appx23-26. Commerce's "double-counting" justification for rejecting the minor correction to Marmen Inc.'s cost reconciliation worksheet is unsupported by substantial evidence.

### B.    Commerce Unreasonably Rejected Marmen Inc.'s Support for the Correction to Marmen Inc.'s Cost Reconciliation Worksheet

In addition to claiming (wrongly) that the minor correction to Marmen Inc.'s cost reconciliation worksheet (reported at **Item L1**) was unnecessary, Commerce also unfairly concluded that Marmen failed to support the correction. As discussed, to support the **Item L1** correction, Marmen provided Commerce a schedule of the invoices issued by Marmen Énergie Inc. to Marmen Inc. during the POI for wind tower sections, with green highlighting to identify the invoices issued in 2018, and a calculation to show the conversion of the year-2018 USD invoice amounts to CAD (tab "L1 USD Purchases from Energie"). *See* Appx3907-3909; *see also* Appx3644-3646 ("Marmen Energie Sales to Marmen Inc – Tab L1"). Commerce's decision to disregard this exhibit is unsupported by substantial evidence.

Referring to the schedule of Marmen Énergie Inc. invoices, Commerce opined, "There is no support for this worksheet, other than an assertion that a

portion of these invoiced purchases was not already properly converted using the actual exchange rate." Appx4824; *see id*. at Appx4858-4859. Contrary to Commerce's claim, the schedule of Marmen Énergie Inc. invoices corroborates Marmen's explanation of its accounting of USD purchases during the POI. As Marmen reported in its questionnaire responses, ***during the 2018 fiscal year*** Marmen recorded USD purchases in its normal accounting records in USD values (at a conversion rate of 1:1 with CAD), while ***during the 2019 fiscal year*** Marmen changed its accounting practice and recorded USD purchases in CAD, using a conversion rate of [ rate ] (*i.e.*, one USD equal to [ rate ] CAD). *See* Appx3601; Appx829, Appx833. As shown in the schedule, all of Marmen Énergie Inc.'s invoices to Marmen Inc. were denominated in USD. *See* Appx3907-3913. Further, the schedule shows that, whereas Marmen Énergie's sales prices for tower sections in the year-2018 invoices average approximately [ price ] in value, the year-2019 invoices average approximately [ price ] in value. *See id*. Multiplying [ price ] by [ rate ] – the USD-CAD conversion rate Marmen used in 2019 – yields [ price ]. Consequently, the schedule is consistent with Marmen's explanation of its normal accounting of USD purchases in 2018 and 2019, and corroborates Marmen's certified representation to Commerce that the **Item L1** correction to Marmen Inc.'s cost reconciliation worksheet was necessary to convert the value of Marmen Inc.'s

purchases of wind tower sections from Marmen Énergie Inc. during the period July 2018 – December 2018 from USD to CAD.

With respect to the exchange rate ([ rate ]) used in the schedule to calculate the **Item L1** correction, Commerce incorrectly claimed, "Marmen provided no support for the average exchange rate that is on the worksheet; rather, it is just an exchange rate that Marmen inserted into the revised version of this worksheet." Appx4824; *see id.* at Appx4859. To the contrary, Marmen used the same [ rate ] exchange rate consistent with its prior submissions. *See* Appx829, Appx835, Appx949, Appx988; Appx1207-1218 (at Items Q & R, using the same exchange rate to calculate USD-CAD exchange rate variances for Marmen Inc.'s purchases of steel materials and paint in January-June 2018 that were consumed during the period July-December 2018).

## IV.  COMMERCE'S USE OF THE AVERAGE-TO-TRANSACTION COMPARISON METHOD SHOULD NOT BE AFFIRMED

The statute permits Commerce to use an average-to-transaction ("A-T") price comparison method when "there is a pattern of export prices (or constructed export prices) for comparable merchandise that ***differ significantly*** among purchasers, regions, or periods of time . . . ." 19 U.S.C. § 1677f-1(d)(1)(B) (emphasis added). Here, Commerce found a pattern of U.S. prices that "differ significantly" based on the Cohen's *d* test. However, Commerce's finding with respect to U.S. sales of five CONNUMs (and consequent application of the A-T

method) should not be sustained for two reasons.  First, Commerce's position that the assumptions underlying the Cohen's *d* test do not apply to data sets consisting of populations is unsupported by substantial evidence.  Second, it was unreasonable for Commerce to rely on the Cohen's *d* test when the price differences exhibited by five CONNUMs were not significant on their face at less than one percent.

     **A.**    **Commerce's Premise – that the Assumptions Underlying the Cohen's *d* Test Do Not Apply When the Data Sets To Be Compared Are Populations, as Opposed to Samples – Is Unsupported by Substantial Evidence**

In *Stupp*, this court expressed concern that "Commerce's application of the Cohen's *d* test to data that do not satisfy the assumptions on which the test is based may undermine the usefulness of the interpretative cutoffs." *Stupp*, 5 F.4[th] at 1357. According to Commerce, the assumptions of normal distribution and equivalent variances underlying the Cohen's *d* test do not apply in the context of the differential pricing analysis, because Commerce relies on the complete universe of U.S. sales prices (*i.e.*, populations) – as opposed to samples.  *See* Appx4837-4839, Appx4842-4843, Appx4863-4864.  Nothing in the academic literature supports Commerce's claim.

Critically, Professor Cohen himself used ***populations*** – not samples – to explain the Coehn's *d* coefficient, yet still explained that the test was based on assumptions of normal distributions and equivalent variances.  *See* Appx4698-

4789 (Attachment 2 (Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* 20-21 (2d ed. 1988) ("*Cohen*") (calculating the Cohen's *d* coefficient using populations, not samples, and explaining that normal distributions and equivalent variances are assumed)) & Appx4790-4802 (Attachment 3 (James Algina et al., *An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in the Two Independent Groups Case*, 10 PSYCHOLOGICAL METHODS 317, 318 ("*Algina*")).

The Cohen's *d* test, named after Professor Jacob Cohen, is used to measure whether there is a significant difference between the "means" of a test group and a comparison group.  The formula for calculating the Cohen's *d* coefficient is as follows:

$$d = \frac{|\,\mu_1 - \mu_2\,|}{\sigma}$$

Where:
$\mu_1$ = mean of population 1
$\mu_2$ = mean of population 2
$\sigma$ = population standard deviation (assumed to be equal for both populations)

*See* Appx4735; Appx4792.  As shown above, Professor Cohen used the symbol "$\mu$" for the means, signifying that the test and comparison data sets consist of ***populations*** – not samples.  Further, as recognized by the *Stupp* Court, Professor Cohen explicitly stated that, for the Cohen's *d* coefficient to be meaningful, "we maintain the assumption that ***the populations*** being compared are normal and with

equal variability, and conceive them further as equally numerous." Appx4736 (emphasis added); *Stupp*, 5 F.4th at 1357. According to Commerce, "{i}n this analysis, Dr. Cohen is considering the extent that two compared sets of ***sampled data*** do not overlap one another." Appx4843 (emphasis added). Commerce's position, however, cannot be squared with Professor Cohen's reference to "populations" in the context of explaining the underlying assumptions that must be satisfied, and use of the ***population*** symbol for mean ($\mu$) in the formula for the Cohen's *d* coefficient.

Nor does Commerce find support for its premise – that the Cohen's *d* assumptions of normal distributions and equivalent variances can be disregarded when comparing populations – in the academic literature cited by the *Stupp* Court. For example, the *Stupp* Court cited Robert J. Grissom and John J. Kim as further evidence that the assumptions of normal distributions and equivalent variances must be satisfied for the Cohen's *d* coefficient to be a reliable measure of effect size between two populations:

> When ***the distribution*** of scores of a comparison ***population*** is ***not normal***, the usual interpretation of a $d_G$ or *d* in terms of estimating the percentile standing of the average-scoring members of another group with respect to the supposed normal distribution of the comparison group's scores ***would be invalid***. Also, because standard deviations can be very sensitive to a distribution's shape, . . . nonnormality can greatly influence the value of a standardized-mean-difference effect size and its estimate.

*Stupp*, 5 F.4th at 1358 (quoting Robert J. Grissom & John J. Kim, *Effect Sizes for Research: Univariate and Multivariate* 66 (2d ed. 2012)) (emphasis added). On remand, Commerce claimed the authors were describing "a similar analysis concerning the overlap of the two compared sets of ***sampled data***{,}" Appx4844 (emphasis added) – but that interpretation cannot be squared with the authors' explicit reference to "population," as quoted above.

The *Stupp* Court also recognized that Grissom and Kim "not{ed} that 'Cohen's *d*' is appropriate 'if the two ***populations*** that are being compared are assumed to have equal variances.'" *Stupp*, 5 F.4th at 1358 (emphasis added). On remand, Commerce provided the complete quote from Grissom's and Kim's text, and asserted that the authors merely stated that, "in the situation involving sampling where the variances are equal, the denominator can be an average of the two variances." Appx4845.

> However, *if the two populations that are being compared are assumed to have equal variances*, then a better estimate of the denominator of a standardized difference between population means can be made if one pools the data from both samples to estimate the common σ {*i.e.*, the standard deviation of a population} instead of using $s_b$ {*i.e.*, the standard deviation of sample data b} that is based on the data of only one sample.

Appx4844-4845 (quoting Robert J. Grissom & John J. Kim, *Effect Sizes for Research: Univariate and Multivariate* 68 (2d ed. 2012)). Commerce's interpretation, even if correct, does not negate the authors' recognition that "equal

variances" is an assumption that applies to comparisons of "populations" – not only to comparisons of sampled data sets.

The *Stupp* Court also noted the work of James Algina, who "inspected the robustness of Cohen's *d* as an effect-size parameter, seeking to determine 'if a small change in ***the population*** distribution can strongly affect the parameter.'" *Stupp*, 5 F.4[th] at 1358 (emphasis added) (quoting *Algina* at 318). James Algina and his collaborators concluded that Cohen's *d* has a "serious limitation" as a measure of effect size when the data sets for comparison do not both exhibit normal distributions. *See* Appx4792; *see also Stupp*, 5 F.4[th] at 1358 ("they concluded that Cohen's *d* was not robust to mixed-normal distributions, and that applying Cohen's *d* to such data caused serious flaws in interpreting the resulting parameter") (quoting *Algina* at 318-319). Importantly, the authors arrived at this conclusion after analyzing the Cohen's *d* coefficient as derived from comparisons of ***populations*** – not samples. The authors specifically noted that they preferred to use the Greek letter δ to refer to the ***population*** effect size, and to use "d" when referring to the ***sample*** effect size. *See* Appx4792. The authors calculated δ using the following formula:

$$\delta = \frac{|\,\mu_1 - \mu_2\,|}{\sigma}$$

Where:
$\mu_1$ = mean of ***population*** 1
$\mu_2$ = mean of ***population*** 2

σ = ***population*** standard deviation (assumed to be equal for both populations)

*See* Appx4792. Algina's paper further demonstrates the unreasonableness of Commerce's conclusion that the assumptions underlying the Cohen's *d* coefficient matter only when the data sets to be compared are samples, as opposed to populations.

Overall, Commerce opined that "each of the {*Stupp* Court's} quotations to the {academic} literature concerns either the potential inaccuracies in the estimate of effect size which is based on a sample of data, or the analysis of the sampled data to be able to visualize the difference in the means between the sampled data sets." Appx4842. As detailed above, however, Commerce is wrong, because Professor Cohen, Grissom/Kim, and Algina discussed the Cohen's *d* coefficient's limitations with respect to data sets consisting of complete populations, not samples. Moreover, to the extent other authors cited by the *Stupp* Court examined the Cohen's *d* text with respect to sampled data sets, Commerce failed to identify any evidence that these authors limited their conclusions to comparisons involving sampled data – to the exclusion of populations.

For these reasons, the record lacks substantial evidence supporting Commerce's assertion that the limitations on the use of the Cohen's *d* test do not

apply when the data sets to be compared consist of complete populations.[2]   On

appeal, the CIT did not address any of the academic literature cited above; instead,

the trade court simply affirmed Commerce's conclusion as reasonable.    *See*

Appx26-28.   The CIT erred in this regard, because the existence of substantial

evidence must be determined "by considering the record as a whole, including

evidence that supports as well as evidence that 'fairly detracts from the

substantiality of the evidence.'"   *Huaiyin*, 322 F.3d at 1374 (quoting *Atlantic*

*Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

### B.   Commerce Unreasonably Determined Based on Rigid Application of the Cohen's *d* Test that Less-than-One-Percent Differences in Price Are Significant

The *Stupp* Court described a hypothetical example in which the Cohen's *d*

test yields a large coefficient even though the price differences are not significant

on their face.  *See Stupp*, 5 F.4th at 1359.  The *Stupp* Court's hypothetical mirrors

Marmen's case, where Commerce unreasonably concluded that price differences

less than one percent are "significant" within the meaning of 19 U.S.C. § 1677f-

1(d)(1)(B) by blindly relying on the Cohen's *d* test (and ignoring its limitations).

In the *Stupp* Court's example, the per-unit sales prices for a particular

purchaser (the test group) are not normally distributed and fluctuate within a very

_____

[2] On remand, Commerce also unreasonably rejected an analysis submitted by
Marmen demonstrating that the Cohen's *d* assumptions were ***not*** satisfied with
respect to Marmen's U.S. sales data.  *See* Appx3987-4663.

narrow range (*e.g.*, $100.01, $100.01, $100.01, $100.01, and $99.99). *See Stupp*, 5 F.4[th] at 1359. Meanwhile, the per-unit sales prices across the entire set of purchasers (the comparison group) also "fall{} within a relatively small range (such as between $99.92 and $101.01)." *Id.* The *Stupp* Court explained the problem raised by this fact pattern as follows:

> Applying Cohen's *d* to that hypothetical data seems problematic: As the variance within each test group approaches zero, the denominator in the Cohen's *d* equation is greatly reduced and, in fact, approaches half of the values of the standard deviations of the larger comparison groups. . . . As the denominator is reduced, the resulting effect-size parameter is increased, tending to artificially inflate the dumping margins for a set of export sales prices that has minimal variance. An objective examiner inspecting those export sales prices would be unlikely to conclude that they embody a 'pattern' of prices that 'differ significantly.'

*Id.* (citing 19 U.S.C. § 1677f-1(d)(1)(B)(i)).

Here, during Commerce's remand proceeding, Marmen highlighted the *Stupp* Court's hypothetical, adding calculations to illustrate the problem. *See* Appx4692-4695. Fleshing out the court's example, Marmen posited that, in the test (or control) group, the prices vary from $99.2 to $101.01, and each such price occurs with the same frequency (that is, their distribution is uniform). Likewise, in the comparison group, the prices also occur with the same frequency (uniform distribution), but range from $99.99 and $100.01. Although the price levels are very similar, Marmen explained, the variance is broader in the test group than in the comparison group (with standard deviations of 0.314 and 0.0058, respectively).

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS

*See* Appx4693.  Consequently, not only is the assumption of normal distributions

violated, but also there is no homogeneity in the variances.  This is illustrated

below:



*See* Appx4694.

Further, to simplify the example, Marmen assumed that the prices in the

range of $99.92 to $101.01 (test group) were as numerous as the prices in the range

of $99.99 to $100.01 (comparison group), so that the simple average of both

standard deviations (equal to 0.160) could be used in the denominator of the

Cohen's *d* coefficient formula (following Commerce's normal practice).  Plugging

the values into the Cohen's *d* formula yields the following:

- Uniform Distribution 1 (99.92 to 101.01) versus Uniform Distribution 2 (99.99 to 100.01):

  d'Cohen = $\delta = \frac{|avg(99.92,101.01) - avg(99.99,100.01)|}{0.160} = \frac{|100.47 - 100|}{0.160} = \frac{0.47}{0.160} = 2.94 > 0.8$

As shown above, the difference in the average prices (means) amounts to less than half a dollar ($0.47); in other words, the price levels in the test and comparison groups are very similar – with means differing by only 0.47%. For this reason, the *Stupp* Court reasoned that "{a}n objective examiner inspecting those export sales prices would be unlikely to conclude that they embody a 'pattern' of prices that 'differ significantly.'" *Stupp*, 5 F.4th at 1359. Yet the Cohen's *d* coefficient (2.94) exceeds the "large" threshold (0.8) relied upon by Commerce as evidence of a "significant" difference in price. The distortion arises because the price variances within each group are not homogeneous (and the distributions are not normal). Moreover, as Marmen argued to Commerce, this distortion would arise regardless of whether the data sets include the universe of prices (populations) or samples thereof. *See* Appx4695.

Similarly, in Marmen's case, Commerce unreasonably concluded based on application of the Cohen's *d* test that price differences of less than 1.00% for five CONNUMs were "significant." An "objective examiner" would not consider such minor price differences to be "significant" within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B). The term "significant" must be read in accordance with its "plain meaning to avoid absurd results." *See Viraj Forgings, LTD. v. United States*, 350 F. Supp. 2d 1316, 1324 (Ct. Int'l Trade 2004) (citations omitted). "Significant" means "of a noticeably or measurably *large* amount." MERRIAM-

WEBSTER'S COLLEGIATE DICTIONARY 1159 (11th ed. 2003) (emphasis added). Commerce's determination that less-than-one-percent differences in price are "significant" conflicts with the plain meaning of the statute and is unreasonable.

Commerce's application of the of the Cohen's *d* test in a particular case must be reasonable. *See Dillinger France S.A. v. United States*, 981 F.3d 1318, 1326 n.6 (Fed. Cir. 2020) ("The record does not indicate that Commerce's use of the Cohen's *d* test or its thresholds is irrebuttable."); *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019) ("Commerce must provide an explanation that is adequate to enable the court to determine whether the choices are in fact reasonable, including as to calculation methodologies."). Here, Commerce's blind application of the Cohen's *d* test yielded patently unreasonable results – attributing significance to price differences that are considered minor in the "real world." This was the problem highlighted by the *Stupp* Court, and it is why Commerce's application of the A-T comparison method to Marmen's U.S. sales of the five CONNUMs with price differences less than one percent should not be sustained.

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

For the foregoing reasons, Commerce's conclusions in the *Final AD Determination* regarding cost smoothing, Marmen Inc.'s cost reconciliation, and differential pricing, and the CIT's decisions sustaining Commerce's conclusions, are unsupported by substantial evidence on the record and otherwise not in accordance with law. Therefore, Appellants respectfully request that the Court reverse the CIT's decisions on these issues, and remand to Commerce with instructions to issue a revised determination, consistent with the opinion of the Court.

Respectfully submitted,

/s/ Jay C. Campbell
Jay C. Campbell
Ron Kendler
Allison J.G. Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co.

July 10, 2023

**ADDENDUM**

*Marmen Inc.  v. United States*

**545 F.Supp.3d 1305 (CIT 2021)**

**(Appx1-20)**

fault Ilias's counsel—her client was badly injured, and Dunbar was underinsured. She is seeking as great a recovery for him as the legal theories permit. But to contend that a $10,000 tender issue caused this $5 million-plus jury verdict—and would have prevented it had USAA acted slightly differently—is not plausible to any realistic Florida personal injury lawyer.

The undisputed evidence establishes that Furman never made a demand for the policy limits; never expressed to USAA that she intended to settle; never followed up with USAA when she did not receive information about possible (nonexistent) umbrella coverage; and did not settle after confirming Dunbar had no coverage beyond his USAA policy. Considering all this, no reasonable jury could conclude that Ilias's injury claim would have settled had USAA properly executed and mailed the coverage form Furman requested.

## IV. CONCLUSION

There is no genuine dispute as to material fact: USAA's actions did not constitute bad faith and did not cause the excess verdict against its insured. USAA's Motion for Summary Judgment is therefore **GRANTED**.

**DONE AND ORDERED** at Tampa, Florida, on June 24, 2021.



**MARMEN INC., Marmen Énergie Inc., and Marmen Energy Co., Plaintiffs,**

**and**

**Wind Tower Trade Coalition, Consolidated Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Wind Tower Trade Coalition, Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co., Defendant-Intervenors.**

**Slip Op. 21-148
Consol. Court No. 20-00169**

United States Court of International Trade.

October 22, 2021

**Background:** Exporters filed suit challenging final determination of Department of Commerce in antidumping duty investigation on utility scale wind towers from Canada. Exporters moved for judgment on agency record.

**Holdings:** The Court of International Trade, Jennifer Choe-Groves, J., held that:

(1) decision to weight-average product-specific plate costs was supported by substantial evidence;

(2) rejection of additional cost reconciliation information was abuse of discretion;

(3) differential pricing analysis was not supported by substantial evidence;

(4) date of sale determination was supported by substantial evidence;

(5) reliance on exporter's home market sales reporting was supported by substantial evidence; and

(6) decision not to apply adverse facts available (AFA) was supported by substantial evidence.

Sustained in part and remanded in part.

**1. Customs Duties ⟚21.5(1)**

Before calculating a dumping margin, Department of Commerce must identify a suitable foreign like product with which to compare the exported subject merchandise. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677(16).

**2. Customs Duties ⟚21.5(1)**

To identify a foreign like product in order to calculate a dumping margin, Department of Commerce employs a model match methodology consisting of a hierarchy of certain characteristics used to sort merchandise into groups; each group is assigned a control number (CONNUM), used to match home market sales with United States sales. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677(16).

**3. Customs Duties ⟚21.5(5)**

The antidumping statute requires that reported costs must normally be used only if (1) they are based on the records kept in accordance with the generally accepted accounting principles (GAAP) and (2) reasonably reflect the costs of producing and selling the merchandise. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(f)(1)(A).

**4. Customs Duties ⟚21.5(5)**

In antidumping proceedings, Department of Commerce is not required to accept an exporter's records. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(f)(1)(A).

**5. Customs Duties ⟚21.5(5)**

In antidumping proceedings, Department of Commerce may reject a company's records if it determines that accepting them would distort the company's true costs. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(f)(1)(A).

**6. Customs Duties ⟚21.5(3)**

In antidumping proceedings, physical characteristics are a prime consideration when Commerce conducts its analysis of the costs of production. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(f)(1)(A).

**7. Customs Duties ⟚21.5(3)**

In antidumping proceedings if factors beyond the physical characteristics influence the costs of production, Department of Commerce will normally adjust the reported costs in order to reflect the costs that are based only on the physical characteristics. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(f)(1)(A).

**8. Customs Duties ⟚21.5(3)**

To determine whether the subject merchandise was sold in the United States at less than fair value under the antidumping statute, Department of Commerce first considers all products produced and sold by the exporter during the period of investigation for the purpose of determining the appropriate product comparisons to United States sales. Tariff Act of 1930 § 731, 19 U.S.C.A. § 1673.

**9. Customs Duties ⟚21.5(3)**

Department of Commerce's stated practice is to adjust costs to address distortions when cost differences are attributable to factors beyond differences in the physical characteristics of such products, as required by the antidumping statute. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(f)(1)(A).

**10. Customs Duties ⟚21.5(3)**

Department of Commerce's decision, in antidumping duty investigation on utility scale wind towers from Canada, to determine exporter's costs of production using weighted average of reported steel plate costs, comported with antidumping statute and Commerce's stated practice and was supported by substantial evidence

including Commerce's determination that exporter's records did not reasonably reflect costs associated with production and sale of its merchandise, as differences in plate prices were related to timing of production and factors other than differences in physical characteristics, and higher priced control numbers (CONNUMs) were sold earlier in period of investigation. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(f)(1)(A).

**11. Customs Duties ⚖=21.5(5)**

In antidumping proceedings, Department Commerce has the right to reject information that is untimely or unsolicited. 19 C.F.R. § 351.302(d).

**12. Customs Duties ⚖=21.5(3)**

Department of Commerce has a duty to determine dumping margins as accurately as possible.

**13. Customs Duties ⚖=21.5(5)**

Department of Commerce is obliged to correct any errors in its calculations during the preliminary results stage to avoid an imposition of unjustified antidumping duties.

**14. Customs Duties ⚖=21.5(5)**

Department of Commerce is free to correct any type of importer error that is clerical, methodology, substantive, or one in judgment, in the context of making an antidumping duty determination, provided that the importer seeks correction before Commerce issues its final determination and adequately proves the need for the requested corrections. 19 C.F.R. § 351.301(c).

**15. Customs Duties ⚖=84(6)**

Court of International Trade reviews whether Department of Commerce abused its discretion when rejecting submitted information in antidumping proceedings. 19 C.F.R. § 351.302(d).

**16. Customs Duties ⚖=84(6)**

When reviewing Department of Commerce's determination to reject corrective information, Court of International Trade may consider factors such as Commerce's interest in ensuring finality, the burden of incorporating the information, and whether the information will increase the accuracy of the calculated dumping margins. 19 C.F.R. § 351.301(c).

**17. Customs Duties ⚖=21.5(5)**

Department of Commerce's decision to reject exporter's supplemental cost reconciliation information as untimely and unsolicited new information was abuse of discretion, in antidumping duty investigation on utility scale wind towers from Canada; information submitted by exporter in its response corresponded directly to prior cost reconciliation information submitted in exporter's prior response and stated that it updated purchase information that had not been properly converted to Canadian dollars, Commerce itself also stated that exporter's submission was correction, information was submitted five months before publication of final determination so was not filed too late to be considered, and submitted information was not inaccurate. 19 C.F.R. §§ 351.301(c)(5), 351.302(d).

**18. Customs Duties ⚖=21.5(5)**

Department of Commerce must accept corrections when there is sufficient time for Commerce to consider the submission prior to the final antidumping determination. 19 C.F.R. §§ 351.301(c)(5), 351.302(d).

**19. Customs Duties ⚖=21.5(3)**

Department of Commerce ordinarily uses an average-to-average (A-to-A) comparison of the weighted average of the normal values of subject merchandise to the weighted average of export prices and constructed export prices for comparable merchandise when calculating a dumping

margin. Tariff Act of 1930 § 777A, 19 U.S.C.A. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1).

**20. Customs Duties ⚖21.5(3)**

In contrast to the average-to-average (A-to-A) method of calculating a dumping margin, which may mask dumped sales at low prices by averaging them with sales at higher prices, the average-to-transaction (A-to-T) method allows Department of Commerce to identify a merchant who dumps the product intermittently, sometimes selling below the foreign market value and sometimes selling above it. Tariff Act of 1930 § 777A, 19 U.S.C.A. §§ 1677f-1(d)(1)(A)(i), 1677f-1(d)(1)(B)(i)-(ii); 19 C.F.R. § 351.414(c)(1).

**21. Customs Duties ⚖21.5(3)**

The antidumping statute does not set forth the analysis for how Department of Commerce is to identify a pattern of price differences that would allow Commerce to use the average-to-transaction (A-to-T) comparison of the weighted average of normal values to the export prices and constructed export prices of individual transactions for comparable merchandise. Tariff Act of 1930 § 777A, 19 U.S.C.A. § 1677f-1(d)(1)(B)(i)-(ii).

**22. Customs Duties ⚖84(6)**

Court of International Trade affords Department of Commerce deference in antidumping determinations involving complex economic and accounting decisions of a technical nature.

**23. Customs Duties ⚖21.5(5)**

In antidumping proceedings, Department of Commerce must explain cogently why it has exercised its discretion in a given manner.

**24. Customs Duties ⚖21.5(3)**

In antidumping proceedings, Department of Commerce uses a differential pricing analysis to determine if a pattern of significant price differences exist and whether the difference can be taken into account using the average-to-average (A-to-A) method. Tariff Act of 1930 § 777A, 19 U.S.C.A. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1).

**25. Customs Duties ⚖84(6)**

The standard of review for considering Department of Commerce's differential pricing analysis in antidumping proceedings is reasonableness.

**26. Customs Duties ⚖21.5(3)**

In antidumping proceedings, the "Cohen's $d$ test" is a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group.

> See publication Words and Phrases for other judicial constructions and definitions.

**27. Customs Duties ⚖21.5(3)**

In antidumping proceedings, the Cohen's $d$ test relies on assumptions that the data groups being compared are normal, have equal variability, and are equally numerous; applying the Cohen's $d$ test to data that do not meet these assumptions can result in serious flaws in interpreting the resulting parameter.

**28. Customs Duties ⚖21.5(3)**

Department of Commerce's decision, in antidumping duty investigation on utility scale wind towers from Canada, to use average-to-transaction (A-to-T) method based on its differential pricing analysis relying on Cohen's $d$ test, was not supported by substantial evidence, since Commerce failed to explain whether data applied to Cohen's $d$ test were normally distributed or contained roughly equal variances. Tariff Act of 1930 § 777A, 19 U.S.C.A. § 1677f-1(d)(1)(B)(i)-(ii).

**29. Customs Duties ⬁21.5(3)**

In antidumping proceedings, Department of Commerce must conduct a fair comparison of normal value and export price in determining whether merchandise is being, or is likely to be, sold at less than fair value. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(a).

**30. Customs Duties ⬁21.5(3)**

Under the antidumping regulation, authorizing Department of Commerce to use a date other than the date of invoice as the date of sale in order to compare normal value and export price if Commerce is satisfied that a different date better reflects the date on which the exporter establishes the material terms of sale, the "material terms of sale" generally include the price, quantity, payment, and delivery terms. 19 C.F.R. § 351.401(i).

> See publication Words and Phrases for other judicial constructions and definitions.

**31. Customs Duties ⬁21.5(3)**

Under the antidumping regulation, authorizing Department of Commerce to use a date other than the date of invoice as the date of sale in order to compare normal value and export price if Commerce is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale, the important factor to determine is when the parties have reached a meeting of the minds. 19 C.F.R. § 351.401(i).

**32. Customs Duties ⬁21.5(3)**

In antidumping proceedings, Department of Commerce will normally rely on the date provided on the invoice as recorded in a firm's records kept in the ordinary course of business, in comparing normal value and export price. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(a)(1)(A).

**33. Customs Duties ⬁21.5(5)**

In antidumping proceedings, Department of Commerce prefers to use a single and uniform source for the date of sale for each respondent, rather than determining the date of sale for each sale individually. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(a)(1)(A); 19 C.F.R. § 351.401(i).

**34. Customs Duties ⬁21.5(3)**

In comparing normal value and export price in antidumping proceedings, as a matter of commercial reality, the date on which the terms of a sale are first agreed is not necessarily the date on which those terms are finally established, because price and quantity are often subject to continued negotiation between the buyer and the seller until a sale is invoiced. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(a)(1)(A); 19 C.F.R. § 351.401(i).

**35. Customs Duties ⬁21.5(5)**

In comparing normal value and export price in antidumping proceedings, absent satisfactory evidence that the terms of sale were finally established on a different date, Department of Commerce will presume that the date of sale is the date of invoice; however, if Commerce is presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of invoice, Commerce will use that alternative date as the date of sale. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(a)(1)(A); 19 C.F.R. § 351.401(i).

**36. Customs Duties ⬁21.5(5)**

In comparing normal value and export price in antidumping proceedings, the party seeking date other than invoice date bears burden of presenting Department of Commerce with sufficient evidence demonstrating that another date better reflects date on which exporter or producer establishes material terms of sale. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(a)(1)(A); 19 C.F.R. § 351.401(i).

**37. Customs Duties ⬅21.5(3)**

Department of Commerce's decision, in antidumping duty investigation on utility scale wind towers from Canada, to use exporter's reported invoice dates as date of sale for home market and United States sales in comparing normal value and export price, was supported by substantial evidence including that material terms of sale were not established prior to invoice date, as there were material changes to delivery, price, quantity, and payment terms between purchase order and invoice date. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(a)(1)(A); 19 C.F.R. § 351.401(i).

**38. Customs Duties ⬅21.5(5)**

Department of Commerce's decision, in antidumping duty investigation on utility scale wind towers from Canada, to rely on exporter's reporting of home market sales as sales of wind tower sections, was supported by substantial evidence including that Commerce determined that exporter's reporting was consistent with Commerce's instructions and with manner in which exporter actually invoiced its customer.

**39. Customs Duties ⬅21.5(5)**

When Department of Commerce can fill in gaps in the antidumping record independently, an adverse inference is not appropriate. 19 U.S.C.A. § 1677e(b)(1)(A).

**40. Customs Duties ⬅21.5(5)**

Department of Commerce's decision, in antidumping duty investigation on utility scale wind towers from Canada, not to apply facts otherwise available or adverse inference to exporter, was supported by substantial evidence including Commerce's determination that exporter was responsive to information requested, that its responses were submitted in timely manner, and that there was no missing information from record. Tariff Act of 1930 § 776, 19 U.S.C.A. §§ 1677e(a)(1), 1677e(a)(2)(B); 19 U.S.C.A. § 1677e(b)(1)(A).

Jay C. Campbell, Allison J.G. Kepkay, Ron Kendler, and Ting-Ting Kao, White & Case, LLP, of Washington, D.C., for Plaintiffs and Defendant-Intervenors Marmen Inc., Marmen Energy Co., and Marmen Energie Inc.

Alan H. Price, Daniel B. Pickard, Robert E. DeFrancesco, III, Maureen E. Thorson, and Laura El-Sabaawi, Wiley Rein, LLP, of Washington, D.C., for Consolidated Plaintiff and Defendant-Intervenor Wind Tower Trade Coalition.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With him on the brief were Brian M. Boynton, Acting Assistant Attorney General, and Jeanne E. Davidson, Director. Of counsel on the brief were Kirrin A. Hough, Attorney, and Natalie M. Zink, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

## OPINION AND ORDER

CHOE-GROVES, Judge:

Plaintiffs Marmen Inc., Marmen Energy Co., and Marmen Energie Inc. (collectively, "Marmen") and Consolidated Plaintiff Wind Tower Trade Coalition ("WTTC") filed this consolidated action challenging the final determination published by the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation on utility scale wind towers from Canada. See Utility Scale Wind Towers from Canada ("Final Determination"), 85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020) (final determination of sales at less than fair value and final negative determination of critical circumstances; 2018–2019); see also Issues and Decision Mem. for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Canada

(June 29, 2020) ("Final IDM"), ECF No. 18-5. Before the Court are the Rule 56.2 Motion for Judgment on the Agency Record on Behalf of Plaintiffs Marmen Inc., Marmen Energie Inc., and Marmen Energy Co., ECF Nos. 23, 24, and Wind Tower Trade Coalition's Rule 56.2 Motion for Judgment on the Agency Record, ECF Nos. 25, 26. See also Mem. P. & A. Supp. Pls.' Rule 56.2 Mot. J. Agency R. ("Marmen's Br."), ECF Nos. 23-2, 24-2; Wind Tower Trade Coalition's Mem. Supp. Rule 56.2 Mot. J. Agency R. ("WTTC's Br."), ECF Nos. 25-1, 26-1. For the following reasons, the Court sustains in part and remands in part the Final Determination.

### ISSUES PRESENTED

The Court reviews the following issues:

1.  Whether Commerce's determination to weight-average product-specific plate costs is supported by substantial evidence;

2.  Whether Commerce's determination to reject Marmen's additional cost reconciliation information was an abuse of discretion;

3.  Whether Commerce's determination to apply an average-to-transaction comparison method is supported by substantial evidence;

4.  Whether Commerce's determination regarding the home market and the U.S. date of sale is supported by substantial evidence;

5.  Whether Commerce's determination to treat Marmen's home market sales as being sales of tower sections rather than complete towers is supported by substantial evidence; and

6.  Whether Commerce's determination not to apply facts otherwise available with an adverse inference is supported by substantial evidence.

### BACKGROUND

In August 2019, Commerce initiated an antidumping duty investigation into wind towers from Canada for the period covering July 1, 2018 through June 30, 2019. Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam, 84 Fed. Reg. 37,992, 37,992–93 (Dep't of Commerce Aug. 5, 2019) (initiation of less-than-fair-value investigations). Commerce selected Marmen Inc. and Marmen Energie Inc. as mandatory respondents. See Decision Mem. for the Prelim. Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Canada (Feb. 4, 2020) ("Prelim. DM") at 1–2, PR 146.[1]

In the Final Determination, Commerce assigned weighted-average dumping margins of 4.94% to Marmen Inc. and Marmen Energie Inc.[2] Final Determination, 85 Fed. Reg. at 40,239. Commerce determined the all-others weighted average dumping margin of 4.94% based on Marmen's dumping margin. Id.

Commerce determined that Marmen's steel plate costs did not reasonably reflect the costs associated with the production and sale of the products and weight-averaged Marmen's reported steel plate costs. Final IDM at 4–6. Commerce rejected a portion of the supplemental cost reconciliation information submitted by Marmen as untimely, unsolicited new information. Id.

---

1.  Citations to the administrative record reflect public record ("PR") document numbers.

2.  The Court notes that, although Marmen Energy Co. was not included as a mandatory respondent alongside Marmen Inc. and Marmen Energie Inc., comments and questionnaire responses were submitted collectively by the three Plaintiffs during Commerce's investigation. The Court herein refers to their assigned weighted-average dumping margins collectively as "Marmen's dumping margin."

at 7–9. Commerce applied a differential pricing analysis, using the Cohen's $d$ test, and determined that there was a pattern of export prices that differed significantly. Id. at 10–11. As a result, Commerce calculated Marmen's weighted-average dumping margin by using the alternative average-to-transaction method. Id. Commerce determined that Marmen complied with its instructions by reporting invoice dates as the home market and U.S. dates of sale and by reporting home market sales as sales of wind tower sections. Id. at 13–18. Further, Commerce determined that the record contained the necessary information to calculate Marmen's dumping margin and relied on the data provided by Marmen, declining to apply facts otherwise available or an adverse inference. Id. at 18–20.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final determination in an antidumping duty investigation. The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.  Commerce's Determination to Weight-Average Marmen's Steel Plate Costs**

[1, 2]  In order to determine whether certain products are being sold at less than fair value in the United States, Commerce compares the export price, or constructed export price, with normal value. 19 U.S.C. § 1677b(a)(1)(A). Export price or constructed export price is the price at which the subject merchandise is being sold in the U.S. market, while normal value is the

price at which a "foreign like product" is sold in the producer's home market or in a comparable third-country market. Id. § 1677a(a)–(b). Before calculating a dumping margin, Commerce must identify a suitable "foreign like product" with which to compare the exported subject merchandise. A "foreign like product," in order of preference, is:

(A)  The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B)  Merchandise —

(i)  produced in the same country and by the same person as the subject merchandise,

(ii)  like that merchandise in component material or materials and in the purposes for which used, and

(iii)  approximately equal in commercial value to the subject merchandise.

(C)  Merchandise —

(i)  produced in the same country and by the same person and of the same general class or kind as the subject merchandise,

(ii)  like that merchandise in the purposes for which used, and

(iii)  which the administering authority determines may reasonably be compared with that merchandise.

Id. § 1677(16); see NSK Ltd. v. United States, 26 C.I.T. 650, 656, 217 F. Supp. 2d 1291, 1299–1300 (2002). To identify such merchandise, Commerce employs a "model match" methodology consisting of a hierarchy of certain characteristics used to sort merchandise into groups. See SKF USA, Inc. v. United States, 537 F.3d 1373, 1378–

80 (Fed. Cir. 2008). Each group is assigned a control number ("CONNUM"), used to match home market sales with U.S. sales. See Thuan An Prod. Trading & Serv. Co. v. United States, 42 CIT ——, ——, 348 F. Supp. 3d 1340, 1344 n.7 (2018).

[3–7] When determining costs of production, the statute states that:

[c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such record are kept in accordance with the generally accepted accounting principles ["GAAP"] of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A). The statute requires that "reported costs must normally be used only if (1) they are based on the records . . . kept in accordance with the GAAP *and* (2) reasonably reflect the costs of producing and selling the merchandise." See Dillinger France S.A. v. United States, 981 F.3d 1318, 1321 (Fed. Cir. 2020) (emphasis in original) (internal quotation marks and citations omitted). Commerce is not required to accept the exporter's records. Thai Plastic Bags Indus. Co. v. United States, 746 F.3d 1358, 1365 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677b(f)(1)(A)). Commerce may reject a company's records if it determines that accepting them would distort the company's true costs. See Am. Silicon Techs. v. United States, 261 F.3d 1371, 1377 (Fed. Cir. 2001). Commerce is directed to consider all available evidence on the proper allocation of costs. 19 U.S.C. § 1677b(f)(1)(A). Physical characteristics are a prime consideration when Commerce conducts its analysis. Thai Plastic Bags, 746 F.3d at 1368. If factors beyond the physical characteristics influence the costs, however, Commerce will normally adjust the reported costs in order to reflect the costs that are based only on the physical characteristics. See id.

[8] To determine whether the subject merchandise wind towers from Canada were sold in the United States at less than fair value under section 731 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673, Commerce first considered all products produced and sold by Marmen in Canada during the period of investigation for the purpose of determining the appropriate product comparisons to U.S. sales. Prelim. DM at 13; see also Final IDM at 2–3, 5–6. Commerce determined that there were no sales of identical merchandise in the ordinary course of trade in Canada that could be compared to U.S. sales. Prelim. DM at 13; see also Final IDM at 5–6. Instead, Commerce applied a hierarchy of characteristics, matching foreign like products based on physical characteristics reported by Marmen in the following order of importance: type (tower or section), weight of tower/section, height of tower/section, total sections, type of paint or coating, metalizing, electrical conduit – bus bars, electrical conduit – power cable, elevators, number of platforms, and other internal components. Prelim. DM at 13 (citing Product Characteristics for the Antidumping Duty Investigation of Utility Scale Wind Towers from Canada (Sept. 17, 2019) ("Model Matching Questionnaire"), PR 77); see also Final IDM at 5–6.

Commerce did not dispute whether Marmen's records were kept properly, noting that "the record is clear that the reported costs are derived from the Marmen Group's normal books and records and that those books are in accordance with Canadian GAAP." Final IDM at 5; see also Utility Scale Wind Towers from Canada: Resp. to Question 14.g of Suppl. Section Questionnaire (Dec. 13, 2019) ("Marmen SDQR") at 2–4, PR 123–25. Commerce focused on the second prong of 19 U.S.C.

§ 1677b(f)(1)(A), calling into question whether Marmen reasonably reflected the costs of producing and selling the merchandise. Commerce reviewed evidence submitted by Marmen, concluding that the evidence demonstrated steel plate cost differences between CONNUMs unrelated to the products' physical characteristics, and Commerce weight-averaged the reported steel plate costs for all reported CONNUMs, except the CONNUM for the thickest plate. See Final IDM at 5.

Marmen argues that differences in its reported costs were related to differences in physical characteristics and that Commerce's determination that Marmen's records did not reflect the costs associated with the production and sale of products is not supported by substantial evidence. Marmen's Br. at 15–16. Marmen asserts that Commerce incorrectly determined that Marmen's costs did not reasonably reflect the costs associated with the production and sale of products. See id. Marmen argues that Commerce should have used Marmen's reported costs and should not have weight-averaged the reported costs. Id.

Commerce determined that the most significant physical characteristics in differentiating costs of steel plate were type, thickness, weight, width, and height. See Final IDM at 5. Commerce reviewed Marmen's questionnaire response and determined that Marmen's suppliers did not charge different prices for plates of different grade, thickness, width, or length. Id. (citing Utility Scale Wind Towers from Canada: Resubmission of Second Suppl. Section D Resp. (Feb. 28, 2020) ("Marmen RSSDQR") at 2, Ex. D-2, PR 162–65). Commerce excluded the CONNUM for the thickest plates because the record indicated that there was a surcharge applied to high thickness plates that was not applied to lower thickness plates. Id. at 5–6; see Cost of Production and Constructed Value Calculation Adjustments for the Final Determination—Marmen Inc. and Marmen Energie Inc. (June 29, 2020) ("Marmen Final Cost Calculation Mem.") at 2, PR 194. Commerce explained that there should be little difference in plate costs for different dimensions and grade based on record evidence on a per-unit weight basis, and that reported differences in plate costs are based on factors other than physical differences, such as timing of production. See id. (citing Marmen RSSDQR Ex. D-2). Commerce determined that most of the higher-priced CONNUMs were sold earlier in the period of review, citing information in Marmen's Final Cost Calculation Memorandum. Id. at 6 (citing Marmen Final Cost Calculation Mem. at 1). In the Marmen Final Cost Calculation Memorandum, Commerce relied on record evidence showing that Marmen's steel suppliers did not charge different prices for plates of different grade, thickness width, or length. Marmen Final Cost Calculation Mem. at 2 (citing Marmen RSSDQR at 2, Ex. D-2). Commerce determined, therefore, that differences in plate prices were related to timing of production and factors other than differences in physical characteristics. Final IDM at 6.

Based on its determination that differences in plate costs were related to factors other than differences in the physical characteristics of the plates, Commerce determined that Marmen's records did not reflect the costs associated with the production and sale of products. Id. As a result, Commerce determined costs of production using the weight-average of the reported steel plate costs. Id.; see Marmen Final Cost Calculation Mem. at 1–3.

[9, 10] Commerce's stated practice is to adjust costs to address distortions when cost differences are attributable to factors beyond differences in the physical characteristics of such products, as required by

statute. See Final IDM at 6; Welded Carbon Steel Standard Pipe and Tube Products from Turkey, 82 Fed. Reg. 49,179 (Dep't of Commerce Oct. 24, 2017) (final results of antidumping duty admin. review and final determination of no shipments; 2015–2016). The Court notes that the relevant statute and Commerce's stated practice focus on whether reported costs reasonably reflect the costs of producing and selling the merchandise—without requiring examined CONNUMs to be nearly identical. See id.; 19 U.S.C. § 1677b(f)(1)(A). The Court concludes, therefore, that Commerce's weight-averaging of Marmen's steel plate costs is consistent with the relevant statute and Commerce's stated practice.

The Court observes that Marmen's questionnaire response and record documents cited by Commerce, including one of Marmen's supplier agreements, indicate that plate costs did not vary for plates of different thickness, length, width, and weight. See Marmen RSSDQR Exs. D-1, D-2. Record documents reviewed by Commerce support the determination that Marmen's suppliers did not charge different prices for plates of varying physical characteristics, except to apply an upcharge for plates over a certain thickness. See id. Ex. D-2. The Court notes that record documents cited by Commerce support Commerce's determination that a majority of the higher-priced CONNUMs were sold earlier in the period of investigation. See Marmen Final Cost Calculation Mem. Attachs. 1, 2. Because record evidence cited by Commerce indicates that Marmen's plate costs did not differ between plates of varying physical characteristics and that higher priced CONNUMs were sold earlier in the period of investigation, the Court concludes that Commerce's determination that differences in plate prices were related to timing of production and factors other than differences in physical characteristics is supported by substantial evidence.

The Court concludes that Commerce followed statutory requirements and Commerce's stated practices, and supported with substantial evidence its determination that Marmen's records did not reasonably reflect the costs associated with the production and sale of Marmen's merchandise. The Court sustains Commerce's determination to weight-average Marmen's steel plate costs.

## II. Commerce's Rejection of Marmen's Additional Cost Reconciliation Information

Commerce determined that a portion of Marmen's cost reconciliation information in Marmen's February 7, 2020 response constituted untimely and unsolicited new information and rejected Marmen's submission. See Final IDM at 8–9. Marmen argues that the information was corrective, and not new, and that Commerce abused its discretion by rejecting the correction. Marmen's Br. at 26–27.

[11] A party may submit factual information to rebut, clarify, or correct questionnaire responses. 19 C.F.R. § 351.301(c). The regulations state that

[i]f the factual information is being submitted to rebut, clarify, or correct factual information on the record, the submitter must provide a written explanation identifying the information which is already on the record that the factual information seeks to rebut, clarify, or correct, including the name of the interested party that submitted the information and the date on which the information was submitted.

19 C.F.R. § 351.301(b)(2). The regulations outline time limits for submissions of information to Commerce. See id. § 351.301(c). Section 351.301(c)(1)(v) discusses time lim-

its for factual information submitted to correct or clarify questionnaire responses by "an interested party other than the original submitter." Id. § 351.301(c)(1)(v). Section 351.301(c)(5) requires that miscellaneous new factual information must be submitted either 30 days before the scheduled date of the preliminary determination in an investigation, or 14 days before verification, whichever is earlier. Id. § 351.301(c)(5). Commerce has the right to reject information that is untimely or unsolicited. See 19 C.F.R. § 351.302(d).

**[12–16]** Nevertheless, Commerce has a duty "to determine dumping margins as accurately as possible." See NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (internal quotation marks and citation omitted). "[A]ntidumping laws are remedial not punitive." Id. (citation omitted). The U.S. Court of Appeals for the Federal Circuit has stated that "Commerce is obliged to correct any errors in its calculations during the preliminary results stage to avoid an imposition of unjustified duties." Fischer S.A. Comercio, Industria & Agricultura v. United States, 471 F. App'x 892, 895 (Fed. Cir. 2012) (citation omitted). Further, "Commerce is free to correct any type of importer error—clerical, methodology, substantive, or one in judgment—in the context of making an antidumping duty determination, provided that the importer seeks correction before Commerce issues its final determination and adequately proves the need for the requested corrections." Timken United States Corp. v. United States ("Timken"), 434 F.3d 1345, 1353 (Fed. Cir. 2006). The Court reviews whether Commerce abused its discretion when rejecting submitted information. See Papierfabrik August Koehler SE v. United States, 843 F.3d 1373, 1384 (Fed. Cir. 2016) ("Commerce abused its discretion in refusing to accept updated data when there was plenty of time for Commerce to verify or consider it.") (citations omitted). When reviewing Commerce's determination to reject corrective information, this Court may consider factors such as Commerce's interest in ensuring finality, the burden of incorporating the information, and whether the information will increase the accuracy of the calculated dumping margins. Bosun Tools Co. v. United States, 43 CIT ——, ——, 405 F. Supp. 3d 1359, 1365 (2019) (citations omitted).

**[17]** Marmen argues that the information submitted was a minor correction and not new information. See Marmen's Br. at 26–27. Marmen contends that Commerce abused its discretion by rejecting the information. See id. Commerce determined that the information was not responsive to its questionnaire and was new factual information that had not been requested. See Final IDM at 8 (citing Utility Scale Wind Towers from Canada: Second Suppl. Section D Resp. (Feb. 7, 2020) ("Marmen SSDQR") Ex. D-9, PR 151–54).

The Court notes that the cost reconciliation information submitted by Marmen in its February 7, 2020 response corresponded directly to prior cost reconciliation information submitted in Marmen's October 11, 2019 response. See Marmen SSDQR Ex. D-9; Utility Scale Wind Towers from Canada: Sections B, C, and D Resp. (Oct. 11, 2019) ("Marmen SBCDR") Ex. D-14, PR 89–97. The Court observes that Marmen's submission stated that the information updated purchase information that had not been properly converted to Canadian dollars. See Marmen SSDQR Ex. D-9. Commerce itself called Marmen's submission a "correction." See Final IDM at 8–9. Because of Commerce's own characterization of the submission, and because the information directly corresponds to a prior submission, the Court concludes that Commerce's determination that the additional cost reconciliation information submitted by Marmen was new factual information is

not supported by substantial evidence. The Court concludes that Marmen's submission is a correction and reviews whether Commerce abused its discretion when rejecting Marmen's submission.

[18]   When rejecting Marmen's corrective submission, Commerce stated that because it was submitted after the preliminary determination, the information was submitted too late for Commerce to use. Id. at 9. This Court and the U.S. Court of Appeals for the Federal Circuit have repeatedly held that Commerce must accept corrections when there is sufficient time for Commerce to consider the submission prior to the final determination. See, e.g., Timken, 434 F.3d at 1353–54 (holding that the court did not err by remanding a case to Commerce for analysis of corrective evidence that was submitted after the preliminary results but before the final results); Pro-Team Coil Nail Enter. v. United States, 43 CIT ——, ——, 419 F. Supp. 3d 1319, 1332 (2019) (finding that finality concerns were not implicated when the information was submitted eight months prior to publication of the final results).

The information was submitted on February 7, 2020, approximately five months before publication of the Final Determination. See Marmen SSDQR at 1. The Court notes that Commerce cites no other reason for there being insufficient time to consider Marmen's submission other than the fact that the submission was made after the preliminary determination. See Final IDM at 8–9. Because the information was submitted to Commerce five months prior to the Final Determination, the Court concludes that finality concerns are not implicated in this case and rejects Commerce's determination that the information was filed too late to be considered.

The Court notes that Commerce stated summarily that Marmen's submission was "not supported by factual information on the record," but did not point to record evidence that contradicts the supplemental information submitted. See Final IDM at 9. Absent record evidence indicating a reason to question the veracity of Marmen's cost reconciliation information, concerns over the accuracy of the calculated dumping margin favor accepting Marmen's submitted cost reconciliation information. See Pro-Team Coil Nail, 43 CIT at ——, 419 F. Supp. 3d at 1332. Record documents cited by Commerce indicate that Marmen's cost reconciliation worksheet stated prices in Canadian dollars. See Marmen SSDQR Ex. D-9. The Court observes that record documents also indicate that, prior to Marmen's supplemental submission, Marmen had not converted one line of the cost reconciliation sheet from U.S. dollars to Canadian dollars. See id. The Court notes that Marmen explained that its submission corrected one line of the cost reconciliation worksheet to properly list prices in Canadian dollars. See id. In light of record evidence that supports Marmen's corrective submission and its explanation, and absent evidence questioning the veracity of the submission, the Court concludes that Commerce has not supported with substantial evidence its determination that Marmen's supplemental cost reconciliation information is inaccurate and, therefore, that Commerce abused its discretion by failing to consider Marmen's corrective submission.

The Court holds that Commerce's determination to reject Marmen's supplemental cost reconciliation information was an abuse of discretion. The Court remands Commerce's determination for further explanation or consideration in accordance with this opinion.

### III.  Commerce's Use of an Average-to-Transaction Methodology

Commerce determined that its differential pricing analysis showed a pattern of

prices that differed significantly for Marmen's U.S. sales of five CONNUMs that justified the use of an alternative average-to-transaction ("A-to-T") methodology to calculate Marmen's dumping margin. See Final IDM at 11. Marmen argues that Commerce's application of its differential pricing analysis methodology is unreasonable because there is not a significant difference in Marmen's U.S. prices and that, therefore, Commerce's determination to use an A-to-T method to calculate Marmen's dumping margin is unreasonable and not supported by substantial evidence. See Marmen's Br. at 32–34.

[19, 20]    Commerce ordinarily uses an average-to-average ("A-to-A") comparison of "the weighted average of the normal values [of subject merchandise] to the weighted average of export prices (and constructed export prices) for comparable merchandise" when calculating a dumping margin. See 19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1). The statute allows Commerce to depart from using the A-to-A methodology and instead use an A-to-T comparison of the weighted average of normal values to the export prices and constructed export prices of individual transactions for comparable merchandise when: (1) Commerce observes "a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time;" and (2) "[Commerce] explains why such differences cannot be taken into account using [the A-to-A methodology]." 19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii). In contrast to the A-to-A method, which may mask dumped sales at low prices by averaging them with sales at higher prices, the A-to-T method allows Commerce "to identify a merchant who dumps the product intermittently—sometimes selling below the foreign market value and sometimes selling above it." Apex Frozen Foods Priv. Ltd. v. United States,

862 F.3d 1337, 1341 (Fed. Cir. 2017) (citation and internal quotation marks omitted).

[21–23]    The statute does not set forth the analysis for how Commerce is to identify a pattern of price differences. See 19 U.S.C. §§ 1677, 1677f-1; see also Apex Frozen Foods, 862 F.3d at 1346; Dillinger France S.A., 981 F.3d at 1325. The Court affords Commerce deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature." See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citation omitted). However, Commerce still "must [ ] explain [cogently] why it has exercised its discretion in a given manner." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation omitted).

[24, 25]    Commerce uses a differential pricing analysis to determine if a pattern of significant price differences exist and whether the difference can be taken into account using the A-to-A method. See Final IDM at 11. The standard of review for considering Commerce's differential pricing analysis is reasonableness. Stupp Corp. v. United States, 5 F.4th 1341, 1353 (Fed. Cir. 2021). The U.S. Court of Appeals for the Federal Circuit and this Court have held the steps underlying the differential pricing analysis as applied by Commerce to be reasonable. See e.g., Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662, 670–74 (Fed. Cir. 2019) (discussing zeroing and the 0.8 threshold for the Cohen's $d$ test); Apex Frozen Foods Priv. Ltd. v. United States, 40 CIT ——, ——, 144 F. Supp. 3d 1308, 1314–35 (2016) (discussing application of the A-to-T method, the Cohen's $d$ test, the meaningful difference analysis, zeroing, and the "mixed comparison methodology" of applying the A-to-A method and the A-to-T method when 33–66% of a respondent's sales pass

the Cohen's *d* test), aff'd, 862 F.3d 1337; Apex Frozen Foods Priv. Ltd. v. United States, 862 F.3d 1322 (Fed. Cir. 2017) (affirming zeroing and the 0.5% *de minimis* threshold in the meaningful difference test). However, the U.S. Court of Appeals for the Federal Circuit has stated that "there are significant concerns relating to Commerce's application of the Cohen's *d* test . . . in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances." Stupp, 5 F.4th at 1357.

[26, 27]    The Cohen's *d* test is "a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group." Apex Frozen Foods, 862 F.3d at 1342 n.2. The Cohen's *d* test relies on assumptions that the data groups being compared are normal, have equal variability, and are equally numerous. See Stupp, 5 F.4th at 1357. Applying the Cohen's *d* test to data that do not meet these assumptions can result in "serious flaws in interpreting the resulting parameter." See id. at 1358.

In Stupp Corp. v. United States, 5 F.4th 1341 (Fed. Cir. 2021), the U.S. Court of Appeals for the Federal Circuit remanded Commerce's use of the Cohen's *d* test for further explanation because the data Commerce used may have violated the assumptions of normality, sufficient observation size, and roughly equal variances. Id. at 1357–60. The Court addressed Commerce's argument that it does not need to worry about normality because it is using a population instead of a sample, stating that Commerce's argument "does not address the fact that Professor Cohen derived his interpretive cutoffs under the assumption of normality." Id.

Marmen contends that the price differences of its U.S. sales of five of the seven CONNUMs used in the differential pricing analysis were less than one percent and were not significant. See Marmen's Br. at 32. Marmen argues that Commerce's application of its differential pricing analysis in this case was unreasonable. Id.

[28]    Commerce applied its two-step differential pricing methodology to determine if a pattern of significant price differences existed and whether the difference could be taken into account using the A-to-A method. See Final IDM at 11. Commerce chose the Cohen's *d* test "to evaluate the extent to which the prices to a particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise." Prelim. DM at 10. Commerce applied the Cohen's *d* test and determined that 68.29% of Marmen's U.S. sales passed. Final IDM at 11; Analysis for the Final Determination of Utility Scale Wind Towers: Final Margin for Calculation for the Marmen Group (June 29, 2020) ("Marmen Final Margin Calculations Mem.") at 3, PR 195. Based on the results of its Cohen's *d* test and its meaningful difference test, Commerce determined that a pattern of prices that differed significantly among purchasers, regions, or time periods existed, that the A-to-A method could not account for the pattern of price differences, and that the A-to-T method was appropriate to calculate Marmen's dumping margin. Final IDM at 11; Marmen Final Margin Calculations Mem. at 3.

Commerce determined that Marmen's U.S. prices differed significantly and decided to use the A-to-T method based on its differential pricing analysis, which utilized the Cohen's *d* test. See Marmen Final Margin Calculations Mem. at 3–4. Commerce applied the Cohen's *d* test to data that showed differences that were not large in absolute terms, because the overall differences for five of the CONNUMs were less than one percent. See id. Attach. 2. The Court notes that Commerce did not explain whether the data applied to the

Cohen's $d$ test were normally distributed or contained roughly equal variances. See Final IDM at 10–11. Because the record appears to indicate that the price differences were not large in absolute terms, the evidence before the Court calls into question whether the data Commerce used in its differential pricing analysis violated the assumptions of normality and roughly equal variances associated with the Cohen's $d$ test.

The Court remands the issue of Commerce's use of the Cohen's $d$ test for Commerce to explain further whether the limits on the use of the Cohen's $d$ test were satisfied in this case in the context of the Stupp case. The Court remands Commerce's use of the A-to-T method for further explanation of Commerce's differential pricing analysis in accordance with this opinion.

### IV. Commerce's Determination to Use Marmen's Invoice Dates as the Date of Sale for Marmen's Home Market and U.S. Sales

Commerce determined the date of sale for Marmen's home market and U.S. sales based on reported invoice dates. Final IDM at 15–16. WTTC argues that Commerce should use a date other than the invoice date when determining Marmen's home market and U.S. dates of sale. See WTTC's Br. at 18–19.

**[29–31]** Commerce must conduct a "fair comparison" of normal value and export price in determining whether merchandise is being, or is likely to be, sold at less than fair value. See 19 U.S.C. § 1677b(a); see also Smith-Corona Grp. v. United States, 713 F.2d 1568, 1578 (Fed. Cir. 1983). In doing so, normal value must be from "a time reasonably corresponding to the time of sale used to determine the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(A). Commerce has promulgated the following regulation re-

garding the date that should be used as the date of sale for purposes of comparing normal value and export price:

> In identifying the date of sale of the subject merchandise or foreign like product, [Commerce] normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, [Commerce] may use a date other than the date of invoice if [Commerce] is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

19 C.F.R. § 351.401(i). This Court has previously held that the material terms of a sale generally include the price, quantity, payment, and delivery terms. See, e.g., ArcelorMittal USA LLC v. United States, 42 CIT ——, ——, 302 F. Supp. 3d 1366, 1378 (2018); Nakornthai Strip Mill Pub. Co. v. United States, 33 C.I.T. 326, 337, 614 F. Supp. 2d 1323, 1333 (2009); USEC Inc. v. United States, 31 C.I.T. 1049, 1055, 498 F. Supp. 2d 1337, 1343 (2007); see also Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1377 n.1 (Fed. Cir. 2003). The important factor to determine is when the parties have reached a "meeting of the minds." Nucor Corp. v. United States, 33 C.I.T. 207, 249, 612 F. Supp. 2d 1264, 1300 (2009).

**[32–36]** In promulgating the implementing regulation, Commerce explained that it will normally rely on the date provided on the invoice "as recorded in a firm's records kept in the ordinary course of business." See Antidumping Duties; Countervailing Duties ("Preamble"), 62 Fed. Reg. 27,296, 27,348 (Dep't of Commerce May 19, 1997). Commerce prefers to use a single and uniform source for the date of sale for each respondent, rather than determining the date of sale for each sale individually. Id. Commerce stated that

"as a matter of commercial reality, the date on which the terms of a sale are first agreed is not necessarily the date on which those terms are finally established" because "price and quantity are often subject to continued negotiation between the buyer and the seller until a sale is invoiced." Id. Commerce explained that:

> absent satisfactory evidence that the terms of sale were finally established on a different date, [Commerce] will presume that the date of sale is the date of invoice .... If [Commerce] is presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of invoice, [Commerce] will use that alternative date as the date of sale.

Id. at 27, 349. The party seeking a date other than the invoice date bears the burden of presenting Commerce with sufficient evidence demonstrating that "another date ... 'better reflects the date on which the exporter or producer establishes the material terms of sale.'" Viraj Grp., Ltd., 343 F.3d at 1377 n.1 (quoting 19 C.F.R. § 351.401(i)).

[37] WTTC argues that Commerce has stated that "in situations involving large custom-made merchandise in which the parties engage in formal negotiation and contracting procedures, [Commerce] usually will use a date other than the date of invoice." WTTC's Br. at 19 (citing Preamble, 62 Fed. Reg. at 27,349). However, the Court notes that "[Commerce] emphasizes that in these situations, the terms of sale must be firmly established and not merely proposed." Preamble, 62 Fed. Reg. at 27,349. The regulatory presumption exists that Commerce will use the date of invoice, and WTTC had the burden of proving to Commerce that another date better reflects the date on which the material terms of sale were established. See 19 C.F.R. § 351.401(i).

WTTC argues that Commerce should have used a date other than the invoice date as Marmen's date of sale for home market and U.S. sales. See WTTC's Br. at 18–19. WTTC asserts that the material terms of sale for Marmen's sales did not change between when purchase orders were issued and when invoices were issued. See id. at 21. Commerce determined that Marmen had reported the invoice dates as the date of sale for home market and U.S. sales, as instructed, and that Marmen had responded to Commerce's request for examples in which the terms of sale changed between the purchase order date and the invoice date. Final IDM at 15–16. Commerce reviewed Marmen's questionnaire responses and determined that the record supported that "changes to the material terms of sale occurred between the purchase order and the invoice date in both the home and U.S. markets." Id. (citing Utility Scale Wind Towers from Canada: Section A Resp. (Sept. 13, 2019) ("Marmen AQR"), PR 76; Utility Scale Wind Towers from Canada: Sections B, C, and D Resp. (Oct. 11, 2019) ("Marmen BCDQR"), PR 89–97; Utility Scale Wind Towers from Canada: Suppl. Sections A, B, and C Resp. (Feb. 6, 2020) ("Marmen First SABCQR"), PR 120–21; Utility Scale Wind Towers from Canada: Second Suppl. Sections A, B, and C Resp. (Feb. 6, 2020) ("Marmen Second SABCQR"), PR 181–83; Marmen SDQR). In support of using the invoice date as the date of sale for both home market and U.S. sales, Commerce cited the examples that Marmen provided of a change to the delivery terms in a home market sale and changes to the price, quantity, and payment terms in a U.S. sale. Id. at 16 (citing Marmen First SABCQR Exs. FSQ-6, FSQ-7, FSQ-12, FSQ-14).

The Court notes that Commerce's questionnaires requested that Marmen state the "date of sale (e.g., invoice date, etc.)"

and provide an example of a change in the terms of sale between the purchase order and invoice date for both home market and U.S. sales. See Antidumping Duty Investigation Req. for Information for Marmen Inc., Utility Scale Wind Towers from Canada (Aug. 19, 2019) ("Initial Questionnaire") at A-8, PR 54; Antidumping Duty Investigation on Utility Scale Wind Towers from Canada: Suppl. Questionnaire for Marmen ("Nov. 20, 2019") ("Supplemental Questionnaire") at 5, PR 103. The Court observes that Marmen's responses complied with Commerce's requests, because Marmen reported the invoice date as the date of sale for its home market and U.S. sales, in line with Commerce's questionnaire. See Initial Questionnaire at A-8; Marmen AQR at A-20. The Court notes that Marmen also provided examples of changes to the material terms of sale between the purchase order and invoice date, consistent with Commerce's request. See Supplemental Questionnaire at 5; Marmen First SABCQR at 12–14.

The record evidence cited by Commerce supports a determination that the material terms of sale were not established prior to the invoice date, because the evidence shows changes to the terms between the purchase order and invoice date. The Court observes that record documents cited by Commerce show an example of a change in the delivery terms for one of Marmen's home market sales between the purchase order and invoice. See Marmen First SABCQR at 12 (stating that the change in delivery terms resulted in additional costs for the delivery of the sale). Record documents cited by Commerce also show a change in the terms of one of Marmen's U.S. sales, showing that price, quantity, and payment terms changed between the letter of intent and the invoice date. See id. at 13–14, Ex. FSQ-7. Because record evidence cited by Commerce show changes to delivery terms, price, quantity, and payment terms, and these terms are

considered material, the Court concludes that Commerce's determination that there were changes to the material terms between the purchase order and invoice date is supported by substantial evidence.

Commerce has supported its determination that there were changes to the material terms of sale between the purchase order and invoice date, and the Court concludes that Commerce has supported with substantial evidence its determination that the invoice date best reflects when the material terms of sale were established. Therefore, the Court concludes that Commerce correctly applied the regulatory presumption to use the invoice date as the date of sale and that Commerce's determination to use Marmen's reported invoice dates as the date of sale for home market and U.S. sales is supported by substantial evidence.

### V. Commerce's Use of Marmen's Reporting of Home Market Sales of Tower Sections

[38]  Commerce determined that Marmen correctly reported its home market sales as sales of wind tower sections and relied on Marmen's reported information. Final IDM at 17–18. WTTC argues that Marmen incorrectly reported its home market sales as sales of sections and that Commerce should not use Marmen's reported home market sales information. WTTC's Br. at 34–37.

Commerce cited Marmen's questionnaire responses, which showed that Marmen issued invoices for each section of its home market sales. See Final IDM at 17–18 (citing Marmen AQR; Marmen BCDQR; Marmen First SABCQR Exs. FSQ-11, FSQ-12). Despite Marmen issuing purchase orders for whole towers, Commerce noted that Marmen issued invoices by section. See id.; see also Marmen First SABCQR Exs. FSQ-11, FSQ-12. Com-

merce determined, therefore, that Marmen's reporting was consistent with Commerce's instructions and with the manner in which Marmen actually invoiced its customer. See Final IDM at 17–18.

The Court notes that Commerce's questionnaires requested that Marmen report its sales by wind tower section as invoiced. See Initial Questionnaire at B-2; Model Matching Questionnaire Attach. 1. The Court observes that record documents cited by Commerce show that Marmen invoiced customers by section. See Marmen First SABCQR Exs. FSQ-11, FSQ-12. Because Marmen invoiced customers by wind tower section and Commerce instructed Marmen to report its sales as they were invoiced, the Court agrees with Commerce's determination that Marmen accurately reported its sales as sales of wind tower sections, consistent with Commerce's requests.

The Court concludes that Commerce's reliance on Marmen's reported information as accurate and treatment of Marmen's home market sales as sales of tower sections is reasonable and supported by substantial evidence on the record.

## VI. Commerce's Determination Not to Apply Facts Otherwise Available or an Adverse Inference to Marmen

Commerce determined that the record provided sufficient information to calculate Marmen's dumping margin and declined to apply adverse facts available to Marmen. See Final IDM at 19–20. WTTC contends that Marmen was not responsive to Commerce's questionnaires and that Marmen reported inaccurate and incomplete data. See WTTC's Br. at 37–44. WTTC argues that Commerce should have applied facts otherwise available or an adverse inference. Id. at 38.

**[39]** Section 776 of the Tariff Act of 1930, as amended, provides that if "neces-sary information is not available on the record" or if a respondent "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," then the agency shall "use the facts otherwise available in reaching" its determination. 19 U.S.C. § 1677e(a)(1), (a)(2)(B). If Commerce finds further that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" from the agency, then Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." Id. § 1677e(b)(1)(A). When Commerce can fill in gaps in the record independently, an adverse inference is not appropriate. See Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011).

**[40]** WTTC asserts that Marmen's reporting was incomplete and that the record lacked necessary information. WTTC's Br. at 39–41. WTTC argues that Commerce should have applied facts otherwise available to calculate Marmen's dumping margin. See id. at 41. WTTC asserts that Marmen mischaracterized its home market date of sale and misreported its sales as sales of wind tower sections. See id. at 38–41. As a result, WTTC argues that Marmen's reporting did not comply with Commerce's requests and Commerce should have applied an adverse inference. See id. at 40–44. Commerce cited Marmen's questionnaire responses and determined that Marmen was "responsive to the information requested," that its responses were submitted in a timely manner, and that there was "no missing information from the record that is a condition necessary for applying facts available." Final IDM at 19–20. Commerce also determined that Marmen's reporting of its home market date of sale based on invoice date and its sales of

wind tower sections was consistent with Commerce's requests and Marmen's invoicing practices. Id. at 20. Because Marmen complied with Commerce's requests and the record contained sufficient information for Commerce's determination, Commerce declined to apply facts otherwise available or an adverse inference. Id. at 20.

The Court observes that Marmen's questionnaire responses, cited by Commerce, were consistent with Commerce's instructions. See Marmen AQR; Marmen BCDQR; Marmen First SABCQR. As discussed above, the Court concludes that Commerce's determinations that Marmen reported invoice dates as the date of sale for home market and U.S. sales and reported home market sales as sales of wind tower sections, in accordance with Commerce's questionnaire instructions, are supported by substantial evidence. See supra Parts IV & V. The Court concludes that Commerce's determination that Marmen's reporting was responsive to Commerce's requests and no information was missing from the record is supported by substantial evidence. The Court holds that Commerce's determination not to apply facts otherwise available or an adverse inference to Marmen is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Court sustains Commerce's determination to weight-average Marmen's plate costs; Commerce's use of invoice dates as the date of sale; Commerce's use of Marmen's reported sales of tower sections; and Commerce's decision not to apply facts otherwise available or an adverse inference. The Court remands Commerce's determination rejecting Marmen's additional cost reconciliation information and Commerce's use of the A-to-T methodology to calculate Marmen's dumping margin for further

consideration in accordance with this opinion.

Accordingly it is hereby

**ORDERED** that the Final Determination is remanded to Commerce for further proceedings consistent with this opinion; and it is further

**ORDERED** that this action shall proceed according to the following schedule:

1. Commerce shall file the remand determination on or before December 17, 2021;

2. Commerce shall file the remand administrative record on or before January 14, 2022;

3. Comments in opposition to the remand determination shall be filed on or before February 11, 2022;

4. Comments in support of the remand determination shall be filed on or before March 4, 2022; and

5. The joint appendix shall be filed on or before March 25, 2022.



**DIAMOND TOOLS TECHNOLOGY LLC, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**and**

**Diamond Sawblades Manufacturers' Coalition, Defendant-Intervenor.**

**Slip Op. 21-151**

**Court No. 20-00060**

United States Court of International Trade.

October 29, 2021

**Background:** Importer of diamond sawblades sought review of affirmative final

***Marmen Inc.  v. United States***

**627 F.Supp.3d 1312 (CIT 2023)**

**(Appx21-28)**

⚑ KeyCite Blue Flag – Appeal Notification
Appeal Filed by  MARMEN INC. v. US,   Fed.Cir.,   May 11, 2023

627 F.Supp.3d 1312
United States Court of International Trade.

MARMEN INC., Marmen Énergie Inc.,
and Marmen Energy Co., Plaintiffs,
and
Wind Tower Trade Coalition, Consolidated Plaintiff,
v.
UNITED STATES, Defendant,
and
Wind Tower Trade Coalition, Marmen
Inc., Marmen Énergie Inc., and Marmen
Energy Co., Defendant-Intervenors.

Slip Op. 23-37
|
Consol. Court No. 20-00169
|
March 20, 2023

**Synopsis**
**Background:** Exporters filed action challenging final
determination of Department of Commerce in antidumping
duty investigation on utility scale wind towers from Canada.
The Court of International Trade, Choe-Groves, J., 545
F.Supp.3d 1305, sustained in part and remanded in part
exporters' motion for judgment on agency record.

**Holdings:** After remand, the Court of International Trade,
Choe-Groves, J., held that:

Commerce's determination, rejecting exporters' cost
reconciliation information concerning alleged discovery of
their failure to convert currencies in records, was supported
by substantial evidence, and

Commerce's application of Cohen's d test to determine
whether there was significant pattern of differences was
reasonable.

Sustained.

**Procedural Posture(s):** Review of Administrative Decision.

**Attorneys and Law Firms**

**\*1314**  Jay Charles Campbell, Allison Jessie Gartner
Kepkay, and  Ron Kendler, White & Case, LLP, of
Washington, D.C., for Plaintiffs and Defendant-Intervenors
Marmen, Inc., Marmen Energy Co., and Marmen Energie Inc.

Alan Hayden Price, Derick G. Holt, Elizabeth Seungyon Lee,
John Allen Riggins, Laura El-Sabaawi, Maureen Elizabeth
Thorson, Robert Edward DeFrancesco, III, Tessa Victoria
Capeloto, and Theodore Paul Brackemyre, Wiley Rein,
LLP, of Washington, D.C., for Consolidated Plaintiff and
Defendant-Intervenor Wind Tower Trade Coalition.

Reginald T. Blades, Jr., Assistant Director, and Joshua
Ethan Kurland, Senior Trial Attorney, Commercial Litigation
Branch, Civil Division, U.S. Department of Justice, of
Washington, D.C., for Defendant United States. With them on
the brief were Brian M. Boynton, Principal Deputy Assistant
Attorney General, and Patricia M. McCarthy, Director. Of
counsel on the brief was Jesus N. Saenz, Attorney, Office of
the Chief Counsel for Trade Enforcement and Compliance,
U.S. Department of Commerce.

## OPINION AND ORDER

Choe-Groves, Judge:

Before the Court is the U.S. Department of Commerce's
("Commerce") remand redetermination in the antidumping
duty investigation of utility scale wind towers from Canada,
filed pursuant to the Court's Remand Order in Marmen
Inc. v. United States ("Marmen I"), 45 CIT ——, 545 F.
Supp. 3d 1305 (2021). See Final Results of Redetermination
Pursuant to Court Remand ("Remand Redetermination"),
ECF Nos. 61, 62; see also Utility Scale Wind Towers from
Canada ("Final Determination"), 85 Fed. Reg. 40,239 (Dep't
of Commerce July 6, 2020) (final determination of sales
at less than fair value and final negative determination of
critical circumstances; 2018–2019), accompanying Issues
and Decision Mem. for the Final Affirmative Determination
in the Less-Than-Fair-Value Investigation of Utility Scale
Wind Towers from Canada, ECF No. 18-5 (June 29, 2020)
("Final IDM").

In Marmen I, the Court remanded for Commerce to reconsider
the rejection of the cost reconciliation information of
Plaintiffs Marmen Inc., Marmen Energy Co., and Marmen
Energie Inc. (collectively, "Marmen") and Commerce's

use of the differential pricing average-to-transaction ("A-to-T") method to calculate Marmen's dumping margin. Marmen I, 45 CIT at ——, 545 F. Supp. 3d at 1315–20. On remand, Commerce reconsidered the additional cost reconciliation information and the use of the Cohen's *d* test in light of 🔖Stupp Corp. v. United States, 5 F.4th 1341 (Fed. Cir. 2021). See generally, Remand Redetermination. Marmen filed comments in opposition to the Remand Redetermination. Pls.' Comments Opp'n Final Results **\*1315** of Redetermination Pursuant to Court Remand ("Pls.' Cmts."), ECF Nos. 66, 67. Defendant United States ("Defendant") responded to Plaintiffs' Comments. Def.'s Resp. Pls.' Comments Commerce' Remand Redetermination ("Def.'s Resp."), ECF Nos. 70, 71 (superseded by ECF Nos. 79, 80). Defendant-Intervenor Wind Tower Trade Coalition ("Defendant-Intervenor") filed comments in support of the Remand Redetermination. [Def.-Interv.'s] Comments Supp. Remand Redetermination ("Def.-Interv.'s Cmts."), ECF Nos. 72, 73. For the following reasons, the Court sustains the Remand Redetermination.

### BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the Remand Redetermination. See Marmen I, 45 CIT at ——, 545 F. Supp. 3d at 1311–12. In August 2019, Commerce initiated an antidumping duty investigation into wind towers from Canada for the period covering July 1, 2018 through June 30, 2019. Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam, 84 Fed. Reg. 37,992, 37,992–93 (Dep't of Commerce Aug. 5, 2019) (initiation of less-than-fair-value investigations). Commerce selected Marmen, Inc. and Marmen Energie Inc. as mandatory respondents. See Decision Mem. for the Prelim. Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from Canada (Feb. 4, 2020) ("Prelim. DM") at 1–2, PR 146.[1] In the Final Determination, Commerce assigned weighted-average dumping margins of 4.94 percent to Marmen, Inc. and Marmen Energie Inc.[2] Final Determination, 85 Fed. Reg. at 40,239. Commerce determined the all-others weighted average dumping margin of 4.94 percent based on Marmen's dumping margin. Id.

In the Final Determination, Commerce determined that Marmen's steel plate costs did not reasonably reflect the costs associated with the production and sale of the products and weight-averaged Marmen's reported steel plate costs. Final IDM at 4–6. Commerce rejected a portion of the supplemental cost reconciliation information submitted by Marmen as untimely, unsolicited new information. Id. at 7–9. Commerce applied a differential pricing analysis using the Cohen's *d* test and determined that there was a pattern of export prices that differed significantly. Id. at 10–11. As a result, Commerce calculated Marmen's weighted-average dumping margin by using the alternative average-to-transaction method. Id.

The Court remanded for Commerce to explain its use of the Cohen's *d* test in light of 🔖Stupp Corp. v. United States, 5 F.4th 1341 (Fed. Cir. 2021), and for Commerce to further explain or consider Marmen's supplemental cost reconciliation information. Marmen I, 45 CIT at ——, 545 F. Supp. 3d at 1317–21.

On remand, Commerce accepted the previously rejected information from Marmen. Remand Redetermination at 4–11. Commerce examined the additional cost reconciliation information together with **\*1316** other information on the record, and Commerce determined that the purported corrections were already reflected in Marmen's audited financial statements. Id. Commerce did not adjust Marmen's cost of manufacturing or cost of production. Id. Commerce also reconsidered the differential pricing analysis and determined that the assumptions of normality and roughly equal variances at issue in 🔖Stupp were not relevant to Commerce's application of the Cohen's *d* test on remand. Id. at 12–50.

### JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final determination in an antidumping duty investigation. The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i). The Court also reviews determinations made on remand for compliance with the Court's remand order. Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT ——, ——, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 🔖802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I. Commerce's Rejection of Marmen's Additional Cost Reconciliation Information

In order to determine whether certain products are being sold at less than fair value in the United States, Commerce compares the export price, or constructed export price, with normal value. 🚩 19 U.S.C. § 1673. Export price and constructed export price are the price at which the subject merchandise is being sold in the U.S. market, while normal value is the price at which a "foreign like product" is sold in the producer's home market or in a comparable third-country market. Id. §§ 1677a(a)–(b), 1677b(a)(1)(B). Before calculating a dumping margin, Commerce must identify a suitable "foreign like product" with which to compare the exported subject merchandise. See § 1677b(a)(1)(B). A "foreign like product," in order of preference, is:

(A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise —

(i) produced in the same country and by the same person as the subject merchandise,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise —

(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

🚩 19 U.S.C. § 1677(16); NSK Ltd. v. United States, 26 C.I.T. 650, 657–58, 217 F. Supp. 2d 1291, 1299–1300 (2002).

When determining costs of production, 19 U.S.C. § 1677b states that:

> costs shall normally be calculated based on the records of the exporter or producer **\*1317** of the merchandise, if such records are kept in accordance with the generally accepted accounting principles ["GAAP"] of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

19 U.S.C. § 1677b(f)(1)(A). The statute requires that "reported costs must normally be used only if (1) they are based on the records ... kept in accordance with the GAAP *and* (2) reasonably reflect the costs of producing and selling the merchandise." See Dillinger France v. United States, 981 F.3d 1318, 1321 (Fed. Cir. 2020) (emphasis in original) (internal quotation marks and citations omitted). Commerce is not required to accept the exporter's records. Thai Plastic Bags Indus. Co. v. United States, 746 F.3d 1358, 1365 (Fed. Cir. 2014). Commerce may reject a company's records if it determines that accepting them would distort the company's true costs. See Am. Silicon Techs. v. United States, 261 F.3d 1371, 1377 (Fed. Cir. 2001). Commerce is directed to consider all available evidence on the proper allocation of costs. 19 U.S.C. § 1677b(f)(1)(A). Physical characteristics are a prime consideration when Commerce conducts its analysis. Thai Plastic Bags, 746 F.3d at 1368. If factors beyond the physical characteristics influence the costs, however, Commerce will normally adjust the reported costs in order to reflect the costs that are based only on the physical characteristics. See id.

To determine whether the subject merchandise wind towers from Canada were sold in the United States at less than fair value under section 733 of the Tariff Act of 1930, Commerce first considered all products produced and sold by Marmen in Canada during the period of investigation for the purpose of determining the appropriate product comparisons to U.S. sales. Prelim. DM at 13. Commerce determined that there were no sales of identical merchandise in the ordinary course of trade in Canada that could be compared to U.S. sales. Id.

Commerce did not dispute whether Marmen's records were kept properly, noting that "the record is clear that the reported costs are derived from the Marmen Group's normal books and records and that those books are in accordance with Canadian GAAP." Final IDM at 5; see also Marmen's Utility Scale Wind Towers from Canada: Response to Question 14.g of the Supplemental Section Questionnaire (Dec. 13, 2019) at 2–4, PR 123–25. Commerce focused on the second prong of 19 U.S.C. § 1677b(f)(1)(A), calling into question whether Marmen reasonably reflected the costs of producing and selling the merchandise. Final IDM at 5.

In Marmen I, this Court remanded for Commerce to reconsider the rejection of Plaintiffs' cost reconciliation information. Marmen I, 45 CIT at ——, 545 F. Supp. 3d at 1315–17. On remand, Commerce accepted and reconsidered Marmen's cost reconciliation information that Commerce had previously rejected. See Remand Redetermination at 4–11. Commerce explained that on remand it evaluated the information provided by Plaintiffs and determined that one portion of the information should be rejected because the information adjusted for amounts already accounted for in the costs that were reported to Commerce. Id. Commerce determined that Plaintiffs' overall cost reconciliation difference remained outstanding and attributed the amount to Marmen's cost of production. Id. Defendant-Intervenor supports Commerce's determination. See Def.-Interv.'s Cmts. at 10–16.

Marmen argues that Commerce's rejection of the information was unreasonable because the information was a "minor correction **\*1318** to Marmen Inc.'s cost reconciliation worksheet based on incorrect and confused claims that are unsupportable." Pls.' Cmts. at 2. Marmen challenges Commerce's characterization that the information would double count an exchange rate adjustment already reflected in the audited cost of goods sold and reported cost of production. Id.

A party may submit factual information to rebut, clarify, or correct questionnaire responses. 19 C.F.R. § 351.301(c). The regulations state that

> [i]f the factual information is being submitted to rebut, clarify, or correct factual information on the record, the submitter must provide a written explanation identifying the

information which is already on the record that the factual information seeks to rebut, clarify, or correct, including the name of the interested party that submitted the information and the date on which the information was submitted.

Id. § 351.301(b)(2).

Commerce has a duty "to determine dumping margins as accurately as possible." See NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (internal quotation marks and citation omitted). "[A]ntidumping laws are remedial not punitive." Id. (citation omitted). The U.S. Court of Appeals for the Federal Circuit ("CAFC") has stated that "Commerce is obliged to correct any errors in its calculations during the preliminary results stage to avoid an imposition of unjustified duties." Fischer S.A. Comercio, Industria & Agricultura v. United States, 471 Fed. App'x 892, 895 (Fed. Cir. 2012) (citation omitted). Further, "Commerce is free to correct any type of importer error—clerical, methodology, substantive, or one in judgment—in the context of making an antidumping duty determination, provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections." Timken United States Corp. v. United States ("Timken"), 434 F.3d 1345, 1353 (Fed. Cir. 2006). The Court reviews whether Commerce abused its discretion when rejecting submitted information. See Papierfabrik August Koehler SE v. United States, 843 F.3d 1373, 1384 (Fed. Cir. 2016) ("Commerce abused its discretion in refusing to accept updated data when there was plenty of time for Commerce to verify or consider it.") (citations omitted). When reviewing Commerce's determination to reject corrective information, this Court may consider factors such as Commerce's interest in ensuring finality, the burden of incorporating the information, and whether the information will increase the accuracy of the calculated dumping margins. Bosun Tools Co. v. United States, 43 CIT ——, ——, 405 F. Supp. 3d 1359, 1365 (2019) (citations omitted).

On remand, Commerce accepted and considered the numerous revisions presented by Marmen. Remand Redetermination at 4–11, 38–46. Marmen argues that the information submitted consisted of minor corrections and

not new information. See Pls.' Cmts. at 2. Commerce agreed that several of the revised reconciliations were "minor errors," such as cell formatting errors and other small clerical errors, which Commerce accepted because they did not alter the data presented in the audited financial statements. Remand Redetermination at 6–7. Commerce stated in the Remand Redetermination, however, that "there was one non-clerical revision that Marmen explained it found while reviewing its records for purposes of preparing the revised cost reconciliations. This revision resulted from an alleged discovery of certain expenses that Marmen claims were not converted from [U.S. dollars] to **\*1319** [Canadian dollars]." Id. at 7 (citing Marmen's Utility Scale Wind Towers from Canada: Second Supp. Section D Resp. (Feb. 7, 2020) ("Marmen's Second Supplemental Section D Response") at 14, PR 151–54). Commerce determined that:

> In short, the increase to the [cost of manufacturing] (*i.e.*, the increase in the unreconciled difference) driven by the restatement of the audited financial statements was offset by this new change to Marmen's cost reconciliation. According to Marmen, this new reconciling item represents non-booked exchange losses that Marmen Inc. incurred on purchases of wind tower sections from affiliate Marmen Energie. This explanation is parallel to the adjusting entry to restate Marmen Inc.'s other purchases to the [Canadian dollar] equivalent values, as discussed above, as an auditor amendment to the financial statements.

Id. (citing Marmen's Utility Scale Wind Towers from Canada: Request for Additional Information Concerning Second Supp. Section D Resp. (Dec. 8, 2021) ("Marmen's Second Supplemental Remand Section D Response") at Attachment 1), PRR 2. Commerce rejected Marmen's cost reconciliation information because "Marmen did not further explain how, if at all, this error and correction related to the restated financial statements, or whether it was one of the adjustments brought up by the external auditor, Deloitte. The record does not provide any actual support that this new change is required, nor that it is not already accounted for within Marmen's normal books." Id.

Defendant asserts that the new cost reconciliation information had the effect of duplicating the adjustments for exchange gains and losses already reflected in Marmen's financial statements. Def.'s Resp. at 24. Defendant contends that Commerce correctly determined that the information in the cost reconciliation spreadsheet, viewed in conjunction with Marmen's representations regarding its auditor's adjustments, indicated that Marmen's auditor had already made any necessary adjustment in restating Marmen's financial statements that produced the cost of goods sold figure used in the reconciliation. Id.

In support of its determination that the new cost reconciliation information was already accounted for in Marmen's costs, Commerce cited record evidence comparing an Excel spreadsheet in the Supplemental Remand Section D Response at Attachment 1 with Marmen's Initial Section D Response at pages D-15 and D-33 and Exhibit D-3.[3] Remand Redetermination at 8–9; see Marmen's Second Supplemental Remand Section D Response at Attachment 1; Marmen's Utility Scale Wind Towers from Canada: Sections B, C, and D Response (Oct. 11, 2019) ("Marmen's Initial Section D Response") at D-15, D-33, PR 89–97; Marmen's Utility Scale Wind Towers from Canada: Supplemental Section D Response (Dec. 6, 2019) ("Marmen's December 6, 2019 Supplemental Section D Response") at Ex. Supp. D-3, PR 114–19. Marmen's Initial Section D Response reviewed by Commerce shows that Marmen recorded amounts in its normal books and records in its home currency of Canadian dollars using an alternative exchange rate. Remand Redetermination **\*1320** at 8–9 (citing Marmen's Initial Section D Response at Exhibit D-3). Citing Marmen's Initial Section D Response at page D-15, for example, Commerce determined that for purchases in U.S. dollars, Marmen reported that its normal books reflected a cost system conversion from U.S. dollar purchases to Canadian dollars at specific conversion rates. Id. at 8–9. Commerce cited Marmen's December 6, 2019 Supplemental D Response at D-17 and D-18 to support its determination that Marmen's auditors periodically adjusted the already converted purchases, and that in preparing Marmen's original 2018 audited financial statements, the auditors had already made adjustments to reflect actual exchange rates during 2018. Id. at 9; see Marmen's December 6, 2019 Supplemental Section D Response at D-17–D-18. Based on its review of these record documents, Commerce determined that Marmen's prior statements and reported calculations established that the exchange gains and losses

were already accounted for in Marmen's costs. Remand Redetermination at 9, 38–46. Thus, Commerce determined that "the record evidence thereby demonstrates that the reported costs, including those of the sections purchased from Marmen Energie were, in fact, already correctly inclusive of exchange rate differences, and it would be inappropriate to adjust them again for those exchange gains and losses." Id. at 11.

Because record evidence, including Marmen's Initial Section D Response with exhibits, Marmen's December 6, 2019 Supplemental Section D Response with exhibits, and Marmen's Second Supplemental Remand Section D Response at Attachment 1, shows that Marmen's auditors already adjusted the reported costs to account for exchange rate differences, the Court concludes that Commerce's determination that another adjustment would be inappropriate is supported by substantial evidence. The Court holds that Commerce did not abuse its discretion by rejecting Marmen's proposed corrective information, recognizing that Commerce has an interest in ensuring finality and increasing the accuracy of the calculated dumping margins. Bosun Tools, 43 CIT at ——, 405 F. Supp. 3d at 1365.

## II. Commerce's Use of the Cohen's *d* Test

In Stupp, the CAFC directed the Court to remand Commerce's use of the Cohen's *d* test for further explanation because the data Commerce used may have violated the assumptions of normality, sufficient observation size, and roughly equal variances. 5 F.4th at 1357–60. Before the CAFC, Commerce argued that concerns of normality and population were misplaced because, unlike sampling data used in determining probability or statistical significance, Commerce's review considered a complete universe of data. Id. at 1359–60. The CAFC expressed concern with Commerce's explanation because it failed to "address the fact that Professor Cohen derived his interpretive cutoffs under the assumption of normality." Id. at 1360.

On remand, Commerce reconsidered the use of the Cohen's *d* test in light of Stupp as this Court directed in Marmen I. See Remand Redetermination at 12–37, 46–50; Marmen I, 45 CIT at ——, 545 F. Supp. 3d at 1320. The standard of review for considering Commerce's differential pricing analysis is reasonableness. Stupp, 5 F.4th at 1353. The CAFC and the U.S. Court of International Trade have held the

steps underlying the differential pricing analysis as applied by Commerce to be reasonable. See e.g., Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662, 670–74 (Fed. Cir. 2019) (discussing zeroing and the 0.8 threshold for the Cohen's *d* test); **\*1321** Apex Frozen Foods Priv. Ltd. v. United States, 40 CIT ——, ——, 144 F. Supp. 3d 1308, 1314–37 (2016) (discussing application of the A-to-T method, the Cohen's *d* test, the meaningful difference analysis, zeroing, and the "mixed comparison methodology" of applying the A-to-A method and the A-to-T method when 33–66% of a respondent's sales pass the Cohen's *d* test), aff'd, 862 F.3d 1337 (Fed. Cir. 2017); Apex Frozen Foods Priv. Ltd. v. United States, 862 F.3d 1322, 1330–34 (Fed. Cir. 2017) (affirming zeroing and the 0.5% *de minimis* threshold in the meaningful difference test); Stupp Corp. v. United States, 47 CIT ——, ——, 619 F.Supp.3d 1314, 1322-28 (2023) (discussing the reasonableness of the Cohen's *d* test as one component of Commerce's differential pricing analysis). However, the CAFC has stated that "there are significant concerns relating to Commerce's application of the Cohen's *d* test ... in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances." Stupp, 5 F.4th at 1357.

The Cohen's *d* test is "a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group." Apex Frozen Foods, 862 F.3d at 1342 n.2. The Cohen's *d* test relies on assumptions that the data groups being compared are normal, have equal variability, and are equally numerous. See Stupp, 5 F.4th at 1357. Applying the Cohen's *d* test to data that do not meet these assumptions can result in "serious flaws in interpreting the resulting parameter." See id. at 1358.

Commerce determined on remand that "the assumptions of normality and roughly equal variances" are not relevant to Commerce's application of the Cohen's *d* test. Remand Redetermination at 18. Commerce explained that its dumping analysis in this case assessed the pricing behavior of Marmen in the entire United States market, stating:

> The U.S. sale price data on which this analysis is based constitute the entire population of sales data and are not a sample of a respondent's sales data (*i.e.*, the data are for

*all* sales in the United States of subject merchandise by a company during the period of investigation or review). The basis for this analysis is the respondent's U.S. sales of the subject merchandise for a given period of time. By definition, these U.S. sales comprise the universe of sales on which the respondent's weighted-average dumping margin depends. The Differential Pricing Analysis examines all sales to determine whether the A-to-A method is the appropriate approach on which to base this calculation. Therefore, in the context of the calculation of the weighted-average dumping margin, the data used are not a sample, but rather constitute the entire population of a respondent's sales of subject merchandise during the period under examination for the calculation of the weighted-average dumping margin.

Id. at 22.

Commerce determined on remand that the statistical criteria, such as the number of observations, a normal distribution, and approximately equal variances, are related to the statistical significance of sampled data and establish the reliability of an estimated parameter based on the sample data. Id. at 23. Commerce explained further that:

However, for the Cohen's *d* test applied in the context of the Differential Pricing Analysis, there is no estimation of the parameters (*i.e.*, mean, standard deviation, and effect size) of the test group or of the comparison group as the calculation of these parameters is based on the **\*1322** complete universe of sale prices to the test and comparison groups. Unlike with a sample of data where the estimated parameters will change with each sample selected from a population, each time these parameters would

be calculated as part of Commerce's Cohen's *d* test, the exact same results would be found because the calculated parameters are the parameters of the entire population and not an estimate of the parameters based on a sample. Accordingly, the means, standard deviations, and Cohen's *d* coefficients calculated are not estimates with confidence levels or sampling errors as would be associated with sampled data, but, rather, are the actual values which describe a company's pricing behavior. Consequently, the statistical significance of the results of the Cohen's *d* test is not relevant in Commerce's application of the differential pricing analysis, which measures practical significance.

Id. at 23–24. Commerce determined, therefore, that:

[i]n Commerce's application of the Cohen's *d* test, such additional analysis is not relevant because the data in both the test group and the comparison group use the full population of sales in each group and are not determined based on controlled random and independent samples of the population. Rather, the results of the Cohen's *d* test are based on the entire population of sale price data for comparable merchandise for the test and comparison groups.

Id. at 26.

The Court concludes that Commerce's use of a population, rather than a sample, in the application of the Cohen's *d* test sufficiently negates the questionable assumptions about thresholds that were raised in ⚑Stupp. Based on Commerce's explanation, this Court concludes that Commerce's application of the Cohen's *d* test to determine whether there was a significant pattern of differences was

reasonable because Commerce applied the Cohen's *d* test to a population rather than a sample. Because Commerce adequately explained how its methodology is reasonable, the Court holds that Commerce's use of the Cohen's *d* test applied as a component of its differential pricing analysis is in accordance with law.

### CONCLUSION

For the foregoing reasons, Commerce's remand results are supported by substantial evidence, are in accordance with law, and comply with the Court's Order, Oct. 22, 2021, ECF No. 51, and are therefore sustained. Judgment will enter accordingly.

**All Citations**

627 F.Supp.3d 1312

### Footnotes

1    Citations to the administrative record reflect public record ("PR") and public remand record ("PRR") document numbers filed in this case, ECF Nos. 46, 75.

2    The Court notes that, although Marmen Energy Co. was not included as a mandatory respondent alongside Marmen, Inc. and Marmen Energie Inc., comments and questionnaire responses were submitted collectively by the three Plaintiffs during Commerce's investigation. The Court herein refers to their assigned weighted-average dumping margins collectively as "Marmen's dumping margin."

3    Exhibit D-3 to Marmen's Initial Section D Response is not included in the record before the Court. Exhibit Supp. D-3 to Marmen's December 6, 2019 Supplemental Section D Response appears to correspond to the information referenced by Commerce in the Remand Redetermination. See Marmen's Utility Scale Wind Towers from Canada: Supplemental Section D Response (Dec. 6, 2019) ("Marmen's December 6, 2019 Supplemental Section D Response") at Ex. Supp. D-3, PR 114–19.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

*Marmen Inc., et. al. v. United States*

**CIT Case No. 20-00169**

**Judgment**

**(Appx29-30)**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MARMEN INC., MARMEN ÉNERGIE INC., and MARMEN ENERGY CO.,** | |
| **Plaintiffs,** | |
| **and** | |
| **WIND TOWER TRADE COALITION,** | |
| **Consolidated Plaintiff,** | **Before: Jennifer Choe-Groves, Judge** |
| **v.** | **Consol. Court No. 20-00169** |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **WIND TOWER TRADE COALITION, MARMEN INC., MARMEN ÉNERGIE INC., and MARMEN ENERGY CO.,** | |
| **Defendant-Intervenors.** | |

## <u>JUDGMENT</u>

This case having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision; now therefore, in conformity with said decision, it is hereby

Consol. Court No. 20-00169                                              Page 2

**ORDERED** that the U.S. Department of Commerce's final determination in

Utility Scale Wind Towers from Canada, 85 Fed. Reg. 40,239 (Dep't of Commerce

July 6, 2020) (final determination of sales at less than fair value and final negative

determination of critical circumstances; 2018–2019), as amended, Final Results of

Redetermination Pursuant to Court, ECF Nos. 61, 62, are sustained and judgment

is entered for Defendant.


                                        /s/ Jennifer Choe-Groves
                                        Jennifer Choe-Groves, Judge


Dated:   March 20, 2023
         New York, New York

**5 U.S.C. § 706(2)(A)**



vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, § 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

#### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

| Sec. | |
|---|---|
| 801. | Congressional review. |
| 802. | Congressional disapproval procedure. |
| 803. | Special rule on statutory, regulatory, and judicial deadlines. |
| 804. | Definitions. |
| 805. | Judicial review. |
| 806. | Applicability; severability. |
| 807. | Exemption for monetary policy. |
| 808. | Effective date of certain rules. |

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of

**19 U.S.C. § 1677b(f)(1)(A)**

or cost values without further investigation if the administering authority has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price or cost values or if those price or cost values were subject to an antidumping order.

**(d) Special rule for certain multinational corporations**

Whenever, in the course of an investigation under this subtitle, the administering authority determines that—

(1) subject merchandise exported to the United States is being produced in facilities which are owned or controlled, directly or indirectly, by a person, firm, or corporation which also owns or controls, directly or indirectly, other facilities for the production of the foreign like product which are located in another country or countries,

(2) subsection (a)(1)(C) applies, and

(3) the normal value of the foreign like product produced in one or more of the facilities outside the exporting country is higher than the normal value of the foreign like product produced in the facilities located in the exporting country,

it shall determine the normal value of the subject merchandise by reference to the normal value at which the foreign like product is sold in substantial quantities from one or more facilities outside the exporting country. The administering authority, in making any determination under this paragraph, shall make adjustments for the difference between the cost of production (including taxes, labor, materials, and overhead) of the foreign like product produced in facilities outside the exporting country and costs of production of the foreign like product produced in facilities in the exporting country, if such differences are demonstrated to its satisfaction. For purposes of this subsection, in determining the normal value of the foreign like product produced in a country outside of the exporting country, the administering authority shall determine its price at the time of exportation from the exporting country and shall make any adjustments required by subsection (a) for the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States by reference to such costs in the exporting country.

**(e) Constructed value**

For purposes of this subtitle, the constructed value of imported merchandise shall be an amount equal to the sum of—

(1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade;

(2)(A) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the

ordinary course of trade, for consumption in the foreign country, or

(B) if actual data are not available with respect to the amounts described in subparagraph (A), then—

(i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

(ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States.

For purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology. For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition that is remitted or refunded upon exportation of the subject merchandise produced from such materials.

**(f) Special rules for calculation of cost of production and for calculation of constructed value**

For purposes of subsections (b) and (e).—[1]

**(1) Costs**

**(A) In general**

Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appro-

---

[1] So in original. The period preceding the dash probably should not appear.

priate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

**(B) Nonrecurring costs**

Costs shall be adjusted appropriately for those nonrecurring costs that benefit current or future production, or both.

**(C) Startup costs**

**(i) In general**

Costs shall be adjusted appropriately for circumstances in which costs incurred during the time period covered by the investigation or review are affected by startup operations.

**(ii) Startup operations**

Adjustments shall be made for startup operations only where—

(I) a producer is using new production facilities or producing a new product that requires substantial additional investment, and

(II) production levels are limited by technical factors associated with the initial phase of commercial production.

For purposes of subclause (II), the initial phase of commercial production ends at the end of the startup period. In determining whether commercial production levels have been achieved, the administering authority shall consider factors unrelated to startup operations that might affect the volume of production processed, such as demand, seasonality, or business cycles.

**(iii) Adjustment for startup operations**

The adjustment for startup operations shall be made by substituting the unit production costs incurred with respect to the merchandise at the end of the startup period for the unit production costs incurred during the startup period. If the startup period extends beyond the period of the investigation or review under this subtitle, the administering authority shall use the most recent cost of production data that it reasonably can obtain, analyze, and verify without delaying the timely completion of the investigation or review. For purposes of this subparagraph, the startup period ends at the point at which the level of commercial production that is characteristic of the merchandise, producer, or industry concerned is achieved.

**(2) Transactions disregarded**

A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.

**(3) Major input rule**

If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).

(June 17, 1930, ch. 497, title VII, § 773, as added Pub. L. 96–39, title I, § 101, July 26, 1979, 93 Stat. 182; amended Pub. L. 98–573, title VI, §§ 615, 620(b), Oct. 30, 1984, 98 Stat. 3036, 3039; Pub. L. 99–514, title XVIII, § 1886(a)(11), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 100–418, title I, §§ 1316(a), 1318, 1319, Aug. 23, 1988, 102 Stat. 1186, 1189; Pub. L. 103–465, title II, § 224, Dec. 8, 1994, 108 Stat. 4878; Pub. L. 114–27, title V, §§ 504(b), (c), 505, June 29, 2015, 129 Stat. 385.)

**Editorial Notes**

**AMENDMENTS**

2015—Subsec. (a)(1)(B)(ii)(III). Pub. L. 114–27, § 504(b), which directed amendment of subcl. (III) by striking out "in such other country.", was executed by striking out "in such other country" after "particular market situation" to reflect the probable intent of Congress.

Subsec. (b)(2)(A). Pub. L. 114–27, § 505(a), added subpar. (A) and struck out former subpar. (A). Prior to amendment, text read as follows: "There are reasonable grounds to believe or suspect that sales of the foreign like product were made at prices that are less than the cost of production of the product, if—

"(i) in an investigation initiated under section 1673a of this title or a review conducted under section 1675 of this title, an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title provides information, based upon observed prices or constructed prices or costs, that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of the product; or

"(ii) in a review conducted under section 1675 of this title involving a specific exporter, the administering authority disregarded some or all of the exporter's sales pursuant to paragraph (1) in the investigation or if a review has been completed, in the most recently completed review."

Subsec. (c)(5). Pub. L. 114–27, § 505(b), added par. (5).

Subsec. (e). Pub. L. 114–27, § 504(c)(2), in concluding provisions, substituted "For purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology.

**19 U.S.C. § 1677f-1(d)(1)(A) and (B)**

**(d) Determination of less than fair value**

**(1) Investigations**

**(A) In general**

In an investigation under part II of this subtitle, the administering authority shall determine whether the subject merchandise is being sold in the United States at less than fair value—

(i) by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or

(ii) by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise.

**(B) Exception**

The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—

(i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

(ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

**(2) Reviews**

In a review under section 1675 of this title, when comparing export prices (or constructed export prices) of individual transactions to the weighted average price of sales of the foreign like product, the administering authority shall limit its averaging of prices to a period not exceeding the calendar month that corresponds most closely to the calendar month of the individual export sale.

**(e) Determination of countervailable subsidy rate**

**(1) General rule**

In determining countervailable subsidy rates under section 1671b(d), 1671d(c), or 1675(a) of this title, the administering authority shall determine an individual countervailable subsidy rate for each known exporter or producer of the subject merchandise.

**(2) Exception**

If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may—

(A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—

(i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or

(ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or

(B) determine a single country-wide subsidy rate to be applied to all exporters and producers.

The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

**(f) Adjustment of antidumping duty in certain proceedings relating to imports from non-market economy countries**

**(1) In general**

If the administering authority determines, with respect to a class or kind of merchandise from a nonmarket economy country for which an antidumping duty is determined using normal value pursuant to section 1677b(c) of this title, that—

(A) pursuant to section 1671(a)(1) of this title, a countervailable subsidy (other than an export subsidy referred to in section 1677a(c)(1)(C) of this title) has been provided with respect to the class or kind of merchandise,

(B) such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period, and

(C) the administering authority can reasonably estimate the extent to which the countervailable subsidy referred to in subparagraph (B), in combination with the use of normal value determined pursuant to section 1677b(c) of this title, has increased the weighted average dumping margin for the class or kind of merchandise,

the administering authority shall, except as provided in paragraph (2), reduce the antidumping duty by the amount of the increase in the weighted average dumping margin estimated by the administering authority under subparagraph (C).

**(2) Maximum reduction in antidumping duty**

The administering authority may not reduce the antidumping duty applicable to a class or kind of merchandise from a nonmarket economy country under this subsection by more than the portion of the countervailing duty rate attributable to a countervailable subsidy that is provided with respect to the class or kind of merchandise and that meets the conditions described in subparagraphs (A), (B), and (C) of paragraph (1).

(June 17, 1930, ch. 497, title VII, § 777A, as added Pub. L. 98–573, title VI, § 620(a), Oct. 30, 1984, 98 Stat. 3039; amended Pub. L. 103–465, title II, §§ 229(a), 269(a), (b)(1), Dec. 8, 1994, 108 Stat. 4889, 4916; Pub. L. 112–99, § 2(a), Mar. 13, 2012, 126 Stat. 265.)

**19 C.F.R. § 351.301(c)**

Customs Service to suspend liquidation of entries of the importer or entries associated with the other interested party and require a cash deposit of estimated duties at the applicable rate if:

(i) The importer or other interested party has not provided to the Secretary or the Customs Service, as appropriate, the certification described under paragraph (a) of this section either as required or upon request for such entries; or

(ii) The importer or other interested party provided a certification in accordance with paragraph (a) of this section for such entries, but the certification contained materially false, fictitious or fraudulent statements or representations, or contained material omissions.

(2) Under paragraph (b)(1)(i) or (ii) of this section, the Secretary may also instruct the Customs Service to assess antidumping or countervailing duties, as the case may be, at the applicable rate.

[86 FR 52383, Sept. 20, 2021]

## Subpart C—Information and Argument

### § 351.301   Time limits for submission of factual information.

(a) *Introduction.* This section sets forth the time limits for submitting factual information, as defined by § 351.102(b)(21). The Department obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. Notwithstanding paragraph (b) of this section, the Secretary may request any person to submit factual information at any time during a proceeding or provide additional opportunities to submit factual information. Section 351.302 sets forth the procedures for requesting an extension of such time limits, and provides that, unless expressly precluded by statute, the Secretary may, for good cause, extend any time limit established in the Department's regulations. Section 351.303 contains the procedural rules regarding filing (including procedures for filing on non-business days), format, translation, service, and certification of documents. In the Secretary's written request to an interested party for a response to a questionnaire or for other factual information, the Secretary will specify the following: The time limit for the response; the information to be provided; the form and manner in which the interested party must submit the information; and that failure to submit the requested information in the requested form and manner by the date specified may result in use of the facts available under section 776 of the Act and § 351.308.

(b) *Submission of factual information.* Every submission of factual information must be accompanied by a written explanation identifying the subsection of § 351.102(b)(21) under which the information is being submitted.

(1) If an interested party states that the information is submitted under § 351.102(b)(21)(v), the party must explain why the information does not satisfy the definitions described in § 351.102(b)(21)(i)–(iv).

(2) If the factual information is being submitted to rebut, clarify, or correct factual information on the record, the submitter must provide a written explanation identifying the information which is already on the record that the factual information seeks to rebut, clarify, or correct, including the name of the interested party that submitted the information and the date on which the information was submitted.

(c) *Time limits.* The type of factual information determines the time limit for submission to the Department.

(1) *Factual information submitted in response to questionnaires.* During a proceeding, the Secretary may issue to any person questionnaires, which includes both initial and supplemental questionnaires. The Secretary will not consider or retain in the official record of the proceeding unsolicited questionnaire responses, except as provided under § 351.204(d)(2), or untimely filed questionnaire responses. The Secretary will reject any untimely filed or unsolicited questionnaire response and provide, to the extent practicable, written notice stating the reasons for rejection (see § 351.302(d)).

(i) Initial questionnaire responses are due 30 days from the date of receipt of such questionnaire. The time limit for

response to individual sections of the questionnaire, if the Secretary requests a separate response to such sections, may be less than the 30 days allotted for response to the full questionnaire. In general, the date of receipt will be considered to be seven days from the date on which the initial questionnaire was transmitted.

(ii) Supplemental questionnaire responses are due on the date specified by the Secretary.

(iii) A notification by an interested party, under section 782(c)(1) of the Act, of difficulties in submitting information in response to a questionnaire issued by the Secretary is to be submitted in writing within 14 days after the date of the questionnaire or, if the questionnaire is due in 14 days or less, within the time specified by the Secretary.

(iv) A respondent interested party may request in writing that the Secretary conduct a questionnaire presentation. The Secretary may conduct a questionnaire presentation if the Secretary notifies the government of the affected country and that government does not object.

(v) *Factual information submitted to rebut, clarify, or correct questionnaire responses.* Within 14 days after an initial questionnaire response and within 10 days after a supplemental questionnaire response has been filed with the Department, an interested party other than the original submitter is permitted one opportunity to submit factual information to rebut, clarify, or correct factual information contained in the questionnaire response. Within seven days of the filing of such rebuttal, clarification, or correction to a questionnaire response, the original submitter of the questionnaire response is permitted one opportunity to submit factual information to rebut, clarify, or correct factual information submitted in the interested party's rebuttal, clarification or correction. The Secretary will reject any untimely filed rebuttal, clarification, or correction submission and provide, to the extent practicable, written notice stating the reasons for rejection (see § 351.302). If insufficient time remains before the due date for the final determination or final results of review, the Secretary

may specify shorter deadlines under this section.

(2) *Factual information submitted in support of allegations.* Factual information submitted in support of allegations must be accompanied by a summary, not to exceed five pages, of the allegation and supporting data.

(i) *Market viability and the basis for determining normal value.* Allegations regarding market viability in an antidumping investigation or administrative review, including the exceptions in § 351.404(c)(2), are due, with all supporting factual information, 10 days after the respondent interested party files the response to the relevant section of the questionnaire, unless the Secretary alters this time limit.

(ii) *Sales at prices below the cost of production.* Allegations of sales at prices below the cost of production made by the petitioner or other domestic interested party are due within:

(A) In an antidumping investigation, on a country-wide basis, 20 days after the date on which the initial questionnaire was issued to any person, unless the Secretary alters this time limit; or, on a company-specific basis, 20 days after a respondent interested party files the response to the relevant section of the questionnaire, unless the relevant questionnaire response is, in the Secretary's view, incomplete, in which case the Secretary will determine the time limit;

(B) In an administrative review, new shipper review, or changed circumstances review, on a company-specific basis, 20 days after a respondent interested party files the response to the relevant section of the questionnaire, unless the relevant questionnaire response is, in the Secretary's view, incomplete, in which case the Secretary will determine the time limit; or

(C) In an expedited antidumping review, on a company-specific basis, 10 days after the date of publication of the notice of initiation of the review.

(iii) *Purchases of major inputs from an affiliated party at prices below the affiliated party's cost of production.* An allegation of purchases of major inputs from an affiliated party at prices below the affiliated party's cost of production

295

made by the petitioner or other domestic interested party is due within 20 days after a respondent interested party files the response to the relevant section of the questionnaire, unless the relevant questionnaire response is, in the Secretary's view, incomplete, in which case the Secretary will determine the time limits.

(iv) *Countervailable subsidy; upstream subsidy.* A countervailable subsidy allegation made by the petitioner or other domestic interested party is due no later than:

(A) In a countervailing duty investigation, 40 days before the scheduled date of the preliminary determination, unless the Secretary extends this time limit for good cause; or

(B) In an administrative review, new shipper review, or changed circumstances review, 20 days after all responses to the initial questionnaire are filed with the Department, unless the Secretary alters this time limit.

(C) Exception for upstream subsidy allegation in an investigation. In a countervailing duty investigation, an allegation of upstream subsidies made by the petitioner or other domestic interested party is due no later than 60 days after the date of the preliminary determination.

(v) *Other allegations.* An interested party may submit factual information in support of other allegations not specified in paragraphs (c)(2)(i)–(iv) of this section. Upon receipt of factual information under this subsection, the Secretary will issue a memorandum accepting or rejecting the information and, to the extent practicable, will provide written notice stating the reasons for rejection. If the Secretary accepts the information, the Secretary will issue a schedule providing deadlines for submission of factual information to rebut, clarify or correct the factual information.

(vi) *Rebuttal, clarification, or correction of factual information submitted in support of allegations.* An interested party is permitted one opportunity to submit factual information to rebut, clarify, or correct factual information submitted in support of allegations 10 days after the date such factual information is served on an interested party.

(3) *Factual information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2).*

(i) *Antidumping or countervailing duty investigations.* All submissions of factual information to value factors of production under § 351.408(c) in an antidumping investigation, or to measure the adequacy of remuneration under § 351.511(a)(2) in a countervailing duty investigation, are due no later than 30 days before the scheduled date of the preliminary determination;

(ii) *Administrative review, new shipper review, or changed circumstances review.* All submissions of factual information to value factors under § 351.408(c), or to measure the adequacy of remuneration under § 351.511(a)(2), are due no later than 30 days before the scheduled date of the preliminary results of review; and

(iii) *Expedited antidumping review.* All submissions of factual information to value factors under § 351.408(c) are due on a date specified by the Secretary.

(iv) *Rebuttal, clarification, or correction of factual information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2).* An interested party is permitted one opportunity to submit publicly available information to rebut, clarify, or correct such factual information submitted pursuant to § 351.408(c) or § 351.511(a)(2) 10 days after the date such factual information is served on the interested party. An interested party may not submit additional, previously absent-from-the-record alternative surrogate value information under this subsection. Additionally, all factual information submitted under this subsection must be accompanied by a written explanation identifying what information already on the record of the ongoing proceeding the factual information is rebutting, clarifying, or correcting. Information submitted to rebut, clarify, or correct factual information submitted pursuant to § 351.408(c) will not be used to value factors under § 351.408(c).

(4) *Factual information placed on the record of the proceeding by the Department.* The Department may place factual information on the record of the proceeding at any time. An interested

party is permitted one opportunity to submit factual information to rebut, clarify, or correct factual information placed on the record of the proceeding by the Department by a date specified by the Secretary.

(5) *Factual information not directly responsive to or relating to paragraphs (c)(1)–(4) of this section).* Paragraph (c)(5) applies to factual information other than that described in § 351.102(b)(21)(i)–(iv). The Secretary will reject information filed under paragraph (c)(5) that satisfies the definition of information described in § 351.102(b)(21)(i)–(iv) and that was not filed within the deadlines specified above. All submissions of factual information under this subsection are required to clearly explain why the information contained therein does not meet the definition of factual information described in § 351.102(b)(21)(i)–(iv), and must provide a detailed narrative of exactly what information is contained in the submission and why it should be considered. The deadline for filing such information will be 30 days before the scheduled date of the preliminary determination in an investigation, or 14 days before verification, whichever is earlier, and 30 days before the scheduled date of the preliminary results in an administrative review, or 14 days before verification, whichever is earlier.

(i) Upon receipt of factual information under this subsection, the Secretary will issue a memorandum accepting or rejecting the information and, to the extent practicable, will provide written notice stating the reasons for rejection.

(ii) If the Secretary accepts the information, the Secretary will issue a schedule providing deadlines for submission of factual information to rebut, clarify or correct the factual information.

[78 FR 21254, Apr. 10, 2013]

**§ 351.302  Extension of time limits; return of untimely filed or unsolicited material.**

(a) *Introduction.* This section sets forth the procedures for requesting an extension of a time limit. In addition, this section explains that certain untimely filed or unsolicited material will be rejected together with an explanation of the reasons for the rejection of such material.

(b) *Extension of time limits.* Unless expressly precluded by statute, the Secretary may, for good cause, extend any time limit established by this part.

(c) *Requests for extension of specific time limit.* Before the applicable time limit established under this part expires, a party may request an extension pursuant to paragraph (b) of this section. An untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists. The request must be in writing, in a separate, stand-alone submission, filed consistent with § 351.303, and state the reasons for the request. An extension granted to a party must be approved in writing.

(1) An extension request will be considered untimely if it is received after the applicable time limit expires or as otherwise specified by the Secretary.

(2) An extraordinary circumstance is an unexpected event that:

(i) Could not have been prevented if reasonable measures had been taken, and

(ii) Precludes a party or its representative from timely filing an extension request through all reasonable means.

(d) *Rejection of untimely filed or unsolicited material.* (1) Unless the Secretary extends a time limit under paragraph (b) of this section, the Secretary will not consider or retain in the official record of the proceeding:

(i) Untimely filed factual information, written argument, or other material that the Secretary rejects, except as provided under § 351.104(a)(2); or

(ii) Unsolicited questionnaire responses, except as provided under § 351.204(d)(2).

(2) The Secretary will reject such information, argument, or other material, or unsolicited questionnaire response with, to the extent practicable, written notice stating the reasons for rejection.

[62 FR 27379, May 19, 1997, as amended at 76 FR 39275, July 6, 2011; 78 FR 57795, Sept. 20, 2013]

**19 C.F.R. § 351.414(b)(1) and (c)(1)**

product by the producer or exporter. Where this is not possible, the Secretary may use sales of different or broader product lines, sales by other companies, or any other reasonable basis.

(e) *Amount of adjustment.* The Secretary normally will calculate the amount of a level of trade adjustment by:

(1) Calculating the weighted-averages of the prices of sales at the two levels of trade identified in paragraph (d), after making any other adjustments to those prices appropriate under section 773(a)(6) of the Act and this subpart;

(2) Calculating the average of the percentage differences between those weighted-average prices; and

(3) Applying the percentage difference to normal value, where it is at a different level of trade from the export price or constructed export price (whichever is applicable), after making any other adjustments to normal value appropriate under section 773(a)(6) of the Act and this subpart.

(f) *Constructed export price offset*—(1) *In general.* The Secretary will grant a constructed export price offset only where:

(i) Normal value is compared to constructed export price;

(ii) Normal value is determined at a more advanced level of trade than the level of trade of the constructed export price; and

(iii) Despite the fact that a person has cooperated to the best of its ability, the data available do not provide an appropriate basis to determine under paragraph (d) of this section whether the difference in level of trade affects price comparability.

(2) *Amount of the offset.* The amount of the constructed export price offset will be the amount of indirect selling expenses included in normal value, up to the amount of indirect selling expenses deducted in determining constructed export price. In making the constructed export price offset, "indirect selling expenses" means selling expenses, other than direct selling expenses or assumed selling expenses (*see* §351.410), that the seller would incur regardless of whether particular sales were made, but that reasonably may be

attributed, in whole or in part, to such sales.

(3) *Where data permit determination of affect on price comparability.* Where available data permit the Secretary to determine under paragraph (d) of this section whether the difference in level of trade affects price comparability, the Secretary will not grant a constructed export price offset. In such cases, if the Secretary determines that price comparability has been affected, the Secretary will make a level of trade adjustment. If the Secretary determines that price comparability has not been affected, the Secretary will not grant either a level of trade adjustment or a constructed export price offset.

§351.413 **Disregarding insignificant adjustments.**

Ordinarily, under section 777A(a)(2) of the Act, an "insignificant adjustment" is any individual adjustment having an *ad valorem* effect of less than 0.33 percent, or any group of adjustments having an *ad valorem* effect of less than 1.0 percent, of the export price, constructed export price, or normal value, as the case may be. Groups of adjustments are adjustments for differences in circumstances of sale under §351.410, adjustments for differences in the physical characteristics of the merchandise under §351.411, and adjustments for differences in the levels of trade under §351.412.

§351.414 **Comparison of normal value with export price (constructed export price).**

(a) *Introduction.* This section explains when and how the Secretary will average prices in making comparisons of export price or constructed export price with normal value. (*See* section 777A(d) of the Act.)

(b) *Description of methods of comparison*—(1) *Average-to-average method.* The "average-to-average" method involves a comparison of the weighted average of the normal values with the weighted average of the export prices (and constructed export prices) for comparable merchandise.

(2) *Transaction-to-transaction method.* The "transaction-to-transaction" method involves a comparison of the

321

normal values of individual transactions with the export prices (or constructed export prices) of individual transactions for comparable merchandise.

(3) *Average-to-transaction method.* The "average-to-transaction" method involves a comparison of the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise.

(c) *Choice of method.* (1) In an investigation or review, the Secretary will use the average-to-average method unless the Secretary determines another method is appropriate in a particular case.

(2) The Secretary will use the transaction-to-transaction method only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made.

(d) *Application of the average-to-average method*—(1) *In general.* In applying the average-to-average method, the Secretary will identify those sales of the subject merchandise to the United States that are comparable, and will include such sales in an "averaging group." The Secretary will calculate a weighted average of the export prices and the constructed export prices of the sales included in the averaging group, and will compare this weighted average to the weighted average of the normal values of such sales.

(2) *Identification of the averaging group.* An averaging group will consist of subject merchandise that is identical or virtually identical in all physical characteristics and that is sold to the United States at the same level of trade. In identifying sales to be included in an averaging group, the Secretary also will take into account, where appropriate, the region of the United States in which the merchandise is sold, and such other factors as the Secretary considers relevant.

(3) *Time period over which weighted average is calculated.* When applying the average-to-average method in an investigation, the Secretary normally will calculate weighted averages for the entire period of investigation. However, when normal values, export prices, or

constructed export prices differ significantly over the course of the period of investigation, the Secretary may calculate weighted averages for such shorter period as the Secretary deems appropriate. When applying the average-to-average method in a review, the Secretary normally will calculate weighted averages on a monthly basis and compare the weighted-average monthly export price or constructed export price to the weighted-average normal value for the contemporaneous month.

(e) *Application of the average-to-transaction method*—In applying the average-to-transaction method in a review, when normal value is based on the weighted average of sales of the foreign like product, the Secretary will limit the averaging of such prices to sales incurred during the contemporaneous month.

(f) *Contemporaneous Month.* Normally, the Secretary will select as the contemporaneous month the first of the following months which applies:

(1) The month during which the particular U.S. sales under consideration were made;

(2) If there are no sales of the foreign like product during this month, the most recent of the three months prior to the month of the U.S. sales in which there was a sale of the foreign like product.

(3) If there are no sales of the foreign like product during any of these months, the earlier of the two months following the month of the U.S. sales in which there was a sale of the foreign like product.

[77 FR 8114, Feb. 14, 2012]

## § 351.415  Conversion of currency.

(a) *In general.* In an antidumping proceeding, the Secretary will convert foreign currencies into United States dollars using the rate of exchange on the date of sale of the subject merchandise.

(b) *Exception.* If the Secretary establishes that a currency transaction on forward markets is directly linked to an export sale under consideration, the Secretary will use the exchange rate specified with respect to such foreign currency in the forward sale agreement to convert the foreign currency.

(Form 19)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## CAFC Court No. 2023-1877
## <u>Marmen Inc. v. US</u>

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

    ☑    the filing has been prepared using a proportionally-spaced typeface and includes 12,783 words.

    ☐    the filing has been prepared using a monospaced typeface and includes _____ lines of text.

    ☐    the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: July 10, 2023        Signature:    <u>/s/ Jay C. Campbell</u>

                                  Name:        <u>Jay C. Campbell</u>

# CERTIFICATE OF SERVICE

### Marmen Inc. v. US
### CAFC Court No. 2023-1877

I hereby certify that on July 10, 2023 the foregoing document filed on behalf of Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. was served by operation of the Court's electronic filing system.


Date: June 10, 2023                          /s/ Jay C. Campbell
                                             Jay C. Campbell
                                             WHITE & CASE LLP
                                             701 Thirteenth Street, NW
                                             Washington, DC 20005
                                             (202) 626-3600