NON-CONFIDENTIAL VERSION

2023-1877

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

MARMEN INC., MARMEN ENERGIE INC., MARMEN ENERGY CO.,

Plaintiffs-Appellants

v.

UNITED STATES, WIND TOWER TRADE COALITION,

Defendants-Appellees

---

Appeal from the United States Court of International
Trade in Consol. Case No. 1:20-CV-00169
Judge Jennifer Choe-Groves

---

## RESPONSE BRIEF OF DEFENDANT-APPELLEE
## WIND TOWER TRADE COALITION

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
202-719-7000

*Counsel to Wind Tower Trade
Coalition*

Dated: January 8, 2024

1

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1877

**Short Case Caption** Marmen Inc. v. United States

**Filing Party/Entity** Wind Tower Trade Coalition - Defendant-Appellee

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/25/2023

Signature: /s/ Alan H. Price

Name: Alan H. Price

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Wind Tower Trade Coalition | | Arcosa Wind Towers, Inc. is wholly owned by Arcosa, Inc., a publicly owned company |
| | | Broadwind Towers, Inc. is wholly owned by Broadwind Energy, Inc., a publicly traded company |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable               ☐    Additional pages attached

| | | |
|---|---|---|
| Daniel B. Pickard | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable               ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..............................................................................1

II.    STATEMENT OF RELATED CASES...........................................1

III.   STATEMENT OF THE ISSUES ...................................................2

IV.  STATEMENT OF THE CASE ......................................................3

      A.    Marmen's Reported Costs ...................................................4

      B.    Commere's Treatment of Marmen's Revised Cost Reconciliation.....................................................................9

      C.    Commerce's Differential Pricing Analysis .........................14

V.    SUMMARY OF ARGUMENT....................................................20

VI.  ARGUMENT...............................................................................22

      A.    Commerce's Adjustment of Marmen's Steel Plate Costs Should Be Affirmed ..............................................22

      B.    Commerce's Treatment of Marmen's Reconciling Item Should Be Affirmed .............................................36

      C.    Commerce's Use of the Cohen's *d* Coefficient as part of its Differential Pricing Analysis Should Be Affirmed..............................44

VII. CONCLUSION............................................................................53

## **CONFIDENTIAL MATERIAL OMITTED**

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted from pages 28 identifies certain of Marmen's CONNUMs, specific cost differentials between those CONNUMs, specific characteristics of those CONNUMs, and describes the number and percentage of total CONNUMs that they comprise. The confidential information omitted from pages 31-32 identifies the percentage of CONNUM weight attributable to internal, customer-provided components, provides a specific range for input plate costs, and describes certain plate. The information omitted from page 33 specifies the variance in Marmen's input plate costs. The information omitted from page 35 describes an aspect of Marmen's plate purchasing and wind tower sales agreements. The information omitted from pages 38, 40 and 41 identifies specific currency exchange rates. The information omitted from page 42 identifies or otherwise describes specific currency exchange rates, identifies specific values for plate purchases, identifies dates applicable to such purchases, and identifies certain information provided in Marmen's cost spreadsheets. The information omitted from pages 43 and 44 identifies specific currency exchange rates, describes the nature of an auditor's adjustment, and provides specific values related to that adjustment.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aristocraft of Am., LLC v. United States*,
    269 F. Supp. 3d 1316 (Ct. Int'l Trade 2017) ...............................................24, 25

*Consol. Edison Co. of New York v. NLRB*,
    305 U.S. 197 (1938)...........................................................................................28, 31

*Downhole Pipe & Equip., L.P. v. United States*,
    776 F.3d 1369 (Fed. Cir. 2015) ...........................................................................31

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)..............................................................................................24

*Marmen Inc. v. United States*,
    545 F. Supp. 3d 3015 (Ct. Int'l Trade 2021) .......................................................3

*Marmen Inc. v. United States*,
    627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023) .......................................................4

*Mid Continent Steel & Wire, Inc. v. United States*,
    940 F.3d 662 (Fed. Cir. 2019) ..............................................................................28

*Nexteel Co. v. United States*,
    355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) .......................................................25

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ............................................................................28

*Pastificio Lucio Garofalo, S.p.A. v. United States*,
    783 F. Supp. 2d 1230 (Ct Int'l Trade 2011) .......................................................28

*Siderca S.A.I.C. v. United States*,
    391 F. Supp. 2d 1353 (Ct Int'l Trade 2005) .......................................................28

*Stupp Corp. v. United States*,
  5 F.4th 1341 (Fed. Cir. 2021) ............................................. 17, 18, 19, 21, 50, 51

*Stupp Corp. v. United States*,
  619 F.Supp.3d 1314 (Ct Int'l Trade 2023) ......................................15, 16, 45, 51

*Thai Plastic Bags Indus. Co. v. United States*,
  746 F.3d 1358 (Fed. Cir. 2014) .........................................................................25

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*,
  975 F.2d 807 (Fed. Cir. 1992) ...........................................................................31

**Statutes**

19 U.S.C §§ 1673d(a)(4) & 1673b(b)(3) ................................................................43

19 U.S.C. §§ 1677b(a)(4), 1677b(a)(6)(C)(ii), 1677b(e), 1677b(f)(1) ...............9, 21

19 U.S.C. §§ 1677b(a)(4) & 1677b(e) ....................................................................4

19 U.S.C. § 1677b(f)(1) ...............................................................................4, 5, 21, 22

19 U.S.C. § 1677f-1(d) .............................................................................................4

19 U.S.C. § 1677f-1(d)(1)(A)(i) .............................................................................14

19 U.S.C. § 1677f-1(d)(1)(B) ...............................................................14, 16, 49, 50

Tariff Act of 1930 ..................................................................................................43

**Regulations**

19 C.F.R. § 351.411 ............................................................................................4, 9

**Administrative Materials**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy*,
  85 Fed. Reg. 3,026 (Dep't Commerce Jan. 17, 2020) ........................................24

*Certain Cut-to-length Carbon-Quality Steel Plate Products from the
  Republic of Korea*,
  81 Fed. Reg. 62,712 (Dep't Commerce Sept. 12, 2016) ......................................5

*Stainless Steel Bar from the United Kingdom*,
    72 Fed. Reg. 43,598 (Dep't Commerce Aug. 6, 2007)....................................5, 6

*Welded Line Pipe from the Republic of Korea*,
    80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015)........................................5

## Other Authorities

Uruguay Round Agreements Act, H.R. Doc. No. 103-316, *reprinted
    in* 1994 U.S.C.C.A.N. 4040 ...............................................................................49

Fed. Cir. R. 28(b) ...............................................................................................2, 20

## I.    <u>INTRODUCTION</u>

On behalf of Defendant-Appellee the Wind Tower Trade Coalition ("WTTC"), we respectfully submit this response to the July 10, 2023 opening brief of Plaintiffs-Appellants Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively "Marmen"), and the August 31, 2023 corrected *amicus curiae* brief of the Government of Canada, Canfor Corporation; Canadian Forest Products, Ltd.; Canfor Wood Products Marketing, Ltd.; Resolute FP Canada Inc.; Tolko Industries Ltd.; Tolko Marketing and Sales Ltd.; and West Fraser Mills Ltd. (collectively "*amici*"). *See* Brief of Pl.-Appellants (July 10, 2023), ECF No. 11 ("Appellants' Br."); *Amici*'s Corrected Brief (Aug. 31, 2023), ECF No. 33 ("*Amici*'s Br.").

## II.    <u>STATEMENT OF RELATED CASES</u>

Like Marmen, WTTC is unaware of any appeals in or from the same civil action or proceeding that have previously been before this Court or any other appellate court. Likewise, WTTC is unaware of any action pending in the U.S. Court of International Trade ("CIT") that stands to be directly affected by the outcome of this appeal.

1

## III.   **STATEMENT OF THE ISSUES**[1]

1. Whether the U.S. Department of Commerce ("Commerce") appropriately adjusted Marmen's reported input costs for steel plate used to produce wind towers, where the reported per-ton plate costs for similar models of wind towers varied significantly in ways not traceable to the physical nature of those goods?

2. Whether Commerce reasonably declined to accord Marmen's preferred treatment to a line item included in the company's amended cost reconciliation, where the record indicated that the line item unnecessarily and inappropriately offset an auditor's adjustment for foreign exchange gains and losses, and where the record did not support the calculated amount of the item?

3. Whether Commerce reasonably applied the Cohen's $d$ coefficient to fulfill Congress's statutory mandate in assessing whether Marmen's U.S. prices reflected significant differences among purchasers, regions, or time periods, where the agency explained the validity of that coefficient as applied to entire populations of data, and the conservative nature of the test as so applied?

---

[1]    WTTC agrees with Marmen's jurisdictional statement, and therefore does not provide a separate jurisdictional statement, consistent with Fed. Cir. R. 28(b).

## IV.   STATEMENT OF THE CASE

This appeal arises from Commerce's final determination in an antidumping duty ("AD") investigation into utility-scale wind towers from Canada. *See, e.g.,* Appx0006. Commerce initiated the investigation on August 5, 2019. Appx0007. Commerce selected Marmen as its mandatory respondent, and ultimately calculated a final antidumping duty margin of 4.94%. *Id.* Marmen and the WTTC each appealed aspects of Commerce's final determination. Appx0006. The CIT upheld Commerce's averaging of certain input costs that Marmen reported, but remanded for the agency to (1) accept certain cost reconciliation data that Commerce had previously rejected from the record and (2) reconsider its differential pricing analysis. Appx0011; *see also* Appx0021 - Appx0022. The CIT's determination was published as *Marmen Inc. v. United States*, 545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021). *See* Appx0001.

On remand, Commerce included the revised cost reconciliation data in the record, but found that it reflected an unnecessary, duplicative reconciling item. Appx0024 - Appx0026. The agency therefore made no changes to its margin calculations based on the newly accepted data. *Id.* Commerce also further explained its reliance on the Cohen's *d* coefficient in performing its differential pricing analysis. Appx0026 - Appx0028. The CIT upheld Commerce's remand results in

3

their entirety. Appx0028. The CIT's determination was published as *Marmen Inc. v. United States*, 627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023). *See* Appx0021.

Marmen subsequently lodged this appeal to renew the challenges that it raised at the CIT.

## A. <u>Marmen's Reported Costs</u>

Commerce determines antidumping duty margins by comparing the prices at which foreign companies sell subject goods in their home market against the prices that they charge in the United States, so long as the home market prices are above the goods' cost of production. *See, e.g.*, 19 U.S.C. § 1677f-1(d); *see also id.* §§ 1677a, 1677b(a), 1677b(b). Commerce normally relies on the costs recorded in a company's normal books and records to determine the cost of production for goods sold in the home market. *Id.* § 1677b(f)(1). Commerce also normally relies on such costs in adjusting its calculations to account for physical differences in the merchandise sold in the home and U.S. markets (known as a "DIFMER adjustment") and, where necessary, to calculate constructed value.[2] *See, e.g., id.* §§ 1677b(a)(4), 1677b(a)(6)(C)(ii), 1677b(e); 19 C.F.R. § 351.411. However, Commerce will

---

[2]    Where there are no sales of subject goods in the home market, or the sales in the home market are all below-cost or otherwise unsuitable for comparison with U.S. prices, Commerce will construct a value for comparison with U.S. prices, based on the costs to produce subject goods and other factors. 19 U.S.C. §§ 1677b(a)(4) & 1677b(e).

deviate from the costs recorded in a company's normal books and records if they do not reasonably reflect the costs of producing the merchandise at issue. *See, e.g.*, 19 U.S.C. § 1677b(f)(1).

One situation in which Commerce will deviate from a company's books and records is where the respondent reports significantly differing production costs for similar goods, and the reported costs vary in a way not explained by the goods' physical characteristics. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Cut-to-length Carbon-Quality Steel Plate Products from the Republic of Korea*, 81 Fed. Reg. 62,712 (Dep't Commerce Sept. 12, 2016) (final results of antidumping duty admin. review and new shipper review; 2014-2015) at 4-6. For example, a company might produce goods using multiple processes, or using inputs purchased at different times. In such cases, the costs to produce the goods could vary with the processes used or changing input prices, rather than arising solely from the output goods' physical characteristics. *See, e.g.*, *id.* at 5; *see also* Issues and Decision Memorandum accompanying *Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) (final deter. of sales at less than fair value) at 38-40 ("*Korean Pipe* IDM") (goods produced using differing processes); Issues and Decision Memorandum accompanying *Stainless Steel Bar from the United Kingdom*, 72 Fed. Reg. 43,598 (Dep't Commerce Aug. 6, 2007) (final results

of antidumping duty admin. review) at 3-7 ("*UK Bar* IDM") (goods produced using inputs that had undergone price swings).

During the investigation into Canadian wind towers, Marmen submitted information on its costs of production, including information on the per-ton cost of the steel plate that Marmen used to produce wind towers for the home and U.S. markets. Appx2462, Appx2467 - Appx2468. Commerce relied, in general, on Marmen's reported cost information in making its preliminary calculations. Appx2467 - Appx2468. However, Commerce weight-averaged Marmen's reported per-ton costs for steel plate across all product models, or "CONNUMs." *Id.*[3] Commerce explained that it averaged these costs because "Marmen reported steel plate cost differences between CONNUMs that appear to be unrelated to the physical characteristics of the products," and because Commerce had found the differences significant. Appx2469, Appx2472.

---

[3]    CONNUMs, or "control numbers," refer to codes that identify products by specific physical characteristics. After determining which physical characteristics most impact the cost and commercial nature of relevant goods, Commerce requires respondents in its investigations to code the goods sold to the home and U.S. market in accordance with these characteristics, and to report sales and cost data on a CONNUM-specific basis. For example, the CONNUM coding system in this investigation identified products based on whether they consisted of complete towers or tower sections, and then by product weight, product height, number of sections, type of paint coating, metallization, inclusion of bus bars, type of power cables, etc. *See, e.g.*, Appx0806 - Appx0814.

6

In its case brief, Marmen argued that Commerce had erred in preliminarily weight-averaging its input plate costs across all product models. Appx3759 - Appx3767. Marmen argued that the per-ton plate costs for its most similar U.S. and home market products were not significantly different, and that, in finding that there were similar products for which plate costs varied significantly, Commerce had misidentified certain U.S. products as home market products. Appx3761 - Appx3763. Marmen further argued that, where there were significant differences in per-ton plate costs across product types, these differences were related to the physical characteristics of the goods, and particularly to the thickness of plate used to produce the bottom-most sections of the towers that Marmen sold to a Canadian customer, Vestas. Appx3763 - Appx3766.

In its final determination, Commerce excluded the CONNUM relating to Marmen's bottom-most tower sections from its cost-averaging. Appx3857 - Appx3858. Commerce also corrected its preliminary misidentification of certain U.S. products as home market products. Appx3873 - Appx3874, Appx3878. However, Commerce continued to find that there were significant differences in per-ton plate costs that were not attributable to the physical characteristics of the output goods, and it weight-averaged Marmen's reported per-ton costs for steel plate across product models other than the bottom-most tower section. Appx3874.

7

Commerce explained that Marmen's steel suppliers generally did not charge different per-ton prices for steel plate of different grades, thickness, widths, or lengths. Appx3858; Appx3874. The only exception was plate at least 50.8mm thick. Appx3857 - Appx3858; Appx3874. Marmen used steel plate of this thickness for only one CONNUM, which Commerce excluded from its smoothing calculations. Appx3857 - Appx3858; Appx3874. With respect to the steel plate used to produce other CONNUMs, the record indicated that Marmen's reported per-unit cost differences were related to the timing of tower production. Appx3858; Appx3874. Commerce also noted that, contrary to one of Marmen's claims, differences in plate costs across CONNUMs did not appear to be attributable to the weight of internal components included in certain CONNUMs, given the extremely small weight of such internal components. Appx3858; Appx3874.

Marmen appealed this issue to the CIT; the court affirmed Commerce's decision to smooth plate costs. Appx0008 - Appx0011. The CIT found that Commerce reasonably interpreted the record, inclusive of Marmen's questionnaire response and the company's supplier agreements, as indicating that plate costs did not vary with thickness, length, etc. Appx0011; *see also* Appx3718 - Appx3735. The CIT also found that the record supported Commerce's conclusion that the distinct costs reflected the timing of production and sale, rather than physical characteristics.

8

Appx0011. Finally, the lower court found that Commerce's decision to adjust Marmen's reported costs was consistent with its past practice, contrary to Marmen's assertions. Appx0010 - Appx0011.

### B. Commerce's Treatment of Marmen's Revised Cost Reconciliation

In antidumping duty investigations, Commerce requires respondent companies to reconcile the sales and cost data that they report for subject merchandise with the companies' financial statements and other standard accounting records. Appx0804 - Appx0805; Appx0821 - Appx0822; Appx0828 - Appx0832; Appx0836 - Appx0839. This enables Commerce to analyze the accuracy of the reported data and determine the degree to which those data depart from the respondents' books and records, which form the normal basis for calculating the costs used in the antidumping calculations. *See* 19 U.S.C. §§ 1677b(a)(4), 1677b(a)(6)(C)(ii), 1677b(e), 1677b(f)(1); 19 C.F.R. § 351.411.

Marmen initially submitted cost reconciliation data in response to Section D of the agency's standard questionnaire. Appx0836 - Appx0839 and Appx0854 - Appx0942. Marmen's auditors subsequently revised the company's financial statements, and Commerce requested that Marmen include an updated reconciliation in its second supplemental Section D questionnaire response. *See* Appx3604 - Appx3605 and Appx3640 - Appx3695. However, Marmen did not simply reconcile

9

its previously reported costs to its amended financial statements, as requested. Marmen included an entirely new reconciling line and related data that Marmen described as "unrelated to the financial statement amendments." Appx3604 - Appx3605. Commerce rejected the new reconciling line and related data as unsolicited and untimely new factual information, and required Marmen to resubmit its second supplemental Section D questionnaire response with this new information removed. Appx3706 - Appx3707.

In its case brief, Marmen argued that Commerce should have accepted the new information. Appx3768 - Appx3775. Marmen stated that in the course of preparing its second supplemental Section D questionnaire response, it realized that it had not previously adjusted certain U.S. dollar ("USD") values recorded in its general ledger at a 1:1 exchange rate with Canadian dollars ("CAD") to reflect the exchange rate used to convert USD purchases to CAD in its cost reporting. Appx3769 - Appx3770; Appx3773 - Appx3774. Marmen argued that the new reconciling line item and data presented in its supplemental questionnaire response should not be considered new factual information, but rather a correction to prior-submitted data. Appx3771 - Appx3772.

After Commerce continued to reject the new information, Marmen challenged that rejection at the CIT. Appx0011 - Appx0013. The court found that Commerce

10

"abused its discretion by failing to consider Marmen's corrective submission." Appx0013. On remand, Commerce requested that Marmen refile the rejected portions of its original second supplemental Section D response, and Marmen duly submitted the relevant portions for the remand record. *See, e.g.*, Appx4819; *see also* Appx3899 - Appx3913.

On remand, Commerce noted that the resubmitted data included "an additional reconciling item related to converting purchases of sections from Marmen Énergie from U.S. dollars (USD) to Canadian dollars (CAD)." Appx4820. The agency concluded that there was "insufficient record evidence to support this new reconciling item" because "it adjusts for amounts already accounted for in the costs that were reported to Commerce." *Id.*

Commerce explained that during the course of the investigation, Commerce asked questions that alerted Marmen and its auditors to an error in the company's 2018 financial statements "related to the recording of U.S. currency transactions and the presentation of foreign exchange . . . ." Appx4281. Marmen's auditor subsequently made two sets of corrections to the company's 2018 financial statements. Appx4821 - Appx4822. These corrections (1) recategorized some expenses, mainly relating to exchange gains and losses, as part of the cost of goods sold ("COGS") and (2) brought the statements into compliance with Canadian

11

accounting principles relating to financial transactions. *Id.* However, when Commerce requested a revised cost reconciliation to reflect these changes, Marmen submitted information that reflected changes beyond those that implemented the auditor's amendments. Appx4822. While most of these were clerical corrections, one of the changes offset the auditor's recategorization of certain expenses as part of COGS. Appx4822 - Appx4823. Indeed, rather than reconcile Marmen's reported costs to the restated final statements, the new information undid the principal change that the auditor made. *Id.*

In comments filed with the agency, Marmen argued that Commerce had misinterpreted the record in finding that the additional line item inappropriately offset the auditor's adjustment. Appx4679 - Appx4682. Rather, Marmen again argued that the line item represented Marmen's self-instituted correction of its failure, in its original reconciliation, to fully convert certain USD values for wind tower sections that Marmen Inc. purchased from Marmen Énergie CAD. Appx4679 - Appx4680. While the line item had the effect of offsetting the auditor's adjustment to Marmen's COGS (and the corresponding impact of that adjustment in relation to the company's reported cost of manufacturing, or "COM," for subject merchandise), Marmen argued that this was beside the point, given the need to correct the

12

company's separate failure to fully convert the value of purchased tower sections. Appx4679 - Appx4682.

In the final remand results, Commerce continued to find that Marmen's additional change, was unmerited. Appx4854 - Appx4862. Commerce found that the record indicated that exchange gains and losses were already accounted for in other lines of the reconciliation worksheet. *Id.* at Appx4854 - Appx4856, Appx4859 - Appx4860. Commerce also disagreed with Marmen's argument that the additional line was needed to properly reconcile the 2018 COGS in Marmen's restated financial statements to the company's reported COM during the period of investigation ("POI"). Appx4856 - Appx4857. Rather, the record indicated that (1) Marmen kept its books and records so as to reflect exchange gains and losses on purchases in USD at a fixed rate, and (2) its auditors later trued up the fixed rate to reflect the actual exchange rate for purchases originally incurred in USD. The auditors made no adjustment for Marmen Inc.'s purchases of wind tower sections from Marmen Énergie, indicating that these values required no correction. Appx4857 - Appx4858.

Commerce also noted that to support its calculation of the additional line, Marmen provided a worksheet listing purchases of wind tower sections from Marmen Énergie by invoice number. But while Marmen argued that the July-December 2018 purchases were in USD and the January-June 2019 purchases

13

properly reflected CAD, "virtually every invoice listed in the document, which encompasses the entire POI, is designated as a USD-denominated sale." Appx4858 - Appx4859. Further, the exchange rate reflected in the document was both unsupported and presented as relating to calendar year 2018, a period that included significant time outside the bounds of the July 1, 2018 – June 30, 2019 POI. Appx4859. Finally, Commerce noted that the fact that Marmen's amended financial statements did not fully reconcile to its reported costs did not, on its own, establish that the additional line was a merited adjustment. Appx4860 - Appx4862.

The CIT affirmed Commerce's remand results. Appx0023 - Appx0026. The court found that the record supported Commerce's conclusion that the additional line item was unnecessary and inappropriate, because it would have re-adjusted the reported costs to reflect foreign exchange rate differences, despite those differences having already been accounted for in the reported costs. *Id.*

## C. Commerce's Differential Pricing Analysis

To calculate antidumping duty margins, Commerce typically compares weight-averaged, above-cost home market prices with weight-averaged U.S. prices for the same or similar goods. *See, e.g.,* Appx2463; *see also* 19 U.S.C. § 1677f-1(d)(1)(A)(i). However, the statute contains an exception to this general rule, authorizing Commerce to compare averaged home market prices with individual

U.S. prices where it finds that (1) there is a pattern of U.S. prices that differ significantly among purchasers, regions, or time periods, and (2) there would be a meaningful difference in the margins calculated using its standard methodology and the alternative methodology. *Id.*; *see also Stupp Corp. v. United States*, 619 F. Supp. 3d 1314, 1322-1323 (Ct Int'l Trade 2023) ("*Stupp IV*"); 19 U.S.C. § 1677f-1(d)(1)(B). Congress did not provide guidance regarding how Commerce should determine whether these conditions are met.

To fill the gap in the statute, Commerce developed its differential pricing analysis, which contains three parts: the Cohen's *d* test, the ratio test, and the meaningful difference test. Only the Cohen's *d* part of the analysis is challenged in this case, but Commerce relies on all three parts collectively in determining whether the statutory exception to its standard comparison methodology applies. Under the Cohen's *d* test, Commerce assesses the degree of variation in the prices of sales to different purchasers, regions, and time periods. It does so by establishing the difference between the mean prices of test groups of U.S. sales transactions and comparison groups, calculating a coefficient, known as "Cohen's *d*," for each comparison. Appx2463 - Appx2464; *see also Stupp IV*, 619 F. Supp. 3d at 1322. If the coefficient is 0.8 or larger for a given test group, then sales within that group "pass" the Cohen's *d* portion of the analysis. *Id.* at 1322-1323.

15

Commerce then moves to the ratio test, which considers the ratio of passing sales to total sales by value. If fewer than 33% of all sales "pass," then Commerce defaults to its standard average-to-average comparison methodology. *Id.* at 1322. If more than 66% pass, Commerce will calculate dumping margins using the average-to-transaction methodology. If the ratio of passing sales falls between 33% and 66%, Commerce will use a combination of the two methodologies on a sales-specific basis. *Id.* at 1322-1323.

If Commerce calculates any portion of the margin on an average-to-transaction methodology based on the ratio test, Commerce will then proceed to the meaningful difference test. Under this test, the agency compares the margin calculated using its alternative methodology with the margin that would result from its standard methodology. If the difference in these margins is less than 25%, the agency will again default to its standard average-to-average methodology. *Id.*

In other words, while determining the Cohen's *d* coefficient for groups of sales is the starting point for determining whether to employ an alternative methodology, it is not the end point. An alternative methodology will only be employed if (1) a specific percentage of overall sales have a Cohen's *d* value of 0.8 or larger, and (2) there is a 25% or greater difference in the margins calculated using the standard methodology and the relevant alternative methodology.

16

Here, Commerce found that more than 66% of Marmen's U.S. sales, by value, passed the Cohen's *d* portion of its analysis. Appx2465. Commerce also found that there was at least a 25% relative change between the dumping margins calculated using its standard methodology and the average-to-transaction methodology. *Id.* It therefore preliminarily calculated Marmen's margin using the alternative, average-to-transaction methodology. *Id.*

Marmen argued that the alternative methodology constituted "zeroing," and was thus inconsistent with the United States' obligations under the World Trade Organization Agreements. Appx3776. Marmen also argued that five of the CONNUMs for which Commerce conducted its differential pricing analysis showed price variations of less than one percent, and that it was unreasonable for Commerce to treat such differences as "significant" within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B). Appx3777 - Appx3779. In its final determination, Commerce continued to calculate Marmen's margin using the average-to-transaction approach. Appx3862 - Appx3863.

Marmen appealed. While noting Marmen's specific arguments, the lower court remanded Commerce's differential pricing analysis for the agency to address the concerns expressed in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) ("*Stupp III*"). Appx0013 - Appx0016. In *Stupp III*, this Court remanded "to give

17

Commerce an opportunity to explain whether the limits on the use of the Cohen's *d*

test prescribed by Professor Cohen and other authorities were satisfied in this case

or whether those limits need not be observed when Commerce uses the Cohen's *d*

test in less-than-fair-value adjudications." *Stupp III*, 5 F.4th at 1360.

On remand, Commerce continued to employ the Cohen's *d* coefficient in its

differential pricing analysis. Commerce explained that it uses the Cohen's *d*

coefficient to measure the practical significance of differences between entire

populations of data, rather than the statistical significance of variability within

sampled data. Appx4835 - Appx4838. Because the entire population of both the test

and comparison groups is used in the agency's differential pricing analysis, "the

means, standard deviations, and Cohen's *d* coefficients calculated are not estimates

with confidence levels or sampling errors . . . but . . . actual values which describe a

company's pricing behavior." Appx4839 - Appx4840, Appx4864 - Appx4865. In

other words, the assumptions that underlie sampling are not relevant where

Commerce can measure the characteristics of the actual population, rather than

estimating the characteristics of a population through statistical analysis that relies

on assumptions. Commerce also explained that "Dr. Cohen's {effect size}

thresholds are operational and not based on a statistical analysis," meaning that their

18

utility is not impacted by their being applied to situations involving whole populations of data, rather than samples. Appx4842.

Commerce similarly explained that the concerns identified in *Stupp III* were largely addressed by Commerce's application of the Cohen's *d* test to entire data populations, rather than samples, and further explained that false positives are less likely given the conservative nature of the test as so applied. Appx4840 - Appx4849; Appx4865. Commerce found that, in arguing that the price differences at issue in this case were not reasonably deemed "significant," Marmen failed to recognize that the nature of the Cohen's *d* coefficient is such that, where there is little variation in the prices within (not between) test and comparison groups, then the small difference in the mean prices of the two groups will be found significant. Appx4850 - Appx4851. Commerce explained that the Statement of Administrative Action accompanying the Uruguay Round Agreements Act acknowledged that "small differences" in pricing "may be significant for one industry or {} product," such that the magnitude of the differential prices is not an indication of whether those prices are targeted. Appx4852. Finally, Commerce noted that it does not use the Cohen's *d* coefficient by itself to determine whether to employ an alternative methodology, because the coefficient is used in only part of the agency's three-part differential pricing analysis. Appx4863 - Appx4865.

The lower court affirmed Commerce's use of the Cohen's *d* statistic and its overall differential pricing analysis as applied to Marmen. Appx0027. The court agreed that Commerce's use of an entire population, rather than a sample, negated the questions raised in *Stupp*. Appx0027 - Appx0028.

## V.    <u>SUMMARY OF ARGUMENT</u>

Collectively, Marmen and *amici* challenge three aspects of Commerce's final determination in the AD investigation into Canadian wind towers, and fail to make their case regarding any of these aspects.

First, Marmen argues that Commerce erred in adjusting the reported costs for steel plate used in producing wind towers sold to U.S. customers. Marmen claims that the agency violated its past practice in adjusting these costs, and that it lacked substantial record evidence to support its conclusion that Marmen's per-unit input steel costs varied significantly in ways not explained by physical characteristics of the goods being produced. However, Commerce's decision to adjust the reported input costs was perfectly in keeping with its practice. Further, the record supported Commerce's conclusion that Marmen's reported steel plate costs varied significantly in ways that were traceable to the time at which the towers were produced/sold, rather than the physical differences in the goods being produced.

Second, Marmen claims that Commerce inappropriately refused to give effect to a line item included in the company's revised cost reconciliation. It argues that the line item properly implemented Marmen's self-correction of an error in its original cost reconciliation. However, the record supported Commerce's conclusion that there was no such error and that, as such, the new line item would in fact distort – rather than correct – the original reconciliation. Further, Commerce properly found that, even if one accepted that an adjustment was necessary (which it was not), Marmen had not supported its calculation of the line item's value.

Third, Marmen and *amici* argue that Commerce erred in conducting its differential pricing analysis. They claim that the Cohen's *d* coefficient, which Commerce employed in its analysis, cannot be appropriately used to measure the significance of price differences where datasets are not normally distributed, have few datapoints, or the variation in prices is not objectively large. They argue that the Cohen's *d* coefficient produces "false positives" in such situations and that the specific facts at issue here are similar to a hypothetical situation that was discussed in *Stupp III* as an example of a potentially problematic use of the coefficient. Marmen and *amici*'s claims are unconvincing, given Commerce's use of the complete population of relevant data, as well as the multi-part nature of its differential pricing analysis. In particular, Marmen and *amici* fail to acknowledge

21

the simple point that Commerce is measuring, not estimating, the relevant characteristics of the sales data because Commerce has the entire universe of data.

## VI.    <u>ARGUMENT</u>[4]

Marmen and *amici* collectively challenge three aspects of Commerce's final determination in the AD investigation concerning utility-scale wind towers from Canada. First, Marmen argues that Commerce erred in adjusting the company's reported costs for steel plate used in producing wind towers sold to U.S. customers. Second, Marmen claims that Commerce inappropriately refused to give effect to a line item included in the company's revised cost reconciliation. Third, Marmen and *amici* argue that Commerce's use of the Cohen's *d* statistic in its differential pricing analysis was unreasonable. As detailed below, these challenges are unpersuasive.

### A.    <u>Commerce's Adjustment of Marmen's Steel Plate Costs Should Be Affirmed</u>

Commerce normally relies on the costs recorded in a respondent company's normal books and records to determine whether the respondent has sold goods in its home market at less than the cost of production, to make DIFMER adjustments and, if necessary, to determine constructed value. 19 U.S.C. §§ 1677b(a)(4), 1677b(a)(6)(C)(ii), 1677b(e), 1677b(f)(1); *see also* discussion *supra* at 3-4.

---

[4]    The WTTC does not disagree with Marmen's description of the standard of review, and thus does not provide a separate description of that standard here, consistent with Fed. Cir. R. 28(b).

However, Commerce will deviate from the respondent's normal books and records where the costs recorded therein do not reasonably reflect the cost to produce the merchandise at issue. *See, e.g.*, 19 U.S.C. § 1677b(f)(1). For example, Commerce will deviate from the respondent's records where the costs to produce similar product models vary significantly due to factors unrelated to the physical nature of the goods. *See, e.g., UK Bar* IDM at 3-7.

Here, Commerce found that Marmen's reported, per-unit input costs for the steel plate used to produce its wind towers varied significantly between similar models of wind towers, in ways not explained by the physical characteristics of the plate or wind towers. Appx3857 - Appx3858. Instead, the reported cost differences appeared to be related to the timing of wind tower production/sale. *Id.* As such, Commerce averaged the company's per-unit plate costs across its wind tower product models – with the exception of one model that used especially thick plate for which suppliers levied an upcharge. *Id.*

Marmen challenges Commerce's determination to smooth the company's per-unit plate costs on two main grounds. Appellants' Br at 29-42. First, it argues that, in deciding to average the per-ton plate costs, Commerce "arbitrarily disregarded" its past practice. *Id.* at 33-36. Second, Marmen argues that substantial record

23

evidence does not support Commerce's determination to smooth the per-ton plate costs. *Id.* at 36-42. These arguments are without merit.

### 1. Commerce Acted Consistently With its Practice

Marmen concedes that Commerce has a past practice of averaging input costs across CONNUMs where the respondent reports CONNUM-specific costs that significantly differ for reasons other than physical product characteristics. *Id.* at 30-31. However, Marmen argues that Commerce's practice requires it to examine only whether costs differ among "nearly identical" or "similar" CONNUMs. *Id.* at 31-33. Marmen claims that Commerce did not limit its analysis of cost differences here to "nearly identical" and "similar" product models, but broadly considered the degree to which the company's per-unit plate costs varied for reasons unrelated to the physical characteristics of the plate or output wind towers. Marmen thus argues that Commerce has "arbitrarily disregarded" its past practice. *Id.* at 33-36.

Marmen's claim is unpersuasive. Marmen's arguments elide the reasons why (1) cost differences that are unrelated to physical characteristics are relevant to the antidumping calculations and (2) courts are concerned with agency deviations from past practice. And crucially, the record showed widely differing costs, unrelated to physical differences, for CONNUMs that even Marmen would appear to concede are at least "similar."

24

Marmen's assumption that Commerce should have assessed only a subset of CONNUMs for cost differences unrelated to physical characteristics is a gross simplification of the agency's practice and methodology – one that elides the reason why the agency is concerned with such cost differences in the first place. As Commerce has explained, it seeks not only to make price-to-price comparisons between physically similar products as sold in the home and U.S. markets, but to make sure that all of the product-specific costs used in the agency's sales-below-cost tests, DIFMER adjustments, and constructed value calculations "accurately reflect the precise physical characteristics of the products whose sales prices are used in the {} dumping calculations." *Korean Pipe* IDM at 39. To ensure that the reported CONNUM-specific costs reflect the physical nature of the products at issue, Commerce assesses the degree to which costs vary with physical product characteristics and are thus "attributable to {} different physical characteristics." *Id.* If it finds cost differences that do not appear traceable to physical product characteristics, Commerce then assesses the "magnitude of {any} cost differences and the number of CONNUMs affected." *See* Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy*, 85 Fed. Reg. 3,026 (Dep't Commerce Jan. 17, 2020) (final results of antidumping duty admin. review; 2016-2018) at 25 (quoting *Korean Pipe* IDM at 40). Nothing about the concerns animating the agency's consideration of the degree to

which costs may not reflect physical characteristics requires Commerce to analyze only "nearly identical" or "similar" CONNUMs (however defined).

Importantly, with respect to deviations from past practice, the courts' concern is to prevent an agency from ignoring, willy-nilly, facts or circumstances that it found crucial to its decision-making in the past. *Aristocraft of Am., LLC v. United States*, 269 F. Supp. 3d 1316, 1334 (Ct. Int'l Trade 2017), discussing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009). Widely varying costs for "nearly identical" or "similar" products certainly indicate that factors beyond physical characteristics may be influencing production costs. But Marmen points to no cases – and WTTC has found none – that indicate that Commerce has previously found it crucial to only assess cost differences that affect putatively identical/similar CONNUMs, or, alternatively, that it has found it important to ignore potential cost differences affecting putatively dissimilar CONNUMs. Indeed, such a requirement or practice would be inconsistent with the reasons Commerce itself has articulated for being concerned to ensure a tight correlation between physical characteristics and product costs – *i.e.*, to broadly ensure conformity with the statutory requirement that the costs used in the antidumping duty calculations "reflect meaningful cost differences attributable to {} different physical characteristics." *See, e.g.*, *Korean Pipe* IDM at 39.

26

Notably, if cost differences attributable to non-physical characteristics were of concern only and uniquely as to "nearly identical" or "similar" CONNUMs, Commerce presumably would never apply cost-smoothing to CONNUMs other than those it found physically similar. But Commerce has applied cost-smoothing more widely than that in past cases. *See Thai Plastic Bags Indus., Co. v. United States*, 746 F.3d 1358, 1366-69 (Fed. Cir. 2014) (noting that Commerce had averaged costs across all CONNUMs, although it had analyzed cost differences across pairs of "similar" CONNUMs); *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1361-62 (Ct. Int'l Trade 2019) (affirming Commerce's adjustment of input costs for all CONNUMs in a proceeding where reported costs varied due to raw material price declines). And even if Commerce could be said to have a past practice of the type alleged by Marmen, agencies may deviate from past practice if they have a reasonable basis for doing so. *Aristocraft*, 269 F. Supp. 3d at 1334. Here, such a reasonable basis existed, given that Marmen's reported costs exhibited significant price differences unrelated to physical product characteristics for nearly all CONNUMs. Final IDM at Appx3857 - Appx3858; Appx3874, Appx3878 - Appx3880.

Moreover, while Commerce included all CONNUMs in its analysis, it remains that there were significant differences between CONNUMs that are at the very least "similar," where similarity is assessed using the type/weight/height rubric that Marmen

BUSINESS PROPRIETARY    NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

relied on its case brief. Appx3761 - Appx3762. Consider that the per-ton plate costs for CONNUMs [          CONNUM          ] and [          CONNUM          ] differed by [figure]%, although the CONNUMs are of the [ CONNUM characteristics ], and [ CONNUM characteristics ]. *See* Appx3878; *see also* Appx0806 - Appx0814 (describing CONNUM characteristics). CONNUMs [          CONNUM          ] and [ CONNUM ] also exhibited a [figure]% difference in the per-ton cost of input plate, despite the CONNUMS' similarity. *See* Appx3878. The plate costs for CONNUM [          CONNUM          ] were [figure]% below those of CONNUM [ CONNUM ], and [figure]% below those of CONNUM [          CONNUM          ], although all three CONNUMs are of the [ CONNUM characteristics ], and [ CONNUM characteristics ]. *Id.* CONNUMs [          CONNUM          ] and [ CONNUM ] also displayed a [ figure ]% difference in the per-ton cost of input plate, although the products were of the [ CONNUM characteristics ], and [CONNUM characteristics ]. *Id.* These [ number ] product models represent [ percentage ] of all CONNUMs. *Id.*

As Commerce explained, the differences in per-unit plate costs for these and other CONNUMs were not fully attributable to the physical characteristics of the plate or finished product. Appx3857 - Appx3858. With the exception of the plate used in the CONNUM excluded from the smoothing calculations, Marmen's suppliers did not charge different per-ton prices for steel plate of different grades, thicknesses, lengths,

28

etc. *Id.* Instead, the per-unit costs that Marmen reported for its steel plate were correlated with the timing of production/sale. *Id.*; *see also* Appx3874 and Appx3879 - Appx3880.

Because Commerce's dumping calculations would be distorted by costs that reflect non-physical issues of this type, Commerce's averaging of the reported plate costs did not constitute a deviation from its past practice. Rather, it represented a logical and reasonable application of that practice given the facts of record. In sum, Commerce did not inappropriately deviate from past practice in determining to smooth Marmen's per-ton plate costs.

### 2. Substantial Record Evidence Supported Commerce's Cost-Smoothing

Marmen next argues that substantial record evidence does not support Commerce's determination to smooth the company's per-ton plate costs. Appellants' Br. at 36-42. Marmen claims that the record does not support the agency's conclusion that, with the exception of an upcharge levied on particularly thick steel plate, Marmen's suppliers charged the same prices for plate of different grades, widths, lengths, or thicknesses. *Id.* at 36-38. Marmen likewise argues that the record does not support Commerce's conclusion that differences in Marmen's reported plate costs reflected the timing of Marmen's production and sales, rather than the physical

characteristics of the underlying plate or resulting wind towers. *Id.* at 39-41. Marmen's arguments are unpersuasive.

To comply with the substantial evidence standard, Commerce's decisions must rest on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). To show inconsistency with this standard, it is not enough for Marmen to present an alternative reading of the record, even one that a reasonable mind would accept. "Reasonable minds may differ, but a determination does not fail for lack of substantial evidence on that account." *See, e.g.*, *Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1233 (Ct Int'l Trade 2011) (quoting *Siderca S.A.I.C. v. United States*, 391 F. Supp. 2d 1353, 1369 (Ct Int'l Trade 2005)). Rather, Marmen must show that the record could *only* support a conclusion other than that reached by the agency. *See Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 669 (Fed. Cir. 2019); *see also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351-52 (Fed. Cir. 2006) (discussing substantial evidence standard). This it cannot do.

Here, Commerce was called upon to examine whether Marmen's steel plate costs reflected only the physical characteristics of the plate (and the resulting wind towers) or were influenced by other factors to a meaningful degree. The record evidence included:

BUSINESS PROPRIETARY
INFORMATION HAS BEEN DELETED

NON-CONFIDENTIAL VERSION

- Marmen's reported per-CONNUM costs for steel plate, as well as the dates of sale for these CONNUMs (Appx1011 - Appx1019 (CONNUM-specific plate costs); Appx2310 - Appx2343 (dates of sale));

- A chart provided by Marmen purporting to show weights and dimensions of plates purchased for producing wind towers for the U.S. market (Appx3719);

- A chart provided by Marmen purporting to show dimensions, weights, and prices of plates purchased for producing wind towers for the Canadian market (Appx3720);

- Supplier communications indicating that a surcharge would be levied for plate over 50.8 mm thick (Appx3857 - Appx3858; Appx3733 - Appx3734);

- Supplier agreements, invoices, and communications indicating that, with the exception of plates over 50.8 mm thick, plate costs did not vary for plates of different thicknesses, lengths, widths, or weights. (Appx0010; Appx3722 - Appx3723); Appx1878 - Appx1885; Appx3735; *see also* Appx2301 - Appx2305; Appx3552 - Appx3553; Appx3751;

- A statement conceding that Marmen used "roughly equivalent" grades of steel plate to produce for both the home and U.S. market (Appx3710); and

- Data confirming that the weight of internal components, including steel plate, provided free of charge by Marmen's customers was approximately [percentage

BUSINESS PROPRIETARY    NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

percentage] the overall weight of the CONNUMs for which Commerce smoothed costs (Appx1001 - Appx1002, Appx1021; *see also* Appx3878).[5]

As indicated in Commerce's decision and analysis memoranda, Marmen's reported CONNUM-specific, per-ton plate costs ranged from [ value ] per net ton to [ value ] per net ton (not including the CONNUM excluded from the smoothing calculations). Appx3874, Appx3878 - Appx3880; Appx3857 - Appx3858.[6] However, Marmen's communications with its suppliers indicated that, with the exception of plates more than 50.8 mm (2") thick, the suppliers "do not charge different prices for plates of different grade, thickness, width, or length." Appx3857; Appx3874. Commerce also found that the weight of the internal components that Marmen received from customers free-of-charge for use in producing wind towers was "extremely small," such that they could not explain the CONNUM-specific plate cost differences at issue. Appx3858; Appx3874.

Given the record data described above, Commerce's conclusion that Marmen's CONNUM-specific plate cost data reflected factors other than physical characteristics

---

[5]    Marmen reported receiving a certain amount of [ descriptor ] steel plate from its customers. Appx1001 - Appx1002, Appx1021.

[6]    Throughout the agency's record, there are values given variably in short tons and net tons. These units of measure are equivalent, *i.e.*, one short ton is the same as one net ton.

BUSINESS PROPRIETARY          NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

is grounded in evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 229. In arguing otherwise, Marmen points to a "plate list for the wind tower{s} sold in the home market," which Marmen claims shows that the per-ton prices it paid for plate varied by as much as Canadian $[value] based on dimension. Appellants' Br. at 37-38. But while the plate list shows different prices for certain plates that happen to have different dimensions, it does not establish that the prices differed *because* of the different dimensions. As Commerce pointed out, Marmen's communications with its steel suppliers indicate that suppliers' per-ton steel plate prices were not, as general matter, changeable with plate dimension. Appx3857 - Appx3858; Appx3874. And to the extent that the "plate list" and the supplier communications might potentially be considered inconsistent with one another, Commerce reasonably weighed more heavily the supplier communications that directly state the basis on which the suppliers' prices were set. In any event, the Court may not "reweigh the evidence or . . . reconsider questions of fact anew." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)).

Marmen goes on to argue that substantial record evidence does not support Commerce's conclusion that the differences in CONNUM-specific plate costs were

correlated with the timing of tower production. Appellants' Br. at 39-41. Marmen argues that Commerce's conclusion is a mere assumption. *Id.* at 40. Marmen also states that the assumption is inconsistent with Commerce's identification of the specific physical product characteristics that "are the most significant in differentiating the costs between products." *Id.* at 40-41. Again, Marmen's claims are unconvincing.

As an initial matter, having reasonably concluded, with the support of substantial record evidence, that factors beyond physical characteristics were influencing Marmen's reported plate costs, it was not incumbent upon Commerce to determine with exactitude what those factors were. Thus, even if Marmen were correct in its assertion that no reasonable mind could accept that the cost differences here were related to "timing of production," Appx3858, this would have no practical bearing on its appeal, given the agency's reasonable, well-supported conclusion that non-physical factors were at work.

Moreover, a reasonable mind could easily accept Commerce's conclusion that the cost differences here were related to "timing of production." Commerce reviewed Marmen's reported sales dates for individual wind towers/sections corresponding to each CONNUM. Appx3874. The agency found that the majority of individual towers/sections corresponding to the CONNUMs with the highest per-unit plate costs were produced mainly during one portion of the POI, while the majority of individual

34

BUSINESS PROPRIETARY    NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

towers/sections corresponding to CONNUMs with the lowest prices were produced mainly during another. *Id.*; Appx3879 - Appx3880. As such, there is a clear correlation between the time of production and the per-unit plate cost differences. Moreover, Marmen's plate purchasing agreements and wind tower sales agreements contemplated plate prices [ agreement term regarding plate prices ]. Appx3721 - Appx3731; Appx1394 - Appx1395. This further supports Commerce's conclusion that the cost differences seen in Marmen's data relate to timing of tower production.

Accordingly, while Marmen faults Commerce for not concluding that the wide variations in Marmen's reported CONNUM-specific per-ton plate costs were attributable to the physical characteristics of the plate/output wind towers, substantial record evidence supports Commerce's determination. Specifically, a reasonable mind could accept Commerce's conclusion that the cost differences were attributable, in a meaningful degree, to factors beyond the dimensions of the plate, given that Marmen's plate suppliers did not vary their prices based on plate dimensions, except as to the thickest plate, which was used in only one CONNUM that was excluded from the smoothing calculations. Appx3857 - Appx3858; Appx3874. And while Commerce's conclusion that the cost differences were attributable to timing is secondary, a reasonable mind could likewise accept this conclusion, given the record evidence regarding how costs changed over time.

### 3. Conclusion

The Court should affirm Commerce's determination to smooth Marmen's reported costs of input plate. Commerce did not impermissibly depart from past practice in analyzing the degree to which Marmen's reported plate costs were attributable to factors beyond the physical characteristics of the plate or output wind towers. Rather, it appropriately applied its practice to ensure that the costs used in the dumping margin calculations reflect the physical nature of the goods under consideration. Further, Commerce's cost-smoothing determination was supported by substantial record evidence. Accordingly, Commerce's treatment of Marmen's input plate costs should be affirmed.

### B. <u>Commerce's Treatment of Marmen's Reconciling Item Should Be Affirmed</u>

After the lower court found unreasonable Commerce's initial refusal to consider certain cost additional reconciliation information that Marmen had submitted, Commerce accepted and considered the information. However, Commerce found that the newly accepted information contained an unnecessary and unsupported line item. Appx4820 - Appx4827, Appx4854 - Appx4862. The item putatively updated the portion of Marmen Inc.'s original reconciliation relating to purchases of wind tower sections from its affiliate, Marmen Énergie, to convert the value of July 1, 2018-December 31, 2018 purchases from USD to CAD. *See* Appx4820, Appx4823,

Appx4857; Appx3904 - Appx3905. But Commerce found that, although Marmen's auditors had amended the company's financial statements specifically to reflect currency conversions, that amendment did not adjust the value of Marmen Inc.'s purchases of sections from Marmen Énergie, indicating that no conversion-related adjustment was warranted. *See* Appx4825 - Appx4827; Appx3904 - Appx3905 (Tab "Marmen Inc.," Line 29 (L), Columns G and H). Commerce further found that Marmen's supportive calculations for the new reconciling item were inconsistent with Marmen's explanations of the item. Appx4858 - Appx4859. Finally, Commerce determined that the exchange rate used in the calculation was unsupported by any source documentation and appeared to relate, at least in part, to a period of time outside of POI. Appx4859.

Marmen argues that Commerce's assessment of the additional item is rooted in misapprehensions of the record evidence. Appellants' Br. at 10-21, 42-49. Marmen begins with a background discussion of the structure and purpose of a cost reconciliation. *Id.* at 10-11. Marmen then explains that, in addition to producing subject goods itself, Marmen Inc. also purchased subject goods from its affiliate, Marmen Énergie. *Id.* at 13. Marmen's booked COGS were therefore reflective not only of Marmen Inc.'s own production of wind towers/sections, but the costs of goods purchased for resale. To reconcile Marmen Inc.'s booked COGS to its reported COM,

37

BUSINESS PROPRIETARY    NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

Marmen explains that it was necessary to subtract the value of the company's purchases of sections from Marmen Énergie during the POI. *Id.*

Marmen argues that while its original cost reconciliation included a line item (Line 29, or L) deducting the value of sections purchased from Marmen Énergie, it failed to convert purchases made in the first half of the POI (July 1, 2018 - December 31, 2018) from USD to CAD when calculating the value of Line 29/L. *Id.* at 14. Marmen explains that no conversion was required for the portion of Line 29/L pertaining to January 1, 2019 - June 30, 2019 purchases, because it changed its method of booking USD purchases between 2018 and 2019. *Id.* at 12-15. Specifically, it booked USD purchases at a 1:1 exchange rate in 2018, requiring later truing-up. *Id.* However, it booked USD purchases in 2019 at a [ rate ] exchange rate, which Marmen implies did not require any later adjustment. *Id.*

Marmen explains that it included new Line 31, or L1, in its updated reconciliation to reflect currency conversions for the portion of Line 29/L's value relating to sections purchased from Marmen Énergie in the first half of the POI; further, Marmen explains that it used "the actual exchange gain or loss . . . based on its exchange rate contracts in place during the POI" to calculate the value of Line 31/L1. *Id.* at 12-16. Marmen argues that, rather than double-count its auditor's adjustments for exchange rate gains/losses, Line 31/L1 corrected a currency error in the

reconciliation data. *Id.* at 43-47. Marmen also argues that Commerce failed to establish any inconsistencies in Marmen's explanations of its calculation worksheet and that the exchange rate used in the calculation is supported. *Id.* at 47-49.

Marmen's arguments are without merit. First, Marmen's background discussion regarding cost reconciliations is misleading. Step 4 of the chart that Marmen provides indicates that part of the reconciliation is the subtraction of "other differences between audited COGS and total COM{.}" *Id.* at 11. What this generic description fails to indicate, however, is that not all differences between audited COGS and a company's reported COM are properly subtracted from a company's booked COGS as part of the cost reconciliation. As Commerce recognized, the mere fact that there are differences between (1) audited COGS minus proper deductions and (2) the reported COM does not mean that additional, unsupported deductions must also be made to eliminate the differences. Appx4860 - Appx4862. Here, while Marmen's books and records properly established that its booked COGS should be lowered by the amount included in Line 29/L, it did not also establish that the booked COGS should be further lowered by the amount in Line 31/L1. Appx4826 - Appx4827, Appx4858.

Marmen argues that Commerce erred in finding that reducing the company's audited COGS value by the amount in Line 31/L1 would double-count exchange gains and losses. Appellants' Br. at 43-47. Marmen argues that because the audited value of

BUSINESS PROPRIETARY    NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

COGS includes Marmen Inc.'s "purchases of wind tower sections from Marmen Énergie {} in CAD," but purchases of sections are not properly part of the reportable COM, the value of those purchases in CAD had to be deducted as part of the reconciliation. *Id.* at 43-44. Marmen further argues that its original calculation of the deduction erroneously expressed a portion of the value in USD, and that correcting this error neither implicates the auditor's adjustments nor would reflect values already accounted for in the reconciliation. *Id.* at 44-46.

These claims are not persuasive. As Commerce found, both Marmen's statements during the investigation and the documentation it submitted indicate that its originally reported value for Line 29/L was correct, and not in need of further adjustment. Appx4824 - Appx4827. Marmen's audited financial statements fully reflected all required exchange adjustments; further, Marmen stated that its cost reporting also reflected exchange rate adjustments. Appx4824 - Appx4827, Appx4857.

Commerce also found that Marmen failed to demonstrate how it derived the rate used to calculate the value in Line 31/L1 of the company's resubmitted cost reconciliation, or to show that the rate was specific to the first half of the POI. Appx4824, Appx4857 - Appx4859. Marmen argues that this is not so, stating that the [ rate ] exchange rate was "the actual exchange gain or loss received by Marmen (based on its exchange rate contracts in place *during the POI*)." Appellants' Br. at 15

BUSINESS PROPRIETARY     NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

(emphasis added). As an initial matter, Marmen's phrasing indicates that the [ rate ] exchange rate reflects the entirety of the POI (July 1, 2018 - June 30, 2019), when only the first half of the POI is relevant. Appx4859. Further complicating matters, Marmen also described the rate as the "average exchange rate 2018." Appx3907. The two assertions are not only inconsistent with one another, but either assertion implicates a substantial period of time beyond the relevant portion of the POI. *See* Appx4859.

Marmen traces the [ rate ] rate to portions of its original Section D and first supplemental Section D questionnaire responses. Appellants' Br. at 49, citing Appx0829, Appx0835, Appx0949, Appx0988; Appx1207 - Appx1218. But these sources underscore the conclusion that the rate is not specific to the first half of the POI, while leaving the method by which Marmen derived the rate a total mystery. *See* Appx4824 (noting that Marmen did not demonstrate the source of the [ rate ] exchange rate in resubmitting the rejected data); *see also* Appx3907 - Appx3913.

Appx0829 and Appx0835 simply assert that Marmen recorded costs at a 1:1 rate in 2018, and a [ rate ] rate in 2019. Appx0829, Appx0835. Meanwhile, the exhibits that include Appx0949 and Appx0988 provide cost buildups for Marmen's most commonly sold products in the home and U.S. markets. Appx0840 - Appx0842, Appx0943 - Appx0988. Portions of these buildups do appear to reflect conversions

BUSINESS PROPRIETARY     NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

from USD to CAD at a [ rate ] rate. For example, Appx0988 includes a value for the conversion of purchased paint from USD to CAD at that rate. But the conversion rate is described as relating to "{t}otal paint costs for POI." *Id.* In other words, the rate is presented as a POI-wide value, not one specific to the first half of the review period. Moreover, there is no source documentation for the rate.

Other portions of the record further complicate Marmen's claims regarding the temporal specificity and overall accuracy of the rate. For example, Exhibit D-16 presents values for purchases of the steel plate used to produce the most commonly sold U.S. CONNUM. Appx0774 - Appx0987. The sum of the USD purchase values is $[ value ], to which $[ value ] is added to reflect CAD, *i.e.*, a conversion rate of [ rate ]. Appx0987. However, the dates given in the column "Job Completion Date" include [ date ] dates; moreover, Marmen applied a [ rate and descriptor ] rate in reporting the [ type of information ] and [ type of information ] values for work orders across the entirety of the POI. –Appx0976 - Appx0987. Again, the rate is not specific to July 1, 2018 - December 31, 2018; there is also no indication of how the rate was derived.

Likewise, the cost reconciliation included with Marmen's first supplemental Section D questionnaire response does not show that the [ rate ] value was either specific to the first six months of the POI or demonstrate its derivation. Marmen claims

BUSINESS PROPRIETARY
INFORMATION HAS BEEN DELETED

NON-CONFIDENTIAL VERSION

that lines Q and R of the reconciliation, relating to certain plate and paint consumed during the POI, were calculated using the [ rate ] exchange rate. Appellants' Br. at 49, citing Appx1207 - Appx1218. But the supporting calculations for Line Q show that plate purchase values were calculated using this rate even where the materials were purchased prior to the POI. Appx1207 - Appx1216. And while the supporting calculations for paint state that an [ rate ] exchange rate was "included in . . . auditor financial statement adjust{,}" Appx1217 - Appx1218, this is not the case. Specifically, the [ rate ] rate does not appear to stem from either (1) the currency-related adjustments that Marmen's auditor made in preparing the original version of the 2018 financial statements, or (2) the additional currency-related adjustments that resulted in the amendment of the statements.

In preparing the original financial statements, Marmen's auditor made adjustments to the COGS values booked in the company's general ledger. Appx1006 - Appx1008. The "main" adjustment made - comprising [ percentage ] of the full value of the overall adjustments – trued-up USD purchases of raw materials to reflect "the actual USD/CAD exchange rate for the year (average)." *See id.* The full value of the auditor's adjustment to Marmen's general ledger value for COGS was CAD[ value ]. Appx1007. Of this value, CAD[ value ] related to currency exchange for raw materials, while the remainder related to other issues. *Id.* Increasing

43

BUSINESS PROPRIETARY          NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

Marmen's originally-recorded COGS value of CAD[   value   ] by the CAD[   value   ] currency adjustment produces a value of CAD[   value   ]. Appx1006 - Appx1007. The difference between this value and the original value reflects a (rounded) ratio of [   rate   ], not a ratio of [   rate   ]. Likewise, the auditor's second currency-related adjustment, which resulted in the restatement of Marmen's 2018 audited financial statements, does not reflect an exchange rate of [   rate   ], or indicate that such a rate would be specific to the July 1, 2018 – December 31, 2018 time period. That adjustment stemmed mainly from "a single invoice issued . . . in December 2018." Appx3602. The auditor adjusted the original USD[   value   ] invoice value using a [   rate   ] conversion rate that was "based on the rate in effect at the end of the year . . . ." *Id.*

As detailed above, it is not clear where, or how, Marmen derived the [   rate   ] rate, much less that it is specifically relevant to the July 1, 2018 – December 31, 2018 time period. As such, WTTC respectfully submits that Commerce's treatment of Marmen's cost reconciliation on remand should stand.

## C. Commerce's Use of the Cohen's *d* Coefficient as part of its Differential Pricing Analysis Should Be Affirmed

As noted above, Commerce typically calculates antidumping duty margins by comparing weight-averaged normal value with weight-averaged export prices *See, e.g.,* Appx2463. However, where it finds that (1) there is a pattern of U.S. prices that

differ significantly among purchasers, regions, or time periods, and (2) its normal methodology is insufficient to address this pattern, Commerce will instead utilize an alternative comparison methodology, as authorized by the statute. *Id.*

Congress did not provide guidance on how Commerce should determine whether the conditions supporting use of an alternative methodology are met in a particular case. To fill the gap in the statute, the agency developed a three-part analysis. To determine whether to employ an alternative methodology, Commerce first assesses the degree of variation in the prices of sales to different purchasers, regions, and time periods. It does so by establishing the difference between the mean prices of test groups of U.S. sales transactions and comparison groups, calculating a coefficient, known as "Cohen's *d*," for each comparison. Appx2463 - Appx2464; *see also Stupp IV*, 619 F.Supp.3d at 1322. If the coefficient is 0.8 or larger for a given test group, then sales within that group "pass" the Cohen's *d* portion of the analysis. *Id.* at 1322-1323. Second, Commerce determines how many sales have a Cohen's *d* coefficient of 0.8 or larger, and thus "pass.". If a sufficient number of sales "pass," then Commerce analyzes whether there is a meaningful difference in the margins calculated using the normal comparison method and an alternative method. *See* discussion *supra* at 15-16.

45

Here, Commerce found that more than two-thirds of Marmen's U.S. sales, by value, passed the Cohen's *d* portion of its analysis. Appx2465. Commerce also found that there was at least a 25% relative change between the weighted-average dumping margins calculated using its standard methodology and its alternative, average-to-transaction methodology. *Id.*; *see also* Appx3883 (calculating a 3.01% margin for Marmin using the standard, average-to-average methodology and 4.94% using the average-to-transaction methodology).[7] Accordingly, Commerce employed an alternative methodology to calculate Marmen's dumping margin. *Id.*; *see also* Appx3862 - Appx3863.

Marmen argues that Commerce's differential pricing analysis, although remanded once by the lower court (and thereafter affirmed), should be remanded for a second time as neither supported by substantial evidence nor reasonable. Appellants' Br. at 49-60. Marmen claims that Commerce's analysis is inconsistent with academic literature regarding the Cohen's *d* coefficient, and that the coefficient

---

[7]    The Tariff Act of 1930 ("the Act") provides that antidumping orders shall not be imposed where the respondent's margin is *de minimis*, *i.e.*, less than 2%. 19 U.S.C §§ 1673d(a)(4) & 1673b(b)(3). As discussed above, Marmen has shown no error in the agency's cost-smoothing of plate input costs or its treatment of Marmen's additional reconciling line item. Absent changes in the agency's treatment of these issues, Marmen's margin remains above-*de minimis* regardless of calculation methodology. Thus, this is not a case in which Commerce's use of the alternative methodology resulted in Marmen's margin passing the *de minimis* threshold.

46

can only be used with normally distributed datasets. *Id.* at 50-56. Marmen also claims that Commerce's analysis rendered unreasonable results in this case. *Id.* at 56-60. *Amici* similarly argue that it is unreasonable for Commerce to rely on the Cohen's *d* coefficient where the datasets do not reflect normal distribution. *See generally Amici*'s Br.

These arguments are unpersuasive and should be rejected.

Marmen first claims that academic literature does not support Commerce's determination that the assumptions of normality, equal variance and sufficient sample size are irrelevant to the use of the Cohen's *d* coefficient in the differential pricing analysis. *Id.* at 50-56. This argument is fundamentally wrong. As an initial matter, and as Commerce has explained, the assumptions of normality, equal variance, and size, are required only where the dataset is sampled. This is because the statistician utilizes sampled data to estimate the parameters of an entire population; where the data set contains the entire population, no estimates—and therefore no assumptions to ensure the reliability of the estimates—are necessary. Appx4839 - Appx48340.

Further, the academic literature supports Commerce's remand determination. When doing any data calculation, having the entire population as the dataset is better than a representative sample; there are no inferences drawn, and no risk of

47

misrepresenting the population. According to Professor Paul Ellis, "The best way to measure an effect is to conduct a census of an entire population but this is seldom feasible in practice." Appx4813. When working with a population, the actual parameters of the population, including the mean and standard deviation, are known rather than having to be inferred. The assumptions of normality and equal variance are crucial to working with sampled data, as Commerce explained, precisely because they are being used to support inferences about the larger whole. Appx4844 - Appx4845. Absent these assumptions, a statistician working with sampled data could not reliably infer the parameters of the larger population, and could not reliably calculate the effect size. But when the entire population is present, there is no need for inferences, and the assumptions are therefore irrelevant because the parameters can be definitively calculated. *See* Appx4848 - Appx4849.

Marmen asserts that Professor Cohen intended for his statistical tests to be applied to entire populations only if the populations had normal distribution and equal variance. Appellants' Br. at 51-52. To support this claim, Marmen quotes Dr. Cohen as maintaining "the assumption that the populations being compared are normal and with equal variability . . . ." *Id.* at 52; *see also* Appx4736. However, the statement is made—along with the assumption that both populations are equally numerous—in Dr. Cohen's explanation of conceiving of *d* as the percentage of non-

overlap. Appx4736. In the context of explaining this manner of conceptualizing *d*, Dr. Cohen assumes that the entire populations are normal, have equal variances, and are equally numerous. But this does not mean, as Marmen implies, that the *d* statistic is functionally useless unless the populations being compared are normal and have equal variances (and equal numerousness). The assumptions that Dr. Cohen speaks of are not conditions of employing the *d* statistic, but are made for the purpose of illustrating one "intuitive{}" way in which the *d* statistic may be understood. *Id.* Underscoring the fact that the assumptions are being made for illustrative purposes, rather than as conditions of employing the *d* statistic, Dr. Cohen goes on to explain that the *d* statistic "and the conventional definitions of small, medium, and large *d*" are, for example, applicable to situations where the populations exhibit unequal variability. Appx4759.

Further, as mentioned above, and in Commerce's remand determination, while assumptions of normality and equal variances are necessary in nearly all statistical calculations, this is because nearly all statistical calculations make inferences about the population from a sample. However, this does not mean the Cohen's *d* test is invalid for a data set containing the entire population. Rather, as Commerce explained, Commerce can calculate the actual effect size because Commerce has the entire universe of data. Appx4847 - Appx4849.

Marmen argues that, in relying on the Cohen's *d* coefficient, Commerce unreasonably found significant price differences to exist with respect to certain of Marmen's CONNUMs here. Appellants' Br. at 56-60. Marmen argues that the price differentials exhibited by these CONNUMS are not "significant on their face," and yet were found significant based on the agency's calculation of relevant Cohen's *d* coefficients. *Id.* at 56. Marmen argues that the facts here are like those of a hypothetical raised in *Stupp III* to illustrate potential flaws in the use of the Cohen's *d* coefficient in assessing the significance of pricing differences. *Id.* at 56-60.

Notably, while claiming that its own data mirror the *Stupp III* court's hypothetical, Marmen does not flesh this argument out by reference to those data. *Id.*; *see also* Appx4692 - Appx465. Instead, it merely observes that five of the seven CONNUMs that Commerce found to "pass" the Cohen's d portion of its multi-part differential pricing analysis despite exhibiting pricing differences of less than 1%. Appellant's Br. at 49-60. But as Commerce explained, the nature of the Cohen's *d* coefficient is such that, where there is little variation in the prices within (not between) test and comparison groups, the small difference in the mean prices of the two groups will be found significant. Appx4850 - Appx4851. This does not make Commerce's use of the Cohen's *d* coefficient unreasonable, particularly given

50

Commerce's conservative adoption of the 0.8 threshold for significance.[8] For that matter, where a seller's pricing is generally uniform, small pricing variations may be significant not just in the technical sense of statistical significance, but because they represent a deviation from the seller's usual behavior.

Further, Commerce did not use the Cohen's *d* coefficient "in a vacuum" to determine whether to calculate Marmen's margin using an alternative calculation methodology. *Stupp IV*, 619 F. Supp. 3d at 1324. Commerce only resorts to such a methodology where, as here, a specific percentage of sales by value have a coefficient value of 0.8 or greater *and* there is a meaningful difference between margins calculated using the standard average-to-transaction methodology and the relevant alternative methodology. *See id*. at 1325 ("Commerce's differential pricing analysis looks at the frequency and impact of effect size to detect targeted dumping—not the effect size alone.") Here, Commerce did not employ the average-to-transaction comparison methodology merely because effect sizes of 0.8 or more were found within Marmen's pricing data. Rather, it additionally found that such effect sizes were both frequent (affecting more than two-thirds of sales by value) and

---

[8]    As noted above, Dr. Cohen's "small," "medium," and "large" thresholds for significance remain applicable in situations that, like the *Stupp III* Court's hypothetical, involve uneven variances. Appx4759.

that the standard comparison methodology would not account for the frequency and impact of the effect size. *See, e.g.*, Appx3883.

For their part, *amici* repeat Marmen's arguments in more general terms, inclusive of references to non-record literature and additional hypotheticals. S*ee generally Amici*'s Br. These generalized complaints are no more persuasive than Marmen's objections to the use of the Cohen's *d* coefficient in this particular case. And notably, while both *amici* and Marmen attack Commerce's current differential pricing methodology as unreasonable, what is reasonable depends on what the agency's task is, and what workable options are available for performing it.

The task that Congress has set for Commerce, simply put, is not the calculation of Cohen's *d* coefficients under perfect experimental conditions. It is the determination of dumping margins with a view toward meaningfully addressing dumping behavior that the agency's standard comparison methodology would otherwise mask. 19 U.S.C. § 1677f-1(d)(1)(B); Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 842-43 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178. The agency's tri-partite differential pricing analysis, which involves the Cohen's *d* coefficient at only the first step, reasonably sets multiple conditions on the resort to an alternative methodology, with those conditions keyed to the statutory requirements that pricing

differences be "significant," be present in a "pattern," and not be addressed by the standard comparison methodology. 19 U.S.C. § 1677f-1(d)(1)(B). Commerce developed the differential pricing analysis, which includes the Cohen's *d* test, to implement this directive from the statute.

Finally, WTTC notes that rejection of Commerce's reliance on the Cohen's *d* coefficient in its differential pricing analysis would not end the story for this litigation – or for others. Commerce would simply be forced back to the drawing board in terms of how it determines when the statutory conditions for employing an alternative methodology comparison are met. But Commerce's current methodology, as the agency has explained and as detailed above, is reasonable given the task it must perform. Certainly, Marmen and *amici* identify no means of making the required determination that is *more* reasonable than the one that they challenge. Accordingly, this Court should affirm Commerce's differential pricing analysis here.

## VII.  <u>CONCLUSION</u>

For the foregoing reasons, Commerce's final affirmative AD determination regarding Canadian wind towers should be affirmed in all respects.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Wind Tower Trade Coalition*

Dated: January 8, 2024

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1877

**Short Case Caption:** Marmen Inc. v. United States

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __11,515__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: January 8, 2024          Signature:    /s/ Alan H. Price

                               Name:         Alan H. Price