2023-1877

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

MARMEN INC., MARMEN ENERGIE INC., MARMEN ENERGY CO.,

Plaintiffs-Appellants,

v.

UNITED STATES, WIND TOWER TRADE COALITION,

Defendants-Appellees

Appeal from the United States Court of International Trade in
Case No. 1: 20-CV-00169, Judge Jennifer Choe-Groves

## NON-CONFIDENTIAL BRIEF OF
## DEFENDANT-APPELLEE UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
JESUS N. SAENZ
Attorney
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

JOSHUA E. KURLAND
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0477
Email: Joshua.E.Kurland@usdoj.gov

January 8, 2024

*Attorneys for Defendant-Appellee*
*United States*

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES...............................................................1

STATEMENT OF THE CASE...............................................................1

STATEMENT OF FACTS ....................................................................2

I.    The Statutory Framework..............................................................2

II.   Commerce's Investigation ...........................................................3

III.  The Trial Court's Initial Decision ..............................................7

IV.   Commerce's Remand Results And The Trial Court's Judgment..............10

SUMMARY OF THE ARGUMENT ...................................................12

ARGUMENT ........................................................................................13

I.    Standard Of Review....................................................................13

II.   Commerce's Determination To Weight-Average Marmen's Steel
      Costs Across CONNUMs Is Supported By Substantial Evidence
      And Lawful ...............................................................................15

      A. Background...........................................................................15

      B. Commerce Lawfully Weight-Averaged Marmen's Reported Steel
         Plate Costs Across CONNUMs..........................................17

      C. Substantial Evidence Supports Commerce's Finding That
         Marmen's Reported Steel Plate Cost Differences Do Not Stem
         From Differences In The Wind Towers' Physical Characteristics ......23

      D. Commerce Reasonably Determined That Marmen's Reported Steel
         Plate Cost Differences Stem From The Timing Of Marmen's Sales...27

III.   Commerce Reasonably Rejected Marmen's Additional Cost
       Reconciliation Item........................................................................31

       A. Background.................................................................................31

       B. Commerce's Remand Determination ...................................35

       C. Commerce Reasonably Determined Not To Rely On Marmen's
          Additional Revision To Its Financial Information .............................37

       D. Marmen's Arguments Concerning The Cost Adjustment Lack
          Merit. ........................................................................................43

IV.   Commerce's Application Of Its Differential Pricing Analysis To
      Evaluate Marmen's United States Sales Is Supported By Substantial
      Evidence And Lawful ................................................................47

       A. Overview Of Differential Pricing Analysis...........................47

       B. Commerce Lawfully Applied Its Differential Pricing Analysis
          In Evaluating Marmen's United States Sales ......................................52

       C. Marmen's Arguments Based On Academic Literature Lack Merit .....56

       D. Marmen's Arguments Based On Its Hypothetical Lack Merit ............65

V.    The Court Should Disregard Materials And Arguments From Outside
      The Record Of This Case ..........................................................70

CONCLUSION ................................................................................73

## **CONFIDENTIAL MATERIAL DESIGNATION**

The material designated as confidential using brackets on pages 24, 26, 28, 30, 37, and 46 of this brief entails information about the costs, specifications, and internal accounting data pertaining to the appellant's wind tower products and steel plate inputs that was designated as confidential in the underlying administrative proceeding and that was released by the Department of Commerce under an administrative protective order (APO).  The APO provides that the information cannot be shared with any party not approved under the APO.  Because the information is proprietary information of another person, pursuant to regulation, no further public summary is provided in the public version of this response brief beyond the general descriptor required by the Court's rules. See 19 C.F.R. § 351.304(c)(1) ("A submitter should not create a public summary of business proprietary information of another person.").

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
   802 F.3d 1339 (Fed. Cir. 2015) ............................................................. 13

*Apex Frozen Foods Priv. Ltd. v. United States*,
   862 F.3d 1337, 1341 (Fed. Cir. 2017) ........................................... 48, 49

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ............................................................ 14

*Axiom Res. Mgmt., Inc. v. United States*,
   564 F.3d 1374 (Fed. Cir. 2009) ............................................................ 71

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017) ............................................................. 71

*Camp v. Pitts*,
   411 U.S. 138 (1973) ......................................................................... 71

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ......................................................................... 14

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ......................................................................... 14

*Corus Staal BV v. United States*,
   502 F.3d 1370 (Fed. Cir. 2007) ............................................................ 72

*Dongkuk S&C Co. Ltd., v. United States*,
   600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022),
   *appeal pending* Fed. Cir. No. 23-1419 ........................................ 21, 22

*Dongkuk S&C Co. v. United States*,
   548 F. Supp. 3d 1376 (Ct. Int'l Trade 2021) ......................................... 4

*Downhole Pipe & Equip. L.P. v. United States,*
    776 F.3d 1369 (Fed. Cir. 2015) ..................................................... 14, 31

*Essar Steel Ltd. v. United States,*
    678 F.3d 1268 (Fed. Cir. 2012) ............................................................71

*Fieger v. Michigan Supreme Ct.,*
    553 F.3d 955 (6th Cir. 2009) ...............................................................66

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ............................................... 14, 43, 47

*Ghigi 1870 S.P.A. v. United States,*
    547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021).......................................47

*Gov't of Quebec v. United States,*
    567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022),
    *appeal pending* Fed. Cir. No. 22-1807 .......................................... 33, 42

*Haixing Jingmei Chem. Prod. Sales Co. v. United States,*
    335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018)................................. 27, 31

*Marmen Inc. v. United States,*
    545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021)................................ *passim*

*Marmen Inc. v. United States,*
    627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023)................................ *passim*

*Mid Continent Steel & Wire, Inc. v. United States,*
    940 F.3d 662 (Fed. Cir. 2019) ............................................... 62, 68, 70

*Mid Continent Steel & Wire, Inc. v. United States,*
    31 F.4th 1367 (Fed. Cir. 2022) ..................................................... 64, 69

*Mittal Steel Point Lisas Ltd. v. United States,*
    548 F.3d 1375 (Fed. Cir. 2008) ...........................................................72

*Nan Ya Plastics Corp. v. United States,*
    810 F.3d 1333 (Fed. Cir. 2016) ...........................................................72

*NEXTEEL Co. v. United States*,
   355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) .................................................. *passim*

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ...........................................................................14

*PSC VSMPO-Avisma Corp. v. United States*,
   688 F.3d 751 (Fed. Cir. 2012) ...................................................................... 15, 43

*Rhone Poulenc, Inc. v. United States*,
   899 F.2d 1185 (Fed. Cir. 1990) ...........................................................................23

*Rita v. United States*,
   551 U.S. 338 (2005) .............................................................................................66

*Sage Prods., Inc. v. Devon Indus., Inc.*,
   126 F.3d 1420 (Fed. Cir. 1997) ...........................................................................72

*Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v.*
   *United States*,
   268 F.3d 1376 (Fed. Cir. 2001) ...........................................................................13

*Stupp Corp. v. United States*,
   5 F.4th 1341 (Fed. Cir. 2021) ........................................................................ *passim*

*Stupp Corp. v. United States*,
   619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) ......................................... 52, 68, 69

*Thai Plastic Bags Indus. Co. v. United States*,
   746 F.3d 1358 (Fed. Cir. 2014) .................................................................. 3, 17, 23

*Torrington Co. v. United States*,
   68 F.3d 1347 (Fed. Cir. 1995) ......................................................................... 3, 14

*U.S. Steel Grp. v. United States*,
   96 F.3d 1352 (Fed. Cir.1996) ..............................................................................15

*Union Steel v. United States*,
   713 F.3d 1101 (Fed. Cir. 2013) ...........................................................................13

*United States v. Eurodif*,
   555 U.S. 305 (2009) ...............................................................13

*United States v. L.A. Tucker Truck Lines, Inc.*,
   344 U.S. 33 (1952) ................................................................72

*Uttam Galva Steels Ltd. v. United States*,
   997 F.3d 1192 (Fed. Cir. 2021) ..............................................2

**Statutes**

19 U.S.C. § 1516a ...................................................................13

19 U.S.C. § 1673 ......................................................................2

19 U.S.C. § 1677b(a) ............................................................2, 3

19 U.S.C. § 1677b(b) ..............................................................16

19 U.S.C. § 1677b(f) .......................................................2, 17, 19

19 U.S.C. § 1677f-1(d)........................................................48, 49

19 U.S.C. § 3512(d) ................................................................47

28 U.S.C. § 2637(d) ................................................................71

28 U.S.C. § 2639(a) ................................................................14

**Regulations**

19 C.F.R. § 351.301(c)..............................................................6

19 C.F.R. § 351.414(b) .......................................................48, 49

19 C.F.R. § 351.414(c)............................................................48

**Legislative Materials**

Uruguay Round Agreements Act, H.R. Rep. No. 103-316 (1994),
*reprinted in* 1994 U.S.C.C.A.N. 4040 ............................................ *passim*

**Administrative Determinations**

*Certain Pasta from Italy*,
    83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 11, 2018) ........................... 19, 20

*Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea,
    and the Socialist Republic of Vietnam,*
    84 Fed. Reg. 37,992 (Dep't of Commerce Aug. 5, 2019) ............................. 4, 15

*Utility Scale Wind Towers from Canada*,
    85 Fed. Reg. 8,562 (Dep't of Commerce Feb. 14, 2020) ..................................... 4

*Utility Scale Wind Towers From Canada*,
    85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020) ................................. 1, 5

*Utility Scale Wind Towers from the Republic of Korea*,
    85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020) .................................... 21

*Welded Carbon Steel Standard Pipe and Tube Products from Turkey*,
    82 Fed. Reg. 49,179 (Dep't of Commerce Oct. 24, 2017) ........................... 19, 21

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, counsel for appellee states that he is unaware of any other appeal in or from this civil action that was previously before this Court or any other appellate court, and is also unaware of any case pending before this Court or any other court or agency that will directly affect or be directly affected by this Court's decision in this appeal.

At the same time, counsel is aware of two actions before this Court that are not "related" under the Court's rule, but involve legal issues similar to issues raised in this appeal (in the context of the separate records of those cases). The first action is *Dongkuk S&C Co., Ltd. v. United States*, Fed. Cir. No. 23-1419, which also involves a challenge to Commerce's "cost smoothing" determination in the context of a proceeding concerning wind towers from the Republic of Korea. The second action is *Stupp Corporation, et al., v. United States*, Fed. Cir. No. 23-1663, which also challenges aspects of the Department of Commerce's "differential pricing" methodology employed in antidumping duty cases. In addition, counsel is aware of several trial court cases involving challenges to Commerce's "differential pricing" methodology. These include:

- *Mid Continent Steel & Wire, Inc. v United States*, Ct. Int'l Trade No. 15-00213
- *NEXTEEL Co., Ltd. v. United States*, Ct. Int'l Trade No. 18-00083
- *HiSteel Co., Ltd v. United States*, Ct. Int'l Trade No. 22-00142
- *Resolute FP Canada Inc. v. United States*, Ct. Int'l Trade No. 23-00095
- *Gov't of Canada, et al. v. United States*, Consol. Ct. Int'l Trade No. 23-00187

## STATEMENT OF THE ISSUES

1.    Whether the Department of Commerce's (Commerce's) determination to adjust appellants' steel plate costs through weight-averaging (also known as "cost smoothing") is supported by substantial evidence and otherwise lawful.

2.    Whether Commerce's rejection of appellants' unaudited adjustment to their cost reconciliation filing is supported by substantial evidence and lawful.

3.    Whether Commerce's use of a Cohen's *d* test as part of its differential pricing analysis is lawful when the test is applied to reported sales data without requiring the data to satisfy certain statistical assumptions.

## STATEMENT OF THE CASE

Plaintiffs-appellants, Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, Marmen), challenge aspects of Commerce's antidumping duty investigation concerning wind towers from Canada.  *Utility Scale Wind Towers From Canada*, 85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020), and accompanying Issues and Decision Memorandum (Appx3853-3872) (*Final Results*).  Marmen, a Canadian wind towers producer, appeals the trial court's decisions and judgment in *Marmen Inc. v. United States*, 545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) (*Marmen I*), and *Marmen Inc. v. United States*, 627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023) (*Marmen II*), sustaining Commerce's investigation.

## STATEMENT OF FACTS

### I.    The Statutory Framework

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade practices.  Under that regime, Commerce must impose antidumping duties on imported goods that are being sold, or are likely to be sold, in the United States at less than fair value (*i.e.*, dumped) in a way that injures a domestic United States industry.  19 U.S.C. § 1673.  Dumping occurs when a foreign firm sells a product in the United States at a price lower than the product's normal value.  *Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192, 1194 (Fed. Cir. 2021) (citation omitted).  Commerce determines a respondent's dumping margin by calculating the amount by which the normal value exceeds the United States export price or a constructed export price.  *Id.*  Normal value is generally calculated as "the price at which the foreign like product is first sold . . . for consumption in the exporting country."  19 U.S.C. § 1677b(a)(1)(B)(i).

When Commerce must evaluate a respondent's costs in its calculations, Commerce relies on the company's normal books and records for purposes of calculating the cost of production if the books and records satisfy two conditions: (1) they are kept in accordance with generally accepted accounting principles (GAAP) in the company's home country, and (2) they reasonably reflect the cost to produce and sell the merchandise.  19 U.S.C. § 1677b(f)(1)(A).  When costs

reported in a company's books are not reasonable—for example, if cost differences among products do not represent differences in their physical characteristics—Commerce may revise the distorted costs. Appx3857 (citations omitted). It is thus normal for Commerce to adjust a company's reported costs to address distortions when it encounters cost differences attributable to factors beyond differences in the products' physical characteristics. *See, e.g.*, *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1366-67 (Fed. Cir. 2014); *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1361-62 (Ct. Int'l Trade 2019) (adjusting steel input costs).

Finally, the statute directs that "a fair comparison shall be made between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a); *see Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (statutory framework seeks "to produce a fair . . . comparison between foreign market value and United States price"). To this end, Commerce identifies the subject merchandise's commercially significant physical characteristics and uses them to establish "control numbers" or CONNUMs assigned to a group of materially identical products to distinguish them from similar but non-identical merchandise for sales comparison purposes.

## II.    <u>Commerce's Investigation</u>

Wind towers are large structures designed to support the nacelle and rotor blades of a wind turbine, and can vary in height and weight, among other physical

characteristics. *Dongkuk S&C Co. v. United States*, 548 F. Supp. 3d 1376, 1379 (Ct. Int'l Trade 2021) (*Dongkuk I*). Wind towers typically consist of three to five cylindrical or conical sections, each consisting of multiple steel plates (the main material input), rolled and welded together to form a steel shell. *Id.*

In response to a petition filed by defendant-appellee, Wind Tower Trade Coalition (WTTC), Commerce initiated an antidumping duty investigation of wind tower imports from Canada in August 2019. *Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam*, 84 Fed. Reg. 37,992 (Dep't of Commerce Aug. 5, 2019). Commerce subsequently selected Marmen Inc. and Marmen Énergie Inc. as the mandatory respondents in the investigation because they were the largest exporters of wind towers to the United States by volume during the period of investigation, later collapsing the companies into a single mandatory respondent. Appx58-64; Appx2462 n.7.

In February 2020, Commerce published an affirmative preliminary determination in its investigation, calculating a 5.04 percent weighted-average dumping margin for Marmen. *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 8,562 (Dep't of Commerce Feb. 14, 2020), and Prelim. Decision Memo (excerpted at Appx2461-2468). As part of the preliminary determination, Commerce weight-averaged or "smoothed" Marmen's reported steel plate costs across its reported CONNUMs. Appx2468. Further, Commerce applied its

4

"differential pricing" analysis to examine whether there was a pattern of export prices that differed significantly among purchasers, regions, or time periods for comparable sales. Appx2463. Based on this analysis, one component of which is a "Cohen's *d*" test to gauge whether significant price differences exist, Commerce preliminarily found such a pattern and that using an "average-to-average" (A-to-A) sales comparison method could not account for the differences, leading Commerce to apply an "average-to-transaction" (A-to-T) comparison method in calculating Marmen's weighted-average dumping margin. Appx2465.

In addition, prior to the preliminary determination, Commerce had requested that Marmen submit a revised cost reconciliation stemming from restatements of Marmen Inc.'s and Marmen Énergie's audited financial statements. Appx2455-2456. Marmen, however, submitted a February 2020 response to this supplemental questionnaire that included unsolicited new factual information revising the cost reconciliation beyond the update that Commerce requested. Appx3706-3707 (Commerce rejection letter); *see generally* Appx4821-4823 (describing these issues). Commerce thus rejected the portions of the submission containing the unsolicited new factual information. Appx3706-3707; Appx3756-3757.

In June 2020, Commerce published its final determination. Consistent with its preliminary determination, Commerce continued to find that wind towers from Canada were being dumped in the United States. *Final Results*, 85 Fed. Reg. at

40,239.  Commerce's final determination also continued to weight-average or "smooth" Marmen's reported steel plate costs across its reported CONNUMs, with the exception of excluding one CONNUM relating to a product for which Marmen used high-thickness plate in production.  Appx3856-3858.  Commerce based its determination on record evidence demonstrating that—with the exception of that one excluded CONNUM—the reported plate cost differences were due to factors unrelated to differences in the physical characteristics of the products.  *Id.*

Commerce in the final determination also maintained its rejection of the cost reconciliation adjustment that Marmen included in its February 2020 submission because Commerce continued to find that the adjustment was unsolicited new factual information.  Appx3859-3861.  Marmen argued that the information was corrective in nature and thus permitted under 19 C.F.R. § 351.301(c).  Appx3859.

Furthermore, Commerce considered Marmen's argument that Commerce's differential pricing analysis had falsely identified a pattern of significant price differences, but continued to use the A-to-T comparison method.  Appx3862-3863.  Commerce determined that, on an overall basis, 68.29 percent of Marmen's United States sales passed the Cohen's *d* test, and that the A-to-A method could not account for the differences because there was a greater than 25 percent change between the margins calculated using the A-to-A and A-to-T methods.  *Id.*

6

### III.    The Trial Court's Initial Decision

Before the Court of International Trade, Marmen challenged Commerce's "smoothing" adjustment to Marmen's reported steel plate input costs, Commerce's rejection of the cost reconciliation adjustment, and Commerce's differential pricing analysis.  In October 2021, the trial court sustained Commerce's determination, in part, and remanded, in part.  *Marmen I*, 545 F. Supp. 3d 1305.  In particular, the trial court sustained Commerce's weight-averaging or "smoothing" adjustment, while remanding Commerce's rejection of Marmen's supplemental cost reconciliation adjustment and its differential pricing analysis.  *Id.* at 1324.[1]

With respect to the weight-averaging or "smoothing" adjustment, the trial court held that Commerce had reasonably determined that Marmen's records did not reflect the costs associated with production and sale of Marmen's merchandise.  *Id.* at 1312-15.  The court recognized that  "Commerce may reject a company's records if it determines that accepting them would distort the company's true costs" and that "Commerce's stated practice is to adjust costs to address distortions when cost differences are attributable to factors beyond differences in the physical characteristics of such products{.}"  *Id.* at 1313, 1314 (citations omitted).  The court further observed that the statute and Commerce's practice "focus on whether

---

[1] The domestic industry also raised several claims challenging Commerce's final results, and the trial court sustained Commerce's determination as to those claims.

reported costs reasonably reflect the costs of producing and selling merchandise—without requiring examined CONNUMs to be nearly identical." *Id*. at 1315 (citations omitted). Thus, the trial court found Commerce's determination in this case consistent with the relevant statute and Commerce's stated practice. *Id.*

The trial court then identified several evidentiary grounds for sustaining Commerce's cost-smoothing adjustment. First, record evidence demonstrates that Marmen's "plate costs did not vary for plates of different thickness, length, width, and weight." *Id*. Second, the record shows that "Marmen's suppliers did not charge different prices for plates of varying physical characteristics, except to apply an upcharge for plates over a certain thickness." *Id*. Third, the "record documents cited by Commerce support Commerce's determination that a majority of the higher-priced CONNUMs were sold earlier in the period of investigation." *Id.* Therefore, the court held that "Commerce's determination that differences in plate prices were related to timing of production and factors other than differences in physical characteristics is supported by substantial evidence." *Id.*

With respect to the cost reconciliation adjustment issue, the trial court remanded Commerce's decision to reject Marmen's additional cost reconciliation item. *Id.* at 1315-17. Specifically, after discussing jurisprudence concerning Commerce's obligation to accept corrective information during the preliminary results stage of a proceeding, the court held that the cost reconciliation information

submitted by Marmen was corrective in nature rather than unsolicited new factual information.  *Id.* at 1316-17.  It further found that "{a}bsent record evidence indicating a reason to question the veracity of Marmen's cost reconciliation information, concerns over the accuracy of the calculated dumping margin favor accepting Marmen's submitted cost reconciliation information."  *Id.* at 1317.  The court thus found Commerce's rejection of the information to be an abuse of discretion and remanded to Commerce for further explanation or consideration.  *Id.*

With respect to Commerce's differential pricing analysis, the trial court remanded Commerce's use of the Cohen's *d* test for further explanation.  In doing so, the trial court recognized this Court's similar remand in *Stupp Corporation v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), and questioned whether Commerce's differential pricing analysis "violated the assumptions of the normality and roughly equal variances associated with the Cohen's *d* test."  *Id*. at 1320.  *Stupp*, in turn, remanded for Commerce "to explain whether the limits on the use of the Cohen's *d* test . . . were satisfied . . . or whether those limits need not be observed when Commerce uses the Cohen's *d* test in {antidumping} adjudications."  5 F.4th at 1360.  Thus, the trial court remanded Commerce's analysis and resulting use of the A-to-T method for Commerce to explain "whether the limits on the use of the Cohen's *d* test were satisfied in this case in the context of the *Stupp* case."  *Marmen I*, 545 F. Supp. 3d at 1320.

9

IV.   **Commerce's Remand Results And The Trial Court's Judgment**

Commerce on remand complied with the Court's directions to provide

further consideration and explanation regarding Marmen's supplemental cost

reconciliation adjustment and the differential pricing analysis.  Appx4817-4866.

Regarding the cost reconciliation issue, Commerce reopened the record to

solicit Marmen's supplemental cost reconciliation information (which Marmen

submitted along with further documentation).  Appx3896-3898; Appx3899-3913.

Commerce then thoroughly evaluated Marmen's proposed adjustment, concluding

that "there is insufficient record evidence to support this new reconciling item

because it adjusts for {exchange losses} already accounted for in the costs that

were reported to Commerce."  Appx4820.  Commerce additionally found that

Marmen's adjustment for a subset of transactions between Canadian companies

that allegedly occurred in U.S. dollars was unreliable due to evidence calling the

currency of the transactions into question.  Appx4858-4859.

Addressing the differential pricing issue, Commerce explained why the

concerns raised in *Stupp* do not establish that use of the Cohen's *d* test distorts

Commerce's differential pricing analysis.  Appx4828-4853, Appx4862-4866.  In

doing so, Commerce explained that the assumptions discussed in *Stupp* are

unnecessary when Commerce uses the full population of observations in tis

Cohen's *d* test, rather than a sample.  Appx4839-4840.

In March 2023, the trial court sustained Commerce's remand results. *Marmen II*, 627 F. Supp. 3d 1312. With respect to the cost reconciliation adjustment, the trial court recognized that Commerce had accepted and considered numerous revisions to the cost reconciliation presented by Marmen. *Id.* at 1318. Likewise, the court recognized Commerce's citation to record evidence that, prior to Marmen's further adjustment, Marmen's auditor had already adjusted the costs reported in Marmen's financial statements to account for exchange rate gains and losses. *Id.* at 1319; *see also id.* at 1319-20 (discussing specific findings and evidence). Thus, the court held that "Commerce's determination that another adjustment would be inappropriate is supported by substantial evidence" and that "Commerce did not abuse its discretion by rejecting Marmen's proposed corrective information, recognizing that Commerce has an interest in ensuring finality and increasing the accuracy of the calculated dumping margins." *Id.* at 1320.

With respect to differential pricing analysis, the trial court recognized Commerce's explanation that "the statistical criteria, such as the number of observations, a normal distribution, and approximately equal variances, are related to the statistical significance of sampled data and establish the reliability of an estimated parameter based on the sample data." *Id.* at 1321. Thus, the court held that "Commerce's use of a population, rather than a sample, in the application of the Cohen's *d* test sufficiently negates the questionable assumptions about

thresholds that were raised in *Stupp*" and that "Commerce's application of the Cohen's *d* test to determine whether there was a significant pattern of differences was reasonable{.}" *Id*. at 1322. Accordingly, the trial court concluded that Commerce's differential pricing analysis and use of the Cohen's *d* test were lawful, and sustained Commerce's remand redetermination. *Id*. This appeal followed.

## SUMMARY OF THE ARGUMENT

The trial court's judgment should be affirmed because Commerce's determinations are both supported by substantial evidence and lawful.

First, Commerce lawfully weight-averaged or "smoothed" Marmen's disparate steel plate costs. The record evidence supports Commerce's finding that significant differences in Marmen's steel plate costs among CONNUMs resulted primarily from factors unrelated to differences in the physical characteristics of the wind tower products associated with the CONNUMs. Thus, Commerce reasonably determined that the timing of the steel plate purchases was the significant factor driving the steel plate cost differences between finished wind towers, and that weight-averaging or "smoothing" the costs was appropriate.

Second, Commerce lawfully rejected the additional adjustment included in Marmen's revised cost reconciliation. Commerce reasonably determined that the record evidence did not support using Marmen's new reconciliation item because it adjusts for amounts already reflected in the costs Marmen reported to Commerce

and also that Marmen's adjustment was otherwise unreliable.

Third, Commerce lawfully relied on its differential pricing analysis in determining to use an average-to-transaction method to calculate Marmen's dumping margin. Commerce explained why statistical assumptions of normality and roughly equal variance are not relevant to Commerce's application of the Cohen's $d$ test. Thus, Commerce's differential pricing analysis and use of the Cohen's $d$ test were both reasonable and lawful.

## ARGUMENT

## I.    Standard Of Review

The Court upholds Commerce's determinations unless they are unsupported by substantial record evidence or otherwise unlawful. *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *see United States v. Eurodif*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies . . . are conclusive unless unsupported by substantial evidence."). Although this amounts to repeating the trial court's work, the Court "will not ignore the informed opinion of the {CIT}." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citations omitted). The Court also recognizes "Commerce's special expertise" as "master" of the antidumping laws. *Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001);

*Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995). Indeed, Commerce's determinations are "presumed to be correct." 28 U.S.C. § 2639(a)(1).

Substantial evidence connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Hence, "{i}t is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." *Downhole Pipe & Equip. L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) (citation omitted). A party disputing Commerce's determination under the substantial evidence standard thus "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains a determination if it is reasonable and supported by the record as a whole, including detracting evidence. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

Further, the Court affords Commerce "tremendous deference" when Commerce exercises its technical expertise to make "complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039

(Fed. Cir. 1996) (citations omitted); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (quoting *Fujitsu*). Thus, when a statute fails to state "any Congressionally mandated procedure or methodology for assessment of the statutory tests," Commerce "may perform its duties in the way it believes most suitable." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir.1996).

## II. Commerce's Determination To Weight-Average Marmen's Steel Costs Across CONNUMs Is Supported By Substantial Evidence And Lawful

Commerce's determination to weight-average or smooth Marmen's reported steel plate costs is supported by substantial evidence showing that significant cost differences among Marmen's CONNUMs resulted from factors unrelated to the products' physical characteristics. None of Marmen's contrary arguments refute Commerce's reasonable finding in this regard.

### A. Background

Upon initiating the investigation, Commerce stated that it would provide all parties with an opportunity to comment on the appropriate wind tower physical characteristics for Commerce to require respondents to report in responding to Commerce's antidumping questionnaire. *Initiation Notice,* 84 Fed. Reg. at 37,993-94. Commerce highlighted that the requested information "will be used to identify the key physical characteristics of the subject merchandise in order to develop appropriate product-comparison criteria, as well as to report the relevant factors of production (FOPs) accurately." *Id.* at 37,994.

15

Ultimately, Commerce identified and selected nearly a dozen physical characteristics as the most significant in differentiating costs among wind tower models. Appx2466; Appx3857. The physical characteristics define the unique products, or CONNUMs, for sales comparison purposes, and the level of detail within each physical characteristic reflects the importance Commerce places on comparing the most similar products in a price-to-price comparison. Appx3857. Importantly, as Commerce explained, a respondent's reported costs should reflect meaningful cost differences attributable to these physical characteristics. *Id.* This ensures that the product-specific costs that Commerce uses in its various calculations accurately reflect the physical characteristics of the products. *Id.*

Correspondingly, in accordance with 19 U.S.C. § 1677b(b)(2)(A)(ii), Commerce requested cost of production information from Marmen and applied its standard methodology of using annual costs to calculate the weighted-average cost of production. Commerce then used the physical characteristics of Marmen's products as a "guidepost" to analyze the steel plate costs. Appx3858. Commerce ultimately weight-averaged or smoothed Marmen's reported steel plate costs across CONNUMs because the record demonstrated that significant cost differences among the CONNUMs resulted from factors unrelated to differences in physical characteristics defining the CONNUMs. *See* Appx2467-2468; Appx3856-3858; *see also* Appx3874 (final cost calculation memo for Marmen).

16

B. **Commerce Lawfully Weight-Averaged Marmen's Reported Steel Plate Costs Across CONNUMs**

Marmen's claims that Commerce's determination is arbitrary and unlawful fail to rebut Commerce's explanation in its decision memorandum. As Commerce explained, it relies on a company's normal books and records in its calculations if they (1) are kept in accordance with GAAP in the company's home country and (2) reasonably reflect the cost to produce and to sell the merchandise. Appx3857; 19 U.S.C. § 1677b(f)(1)(A); *see also Thai Plastic Bags*, 746 F.3d at 1364-65. Accordingly, when the costs reported in a company's books are not reasonable— for example, if cost differences among products do not represent differences in their physical characteristics—it is both appropriate and consistent with Commerce's practice to address such distortions. *See* Appx3857, Appx3858 n.20 (citing examples); *see also*, *e.g.*, *NEXTEEL*, 355 F. Supp. 3d at 1361-62.

Commerce determined in this case that, although Marmen's books and records met the first criterion under section 1677b(f)(1)(A) because they are kept in accordance with Canadian GAAP, they did not "reasonably reflect" the cost to produce subject merchandise based on the physical characteristics that Commerce identified in defining different CONNUMs. *See* Appx3857-3858. Specifically, Commerce explained that cost fluctuations that Commerce observed among Marmen's CONNUMs could not be explained by their physical characteristics, despite the fact that Marmen's suppliers did not charge prices correlating to

different grades, thicknesses, widths, or lengths of steel plate. *See id.* (discussing Appx3709-3710, Appx3718-3735 (Marmen questionnaire response addressing issue)).[2] Moreover, record evidence showed that the cost differences were linked to "a pattern where most of the CONNUMs with the higher plate costs were sold early in the {period of investigation}, whereas CONNUMs with lower plate costs were sold later in the {period of investigation}." Appx3858; *see also* Appx3874, Appx3879-3880 (final cost calculation memo).

When faced with such situations, as explained above, Commerce's practice is to adjust costs to address distortions. *See* Appx3858. Thus, upon determining that Marmen's reported costs did not reflect meaningful differences attributable to physical characteristics defining the CONNUMs, Commerce followed its practice and corrected that distortion (save for a CONNUM involving high-thickness plate). *See id.* Thus, as the trial court found, "Commerce followed statutory requirements and Commerce's stated practices" in supporting its determination that "Marmen's records did not reasonably reflect the costs associated with the production and sale of Marmen's merchandise." *Marmen I*, 545 F. Supp. 3d at 1315.

Nonetheless, Marmen argues that "Commerce arbitrarily disregarded its standard 'cost-smoothing' practice without explanation," allegedly by "failing to examine whether Marmen's reported plate costs differed significantly among

---

[2] The only exception was high-thickness plate entailing a supplier surcharge. *Id.*

nearly identical or very similar products." Marmen Br. 26; *see also id.* at 30-32, 33-36. This reflects a misunderstanding of Commerce's practice.

Contrary to Marmen's claims, Commerce's cost-smoothing practice is not limited solely to instances in which the products are "identical" or "very similar." Although the particular issue addressed by smoothing is easier to identify among products that are very similar, the key factor is whether a respondent's reported cost differences properly reflect production differences associated with physical characteristics, as distinguished from other unrelated factors. *See* Appx3857; 19 U.S.C. § 1677b(f)(1)(A) (providing that Commerce will use records if they "reasonably reflect" production costs); *see also Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 82 Fed. Reg. 49,179 (Dep't of Commerce Oct. 24, 2017), at IDM Cmt. 2 (*Pipe & Tube from Turkey*) (explaining generally that, under section 1677b(f)(1)(A), Commerce may revise costs "if cost differences among products do not represent differences in physical characteristics").

Commerce thus applies its practice of adjusting unreasonable cost reporting both to finished products *and* to individual inputs for such products. *See*, *e.g.*, *Pipe & Tube from Turkey*, 82 Fed. Reg. 49,179, at IDM Cmt. 2 (re-allocating costs for zinc input); *Certain Pasta from Italy*, 83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 11, 2018), at IDM at 3-11 (*Pasta from Italy*) (smoothing costs for semolina input for pasta). When cost differences are unreasonable because they do not stem

from meaningful physical differences in the input—*e.g.*, semolina used in finished products comprising different pasta types—Commerce will smooth the costs for that input. *See Pasta from Italy*, 83 Fed. Reg. 63,627, at IDM at 3-11.

Similarly, even when there are physical differences between finished products, Commerce will smooth costs among product groups when "differences in costs between CONNUMs cannot be explained solely by the differences in the physical characteristics of the CONNUMs." *Id.* at 8; *see NEXTEEL*, 355 F. Supp. 3d at 1361-62 (sustaining determination focusing on cost differences unrelated to physical characteristics, rather than on similarity of end-products). The finished products do not need to be "identical" or "very similar."

In *Pasta from Italy*, for example, Commerce found that the respondents had reported significantly different costs for the semolina input, resulting in variation in direct material costs among CONNUMs. 83 Fed. Reg. 63,627, at IDM at 8-9. Although Commerce explained that the CONNUMs had similar end products, the crux of the issue was that there were disparities in the reported semolina costs for the different products, despite the fact that they used essentially the same semolina. *See id.* The similarities in the end products merely demonstrated that the disparate semolina costs between nearly identical CONNUMS were not related to the products' physical characteristics. *See id.* Accordingly, Commerce adjusted the respondents' submitted input costs by weight-averaging. *See id.* at 9-11.

Likewise, in *Pipe & Tube from Turkey*, Commerce highlighted *differences* in the end products that were obscured by the way in which the respondent recorded the costs for its zinc input in its accounting system. *See* 82 Fed. Reg. 49,179, at IDM Cmt. 2. Commerce, therefore, found that the respondent's zinc cost allocation was unreasonable because it did not accurately reflect the characteristics that affect the zinc costs incurred in producing a given CONNUM, and it adjusted the costs for the individual zinc input to avoid distortion. *See id.*

Additionally, in its most analogous determination, Commerce's smoothed the respondent's steel plate input costs in its investigation concerning *Wind Towers from Korea. Utility Scale Wind Towers from the Republic of Korea,* 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020), at IDM Cmt. 7; *see Dongkuk S&C Co. Ltd., v. United States*, 600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) (*Dongkuk II*) (sustaining cost-smoothing decision following further explanation on remand), *appeal pending* Fed. Cir. No. 23-1419. Like this case, Commerce in the Korea investigation found that there should be minimal, if any, cost differences for the steel plate input and that differences reported in that case reflected *timing* rather than differences in the wind towers' physical characteristics. *See Wind Towers from Korea*, 85 Fed. Reg. 40,243, at IDM Cmt. 7. Given that *Wind Towers from Korea* involved a similar determination for the same product, and that Commerce likewise applied a cost-smoothing adjustment based on cost fluctuations for the

21

respondent's steel plate input, Commerce's application of its practice in the two proceedings is consistent. *Cf. Dongkuk II*, 600 F. Supp. 3d at 1339 ("Although each of Commerce's determinations involve a unique combination and interaction of many variables, DKSC fails to identify what facts, if any, distinguish *Wind Towers from Canada* from this proceeding.").

Thus, Marmen's claim that Commerce can weight-average unreasonable cost differences between products *only if* the finished products are *identical* or *very similar* is unsupported by Commerce's prior practice. Indeed, as we discuss below, Commerce in this case analyzed steel costs on a per-unit basis, removing any distortions from comparing purchases of different dimensions and quantities of steel plate. *See* Appx3858; Appx3874 (citing Appx3878). Moreover, none of the cases that Marmen cites support the proposition that Commerce may apply its cost smoothing practice *only* to finished products that are identical or very similar. *See* Marmen Br. 31-32; *cf. NEXTEEL*, 355 F. Supp. 3d at 1361 (explaining that steel costs varied by time); *Dongkuk II*, 600 F. Supp. 3d at 1337-38 (similar discussion).

In addition to being consistent with past practice, Commerce's "cost smoothing" adjustment is in accordance with law. As the trial court held, "the relevant statute and Commerce's stated practice focus on whether reported costs reasonably reflect the costs of producing and selling the merchandise—without requiring examined CONNUMs to be nearly identical." *Marmen I*, 545 F. Supp.

3d at 1315 (citation omitted). Marmen's arguments on appeal fail to substantively address the trial court's holding. *See* Marmen Br. 29-36. Consequently, Marmen's position invites distortion and would cause Commerce not to meet its mandate to calculate dumping margins as accurately as possible. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *cf. Thai Plastic Bags*, 746 F.3d at 1366 ("A methodology that shifts costs unreasonably from U.S. sales to home-market sales can heavily influence the Department's entire antidumping calculation." (citation and quotation marks omitted)).

### C. Substantial Evidence Supports Commerce's Finding That Marmen's Reported Steel Plate Cost Differences Do Not Stem From Differences In The Wind Towers' Physical Characteristics

Marmen's claim that Commerce's smoothing determination is unsupported by substantial evidence is equally meritless. In response to Commerce's requests for such materials, Marmen submitted information regarding its steel plate lists (showing the grade and dimensions of each type of plate its customer required), plate thicknesses, and plate costs. *See* Appx3709-3710; Appx3718-3735. After reviewing the information, Commerce found that Marmen's suppliers did not charge prices that correlated to plates of different grade, thickness, width, or length, with the exception of certain high-thickness plates greater than 50.8 mm for which the supplier included a surcharge. *See* Appx3857-3858.

Using the wind towers' physical characteristics as its guidepost, Commerce then compared the reported CONNUM-specific steel plate costs on a per-unit basis with the other CONNUMs. *See* Appx3858; Appx3874. Importantly, because Commerce made its comparisons on a *per-unit* basis, there should not have been significant cost differences among Marmen's plate costs for different CONNUMs based on the products' different physical characteristics. *See id.* Yet, Commerce identified significant variance in the per-unit plate costs, ranging from [   #   ] percent to [   #   ] percent of the average cost. Appx3858; Appx3874; *see also* Appx3878 – Column E, Appx3879-3880 – Column D (final cost calculation memo, showing that per-ton plate costs varied considerably). Moreover, as discussed below, it appeared that Marmen's reported cost differences reflect factors other than differences in the physical characteristics of its products (*i.e.*, timing of production). *See* Appx3858; Appx3874, Appx3880 – Sales Date.

The trial court found that the record evidence supported Commerce's finding: "Record documents reviewed by Commerce support the determination that Marmen's suppliers did not charge different prices for plates of varying physical characteristics, except to apply an upcharge for plates over a certain thickness." *Marmen I*, 545 F. Supp. 3d at 1315 (citing Appx3721-3735). Likewise, "record documents cited by Commerce support Commerce's determination that a majority of the higher-priced CONNUMs were sold earlier in

the period of investigation." *Id.* (citing Appx3878-3880). Thus, the trial court

concluded that Commerce "supported with substantial evidence its determination

that Marmen's records did not reasonably reflect the costs associated with the

production and sale of Marmen's merchandise." *Id.*

Despite the trial court's findings, Marmen argues that its steel suppliers'

plate prices varied by dimension, particularly thickness. *See* Marmen Br. 37-38.

According to Marmen, the plate list that it submitted for the wind towers it sold in

its home market "showed significant price differences among plates with varying

dimensions (thickness, length, and width)." *Id.* Marmen likewise claimed before

Commerce that "{t}hickness, in particular, affects steel plate cost." Appx3709.

Marmen further asserted that "{t}hicker plate is more expensive than thinner plate.

Thicker plates are more difficult for steel mills to roll, require a longer cooling

process, and tie up more of a mill's available capacity {while also entailing higher

delivery costs.}" Appx3711. Correspondingly, in addition to submitting plate lists

for the wind towers it sold in its home market, Marmen submitted purchase

agreements showing what other steel plate suppliers charged for plates exceeding

certain thicknesses. *See* Appx3709-3710; Appx3718-3735.

Contrary to Marmen's arguments, however, the record demonstrates that

supplier cost differences *do not* track observable differences in the physical

characteristics of Marmen's relevant home market and United States CONNUMs,

rendering the reported cost differences across CONNUMs unreliable.

For example, according to Exhibit D-1 in Marmen's second supplemental

Section D questionnaire response, four plates ([ Part # ] through [ Part # ]),

ranging from [ # ] to [ # ] mm in thickness, were all priced at $[ # ], while four

plates ([ Part # ] through [ Part # ]), ranging from [ # ] to [ # ] mm in

thickness, were all priced at $[ # ]. *See* Appx3718-3720. Although the [ # ]

to [ # ] mm plates are thicker than the [ # ] to [ # ] mm plates, the [ # ] to [ # ]

mm plates cost slightly *less* per ton. *See id.* Furthermore, [ Part # ] had a price

of $[ # ] with a thickness of [ # ] mm, while [ Part # ] through [ Part

# ] had a price of $[ # ] with thicknesses of [ # ] to [ # ] mm, again

reflecting that plates of greater thickness actually cost less than those that were

thinner. *See id.* Finally, [ # ] plates, ranging from [ # ] to [ # ] mm in

thicknesses, were all priced at $[ # ]. *See id.* Under Marmen's theory, one

would expect the thicker plates in this range of fifteen plates to cost more per ton,

and those that are thinner to cost less per ton.

The fact that the plate costs do not correlate to increases in thickness

undermines Marmen's assertions that there is a significant price difference for

plates of different dimensions. Conversely, that Marmen's *per-unit* costs *did vary*

considerably further undermines its claim that price differences stemmed from

dimensional differences.  The record evidence thus supports Commerce's

determination that the cost variance it observed is not explained by suppliers

charging greater prices based on dimensions and stems from other reasons.

Further, contrary to Marmen's claim that Commerce and the trial court

"ignored" Marmen's contradictory evidence and argument, Marmen Br. 38,

Commerce specifically documented its consideration of the information in

Marmen's case brief.  *See* Appx3856.  Marmen's disagreement with Commerce's

weighing of record evidence is not a valid basis to overturn the decision.  *See*, *e.g.*,

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330,

1346 (Ct. Int'l Trade 2018) ("disagreement with Commerce's weighing of the

evidence" insufficient basis for legal challenge).

### D. Commerce Reasonably Determined That Marmen's Reported Steel Plate Cost Differences Stem From The Timing Of Marmen's Sales

Marmen further argues that Commerce unreasonably assumed that timing,

rather than differences in physical characteristics, explained the differences in

Marmen's steel plate costs in a manner that is inconsistent with the physical

characteristics that Commerce identified as the most significant in differentiating

the costs between products.  Marmen Br. 39-41.  These claims lack merit.

Contrary to Marmen's claims, Commerce explicitly used the physical

characteristics associated with different CONNUMs as a "guidepost" to compare

Marmen's reported CONNUM-specific plate costs with other CONNUMs.

Appx3858.  However, when Commerce computed the plate costs on a per-unit weight basis, for which there should have been little difference among products of different dimensions, it nonetheless found differences from the average plate costs ranging from [ # ] to [ # ] percent (a significant amount for similar inputs). *See* Appx3874, Appx3878 – Column E, Appx3879-3880 – Column D.

Additionally, in further analyzing the record data, Commerce found a pattern indicating that most of the CONNUMs with higher plate costs were sold early in the investigation period, whereas those with lower plate costs were sold later.  *See* Appx3874 (discussing Appx3879-3880).  Thus, as Commerce explained, "it appears that the reported differences in costs are based on factors other than physical differences (*i.e.*, timing)."  *Id.*; *see* Appx3858.

Notwithstanding Commerce's reliance on record evidence in its analysis, Marmen claims (inaccurately) that Commerce simply assumed that timing explained the differences in Marmen's plate costs, without applying Commerce's own identification of the most significant physical characteristics differentiating product costs.  *See* Marmen Br. 39-41.  According to Marmen, Commerce "failed to consider the obvious: that differences in type, weight, and height explained the observed differences in CONNUM specific costs."  *Id.* at 41.

As we explained above, however, Commerce considered physical characteristics in analyzing the cost variance across CONNUMs, and rooted its

analysis in record evidence indicating that physical characteristics did not explain the variance. *See* Appx3858; Appx3874, Appx3878. Further, Marmen provides no compelling evidence demonstrating that differences in physical characteristics account for the differing production costs between products. In fact, before Commerce, Marmen attributed the differences in plate costs to the weight of internal components included in some CONNUMs and not others. *See* Appx3858. Commerce reasonably determined that the record did not support Marmen's claims, and instead, that "{t}he record shows that the weight of the internals is extremely small and does not, therefore, appear to have much of an impact on the analysis of the costs." *Id.*; Appx3874. Marmen later abandoned that argument.

Regarding Marmen's disagreement with Commerce's analysis of the record evidence as to timing, Commerce's examination of Marmen's per-ton costs by date—which appears at Attachment 2 of Commerce's calculation memorandum—supports Commerce's determination that Marmen's reported cost differences are based on timing of steel purchases rather than wind tower physical characteristics. *See* Appx3874, Appx3879-3880. These materials show that the purchases for all of the top five and seven of the top 10 CONNUMs with the most expensive plate costs were made in the first half of the investigation period, while the purchases for six of the remaining nine least expensive CONNUMs were made in the second half

of the period.  *See* Appx3880 – Column D.[3]  In addition, two of the three less

expensive purchases made in the largely high-priced first half of the investigation

period were small quantity purchases that Commerce recognized as "Outlier{s}."

*Id.* – Columns A, D, Sales Date, Final Column.

Thus, the data support Commerce's observation that most of the CONNUMs

with higher plate costs were sold early in the investigation period, while those with

lower plate costs tended to be sold later.  *See* Appx3858; Appx3874.  Indeed, even

Marmen appears to concede that the CONNUMs with lower plate costs were sold

later in the investigation period.  Marmen Br. 40.  Marmen contends that this does

not mean that timing explains the corresponding variance in plate costs, but its

contention ignores the remainder of Commerce's analysis showing that cost varied

on a per-unit basis, even when suppliers charged similar prices for varying grades

and dimensions.  *See id.*; Appx3858; Appx3874.

In sum, as the trial court agreed, record evidence rather than "mere

assumption" supports Commerce's conclusion that the significant differences

across CONNUMs in Marmen's steel plate costs can be attributed to timing rather

---

[3] These figures include the single CONNUM that Commerce excluded in its cost-smoothing adjustment, CONNUM [          CONNUM #          ].  But if that CONNUM is excluded, it would merely mean that the steel purchases for each of the top four and six of the top nine most expensive CONNUMs were made in the first half of the investigation period, while purchases for six of the remaining nine least expensive CONNUMs were made in the second half of the period.  *Id.*

than physical differences, necessitating an adjustment.  Marmen's arguments

amount to "mere disagreement" with Commerce's weighing of record evidence.

*Haixing*, 335 F. Supp. 3d at 1346; *see Downhole Pipe*, 776 F.3d at 1376-77.

## III. Commerce Reasonably Rejected Marmen's Additional Cost Reconciliation Item

The Court should uphold Commerce's reasonable decision not to rely on

Marmen's supplemental cost reconciliation information.  *See Marmen II*, 627 F.

Supp. 3d at 1316-20.  This issue centrally concerns an additional reconciling item

that Marmen included in a supplemental cost reconciliation and asserts is required

to convert the cost of its wind tower purchases from its affiliate Marmen Énergie

from U.S. dollars (USD) to Canadian dollars (CAD) (simultaneously offsetting

adjustments that Marmen's auditor made to its financial statements).  Although

Commerce initially rejected this item as unsolicited new information, following a

trial court remand, Commerce accepted and thoroughly evaluated the supplemental

reconciliation information.  Commerce reasonably found that the record did not

support using Marmen's new reconciliation item because it adjusts for amounts

already reflected in the cost figures that Marmen reported to Commerce and is

otherwise unreliable.  *See* Appx4820-4827; Appx4854-4862.

### A. Background

During the investigation, while responding to Commerce's requests for

information, Marmen reported a series of errors in its audited financial statements.

31

*See* Appx4821-4823 (providing timeline of Marmen's reporting errors).  Marmen

stated that one set of errors related to its recording of U.S. currency transactions

and "a misstatement in the presentation of net foreign exchange gains and losses."

Appx4821; Appx2345 (Marmen Dec. 2019 response to Commerce's supplemental

Section D questionnaire).  The foreign exchange errors caused Marmen's auditors

to restate and to reissue the Marmen Inc. December 31, 2018 audited financial

statements.  Appx4821.  Marmen further stated that its auditors had subsequently

discovered an additional error in Marmen Énergie's financial statements relating to

foreign currency transactions, making it necessary to revise the audited financial

statements for Marmen Énergie as well.  *See id*.

Regarding these errors, Marmen explained that, during its 2018 fiscal year,

Marmen recorded its USD-denominated purchases at a rate of 1:1 such that, at

year-end, Marmen's auditor "makes an adjusting entry to convert those purchases

to the CAD equivalent values."  Appx3713 (excerpt from Marmen Feb. 2020

second supplemental Section D questionnaire response).  Marmen then elaborated,

> {S}ubsequent to the issuance of the original audited
> financial statements, after further investigation of its
> foreign currency transactions for the year, Marmen
> discovered that certain USD purchases for both Marmen
> Inc. and Marmen Énergie had not been converted.
> Consequently, Marmen's auditor determined it was
> necessary to issue amendments for Marmen Inc. to
> convert into CAD certain expenses incurred in USD, and
> in addition recognize the impact of a net loss for the year
> on forward exchange contracts in sales revenue (*i.e.*, as a

> reduction in revenue) rather than as part of exchange
> gains/losses, in conformance with Canadian Generally
> Accepted Accounting Principles ("GAAP").  With
> respect to Marmen Énergie, the company's auditor also
> determined that an amendment was necessary to
> separately present gains/losses on the income statement
> related to foreign currency transactions to align with
> Canadian GAAP.

*Id.*  As a result, the auditors restated Marmen's financial statement while amending

Marmen Énergie's financial statement.  *See id.*; Appx1010-1011 (excerpt from

Marmen first supplemental Section D response, discussing restatement).[4]

After Marmen revised these errors, Commerce accepted both of the restated

financial statements, along with revised financial expense ratio calculations.  *See*

Appx4821.  Notably, the restatement to Marmen's financial statements to account

for foreign exchange gains and losses moved some expenses from other categories

to Marmen's cost of goods sold (COGS).  *Id.*  This caused an increase to Marmen's

COGS, and thus the Cost of Manufacturing (COM) for Marmen's merchandise.

As a result of the changes to the audited financial statements, Commerce

solicited a revised cost reconciliation from Marmen based on the restated financial

statements.  *See* Appx2456.  Commerce's question stated:

---

[4] Marmen's currency accounting issues extended to the companion countervailing
duty investigation concerning wind towers from Canada.  *See Gov't of Quebec v.
United States*, 567 F. Supp. 3d 1273, 1284 (Ct. Int'l Trade 2022), *appeal pending*
Fed. Cir. No. 22-1807 (discussing Commerce discovery of coding errors relating to
currency conversion issues, leading it to reject auditor's currency adjustment).

> Provide a revised cost reconciliation for Marmen Inc. and
> Marmen Énergie, Inc., *which starts with the cost of goods
> sold (COGS) as reported in the amended audited
> financial statements*, and ends with the extended cost file.
> Using the format you have formerly used to report your
> cost reconciliations, provide a comparative analysis to
> these new cost reconciliations using the chart below.
> Quantify and explain all new reconciling items . . .
> Ensure that the COGS figures tie to the December 6,
> 2019 and December 13, 2019 supplemental D responses.

*Id.* (emphasis added).  Commerce further specified that the submission should be

"limited to the questions contained herein.  Additional information or revisions of

previously requested information, not pertinent to this supplemental questionnaire

may result in their rejection, pursuant to 19 CFR 351.301."  *Id.*

Despite Commerce's instructions, Marmen included numerous new

revisions unrelated to the auditor restatements in providing the revised cost

reconciliation.  *See* Appx3706-3707 (Commerce Feb. 2020 rejection letter); *see

generally* Appx4822-4823 (describing these issues).  Although Commerce

accepted nearly all of the revisions as "minor errors" that did not alter the data

presented in Marmen's audited financial statements, Commerce rejected one non-

clerical revision.  *See id.*  According to Marmen, this revision resulted from its

alleged discovery—after its auditor had already restated its financial statement—of

another error by which certain wind tower purchases from Marmen Énergie were

not converted from U.S. to Canadian dollars.  *See* Appx4823 (citation omitted).

34

As Commerce observed on remand, this additional revision by Marmen offset the increase to its Cost of Manufacturing (COM) stemming from Marmen's auditor's previous adjustments for exchange gains and losses (which otherwise resulted in an unreconciled difference in the cost reconciliation). *See* Appx4823. Essentially, Marmen treated this new reconciling item as *non-booked* exchange losses that Marmen Inc. had incurred on purchases of wind tower sections from Marmen Énergie. *See id.* Commerce also observed that Marmen's explanation for the additional adjustment is parallel to the auditor's previous adjustments to restate Marmen's purchases to their CAD equivalent values. *See id.* Marmen at the time did not further explain how, if at all, its additional correction (which was *not* made by its auditor) related to the restated financial statements, or whether it was one of the adjustments brought up by the external auditor. *See id.*

Commerce found that the additional revision amounted to unsolicited new factual information and rejected the submission. *See* Appx3706-3707. The trial court, however, found Commerce's explanation for the rejection insufficient, and remanded for further consideration. *See Marmen I*, 545 F. Supp. 3d at 1315-17.

## B. Commerce's Remand Determination

On remand, Commerce reopened the record and solicited Marmen's supplemental cost reconciliation information. *See* Appx3896-3898. Marmen resubmitted its revised cost reconciliation and other supporting documentation not

previously on the record.  *See* Appx3899-3913.  Marmen alleged that—on top of

its *auditor*'s conversion of various purchases to account for exchange rate gains

and losses (amounts included in the COGS that serves as the starting value in

Marmen's cost reconciliation)—Marmen had omitted in its cost reconciliation a

conversion factor that it applied to a line subtracting from its overall COGS the

value of the company's purchases from Marmen Énergie during the period July 1

to December 31, 2018.  *See* Appx4823; Appx3902-3905 (showing starting COGS

amount (Item A), subtracting value for Marmen Énergie purchases (Item L), and

additional exchange rate conversion (Item L1)).  Marmen claimed that, as a result

of the error, it needed to further correct its reconciliation.  *See* Appx4676-4677.  In

other words, despite representing that its auditor had already subtracted amounts

from its COGS to account for exchange losses, Marmen asserted that it needed to

subtract an *additional amount* to account for the exchange losses on its purchases

from Marmen Énergie, *without* the auditor's endorsement.  *See id.*

      After reviewing Marmen's revised cost reconciliation on remand, Commerce

determined that permitting the new reconciling item would duplicate adjustments

for exchange gains and losses already reflected in Marmen's financial statements.

Appx4823-4827.  Commerce explained that information in the cost reconciliation,

in conjunction with Marmen's representations regarding its auditor's adjustments

for exchange gains and losses, indicate that Marmen's auditor had already made

any necessary adjustments (in addition to those previously included in Marmen's

costs) in restating Marmen's financial statements to produce the COGS used in the

reconciliation.  *See id.*  Conversely, Commerce observed that the record failed to

support the notion that Marmen's additional change was excluded from Marmen's

restated books, and that the claimed need for a further change otherwise would call

into question the completeness of the auditor's revision to Marmen's financial

statements.  *See* Appx4823.  Finally, Commerce observed that Marmen provided

no support for the [    #    ] CAD to USD exchange rate Marmen used to calculate

the additional adjustment.  *See* Appx4824, Appx4859.  Thus, Commerce found it

inappropriate to accept the additional adjustment.  *See* Appx4827.

### C. Commerce Reasonably Determined Not To Rely On Marmen's Additional Revision To Its Financial Information

Marmen claims that Commerce is mistaken that Marmen's additional cost

reconciliation adjustment would "double count" the previous adjustments for

exchange gains and losses made by Marmen's auditor.  *See* Marmen Br. 42-49.

Although Marmen acknowledges that its restated financial statement reflected its

purchases of wind towers from Marmen Énergie in Canadian dollars, as well as its

auditor's various adjustments for exchange gains and losses, Marmen argues that

the reconciling item is the result of a separate inadvertent omission.  *See id.* at 43-

44.  Thus, Marmen claims that it is necessary, when deducting Marmen's July to

December 2018 purchases from Marmen Énergie as part of the reconciliation, to convert the figure from U.S. dollars to Canadian dollars. *See id.*

A review of Marmen's revised cost reconciliation demonstrates that the adjustment is not warranted. As an initial matter, the context for Marmen's further adjustment is that it (1) came late in the investigation, after Commerce had issued a questionnaire instructing Marmen not to make further changes beyond updating its cost reconciliation to reflect those that its auditor made to its financial statements; (2) was *not* made by Marmen's auditor, but by Marmen itself without the auditor's endorsement; and (3) offsets the otherwise unreconciled COGS value resulting from the auditor's similar adjustments to account for foreign exchange gains and losses. Beyond this problematic context, moreover, Commerce explained why the record does not support the adjustment.

Marmen's revised cost reconciliation follows a series of steps to reconcile Marmen's COGS to its financial statements. It begins with Marmen's calendar year 2018 COGS from the restated financial statements, which appears at Item A. Appx3904. Marmen then updates this figure to cover the period of investigation by subtracting the portion of the COGS stemming from January to June 2018 (which is prior to the period of investigation) in Item B, and adding the COGS for January to June 2019 in Item C, to arrive at the total COGS for the investigation period in Item D. *Id.* To reconcile this figure with the Cost of Manufacturing in its

cost database, Marmen next adds and subtracts various accounting items in Items H through R. *Id.* These include subtracting the value of Marmen's wind tower purchases from Marmen Énergie in Item L. *Id.* Marmen, however, then *increases* this figure, while decreasing the COGS, by *also* subtracting Item L1, the additional reconciling items at issue, which it describes as "Exchange Rate Variance on July to Dec 2018 Affiliated Purchases of Wind Sections from Energie." *Id.*

Several other lines from the reconciliation are notable in relation to the exchange rate adjustment issue and Commerce's findings. Specifically, in Item P, Marmen subtracts an item that it describes as the "Auditor Exchange Rate Adjustment" for the period from January to June 2018 (which is outside the period of investigation). Appx3905. Then, in Items Q and R Marmen adds back the portions of the auditor's exchange rate adjustment for the first half of 2018 relating to inputs purchased prior to the period, but still consumed during the period of investigation and thus reported in Marmen's cost database. *Id.* These lines are important because they show, contrary to Marmen's claims that a further exchange rate adjustment is necessary, that the auditor's original and restated exchange rate adjustments (which would include losses on U.S. dollar purchases from Marmen Énergie) are *already* included in the starting COGS figure taken from Marmen's restated financial statements and carried forward in the reconciliation.

Finally, in Item S, Marmen then sums the total of Items H through R to calculate the cost of manufacturing specific to subject merchandise. *Id.* Item T represents the cost of manufacturing specific to subject merchandise reported to Commerce. *Id.* The difference of Items S and T is the reconciling difference between what Marmen reported to Commerce as the cost of manufacturing in its cost database and the total amount calculated in its revised cost reconciliation. *Id.*

Commerce explained the significance of these facts in its remand redetermination. It explained that Marmen had reported on the record that, for USD-denominated purchases in Marmen's normal books, Marmen's cost system converts USD purchases to CAD at specific conversion rates. *See* Appx4825 (citing Appx829). Marmen also stated that "to ensure that the company's actual direct material costs are reported in the cost database, Marmen included the actual exchange gain or loss received by Marmen on purchases of direct materials in USD." *Id.* (citing Appx835). Additionally, in connection with Marmen's original 2018 audited financial statements, Marmen explained that its auditors periodically adjusted these already "converted" purchases to be based on the actual exchange rates during 2018. *Id.* (citing Appx1006-1007). Thus, Marmen's statements regarding adjustments for exchange rates indicate that its exchange rate gains and losses are *already* accounted for in Marmen's reported costs (which would include purchases from Marmen Énergie). *See id.* at Appx4855-4856, Appx4857-4858.

Turning to the reconciliation spreadsheet, Commerce explained why the
information in the spreadsheet indicates that the additional exchange rate
adjustment is duplicative of the auditor's previous adjustments. *See* Appx4825-
4827. Because Item P deducts the portion of the auditor's exchange rate
adjustments applicable to Marmen's U.S. dollar purchases from January to June
2018 (since that portion is *outside* the investigation period), it indicates that the
same auditor exchange rate adjustments for the months falling *within* the period of
investigation (July to December 2018) are also included in the costs carried
through from Item A to Item S. *See* Appx4826-4827. Indeed, this point is
reinforced by the fact that Items Q and R revise the exchange rate adjustment
figure to *add back* portions of the adjustment relating to materials consumed
during the investigation period. *See* Appx3905.[5]

Moreover, as Commerce further explained, the cost reconciliation Item L,
which is the figure that Marmen claims requires adjustment to account for U.S.
dollar purchases from its French-Canadian affiliate, did not change based on the
auditor's adjustment to Marmen's financial statement, indicating that the auditor
did not believe any correction to that figure was necessary. *See id.*; Appx4826,

---

[5] Marmen mischaracterizes Commerce's point by claiming that Commerce asserted
that the Item L1 adjustment that Commerce rejected is already included in these
figures. *See* Marmen Br. 45-46. The figures merely show that any needed
adjustment was already included in Marmen's overall cost figures carried through
from Items A to S, not that Items P to R duplicate Item L1.

Appx4858.  This is consistent with Commerce's finding that any needed exchange

adjustment is already included in Marmen's cost figures, based on Marmen's

representations discussed above.  *See id.*  Marmen seeks to subtract an additional

amount for exchange losses that should already be reflected in its cost figures.

As to Marmen's computation of the additional reconciling item, Commerce

explained that, when it reviewed the underlying list of invoices to which Marmen

refers, almost every invoice listed in the document, which encompasses the entire

period of investigation, is designated as a USD-denominated sale.  *See* Appx4858-

4859 (citing Appx3907-3913).  Marmen has stated that its January to June 2019

purchases from Marmen Énergie were in CAD; however, they are not designated

as such in the document listing the invoices.  *See id.*  Thus, although Marmen has

summed up the purchases listed for July to December 2018, Commerce determined

that the document does not reliably reflect in which currency these transactions

actually occurred between USD  and CAD because it lists all of the purchases as

USD.  *See id.*; *cf. Gov't of Quebec*, 567 F. Supp. 3d at 1284 (discussing Marmen's

currency coding errors at issue in companion countervailing duty case).

Overall, the record evidence shows that Marmen definitively stated that its

reported costs account for exchange gains and losses based on fixed rates during

the year; that its auditors made an initial adjustment to convert the costs to reflect

actual exchange rates for purchases originally made in USD; and that the auditors

then reevaluated Marmen's reporting of exchange gains and losses and made any

needed corrections to the accounts, all reflected in Items A and P of the amended

cost reconciliation while Item L remained the same.  Appx4826 (citations omitted).

Thus, there was no basis for Marmen to make a further adjustment.

Finally, "Commerce is entitled to substantial deference in its choice of

accounting methodology." *PSC VSMPO-Avisma*, 688 F.3d at 764; *see also*

*Fujitsu*, 88 F.3d at 1039 (recognizing "tremendous deference" to Commerce's

resolution of technical accounting issues because "agencies possess far greater

expertise than courts" in such areas).  In this case, as the trial court correctly

concluded, "{b}ecause record evidence . . . shows that Marmen's auditors already

adjusted the reported costs to account for exchange rate differences . . .

Commerce's determination that another adjustment would be inappropriate is

supported by substantial evidence." *Marmen II*, 627 F. Supp. 3d at 1320.  Thus,

"Commerce did not abuse its discretion by rejecting Marmen's proposed corrective

information, recognizing that Commerce has an interest in ensuring finality and

increasing the accuracy of the calculated dumping margins." *Id.* (citation omitted).

### D. <u>Marmen's Arguments Concerning The Cost Adjustment Lack Merit</u>

Nonetheless, Marmen maintains that the additional adjustment is not

duplicative.  *See* Marmen Br. 42-49.  Marmen claims that, as a result of its

purchasing (instead of producing) the tower sections in question, it was necessary

43

to deduct the value of Marmen Inc.'s purchases of wind tower sections from

Marmen Énergie in order to reconcile Marmen Inc.'s audited COGS to its cost of

manufacturing subject merchandise it reported to Commerce.  *See id.* at 13-14, 44.

Marmen further contends that "Commerce employed faulty logic and refused to

accept the simple explanation certified as accurate by Marmen and its counsel: that

Marmen inadvertently had misreported one line in a reconciliation worksheet in

USD instead of in CAD."  *Id.* at 43; *see id.* at 44 ("For a reconciliation worksheet

to function properly, each value in the reconciliation must be expressed in the same

currency.  This is why Marmen reported the correction to Commerce.").

This does not address the issue that Commerce identified, however, because

(1) Marmen concedes that the costs of its wind tower purchases from Marmen

Énergie are already included in the COGS and ensuing cost figures listed in the

cost reconciliation (which, based on Marmen's statement and the information in

the reconciliation itself, also includes any exchange rate gains or losses pertaining

to those purchases); and (2) it does not address Commerce's finding that Marmen's

underlying premise, that Item L in the reconciliation requires further adjusting

because it is stated in USD, is unreliable because virtually all of the underlying

invoices (including those that Marmen agrees reflect CAD) are listed as being in

USD.  *See* Appx4858-4859.  Thus, there is no support for Marmen's adjustment,

other than Marmen's assertion that a portion of its purchases has not already been

converted using the actual exchange rate. *See* Appx4824. Although Marmen's list of sales multiplied by its selected exchange rate totals the Item L1 adjustment, that does not demonstrate that the adjustment is non-duplicative of the exchange gains and losses already included in the cost figures. *See* Marmen Br. 47-49.

Nor does Marmen's argument address Commerce's findings that the figure in Item L did not change as a result of the restatement to Marmen's financial statements, indicating that Marmen's auditor did not believe that any exchange rate adjustment to that figure was needed. *See* Appx4826, Appx4827, Appx4858. In any event, without a detailed listing of the inputs and adjustments reflected in Marmen's Item A COGS figure, Commerce cannot substantiate Marman's claim that it is necessary to deduct the Item L1 additional adjustment.

Relatedly, Marmen argues that the majority of the auditor adjustment that led it to restate in financial statements in December 2019 relates to a U.S. dollar purchase from a specific supplier other than Marmen Énergie, indicating that it did not duplicate the additional adjustment Marmen made to its cost reconciliation. *See* Marmen Br. 45. This misses the point. Commerce has not claimed that Marmen's additional adjustment is *specifically* duplicative of the auditor's restatement, as compared to the auditor's normal adjustments to account for exchange gains and losses more generally. Rather, Commerce explained that the information already on the record, as well as the further information that Marmen submitted, show that

Marmen's auditor made various adjustments—before and after the restatement—to account for Marmen's exchange rate gains and losses, such that any adjustment stemming from Marmen Inc.'s purchases from Marmen Énergie would already be reflected in the COGS figure taken from Marmen's financial statements. *See* Appx4824-4827, Appx4855-4856. Thus, Marmen's assertion about the nature of the restatement does not negate Commerce's determination.

Additionally, apart from finding that the record does not support Marmen's new adjustment, Commerce reasonably found that the [ # ] CAD to USD exchange rate that Marmen used was unsupported. Appx4824, Appx4859. As Commerce explained, "Marmen provided no support for the average exchange rate that is on the worksheet." Appx4824. Although Marmen now points to places in the record where it used the same exchange rate, *see* Marmen Br. 49, there is still no record documentation showing how or from where that rate was derived, nor is there any support for it being an actual average rate for the relevant period. *See* Appx4859. The supporting tab from Marmen's cost reconciliation characterizes the rate as "Average exchange rate 2018," which would include the *entire* period from January through December 2018, rather than the *relevant* period from July to December 2018 that overlaps with the period of investigation. *Id.* (quoting Appx3907). As Commerce explained, "there is no further detail, source document or any other support provided." *Id.*

The authoritative Statement of Administrative Action observes that "with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment."  Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, at 829 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4168 (SAA); *see also* 19 U.S.C. § 3512(d) (discussing authoritative nature of SAA).  This Court similarly recognizes that Commerce reasonably places the burden to establish entitlement to adjustments on the parties seeking them. *Fujitsu*, 88 F.3d at 1040.  Accordingly, it was Marmen's burden to provide information supporting its claims that the exchange rate it used was based on actual rates from July to December 2018.[6]

## IV.   Commerce's Application Of Its Differential Pricing Analysis To Evaluate Marmen's United States Sales Is Supported By Substantial Evidence And Lawful

### A. Overview Of Differential Pricing Analysis

In determining whether subject merchandise has been sold in the United States at less than fair value, Commerce normally compares "the weighted average of the normal values to the weighted average of the export prices (and constructed

---

[6] Before the trial court, Marmen blamed Commerce for failing to develop the record supporting Marmen's new adjustment by declining to conduct on-site verification during Spring 2020.  "The purpose of verification," however, "is to test information provided by a party for accuracy and completeness" rather than "an opportunity for submission of new factual information."  *Ghigi 1870 S.P.A. v. United States*, 547 F. Supp. 3d 1332, 1346 (Ct. Int'l Trade 2021) (citation omitted).

export prices) for comparable merchandise," unless it determines another method is appropriate. 19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. §§ 351.414(b)(1), (c)(1). Under this "average-to-average" (A-to-A) method, Commerce compares the weighted average of a respondent's home or comparison market sales prices during the investigation period to the weighted average of the respondent's United States sales prices during the same period. *See id.*

One downside of the A-to-A method is that it may fail to detect instances of "targeted" or "masked" dumping, which occur when an exporter sells at a dumped price to some customers, regions, or time periods, while selling at higher prices to others. *See Stupp*, 5 F.4th at 1345 (citing *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017)). When Commerce uses the A-to-A method, higher-priced United States sales prices can mask lower-priced sales that are dumped, potentially leaving the domestic industry without relief from unfair trade practices. *See* SAA at 842, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177-78 ("In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.'").

Congress addressed this problem by enacting 19 U.S.C. § 1677f-1(d)(1)(B). *Apex*, 862 F.3d at 1341-42 (discussing provision's "driving rationale"). Section 1677f-1(d)(1)(B) authorizes Commerce to use an "average-to-transaction" (A-to-T) comparison method if "(i) there is a pattern of {U.S. export prices} for comparable

merchandise that differ significantly among purchasers, regions or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {an A-to-A or transaction-to-transaction method}."  19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii); *see* 19 C.F.R. § 351.414(b)(3) ("The 'average-to-transaction' method involves a comparison of the weighted average of the normal values to the {U.S. export prices} of individual transactions for comparable merchandise."). This Court has held that, "{b}y using individual U.S. prices in calculating dumping margins, Commerce is able to identify a merchant who dumps the product intermittently—sometimes selling below the foreign market value and sometimes selling above it."  *Apex*, 862 F.3d at 1341 (citation omitted).

Congress has not specified a methodology for Commerce to determine whether section 1677f-1(d)(1)(B) is satisfied.  However, the SAA explains that Commerce should proceed "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA at 843, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178.  In applying section 1677f-1(d)(1)(B), Commerce conducts a "differential pricing analysis," which it first used in 2013.  *See Stupp*, 5 F.4th at 1346 (citations omitted).

The differential pricing analysis involves three tests to address the statutory requirements of section 1677f-1(d)(1)(B).  *Id.* at 1346-48.  First, Commerce applies the "Cohen's *d* test" to measure whether the United States prices to a particular

49

purchaser, region, or time period differ significantly from the prices for all other

purchasers, regions, and time periods. *Id.* at 1346. The Cohen's *d* coefficient is a

measure of "effect size" that gauges the extent of the difference between the means

of two groups, and thus the significance of that difference. Appx4835; *see also*

*generally* Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* (2d

ed. 1988) (Appx4699-4789). A group of sales with a Cohen's *d* coefficient equal

to or greater than the "large threshold" of 0.8—providing the strongest indication

of a difference between test and comparison group prices—"passes" the test and

signifies that a significant difference in prices exists for the particular purchaser,

region, or time period. *Stupp*, 5 F.4th at 1347.

Second, the ratio test calculates the proportion of a respondent's United

States sales, by value, that "pass" the Cohen's *d* test, to determine whether a

"pattern" exists. *Id.* If 33 percent or less of the sales pass, Commerce finds that no

pattern exists and uses the A-to-A method. *Id.* If 66 percent or more of the sales

pass, Commerce finds that a pattern exists and may use the A-to-T method, subject

to the meaningful difference test. *Id.* If more than 33 percent but less than 66

percent of the sales pass, Commerce finds that a pattern exists but takes a hybrid

approach, considering application of the A-to-T method to those United States

sales passing the Cohen's *d* test, and the A-to-A method to the remainder

(assuming that the meaningful difference test is also met). *Id.*

Finally, if at least 33 percent of a respondent's sales pass the ratio test, Commerce applies a "meaningful difference" test to determine whether the A-to-A method can account for potential masked dumping. *Id*. Commerce applies this test by comparing the respondent's weighted-average dumping margin using both the A-to-A method and the alternative comparison method (*i.e.*, the A-to-T method). *Id*. If the A-to-A rate is below the *de minimis* threshold and the rate from the alternative comparison method is greater than *de minimis*, or if both rates are above *de minimis* and differ by 25 percent or more, Commerce may then resort to the alternative comparison method to calculate the respondent's dumping margin. Otherwise, Commerce applies the A-to-A method to all United States sales. *Id*.

This case concerns Commerce's use of the Cohen's *d* test to compare prices for "test groups" of each purchaser, region, or time period to a "comparison group" composed of the rest of the United States sales prices for comparable merchandise. *Id.* at 1346. Commerce calculates a Cohen's *d* coefficient by measuring the difference in the means of the two groups relative to the variance within each of the groups (represented by an average of the groups' standard deviations).[7] *Id*. Notably, in doing so, Commerce calculates the exact mean and standard deviation for each test and comparison group based on the entire population of United States

---

[7] Hence, $d = $ |mean of test group – mean of control group| $\div$ standard deviation. Commerce uses a modified version of this formula, substituting for the "standard deviation" the root mean square of each group's standard deviations. Appx4759.

prices in each group, without relying on sampling or estimates of these population

parameters. Moreover, even if sales in a particular test group pass the Cohen's *d*

test, it does not automatically mean that Commerce will apply the A-to-T method,

because sales passing the Cohen's *d* test still must be sufficiently numerous to pass

the ratio test and Commerce must determine under the meaningful difference test

whether the A-to-A method can account for the potential masked dumping. *See id.*

at 1355-56 (sustaining those tests); *see also Stupp Corp. v. United States*, 619 F.

Supp. 3d 1314, 1324-28 (Ct. Int'l Trade 2023) (*Stupp 2023*) (sustaining Cohen's *d*

test as one component of analysis); *Marmen II*, 627 F. Supp 3d at 1322 (same).

### B. Commerce Lawfully Applied Its Differential Pricing Analysis In Evaluating Marmen's United States Sales

As a result of the Cohen's *d* test applied in this case, and the results of the

differential pricing analysis overall, Commerce used an alternative approach based

on the A-to-T method to calculate Marmen's dumping margin. Appx3862-3863.

Neither Marmen nor its *amici* dispute the record evidence that 68.29 percent of

Marmen's United States sales passed the Cohen's *d* and ratio tests, and that the A-

to-A method does not account for the potential masked dumping because there is a

greater than 25 percent change in Marmen's weighted-average dumping margin

using the A-to-A versus the alternative comparison method. *See* Appx3863.[8]

---

[8] This also refutes Marmen's *amici*'s inaccurate assertion that "{w}hether and to what extent Commerce will find that a company is engaged in targeted dumping

Addressing the trial court's remand in light of *Stupp*, Commerce provided a detailed explanation regarding why the concerns raised in *Stupp* do not establish that use of the Cohen's *d* test distorts Commerce's differential pricing analysis. *See* Appx4828-4853, Appx4862-4866. Specifically, Commerce (1) described the role of effect size as a measure of practical significance in its Cohen's *d* analysis, while discussing the distinction between statistical and practical significance; (2) examined the role of United States sales price data in the analysis in conjunction with the important fact that a respondent's United States sales data represent the entire universe (rather than a sample or estimate) of the respondent's sales prices; (3) addressed alleged data requirements for the Cohen's *d* test in relation to the statistics literature that this Court had cited in *Stupp*; and (4) discussed the price differences identified for specific CONNUMs sold by Marmen during the investigation period. Appx4834 (summarizing Commerce's determination).

In this context, Commerce explained that the assumptions discussed in *Stupp* are unnecessary when Commerce uses a full population of prices in each of the test and comparison groups in its Cohen's *d* test, rather than sampling the sales prices. Appx4839-4840. Commerce also explained *why* its reliance on the entire universe

---

depends more on statistical idiosyncrasies of datasets selected by Commerce for comparison than on actual pricing behavior," *Amici* Br. 4, because the dumping Commerce identified stems from analyzing Marmen's sales prices at an A-to-T transactional level, not from the Cohen's *d* test.

or population of sales "obviates the need for an analysis of statistical significance and the related underlying statistical criteria." Appx4837-4838. As a recognized measure of effect size and a component of the differential pricing analysis, Commerce explained that the "purpose of the Cohen's *d* test is to evaluate the extent by which the prices to a particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise." Appx4835; *see* Appx4838. Crucially, Commerce uses the Cohen's *d* test to measure the *practical* significance of differences in real-world pricing, rather than *statistical* significance (which arises when one seeks to determine the likelihood that a result observed based on estimation through sampling is a result of chance, or represents the actual parameters of the full populations). *See* Appx4835-4837.

When applying the Cohen's *d* test, Commerce, in accordance with the statute, considers "whether U.S prices for comparable merchandise to a particular purchaser, region, or time period (*i.e.*, the test group) differ significantly from the prices to other purchasers, regions, or time periods (*i.e.*, the comparison group)." Appx4838. Consequently, the sales to these two groups are not sampled and encompass the entire population of sales prices. *See* Appx4839. Moreover, unlike with a sample of data for which the estimated parameters will change with each sample selected from a population, each time these parameters are calculated as part of Commerce's Cohen's *d* test the exact same results will obtain because the

calculated parameters are the actual values of the parameters of the entire

population and not estimated values of the parameters based on a sample. *Id.*

Consequently, because Commerce's calculations "are not estimates with

confidence levels or sampling errors as would be associated with sampled data,"

the limitations needed to ensure that such estimates are statistically significant are

"not relevant in Commerce's application of the differential pricing analysis, which

measures practical significance." Appx4839-4840. Likewise, because the Cohen's

*d* coefficients are operational and not based on statistical analysis, the concerns

about statistical criteria do not undermine their usefulness. Appx4842, Appx4864-

4865; *see also Marmen II*, 627 F. Supp. 3d at 1322 (sustaining remand results).

Additionally, Commerce does not rely on the Cohen's *d* test to calculate the

respondent's weighted-average dumping margin, but only to determine whether

prices differ significantly as one component of its analysis to determine whether it

is appropriate to use an alternate comparison method instead of the A-to-A method

in calculating the dumping margin. *See* Appx4838, Appx4864; *Stupp*, 5 F.4th at

1347 (describing role of Cohen's *d* test). Given Commerce's explanation, there is

no basis for Commerce to use the assumptions or limitations discussed in *Stupp*

outside of the context in which such limitations are designed to apply. If the entire

population of relevant observations is considered, whether prices in each

comparison group satisfy the statistical criteria is irrelevant.

Nonetheless, Marmen (supported by its *amici*) argues that (1) "Commerce's position that the assumptions underlying the Cohen's *d* test do not apply to data sets consisting of populations is unsupported by substantial evidence" and that (2) it was allegedly "unreasonable for Commerce to rely on the Cohen's *d* test when the price differences exhibited by five CONNUMs were not significant on their face at less than one percent."  Marmen Br. 50; *see also Amici* Br. 4.  Commerce's remand redetermination demonstrates that Marmen's contentions lacks merit.[9]

### C. Marmen's Arguments Based On Academic Literature Lack Merit

Contrary to Marmen's and its *amici*'s claims, the academic literature supports Commerce's conclusion that the statistical criteria are not relevant in Commerce's use of the Cohen's *d* test when used with a full population of United States sales prices.  Commerce explained:

> The statistical criteria observed in academic literature (such as the number of observations, a normal distribution and approximately equal variances) are related to the statistical significance of sampled data and establish the reliability of an estimated parameter (*e.g.*, mean) based on the sample data to be within a determined confidence interval of the actual parameter.

Appx4839; *see also* Appx4842-4843.  In contrast, when the Cohen's *d* test is applied in the context of differential pricing analysis, Commerce calculates the *actual* parameters (mean, standard deviation, and effect size) without having to

---

[9] Commerce first addressed these issues in *Stupp* and placed the *Stupp* draft remand redetermination on the record of this case.  *See* Appx3953-3985.

estimate the parameters through sampling the underlying data, as one would if using less than the entire population. Appx4839-4840. The criteria/assumptions that Marmen and its *amici* highlight do not apply in this context.

The academic literature does not require otherwise. First, Marmen and its *amici* are incorrect that Dr. Cohen represented that his measure of effect size for the population cannot be used without assumptions of normal distributions and equivalent variances. *See* Marmen Br. 50-52; *Amici* Br. 6-7. Dr. Cohen presents his general formulation of effect size, which appears at section 2.2 of his text on the record. as the difference in the "population means" of groups A and B, divided by "the standard deviation of either population (since they are assumed equal)," mathematically expressed as:

$$d = \frac{m_A - m_B}{\sigma}$$

when

$$\sigma = \sigma_A = \sigma_B$$

*See* Appx4735-4736, Appx4742; *see also* Marmen Br. 51 (listing a "two-tailed" version of the formula corresponding to Dr. Cohen's equation 2.2.2).

However, when "there is no longer a common within-population σ," (*i.e.*, the standard deviation and variance of group A and group B are *not* equal), Dr. Cohen provides for an alternative calculation of the denominator of effect size, which Commerce used to calculate the Cohen's *d* coefficient in this investigation:

$$\sigma' = \sqrt{\frac{\sigma_A^2 - \sigma_B^2}{2}}$$

*See* Appx4759 (equation 2.3.2)).  Both formulations involve full populations rather than estimates of the population means or standard deviations, but Dr. Cohen also discusses them in terms of samples drawn to estimate the population parameters. *See* Appx4735, Appx4758-4760 (denoting sample size by "n").  Moreover, Dr. Cohen states regarding equation 2.3.2:  "The unequal variability *need not affect the conception of d developed in Section 2.2.*"  Appx4759 (emphasis added).

Additionally, Dr. Cohen explicitly distinguishes situations in which effect size is based on full populations, as just described, and in which effect size is based on sampled data (*i.e.*, when an estimate of the population parameters must be used).  *See* Appx4781-4782 (defining *d* "so that its elements are sample results" and setting forth equations for "tests of the difference between means of independent samples").  More generally, in his introductory discussion of the relationship between effect size and statistical significance, Dr. Cohen explains that "{g}enerally, we can define the effect size *in the sample* ($ES_s$) using sample statistics in the same way as we define it for the population, . . ."  Appx4733; *see also* Appx4722 ( "Depending upon the statistic in question, and the specific statistical model on which the test is based, reliability {of a sample} may or may not be directly dependent upon . . . the shape of the population distribution.").

58

The language from Cohen on which Marmen and its *amici* focus, and that this Court cited in *Stupp*, comes from section 2.2.1 focusing on a specific approach to interpreting Cohen's *d* coefficient values—which Commerce *does not* use in its analysis—called "*d* As Percent Nonoverlap: The U Measures."  Appx4736; *see* Marmen Br. 51-52; *Amici* Br. 12-15, 21-22.  As Commerce observed, this method considers the extent to which the curves of two theoretical datasets overlap, which is one way to interpret effect size values.  *See* Appx4843.[10]  Because that is not the basis for Commerce's interpretation of the Cohen's *d* coefficient it calculates, the assumptions from that context do not apply.  *See* Appx4844 (inability to perform such analysis "does not impact Commerce's application of the Cohen's *d* test").  Indeed, Dr. Cohen states in relation to his equation 2.3.2, which corresponds to the type of analysis that Commerce applies when the standard deviations of the two groups differ (*i.e.*, $\sigma_A \neq \sigma_B$), that "{i}n interpreting *d* for this case {with unequal standard deviations}, the U (percent nonoverlap) measures can no longer be generally defined and the Table 2.2.1 U columns will not obtain."  Appx4759.

Importantly, although "U measures" of percent nonoverlap no longer apply, Dr. Cohen states that "the conventional definitions of small, medium, and large *d*

---

[10] The assumptions of normal distribution and equivalent variance make sense in this context because one cannot quantify the amount of nonoverlap associated with "U Measures" without knowing the area under each bell curve using these criteria. *See* Appx4843-4844; Appx4844 ("Without the assumptions of normality and equal variances, the area beneath the curve of the control group that is less than the mean of the experimental group could not be quantified{.}"); *see also Amici* Br. 16-17.

*can also continue to be used*." *Id.* (emphasis added). It is precisely Dr. Cohen's large threshold that Commerce uses to define significant differences in its Cohen's *d* test. Marmen and its *amici* dispute whether the assumptions stated in the "U Measures" context apply to the analysis of samples or entire populations, *see* Marmen Br. 19-20; *Amici* Br. 7-8, 15, 22-23, but that does not change the fact that this is not the type of interpretive analysis that Commerce applies. *See* Appx4844 ("these measurements of non-overlap in statistical analysis involving sampled data do not define the real-world observed differences used by Dr. Cohen to define the small, medium and large thresholds, as discussed above.").

Equally importantly, Marmen's *amici* portray Cohen's large threshold as dependent on the U Measures and percent nonoverlap analysis generally. *Amici* Br. 15 (quoting Appx4741); *see id.* at 15-20, 27-30 (claiming that this dependency refutes Commerce's position that Cohen's *d* large threshold is based on real-world observations). But Dr. Cohen's statement that his thresholds "can . . . continue to be used" even when the U Measures cannot speaks for itself. Appx4759.

Likewise, Commerce explained that the quote that Marmen highlights from a text by Grissom & Kim regarding the assumption of normality in "interpretation of a $d_G$ or $d$ in terms of estimating the percentile standing of the average-scoring members of another group with respect to the supposed normal distribution of the comparison group's scores" arises in the same context of analyzing the percent

overlap of data sets. *See* Appx4844; Marmen Br. 52-53 (citing Robert J. Grissom

& John J. Kim, *Effect Size for Research, Univariate and Multivariate Applications*

66 (2d. ed. 2012)).[11] Thus, notwithstanding Marmen's dispute about whether the

assumption applies when working with samples or populations in that context,

Commerce explained that it "does not impact Commerce's application of the

Cohen's *d* test." Appx4844. Further, a second quote that Marmen and its *amici*

cite from page 68 of Grissom explicitly involves assumptions about a *population*

when comparing data based on *sampling*. *See* Marmen Br. 53-54; *Amici* Br. 24-25.

Commerce explained that the materials suggest "an alternative approach to

calculate the denominator of the 'd' coefficient in Dr. Grissom's equations"

without undermining Commerce's analysis. Appx4844-4845.

Marmen's and its *amici*'s reliance on the Algina paper is also misplaced.

Marmen Br. 54-55; *Amici* Br. 31 (citing James Algina, *et al.*, *An Alternative to*

*Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and*

*Confidence Interval in the Two Independent Groups Case*, 10 Psychological

Methods 317, 317-19 (2005) (Appx4791-4793)). The purpose of the Algina paper

is to propose, for specific circumstances, an alternative formula to provide a more

"robust version" of effect size based on the difference of the means, analogous to

---

[11] Although the Grissom material is not on the record of this case, Commerce addressed it in the remand redetermination because the Court had cited it in *Stupp* and it was part of the literature addressed in the *Stupp* remand. The same is true of the Coe and Li materials discussed below.

other alternate approaches discussed in the academic literature. *See* Appx4791.

The Algina authors provide an alternate approach to calculating effect size, when

the Cohen's *d* 0.8 coefficient "is 'widely adopted' as part of a 'commonly used

measure' of the difference relative to such overall price dispersion; and it is

reasonable to adopt that measure where there is no better, objective measure of

effect size." *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 673

(Fed. Cir. 2019) (*Mid Continent I*) (citation omitted).

Moreover, Commerce explained that the potential bias Algina identifies is

that Cohen's *d* may *understate* effect size when dealing with "heavy-tailed"

distributions (*i.e.*, ones with greater data toward the end(s) of the curve). *See*

Appx4847-4848. This contradicts Marmen's and its *amici*'s claims that violations

of the statistical limitations it alleges result in false positives. If anything, this

"limitation" of the Cohen's *d* coefficient makes it less likely that Commerce's

approach will result in finding prices that differ significantly among purchasers,

regions or time periods. *See* Appx4846. Further, Commerce explained that, when

basing the calculations on the entire population instead of a sample, the issue

concerning an inherent bias in an estimated effect size is no longer relevant, given

that the results are not an estimate. *See id.*; *see* Appx4839-4840.

Similarly, Commerce on remand addressed the Robert Coe paper cited by

this Court in *Stupp* (which Marmen does not cite and did not place of the record,

but its *amici* rely upon).  Appx4845-4846; *Amici* Br. 26.  Commerce explained that the concerns Coe raises involve issues similar to those discussed above regarding sampled data and the interpretation of effect size based on percent nonoverlap (the U Measures), which must necessarily be based on a normal distribution to permit the calculation of the percentages in those analyses.  Appx4845.  As we showed above, Commerce does not rely on percent nonoverlap analysis in its Cohen's *d* test.  Moreover, Commerce explained that Coe, like Algina, describes a situation in which a heavy-tailed, non-normal distribution leads the Cohen's *d* coefficient to *underestimate* the effect size, which makes it less likely that Commerce will find significant pricing differences.  Appx4846, Appx4847-4848.

Marmen's *amici* additionally misconstrue Commerce's consideration of concerns raised in literature by Dr. Johnson Ching-Hong Li.  *See Amici* Br. 26-27; Appx4848.  Notwithstanding the *amici*'s disagreement with Commerce's reasoning that Li's concerns are not germane when Commerce considers the full universe of data, Commerce considered the concerns and reasonably determined that they do not undermine Commerce's application of the Cohen's *d* test.  *See* Appx4848; *see also Amici* Br. 32 (conceding that Algina, Coe, and Li each involve situations in which violations of assumptions lead to *smaller* Cohen's *d* coefficients).

More generally, Marmen's *amici*'s arguments throughout their brief focus on the idea of the assumptions at issue being necessary for Commerce to perform a

nonoverlap analysis, *see Amici* Br. 33, but as we have explained *that is not* how

Commerce applies its Cohen's *d* test.  *See* Appx4759 (explaining that "the

conventional definitions of small, medium, and large *d* can also continue to be

used" even when "percent nonoverlap" measures cannot).

Other literature further supports Commerce's interpretation of the academic

literature in its redetermination.  Dr. Ellis recognizes that,

> The best way to measure an effect is to conduct a census
> of an entire population but this is seldom feasible in
> practice.  Census-based research may not even be
> desirable if researchers can identify samples that are
> representative of broader populations and then use
> inferential statistics to determine whether *sample-based*
> observations reflect *population-level* parameters.

Paul D. Ellis, *The Essential Guide to Effect Sizes: Statistical Power, Meta-*

*Analysis, and Interpretation of Research Results* 5 (Cambridge Univ. Press 2010)

(emphasis added) (Appx4813; Appx4804-4816); *see also* Appx4837 (citing *Ellis*).

In other words, Dr. Ellis explains that using the entire population is the best way to

measure the size of an effect, but generally is not feasible, which leads to an

estimate of effect size based on sampled data.  Likewise, quoting *Ellis*, this Court

has observed that the "tricky part in this {effect size} calculation is figuring out the

population standard deviation.  If this number is unknown, some approximate

value must be used instead."  *Mid Continent Steel & Wire, Inc. v. United States*, 31

F.4th 1367, 1377 (Fed. Cir. 2022) (*Mid Continent II*) (citation omitted).  Both

quotations recognize that researchers generally work with samples to estimate population-level parameters.[12]  However, a population-based approach is feasible in antidumping proceedings because all of the sales prices used to calculate a respondent's dumping margin are also used in the differential pricing analysis, eliminating the need to estimate the effect size using sampled data.

Overall, the academic literature, mathematical principles, and logic do not require use of the statistical criteria Marmen advocates when the full population of sales prices is used, because Commerce evaluates the *practical* significance of a price difference between two groups of prices by calculating and comparing *actual* parameters.  *See* Appx4863-4865.  The statistical criteria regarding the normality of distribution and similarity of the variances in samples are not relevant to Commerce's application of the Cohen's *d* test.  *See id.*

### D. Marmen's Arguments Based On Its Hypothetical Lack Merit

Marmen contends that it further developed a hypothetical example set forth in *Stupp* by adding calculations to illustrate the problem, and that the *Stupp* hypothetical mirrors the issues raised by Marmen.  Marmen Br. 56-60.  Marmen's version of the hypothetical yields a difference in average prices (or means) of 0.47 percent, and Marmen asserts that it calls Commerce's Cohen's *d* analysis into

---

[12] Ellis also explains that "we can draw no conclusions about the practical significance of a result from tests of statistical significance."  Appx4813.

question by illustrating that unjustifiable results obtain when the statistical criteria of normal distribution and equal variance are absent. *Id*. at 59.

As an initial matter, outside of First Amendment litigation, claims based on hypotheticals are disfavored. *See, e.g.*, *Fieger v. Michigan Supreme Ct.*, 553 F.3d 955, 961 (6th Cir. 2009) ("While litigation based on hypotheticals is disfavored, it is allowed under certain circumstances in the First Amendment context." (citation omitted)).  When a party repeatedly attempts to imagine an extreme set of facts, which do not stem from its own data to which the relevant methodology was applied, hoping to obtain an unusual outcome that is at odds with normal outcomes of methodology, it only demonstrates that the methodology is unlikely to lead to an unreasonable or problematic outcome.  *Cf. Rita v. United States*, 551 U.S. 338, 353 (2005) ("Justice Scalia concedes that the Sixth Amendment concerns he foresees are not presented in this case. . . . And his need to rely on *hypotheticals* to make his points is consistent with our view that the approach adopted here will not 'raise a multitude of constitutional problems.'").  Even if Marmen could demonstrate that there might be a hypothetical scenario that could lead to an unusual outcome under Commerce's differential pricing methodology, it would not demonstrate that Commerce's methodology as a whole is unreasonable.

In any event, the issue presented in the hypothetical is unrelated to Marmen's underlying claim that the sales price data must be normally distributed,

of equal variances, and of sufficient sample size.  As Commerce explained in its draft redetermination in *Stupp*, the issue is that, when the variance of the sales prices in each of the test and comparison groups becomes very small (even if the sales prices in each group are normally distributed, have equal variances, and a large sample size), the difference in the mean sales prices may be significant based on a relatively small difference in the means.  *See* Appx3981-3982.

Further, it is important to bear in mind the nature and role of the Cohen's *d* test within Commerce's differential pricing analysis.  It *does not* constitute a given respondent's dumping margin.  *See* Appx4864.  Rather, it serves as the method by which Commerce determines whether prices differ significantly in connection with the requirement to determine whether a pattern of significant price differences exists.  *See Stupp*, 5 F.4th at 1347.  For Commerce to find a "pattern" of such price differences, the proportion of sales passing the Cohen's *d* test must still exceed 33 percent to satisfy the ratio test.  And even if a "pattern" is found to exist, Commerce under the meaningful difference must find that the A-to-A method cannot account for the potential masked dumping in order to have the ability to apply an alternative comparison method based on the A-to-T method.

This context highlights a key flaw in Marmen's position.  Marmen suggests that an observer would deem the small price differences in its hypothetical—in terms of dollar value—to be insignificant.  *See* Marmen Br. 58-59.  However, this

Court has recognized that "even a small absolute difference in the means of the two groups can be significant (for the present statutory purpose) if there is a small enough dispersion of prices within the overall pool as measured by a proper pooled variance or standard deviation." *Mid Continent I*, 940 F.3d at 673. In other words, just because price differences are small in absolute terms does not mean that they cannot be "significant" in terms of the variability of the prices within the test and comparison groups. The *Mid Continent I* holding is also consistent with the SAA's guidance that "in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because *small differences may be significant for one industry or one type of product, but not for another*." SAA at 843, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 (emphasis added).

This also makes logical sense: When the variances in the sales prices are small, a smaller difference in the mean sales prices may be significant; but when variances in the sales prices is large, there will need to be a larger difference in the mean sales prices for the difference to be significant. Contrary to the thrust of Marmen's argument, it is not unreasonable for a given difference in the mean sales prices that the difference will more likely be significant when the variances in the sales prices are smaller than when the variances are larger. *See Stupp 2023*, 619 F. Supp. 3d at 1326 ("Commerce's approach tailors the question of what is a significant difference in price to the pricing parameters of different products").

The trial court in *Stupp 2023* agreed with Commerce's reasoning in addressing the hypothetical from *Stupp*. The court observed that the Cohen's *d* test does not operate in a vacuum, but as part of the differential pricing analysis as a whole, as well as that "a small variance means a small difference in price will be more significant, and a passing result under these circumstances is not necessarily 'erroneous.'" 619 F. Supp. 3d at 1324, 1327. It also recognized that "Commerce has explained the meaningful difference test compensates for a specific concern with low-variance sales which {this Court} identified." *Id.* at 1328. In other words, given that the Cohen's *d* test would still need to generate enough "false positives" to overcome both the ratio and meaningful difference tests, Commerce use of the Cohen's *d* test as the first step in its analysis is reasonable. *See id.*

Marmen also attempts to link its hypothetical argument to its pre-*Stupp* claim that the price differences for five of its CONNUMs are not "significant" because the relative differences are less than one percent. Marmen Br. 59-60.[13] This is inappropriate because Marmen simply replaces Commerce's definition of "significance" based on the "yardstick" of variance-based effect size with its own alternative definition based on the absolute price level. *See Mid Continent II*, 31

---

[13] In doing so, Marmen does not explain whether the data for these COMMUNs reflect the terms of its hypothetical, aside from exhibiting small relative price differences. It also omits to mention that it had two *additional* CONNUMs that account for a significant portion of its sales for which the price differences were significantly larger. *See* Appx3778.

F.4th at 1377.  Nor is Marmen's definition consistent with this Court's and the

SAA's recognition that small absolute differences can be significant for the present

statutory purposes.  *See Mid Continent I*, 940 F.3d at 673; SAA at 843, *reprinted in*

1994 U.S.C.C.A.N. 4040, 4178.  Commerce's approach to define significance in

terms of effect size rather than absolute price differences is reasonable.  *See id.*

Further, as Commerce has indicated, the absolute price level ultimately *is* taken

into consideration in the "meaningful difference" test portion of its analysis, when

Commerce examines whether the A-to-A method can account for potentially

masked price differences.  *See* Appx3983.

In this case, when Commerce analyzed the totality of Marmen's sales, 68.29

percent passed the Cohen's *d* and ratio tests and there was a greater than 25 percent

change in Marmen's dumping margin using the A-to-T method versus the A-to-A

method.  Appx3863; Appx3883.  Therefore, Marmen's hypothetical example and

its contentions based on specific portions of its sales data do not demonstrate that

Commerce's reliance on effect size in its Cohen's *d* test is unreasonable.

## V.    The Court Should Disregard Materials And Arguments From Outside The Record Of This Case

The *amici* rely on academic materials, charts, and arguments that are not part

of the record of this proceeding.  In doing so, notwithstanding their *amicus* status,

they disregard the well-established limitations on appellate records by referencing

materials that were neither before the agency nor the trial court in this case.

Because this Court's review is limited to the record and arguments before the administrative agency and trial court, both by statute and by the exhaustion and waiver/forfeiture doctrines, the Court should decline to consider the *amici*'s citations and arguments stemming from matters outside the record of this appeal. Specifically, the Supreme Court has explained that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009) ("The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to convert the 'arbitrary and capricious' standard into effectively de novo review." (citation and quotation marks omitted)). Limiting review to the agency record also furthers important finality and efficiency considerations. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277 (Fed. Cir. 2012). Focusing on the record that was actually before the agency is particularly appropriate in this case because Commerce allowed Marmen on remand to submit additional materials related to this appeal. The Court should not permit parties to flout well-established rules regarding the record on appeal.

Moreover, pursuant to 28 U.S.C. § 2637(d), the Court of International Trade "shall, where appropriate, require the exhaustion of administrative remedies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017). Courts

take "a 'strict view' of the requirement that parties exhaust their administrative remedies . . . in trade cases." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("{A}bsent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."). "Simple fairness," moreover, "requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1583-84 (Fed. Cir. 2008) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (emphasis added by Court)). Thus, under the exhaustion doctrine, parties are required to raise issues before Commerce at the time that Commerce is addressing them. *See id.* (requiring exhaustion on remand).

Likewise, "{w}ith a few notable exceptions, such as some jurisdictional matters, appellate courts do not consider a party's new theories, lodged first on appeal." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997). Thus, claims never raised before Commerce or the trial court are generally deemed waived. *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1350 (Fed. Cir. 2016) (holding that contentions based on statistical methodologies never raised before Commerce or trial court were waived).

In this case, because portions of the *amici's* contentions rely on materials that are not part of the record on appeal, and that were never raised either during the investigation or on remand, this Court should disregard these non-record materials and any arguments that rely on them. The materials include:

- Edward L. Thorndike, *et al.*, *The Measurement of Intelligence* (1927);

- Larry V. Hedges, Ingram Olkin, *Overlap Between Treatment and Control Group Distributions as an Effect Size Measure in Experiments*, 21 Psychological Methods 61 (2016);

- Larry V. Hedges, *Review and Analysis of the Cohen's* d *Test as Used in the U.S. Department of Commerce's Differential Pricing Methodology* (Dec. 27, 2022);

- Stephen Stigler, *The History of Statistics* (Harvard University Press 1986);

- Figure 5.

Moreover, this Court should not remand to Commerce simply to permit parties to place these or other materials on the record. As the trial court explained in its decision sustaining Commerce's remand redetermination, Commerce sufficiently explained how its differential pricing methodology and use of the Cohen's *d* test was reasonable. *See Marmen II*, 627 F. Supp 3d at 1320-22. Accordingly, this Court should uphold the trial court's decision.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that this Court affirm the trial court's judgment.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                          /s/ Joshua E. Kurland
JESUS N. SAENZ                       JOSHUA E. KURLAND
Attorney                             Senior Trial Counsel
Office of the Chief Counsel          U.S. Department of Justice
for Trade Enforcement & Compliance   Civil Division
U.S. Department of Commerce          Commercial Litigation Branch
                                     P.O. Box 480, Ben Franklin Station
                                     Washington, D.C.  20044
                                     Tel: (202) 616-0477
                                     Email: Joshua.E.Kurland@usdoj.gov

January 8, 2024                      *Attorneys for Defendant-Appellee*
                                     *United States*

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Federal Circuit Rule 32(b) and the Court's word-limit order of December 26, 2023, the undersigned certifies that the word processing software used to prepare this brief indicates there are a total of 16,899 words, excluding the portions of the brief identified in the rules. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

<u>/s/ Joshua E. Kurland</u>

**FORM 31. Certificate of Confidential Material**

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2023-1877

**Short Case Caption:** Marmen Inc. v. United States

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains _____26_____ number of unique words (including numbers) marked confidential.

☐    This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑    This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐    This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 01/08/2024

Signature: /s/ Joshua E. Kurland

Name: Joshua E. Kurland

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number**  2023-1877

**Short Case Caption**  Marmen Inc. v. United States

> **NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on  01/08/2024

by  ☐  U.S. Mail   ☐  Hand Delivery   ☐ Email   ☐ Facsimile
    ☑  Other:  Encrypted Email

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Jay Campbell | White & Case LLP, 701 13th Street, NW, Washington, DC 20005-3807, jcampbell@whitecase.com |
| Alan H. Price | Wiley Rein, LLP, 2050 M Street NW, Washington, DC 20036, aprice@wiley.law |
|  |  |
|  |  |
|  |  |

☐   Additional pages attached.

Date: 01/08/2024

Signature:  /s/ Joshua E. Kurland

Name:  Joshua E. Kurland