2023-1877

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

MARMEN INC., MARMEN ENERGIE INC., MARMEN ENERGY CO.,

Plaintiffs-Appellants

v.

UNITED STATES, WIND TOWER TRADE COALITION,

Defendants-Appellees

---

Appeal from the United States Court of International Trade
in Consol. Case No. 1:20-CV-00169
Judge Jennifer Choe-Groves

---

### REPLY BRIEF OF PLAINTIFFS-APPELLANTS
### MARMEN INC., MARMEN ENERGIE INC., MARMEN ENERGY CO.

### NON-CONFIDENTIAL VERSION

Jay C. Campbell
Ron Kendler
Allison J.G. Kepkay
WHITE & CASE LLP
701 Thirteenth  Street, NW
Washington, DC 20005
(202) 626-3600

January 30, 2024          Counsel to Plaintiffs-Appellants Marmen
Inc., Marmen Energie Inc., Marmen Energy
Co.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2023-1877 |
| **Short Case Caption** | Marmen Inc. v. US |
| **Filing Party/Entity** | Appellants Marmen Inc., Marmen Energie Inc., Marmen Energy Co. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/30/2024

Signature: /s/ Jay C. Campbell

Name: Jay C. Campbell

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Marmen Inc., Marmen Energie Inc., Marmen Energy Co. | N/A | Gestion Marmen Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION ................................................................................1

ARGUMENT .....................................................................................1

I.    COMMERCE'S DECISION TO MODIFY MARMEN'S REPORTED PRODUCT-SPECIFC PLATE COSTS SHOULD NOT BE AFFIRMED .............................................................................1

    A.    Appellees Fail To Demonstrate that Commerce Followed Its Established Practice for Averaging a Respondent's Reported Product-Specific Costs ...........................................................2

    B.    Appellees Fail To Demonstrate that Commerce's Decision Is Reasonable and Supported by Substantial Evidence ............................7

II.   COMMERCE'S DECISION TO REJECT A MINOR CORRECTION TO ONE LINE OF A COST RECONCILIATION WORKSHEET IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ..................................11

    A.    Like Commerce Below, Appellees Fail To Understand the Nature of the Minor Correction to Marmen Inc.'s Cost Reconciliation Worksheet ...................................................11

    B.    Appellees Fail To Support Commerce's Faulty Logic, Which Is Indefensible as a Matter of Basic Arithmetic......................................15

    C.    Appellees Fail To Identify Substantial Evidence Justifying Commerce's Unreasonable Decision To Reject Marmen's Support for the Correction to the Cost Reconciliation Worksheet ...................................................................18

III.  COMMERCE'S USE OF THE AVERAGE-TO-TRANSACTION COMPARISON METHOD SHOULD NOT BE AFFIRMED.....................21

    A.    Appellees Fail To Defend Commerce's Unsupported Premise That the Conditions Underlying the Cohen's $d$ Test Do Not Apply When the Data Sets to Be Compared Are Populations............22

B.    Marmen's U.S. Price Differences of Less than One Percent Are Not Significant in the "Real World" ...................................................29

C.    Conclusion.............................................................................31

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States*,
  112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ...................................................... 10

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) .......................................................................................... 6

*Chr. Bjelland Seafoods A/S v. United States*,
  19 C.I.T. 35 (1995) ........................................................................................... 9

*Dillinger France S.A. v. United States*,
  981 F.3d 1318 (Fed. Cir. 2020) ........................................................................ 29

*Dongkuk S&C Co. Ltd., v. United States*,
  600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022),
  *appeal pending* Fed. Cir. No. 23-1419 ............................................................. 4

*FCC v. Fox Television Stations, Inc.*,
  129 S. Ct. 1800 (2009) ...................................................................................... 6

*Fujitsu Gen. Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996) .................................................................... 18, 21

*In re Halo Wireless, Inc.*,
  684 F.3d 581 (5th Cir. 2012) ............................................................................ 32

*Mid Continent Steel & Wire, Inc. v. United States*,
  31 F.4th 1367 (Fed. Cir. 2022) ......................................................................... 32

*Mid Continent Steel & Wire, Inc. v. United States*,
  940 F.3d 662 (Fed. Cir. 2019) .......................................................................... 29

*New Mexico Oncology & Hematology Consultants, Ltd. v.
  Presbyterian Healthcare Servs.*,
  994 F.3d 1175 ................................................................................................... 32

*NEXTEEL Co. v. United States*,
  355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ..................................................... 4

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
    976 F.3d 761 (7th Cir. 2020) ................................................................32

*Seah Steel Vina Corp. v. United States*,
    182 F. Supp. 3d 1316 (Ct. Int'l Trade 2016) ........................................6

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ....................................................passim

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ...........................................................10

## STATUTES AND REGULATIONS

19 U.S.C. § 1677b(f)(1)(A)..........................................................1, 2, 7, 10

19 U.S.C. § 1677f-1(d)(1)(B) ............................................................21, 31

## ADMINISTRATIVE DETERMINATIONS

*Antidumping Duties; Countervailing Duties*,
    61 Fed. Reg. 7308, 7339 (Feb. 27, 1996) ............................................3

*Certain Oil Country Tubular Goods from the Republic of Korea*,
    82 Fed. Reg. 18105 (Dep't Commerce Apr. 17, 2017),
    and accompanying Issues & Decision Memorandum ..........................5

*Certain Pasta from Italy*,
    83 Fed. Reg. 63627 Dep't Commerce Dec. 11, 2018),
     and accompanying Issues & Decision Memorandum ..........................4

*Utility Scale Wind Towers from Canada*,
    85 Fed. Reg. 40239 (July 6, 2020).......................................................1

*Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, ,
    82 Fed. Reg. 49179 (Dep't Commerce Oct. 24, 2017) (final results
    2015-2016 review),
    and accompanying Issues & Decision Memorandum .....................4, 5

# MISCELLANEOUS

Fed. R. Evid. 201, Comment (a) ................................................................32

https://access.trade.gov/resources/exchange/index.html .........................................20

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1159
   (11th ed. 2003) ..................................................................................32

## **INTRODUCTION**

Plaintiffs-Appellants Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. (collectively, "Marmen" or "Appellants") reply to the response briefs submitted by Defendants-Appellees the United States ("Gov. Br.") (ECF 42) and the Wind Tower Trade Coalition ("Coalition") ("Coalition Br.") (ECF 40).    As discussed below, the Government and Coalition fail to demonstrate that the challenged aspects of the Department of Commerce's ("Commerce") final antidumping duty ("AD") determination in *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40239 (July 6, 2020), Appx3893-3895, are supported by substantial evidence and otherwise in accordance with law.    For consistency, we refer to underlying documents from the administrative record using the abbreviated documents names set forth in Marmen's initial brief (ECF 11) ("Marmen Br.").

## **ARGUMENT**

**I.    COMMERCE'S DECISION TO MODIFY MARMEN'S REPORTED PRODUCT-SPECIFC PLATE COSTS SHOULD NOT BE AFFIRMED**

Under the statute, "{c}osts shall ***normally*** be calculated based on the records of the exporter or producer of the merchandise, ***if*** such costs are kept in accordance with the generally accepted accounting principles of the exporting country . . . ***and*** reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A) (emphasis added).  Here, in determining that Marmen's reported CONNUM-specific plate costs did not "reasonably reflect

the costs associated with the production and sale" of wind towers, Commerce disregarded its standard practice without explanation and made findings belied by the record evidence, as well as its own identification of "the physical characteristics that are the most significant in differentiating the costs between products."  In attempting to defend Commerce's decision, Appellees misread precedent, reiterate Commerce's flawed logic, and (like Commerce below) ignore significant contradictory evidence.

### A. Appellees Fail To Demonstrate that Commerce Followed Its Established Practice for Averaging a Respondent's Reported Product-Specific Costs

Appellees fail to show that Commerce followed its standard "cost-smoothing" practice in rejecting Marmen's reported product-specific plate costs as unreasonable under 19 U.S.C. § 1677b(f)(1)(A).  Appellees argue that Commerce also averages input costs based on physical characteristics of *the input* – as opposed to physical characteristics of the finished merchandise under investigation – but their cited cases do not support this proposition.  Because it disregarded the physical characteristics of the wind towers and wind tower sections, Commerce's decision to average Marmen's reported product-specific steel plate costs was arbitrary and not in accordance with law.

Marmen demonstrated that Commerce's practice has been to average or "smooth" certain of a respondent's reported product-specific costs only where

(1) the reported costs are significantly different for "nearly identical" or "similar" CONNUMs, and (2) the difference in cost is unrelated to the product's physical characteristics (as defined by the CONNUM structure). *See* Marmen Br. at 31-33 (citing cases). The key is that Commerce examines the reasonableness of the respondent's reported costs by reference to the physical characteristics of ***the merchandise under investigation***. This practice makes sense, because Commerce aims "to calculate costs consistent with the model matching criteria {(defined by CONNUMs)} it develops {at the outset} of an investigation or review, after having received the views of the parties." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7339 (Feb. 27, 1996) (proposed rules).

In response, the Government contends that Commerce also averages costs across multiple CONNUMs based on a lack of "meaningful physical differences in ***the input***" – as opposed to the finished product under investigation. *See* Gov. Br. at 19-20 (emphasis added); *see also* WTTC Br. at 30 ("Commerce was called upon to examine whether Marmen's steel plate costs reflected only the physical characteristics of the plate (and the resulting wind towers) or were influenced by other factors to a meaningful degree."). But neither of the two cases relied upon by the Government supports this proposition. In *Pipe and Tube from Turkey*, Commerce revised the respondent's reporting of input costs (zinc) based on the pertinent CONNUM characteristics of ***the subject merchandise*** (*i.e.*, outside

diameter and wall thickness). *See Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 82 Fed. Reg. 49179 (Dep't Commerce Oct. 24, 2017) (final results 2015-2016 review), accompanying Issues & Decision Memo ("IDM") at 5. Likewise, in *Pasta from Italy*, Commerce averaged the respondent's reported input costs (semolina) based on its analysis of the physical characteristics of pasta, ***the subject merchandise***, as defined by CONNUMs. *See Certain Pasta from Italy*, 83 Fed. Reg. 63627 (Dep't Commerce Dec. 11, 2018) (final results 2016-2017 review), IDM at 8-9. In both cases, consideration of the physical characteristics of ***the finished goods*** – not the inputs – was central to Commerce's analysis.[1]

Similarly, the Government cites the trade court's decision in *NEXTEEL* for the proposition that Commerce may average a respondent's reported raw material costs whether or not such costs differ significantly among nearly identical or similar CONNUMs. *See* Gov. Br. at 20 (citing *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1361-62 (Ct. Int'l Trade 2019)). In the administrative review challenged in that case, however, the respondent itself conceded that raw material costs could differ based on production timing (as opposed to based on the physical characteristics of the end products). *See Certain Oil Country Tubular Goods from*

---

[1] The Government also cites the trade court's decision in *Dongkuk II*, but this case involves a companion Commerce AD investigation of wind towers from Korea currently on appeal before this court. *See* Gov. Br. at 21 (citing *Dongkuk S&C Co. Ltd. v. United States*, 600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022), *appeal pending* Fed. Cir. No. 23-1419)).

*the Republic of Korea*, 82 Fed. Reg. 18105 (Dep't Commerce Apr. 17, 2017), IDM at 104.  Here, in contrast, Marmen demonstrated to Commerce that its reported plate costs reflected physical differences of the end products, the wind towers and wind tower sections (as defined by the CONNUMs).  *See* Appx3761-3765.

Lastly, the Government contends that "none of the cases that Marmen cites support the proposition that Commerce may apply its cost smoothing practice *only* to finished products that are identical or very similar."  Gov. Br. at 22; *see also* Coalition Br. at 26.  The Commerce cases cited by Marmen, however, establish a consistent practice of determining whether a respondent's reported plate costs are reasonable by reference to the physical characteristics of the finished goods, as defined by nearly identical or similar CONNUMs.  *See* Marmen Br. at 31-33.   More importantly, the Government and Coalition are unable to identify a single case in which Commerce departed from this consistent practice (except perhaps the one case, *NEXSTEEL*, in which the respondent conceded that timing affected its reported raw material costs).

Here, despite claiming to have used the physical characteristics of the subject merchandise (as defined by CONNUMs) as a "guidepost," *see* Appx3857-3858, Commerce did nothing of the sort.  Instead, Commerce averaged Marmen's reported product-specific plate costs based on erroneous factual findings and conjecture (as discussed below) – ***without*** measuring the reasonableness of the reported plate costs

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

in relation to the physical characteristics of the finished goods under investigation. Commerce simply compared Marmen's reported plate costs for **all** CONNUMs without any consideration of the physical characteristics that Commerce itself determined "are the most significant in differentiating costs between products" (*i.e.*, TYPE, WEIGHT, and HEIGHT of the finished good).[2]   *See* Appx3857-3858, Appx3874, Appx3878.  In this regard, Commerce not only arbitrarily disregarded its past practice without explanation, which is contrary to law, but also misrepresented that it had followed its "normal practice" for cost smoothing.  Both actions are impermissible and contrary to law.  *See Seah Steel Vina Corp. v. United States*, 182 F. Supp. 3d 1316, 1326 (Ct. Int'l Trade 2016); *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009).

---

[2] Here, the Coalition contends that, "while Commerce included all CONNUMs in its analysis, it remains that there were significant differences between CONNUMs that are at the very least 'similar,' where similarity is assessed using the type/weight/height rubric that Marmen relied on {in} its case brief."  Coalition Br. at 27-28.  The Coalition's argument is both *post hoc* rationalization, which cannot be sustained, *see Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962), and wrong.  The Coalition bases its argument on four CONNUM comparisons.  Two of the comparisons include CONNUMs – [          ] and [                         ] – that Commerce determined were "outliers" based on minimal production.  *See* Appx3880.  Another comparison included two CONNUMs – [                         ] and [          ] – that Commerce considered to have **similar** (*i.e.*, lower) plate costs, not significantly different plate costs.  *See* Appx3874, Appx3879.  Finally, the Coalition's last comparison involved two CONNUMs with only a [  ]% difference in plate costs.  *See* Coalition Br. at 28.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

### B. Appellees Fail To Demonstrate that Commerce's Decision Is Reasonable and Supported by Substantial Evidence

Appellees also fail to demonstrate that substantial evidence supports the two key findings relied upon by Commerce to justify its decision to invoke the exception under 19 U.S.C. § 1677b(f)(1)(A) and disregard Marmen's product-specific plate costs recorded in its normal books and records.  First, Appellees are unable to counter irrefutable record evidence disproving Commerce's finding that "Marmen Group's steel suppliers do not charge different prices for plates of different grade, thickness, width, or length{,}" except for "high thickness range plates" (*i.e.*, greater than 50.8mm), Appx3857-3858, Appx3874.  Second, Appellees are unable to defend Commerce's assumption, contrary to the record evidence and its own findings, that differences in timing explained differences in Marmen's reported CONNUM-specific plate costs, *see* Appx3858, Appx3874.

Like Commerce below, Appellees fail to account for significant evidence disproving the agency's finding that, except for plates with thicknesses greater than 50.8mm, the prices of steel plate supplied to Marmen did not vary by grade, thickness, width, or length.  Addressing a plate list submitted by Marmen showing that prices varied by as much as Canadian dollars ("CAD") [    ] per ton based on dimension (thickness, length, width), *see* Appx3608, the Government quibbles that the prices in the plate list do not appear to correlate with differences in thickness. *See* Gov. Br. at 26.  The Government's argument is both *post hoc* – Commerce did

not even acknowledge the plate list, *see* Appx3857-3858, Appx3874 – and unavailing, as the plate list unquestionably shows different prices based on different dimensions (*i.e.*, combinations of thickness, length, and width), *see* Appx3608.[3] Next, the Coalition claims that Marmen's "communications with its suppliers" indicate that, "with the exception of plates more than 50.8 mm (2") thick, the suppliers 'do not charge different prices for plates of different grade, thickness, width, or length.'" Coalition Br. at 32. Contrary to the Coalition's assertion, however, Marmen's supply agreement with [                ] shows that the supplier charged an additional [     ] per ton for steel plates with widths ranging from [

]. *See* Appx3623. In short, Commerce's finding – that per-unit plate prices differ only for high-thickness plates – is wrong and, thus, unsupported by substantial evidence.

Moreover, Appellees fail to support Commerce's ***assumption*** that differences in Marmen's reported plate costs related to timing. The Government simply reiterates (albeit in a slightly different way) Commerce's finding of a purported pattern where "most of the CONNUMs with higher plate costs were sold early in the

---

[3] For its part, the Coalition acknowledges that "the plate list shows different prices for certain plates that happen to have different dimensions," yet claims the plate list "does not establish that the prices differed *because* of the different dimensions." Coalition Br. at 33. To the contrary, because the listed plates differ only by dimension, see Appx3608, the only reasonable conclusion that can be drawn is that the prices vary based on differences in dimension.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

investigation period, while those with lower plate costs tended to be sold later." Gov. Br. at 29-30 (citing Appx3858, Appx3874, Appx3879-3880). In doing so, the Government avoids confronting Marmen's demonstration that the record evidence disproves any such pattern. *See* Marmen Br. at 39-40. In fact, CONNUMs "with higher plate cost" were sold throughout the POI in nearly equal measure – with six CONNUMs (with per-ton plate costs ranging from CAD [    ] to CAD [    ]) sold in the first half, and five CONNUMs (with per-ton plate costs ranging from CAD [    ] to CAD [    ]) sold in the second half.[4] *See* Appx3879-3880. Meanwhile, although CONNUMs "with lower plate" costs were sold only during the second half of the POI, *see* Appx3879-3880, this observation fails to provide reasonable support for Commerce's ***assumption*** that timing was the reason.

Contrary to the Government's claim, Marmen's arguments do not amount to "mere disagreement." Gov. Br. at 30-31. Commerce merely assumed based on inadequate reasoning that timing – as opposed to the physical characteristics of the finished products under investigation – explained the differences in Marmen's reported product-specific plate costs. That is not substantial evidence. *See Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995) (citations omitted);

---

[4] This comparison omits the one CONNUM Commerce excluded from its "plate smoothing" calculation, CONNUM [                    ].

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013).

Moreover, Commerce ignored its own findings and affirmative record evidence demonstrating that Marmen's reported plate costs "reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A); *see Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000) (stating that Commerce must address significant contradictory evidence). In particular, (1) the Coalition emphasized that, because "the quantity and thickness of steel plate consumed in a particular tower can vary significantly depending on the specification{,}" ***Weight*** and ***Height*** are "the most significant factors associated with wind tower sections{,}" Appx78; (2) on this basis, Commerce selected ***Type*** (*i.e.*, complete wind tower or section of a wind tower), ***Weight*** of the Tower/Section, and ***Height*** of the Tower/Section as the three "physical characteristics that are the most significant in differentiating the costs between products{,}" Appx3857, Appx789-796; and (3) Marmen demonstrated that it did ***not*** incur significantly different plate costs for the most similar CONNUMs (defined by ***Type***, ***Weight***, and ***Height***), *see* Appx3761-3763, and that differences in reported plate costs for ***dissimilar*** CONNUMs related to the tower products' physical characteristics, *see* Appx3763-3765. Because Commerce made incorrect factual findings, relied on assumption, and ignored significant contradictory

evidence, its decision to reject Marmen's reported product-specific plate costs is unsupported by substantial evidence.

## II. COMMERCE'S DECISION TO REJECT A MINOR CORRECTION TO ONE LINE OF A COST RECONCILIATION WORKSHEET IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce unreasonably – and without substantial evidentiary support – rejected a minor correction to one line of a cost reconciliation worksheet. In attempting to defend Commerce's decision, Appellees misstate the nature of the minor correction, reiterate Commerce's flawed logic (which is wrong as a matter of basic arithmetic), and are unable to demonstrate that Commerce's decision to reject documentation supporting the correction was reasonable.

### A. Like Commerce Below, Appellees Fail To Understand the Nature of the Minor Correction to Marmen Inc.'s Cost Reconciliation Worksheet

The nature of the correction to Marmen Inc.'s cost reconciliation worksheet is simple. In preparing the worksheet, Marmen neglected to express one line-item amount (**Item L**, representing Marmen Inc.'s purchases of wind tower sections from its affiliate Marmen Énergie Inc.) in a single currency, CAD. This was an inadvertent error that Marmen made in one line of a worksheet prepared for AD reporting purposes only. That is all. Yet Commerce rejected Marmen's correction based on an unfounded assumption that Marmen was asking Commerce to accept an

additional correction to its financial statements that its auditor had not approved. Commerce's assumption is unreasonable and finds no support in the record.

The error in Marmen Inc.'s cost reconciliation worksheet is understandable. During the POI, Marmen Inc. purchased and resold wind tower sections manufactured by its affiliate, Marmen Énergie Inc. ("Marmen Énergie"). *See* Appx1003, Appx1005. Consequently, to tie Marmen Inc.'s **audited COGS** (which included Marmen Inc.'s purchases of tower sections from Marmen Énergie) to Marmen Inc.'s **reported costs of manufacture** (which did ***not*** include Marmen Inc.'s purchases of tower sections from Marmen Énergie), it was necessary to deduct Marmen Inc.'s purchases of tower sections from Marmen Énergie. *See* Appx1005. To do so, Marmen included a line item in Marmen Inc.'s cost reconciliation worksheet at **Item L**, labeled "Affiliated purchase of wind sections from Marmen Énergie." *See* Appx1023.

Inadvertently, however, Marmen neglected to ensure that the amount reported at **Item L** was expressed entirely in CAD. Marmen Inc.'s purchases of wind tower sections from Marmen Énergie were made in U.S. dollars ("USD"). *See* Appx3644-3650 (schedule of Marmen Inc.'s purchases from Marmen Énergie), Appx3907-3913 (same). During the 2018 fiscal year, Marmen did not convert USD purchases to CAD in its normal accounting records. *See* Appx829, Appx835. Consequently, Marmen's auditor converted such USD purchases to CAD for presentation in

12

Marmen Inc.'s year-2018 financial statements. *See* Appx1006-1007, Appx3601. In preparing Marmen Inc.'s cost reconciliation worksheet, Marmen took the purchase figure from Marmen Inc.'s accounting records, overlooking that Marmen Inc.'s purchases from Marmen Énergie during the first half of the period of investigation ("POI") (July 1, 2018, through December 31, 2018) needed to be converted from USD to CAD. *See* Appx3604-3605, Appx3641. This created a discrepancy because Marmen Inc.'s audited COGS (**Item A** in the cost reconciliation worksheet) and reported cost of manufacture (**Item T**) are expressed in CAD. *See* Appx672, Appx678, Appx843-848, Appx2378-2379. To correct this error, Marmen added **Item LI** ("Exchange Rate Variance on July to Dec 2018 Affiliated Purchases of Wind Sections from Energie") to Marmen Inc.'s cost reconciliation worksheet so that the entire purchase amount would be expressed in CAD (together with supporting documentation). *See* Appx3641, Appx3644-3650.

Importantly, the error was Marmen's alone – limited to one line in a reconciliation worksheet prepared for AD reporting purposes only – a point Marmen emphasized to Commerce during the remand proceeding. *See* Appx4675-4676, Appx4680. Marmen also confirmed that Marmen Inc.'s audited financial statements correctly included the company's purchases of wind tower sections from Marmen Énergie in CAD, *see* Appx4681, and demonstrated that the correction to Marmen Inc.'s cost reconciliation worksheet (**Item L1**) was unrelated to its auditor's

revisions to Marmen Inc.'s year-2018 financial statements, *see* Appx3601-3602, Appx3624-3639, Appx4678-4680.  In the revised Marmen Inc. cost reconciliation worksheet, Marmen noted that **Item L1** was necessary because "it did not convert those purchases to CAD for the original reconciliation."  Appx3641.

Yet, without any evidentiary support, Commerce unreasonably dismissed the minor correction to Marmen Inc.'s cost reconciliation worksheet on the grounds that it was made without the auditor's approval and "potentially call{ed} into question the completeness of the efforts to revise Marmen's financial statement and whether additional items remain undisclosed."  Appx4823; *see id.* at Appx4826. Highlighting its confusion, Commerce observed that **Item L** in Marmen Inc.'s cost reconciliation "did not change based on the auditor's adjustment to Marmen's financial statement, indicating that the auditor did not believe any correction to that figure was necessary." Appx4826.  Again, however, the only error was on Marmen's part in one line of a cost reconciliation worksheet that it prepared solely for AD reporting purposes.  Marmen's auditor had nothing to do with this worksheet; nor was there any additional correction for the auditor to approve.

In response, neither the Government nor the Coalition was able to defend Commerce's gross mischaracterization of the nature of the minor correction to Marmen Inc.'s cost reconciliation worksheet, other than to reiterate Commerce's

unfounded claims, which are unreasonable and unsupported by substantial evidence. *See* Gov. Br. at 36-37, 41; Coalition Br. at 37.

**B.    Appellees Fail To Support Commerce's Faulty Logic, Which Is Indefensible as a Matter of Basic Arithmetic**

In its initial brief, Marmen demonstrated that Commerce mistakenly concluded that the minor correction to Marmen Inc.'s cost reconciliation worksheet would double count an exchange rate adjustment already reflected in the company's audited COGS and reported costs. *See* Marmen Br. at 43-47. In response, Appellees simply reiterate Commerce's flawed reasoning without confronting Marmen's arguments. This is not surprising: Commerce's flawed logic is indefensible.

Appellees argue that Commerce reasonably determined that the correction to Marmen Inc.'s cost reconciliation worksheet (reported at **Item L1**) would adjust for amounts already reflected in Marmen Inc.'s audited COGS and reported costs. *See* Gov. Br. at 12-13, 31, 36; Coalition Br. at 40. Appellees, like Commerce, are wrong on multiple counts. First, Marmen *agrees* – and confirmed to Commerce – that Marmen Inc.'s audited COGS already reflected the company's purchases of tower sections from Marmen Énergie in CAD. *See* Appx4681. That does not mean, however, that the currency correction to one line of Marmen Inc.'s cost reconciliation worksheet was unnecessary. Again, whereas Marmen Inc.'s COGS *includes* its purchases of tower sections from Marmen Énergie, Marmen Inc.'s reported costs *do not* (because Marmen Inc. did not manufacture or further process

15

those sections).  *See* Appx1005.  Consequently, to reconcile Marmen Inc.'s audited COGS to its reported costs, it is necessary to deduct Marmen Inc.'s purchases of tower sections from Marmen Énergie.  *See id.*  In doing so, the deduction – like the audited COGS – must be expressed entirely in CAD.  This is what the correction at **Item L1** of Marmen Inc.'s revised cost reconciliation achieves.

This raises another misconception in Commerce's analysis (as well as Appellees' arguments).  Commerce concluded that Marmen Inc.'s "***reported costs***, ***including those of the sections purchased from Marmen Energie***, were, in fact, already inclusive of exchange rate differences . . . ."  Appx4827 (emphasis added); *see* Gov. Br. at 40.  Commerce was mistaken.  As noted above (and repeatedly explained to Commerce), Marmen Inc.'s reported costs do not include its purchases of tower sections from Marmen Énergie at all – because Marmen Inc. did not produce or further process those sections.  *See* Appx1005, Appx4681.  Rather, Marmen Inc. simply resold them.  *See id.*

Perhaps Commerce meant that the correction was unnecessary because Marmen Inc.'s audited COGS and reported costs were already expressed in CAD.  If so, however, Commerce's logic remains flawed.  Rather, it is ***necessary*** to deduct the full value of Marmen Inc.'s purchases of tower sections from Marmen Énergie in CAD ***precisely because*** the starting point (audited COGS) and ending point

(reported costs) of the reconciliation worksheet are expressed in CAD.  The simple

comparison below illustrates this point.

| Reconciliation without Correction | | | |
|---|---|---|---|
| | Item | Currency | Value |
| | COGS **(A)** | CAD | 100 |
| *Less:* | Purchases **(B)** | USD | 20 |
| *Equals:* | Cost of Manufacture **(C=A-B)** | CAD/USD | 80 |
| | Reported Costs **(D)** | CAD | 75 |
| | Difference **(E=C-D)** | | 5 |
| | Percentage Difference **(E/C)** | | 6% |

| Reconciliation with Correction | | | |
|---|---|---|---|
| | Item | Currency | Value |
| | COGS **(A)** | CAD | 100 |
| *Less:* | Purchases **(B)** | USD | 20 |
| | Currency Adjustment **(b)** | | 5 |
| *Equals:* | Cost of Manufacture **(C=A-B-b)** | CAD | 75 |
| | Reported Costs **(D)** | CAD | 75 |
| | Difference **(E=C-D)** | | 0 |
| | Percentage Difference **(E/C)** | | 0% |

As shown above, the purchases deducted at **Item B** must be expressed in CAD

because COGS **(A)** and Reported Costs **(D)** are expressed in CAD.  Otherwise, the

reconciliation will show a false unreconciled difference (6% in the example above),

the same false outcome that befell Marmen by virtue of Commerce's misguided

decision to reject a necessary (and supported) minor correction to Marmen Inc.'s

cost reconciliation worksheet.[5]

---

[5] Doubling down, the Government argues that **Items P**, **Q**, and **R** of Marmen Inc.'s cost reconciliation worksheet show that "exchange rate adjustments (which would include losses on U.S. dollar purchases from Marmen Énergie) are *already* included in the starting COGS figures taken from Marmen's restated financial statements and carried forward in the reconciliation."  Gov. Br. at 39; *see also id.* at 40-41.  As Marmen demonstrated in its initial brief, however, the **Item L1** correction does not duplicate adjustments already made in **Items P**, **Q**, and **R** of the reconciliation worksheet.  *See* Appellants Br. at 45-46.  Moreover, the Government's logic is flawed.  As illustrated in the simple examples above, the **Item L1** correction (ensuring that the full value of Marmen Inc.'s purchases from Marmen Énergie is expressed in CAD) is necessary ***precisely because*** the starting COGS figure and all other figures in the worksheet are expressed in CAD.

The Government asserts that Commerce is owed "tremendous deference" in its resolution of "technical accounting issues."  Gov. Br. at 43 (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996)).  No such deference is owed here, where Commerce relied on faulty logic and bad math.

### C.    Appellees Fail To Identify Substantial Evidence Justifying Commerce's Unreasonable Decision To Reject Marmen's Support for the Correction to the Cost Reconciliation Worksheet

Appellees also fail to defend Commerce's unreasonable decision to reject the materials Marmen submitted to support the correction to Marmen Inc.'s cost reconciliation worksheet.  To support the **Item L1** correction, Marmen submitted a schedule of the invoices issued by Marmen Énergie to Marmen Inc. during the POI for wind tower sections, with green highlighting to identify the USD invoices issued in 2018 (which needed to be converted to CAD), and a calculation to show the conversion of the year-2018 invoices to CAD ("Marmen Energie Sales to Marmen Inc – Tab L1").  *See* Appx3907-3909; *see also* Appx3644-3646 (same).  In response, Appellees ignore Marmen's explanation for how the schedule of Marmen Énergie invoices corroborates the **Item L1** correction and reiterate Commerce's flawed rationalization for dismissing the exchange rate used in Marmen's calculation.

Echoing Commerce, the Government questions the reliability of the schedule of Marmen Énergie invoices, observing that all the invoices are listed as having been made in USD, whereas Marmen "stated that its January to June 2019 purchases from

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Marmen Énergie were made in CAD . . . ." Gov. Br. at 42. This is not what Marmen said. Rather, Marmen represented that "each invoice was issued in USD{,}" as supported by the schedule. *See* Marmen Br. at 14 (citing Appx1042-1049); *see also* Appx3907-3913; *see also* Appx3644-3650. All Marmen Énergie invoices to Marmen Inc. for wind tower sections were denominated in USD. The only distinction is that, whereas Marmen's system "converted" the USD purchase values to CAD at a rate of 1:1 during the first half of the POI (July 2018 – December 2018), its system converted the USD purchase values at a rate of [    ] during the second half of the POI (January 2019 – June 2019). *See* Appx829, Appx3601.

More importantly, Appellees ignore Marmen's demonstration that the schedule of invoices fully corroborates the **Item L1** correction to Marmen Inc.'s cost reconciliation worksheet. Specifically, as Marmen explained, the schedule shows that, whereas Marmen Énergie's sales prices for tower sections in the year-2018 invoices average approximately [    ] in value, the sales prices in the year-2019 invoices average approximately [    ] in value. *See* Appx3907-3913. Multiplying [    ] by [    ] – the USD-CAD conversion rate Marmen's system used in 2019 – yields [    ]. This confirms that Marmen Inc.'s USD purchases of wind tower sections in July – December 2018 were left unconverted in Marmen's system (*i.e.*, remained in USD). Moreover, the top of the schedule of invoices clearly shows how Marmen calculated the **Item L1** adjustment:

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED



| | |
|---|---|
| Total USD sales in 2018 entered at | [ ] |
| Average exchange rate 2018 | |
| Exchange rate variance to convert in CAD | L1 |

*See* Appx3907. The facts recounted above are irrefutable, and the lack of any response from Appellees speaks volumes.

In its initial brief, Marmen also showed that it consistently used the same [    ] USD to CAD exchange rate in its cost reporting. *See* Marmen Br. at 49 (citing Appx829 (referring to "the actual exchange rate incurred by Marmen (under exchange rate contracts)"), Appx835, Appx949, Appx988, Appx1207-1218. In response, the Government counters that "there is still no record documentation showing how or from where that rate was derived, nor is there any support for it being an actual average rate for the relevant period." Gov. Br. at 46. Moreover, both Appellees reiterate Commerce's questions concerning the timeframe for the [    ] exchange rate – July through December 2018, full year 2018, or the POI. *See* Appx4859; Gov. Br. at 46; Coalition Br. at 42. These objections ring hollow, however, because Commerce could easily confirm the reliability of the [    ] exchange rate by reference to the exchange rate data maintained on its own website "for use only in calculating antidumping duties." *See* https://access.trade.gov/resources/exchange/index.html. Any reasonable decision maker – particularly one that claims to exercise "technical expertise to make

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

'complex economic and accounting decisions of a technical nature,'" Gov. Br. at 14 (citing *Fujitsu*, 88 F.3d at 1039) – would have done just that.[6]

In sum, Commerce's decision to reject Marmen's support for the minor correction to Marmen Inc.'s cost reconciliation worksheet is unsupported by substantial evidence.

## III.  COMMERCE'S USE OF THE AVERAGE-TO-TRANSACTION COMPARISON METHOD SHOULD NOT BE AFFIRMED

The statute permits Commerce to use an average-to-transaction price comparison method when "there is a pattern of export prices (or constructed export prices) that ***differ significantly*** among purchasers, regions, or periods of time . . . ." 19 U.S.C. § 1677f-1(d)(1)(B) (emphasis added). Here, Appellees fail to demonstrate that Commerce reasonably determined, based on substantial evidence, that Marmen's U.S. price differences of ***less than one percent*** establish a pattern of significant price differences. In particular, Commerce's premise for its blind reliance on the Cohen's *d* test is refuted by the coefficient's calculation itself as well as Professor Cohen's representations about the coefficient's limitations. Moreover,

---

[6] The Coalition proffers a flawed calculation to attempt to discredit the [        ] USD-CAD exchange rate. *See* Coalition Br. at 43-44. The Coalition recalculates a USD-CAD exchange rate by dividing the total amount of the auditor's currency exchange adjustment (CAD [          ]) by the COGS recorded in Marmen's general ledger pre-adjustment (CAD [            ]). *See id.* The obvious problem with this calculation is that it wrongly assumes that Marmen Inc. – a Canadian company – recorded its COGS entirely in USD, which is incorrect. *See* Appx672, Appx678, Appx843-848, Appx2378-2379.

Marmen's small U.S. price differences of less than one percent fall well short of the "large" differences (*i.e.*, when the Cohen's *d* coefficient equals 0.8) that Professor Cohen describes as being observable in the "real world."

## A. Appellees Fail To Defend Commerce's Unsupported Premise That the Conditions Underlying the Cohen's *d* Test Do Not Apply When the Data Sets to Be Compared Are Populations

In *Stupp Corp. v. United States*, this court expressed "significant concerns relating to Commerce's application of the Cohen's *d* test . . . in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances." 5 F.4th 1341, 1357 (Fed. Cir. 2021). Here, despite the court's concerns, Appellees persist in defending Commerce's position that these conditions do not apply to Commerce's use of the Cohen's *d* coefficient on the ground that Commerce uses the complete population of the respondent's U.S. price data, as opposed to samples. *See* Gov. Br. at 52-65; Coalition Br. at 44-53. Commerce's premise, however, is wrong on the face of the Cohen's *d* calculation itself, and finds zero support in the academic literature.

Reiterating Commerce's explanation, Appellees maintain that the conditions for use of the Cohen's *d* coefficient – normal distributions, equivalent variances, and sufficient number of observations – do not apply in the context of Commerce's differential pricing analysis. *See* Gov. Br. at 51-53, 55-57; Coalition Br. at 47. The Government stresses that, when Commerce calculates the Cohen's *d* coefficient, it

"calculates the exact mean and standard deviation for each test and comparison group based on the entire population of United States prices in each group, without relying on sampling or estimates of these population parameters."  Gov. Br. at 51-52; *see also id.* at 56-57 (citing Appx4839-4840); Coalition Br. at 47.  Commerce's distinction between populations and samples, however, is artificial:  Regardless of whether the data sets to be compared are populations or samples, the limitations of the Cohen's *d* coefficient apply based on the calculation of the coefficient itself.

The Cohen's *d* test is used to measure whether there is a significant difference between the "means" of a test group and a comparison group.  The formula for calculating the Cohen's *d* coefficient is as follows:

$$d = \frac{\lfloor \mu_1 - \mu_2 \rfloor}{\sigma}$$

Where:
$\mu_1$ = mean of population 1
$\mu_2$ = mean of population 2
$\sigma$ = population standard deviation

*See* Appx4735, Appx4792.  As shown above, the Cohen's *d* coefficient equals the difference in the means of the test and comparison groups divided by the standard deviation.  If the compared means differ by more than one standard deviation, the Cohen's *d* coefficient would be equal to or greater than one.  This is why Professor Cohen concludes that a *d* coefficient of 0.8 or greater (*i.e.*, value close to one) indicates a "large" effect size.  *See* Appx4741-4742.  If the data sets to be compared

23

are not normally distributed, however, this conclusion would not hold, and the Cohen's *d* coefficient ceases to be meaningful. The requirement of normal distributions is built into the Cohen's *d* formula itself and, consequently, applies regardless of whether the data sets are populations or samples.

Equivalent variances are also required for the Cohen's *d* coefficient to be meaningful. Again, the Cohen's *d* coefficient equals the difference in the means of the test and comparison groups divided by the standard deviation, which is the square root of the variance.

$$d = \frac{|\mu_1 - \mu_2|}{\sigma}$$

Professor Cohen uses a unique standard deviation in the formula because the variances of the data sets are assumed to be equal. *See* Appx4735 (noting use of "the standard deviation of either population (since they are assumed equal)"). As with the assumption of normal distributions, the requirement of equivalent variances is built into the Cohen's *d* formula itself – regardless of whether the test and comparison groups consist of populations or samples. Commerce's proposition – that its use of populations obviates the need for normal distributions and equivalent variances – is wrong based on the calculation of the Cohen's *d* coefficient itself.

In introducing the Cohen's *d* coefficient as a measure of effect size, Professor Cohen himself stated that "the assumption is made that ***the populations*** sampled are normally distributed and that they are of homogeneous (i.e., equal) variance."

24

Appx4734 (emphasis added); *see also id.* at 4735.  Moreover, in establishing the "small," "medium," and "large" thresholds of the Cohen's *d* coefficient, Professor Cohen used ***populations*** – while maintaining the assumptions that the data sets are normally distributed and of equal variance and size.  *See* Appx4739-4742; *Stupp*, 5 F.4[th] at 1360 (observing that "Professor Cohen derived his interpretive cutoffs under certain assumptions").  At most, Professor Cohen indicated that "***{m}oderate*** departures from these assumptions" could be tolerated, particularly when the data sets to be compared are of sufficient size.  *See* Appx4734-4735 (emphasis added).  In no way, however, did Professor Cohen suggest that the assumptions may be disregarded when the data sets consist of the entire population.

The Government wrongly argues that Professor Cohen's statements regarding the conditions necessary for Cohen's *d* are limited to "a specific approach to interpreting Cohen's *d* coefficient values—which Commerce *does not* use in its analysis—called '*d* As Percent Nonoverlap: The U Measures.'"  Gov. Br. at 59 (citing Appx4736); *see also* Coalition Br. at 48-49).  Contrary to the Government's reading, however, Professor Cohen presents *d* and "U" (*i.e.*, percentage of nonoverlap) as related parameters to describe comparisons of data sets (in his example, populations).  *See* Appx4736-4738.  As shown in Table 2.2.1 of Professor Cohen's paper, each value of *d* has a corresponding percentage of U.  *See* Appx4737.  Then, in section 2.2.3 of his paper, Professor Cohen defines the "small," "medium,"

and "large" thresholds of the *d* coefficient **in relation to** the corresponding U percentages from Table 2.2.1. *See* Appx4739-4742. In other words, the Cohen's *d* thresholds that Commerce relies upon for its differential pricing analysis (including the 0.8 coefficient establishing a "large" effect size) are **dependent on** – not distinct from – nonoverlap parameters measured by U. For these reasons, Commerce's position – that the conditions for use of the Cohen's *d* coefficient can be ignored if the analysis is not focused on the extent of nonoverlap (or U) – is untenable.

Next, referring to equation 2.3.2 in Professor Cohen's work and the surrounding discussion, the Government argues that the Cohen's *d* conditions are not required under "the type of analysis that Commerce applies . . . ." Gov. Br. at 59 (citing Appx4759); *see also id.* at 57-60; Coalition Br. at 49. Here, Professor Cohen describes a case where the standard deviations (which are defined by the variances of the data sets) are unequal. *See* Appx4758-4759. Contrary to the Government's argument, however, this does not mean that the Cohen's *d* conditions are unimportant or cease to apply when populations are used. As noted above, Professor Cohen stated that only "***{m}oderate*** departures from these assumptions" may be tolerated for the Cohen's *d* coefficient to remain meaningful. *See* Appx4734-4735 (emphasis added).

Bearing this out, Professor Cohen's alternative calculation for the denominator of the $d$ coefficient (at equation 2.3.2) uses the simple average of the unequal standard deviations (dividing by two):

$$\sigma' = \sqrt{\frac{\sigma_A^2 + \sigma_B^2}{2}}$$

*See* Appx4759.[7]  A simple average is only appropriate if the variables to be averaged are comparable – not substantially different.   Furthermore, Professor Cohen reiterated in this context that the Cohen's $d$ coefficient could remain meaningful "despite moderate failure" of the equal variance assumption "provided that the sample sizes are about equal" and the data sets reflect "***normal*** populations." Appx4758 (emphasis added).  In other words, Professor Cohen affirmed that, while the equal variance condition could be relaxed (provided they are not substantially dissimilar), the other two conditions – normal distributions and size – must continue to apply.   Contrary to Commerce's reading, Professor Cohen's discussion of equation 2.3.2 confirms that the Cohen's $d$ assumptions are important and must apply in all cases (with only "moderate departures") – even when the data sets are populations.

---

[7] To be more precise, equation 2.3.2 (1) sums the squares of the unequal standard deviations; (2) divides this sum by two; and then (3) takes the square root of this resulting value.  Appx4759.  Nevertheless, the point remains the same:  Dividing by two is permissible only if the two standard deviations are comparable or similar.

The Government's arguments regarding other academic papers addressing Cohen's *d* fare no better. For example, the Government dismisses Grissom's, Kim's, and Coe's affirmations of the importance of the Cohen's *d* conditions on the ground that their discussions arise "in the same context of analyzing the percent overlap of data sets." Gov. Br. at 60-61 (citing Appx4844) & 63 (citing Appx4845). As explained above, however, Commerce's misguided view that the Cohen's *d* conditions can be ignored if the analysis is not focused on the extent of nonoverlap (or U) finds no support in Professor Cohen's work or any other.

Regarding Algina's paper, the Government reiterates Commerce's assertion "that the potential bias Algina identifies is that Cohen's *d* may *understate* effect size when dealing with 'heavy-tailed' distributions" (*i.e.*, the assumption of normal distributions is unmet). Gov. Br. at 62 (citing Appx4847-4848). Commerce's reasoning is flawed, however, because it ignored another scenario described by Algina – again, when the normal distribution assumption is violated – in which the Cohen's *d* coefficient ***overstated*** the differences in effect sizes between two sets of data. *See* Appx4689-4692. Moreover, the point of Algina's examples is to demonstrate the shortcomings of the Cohen's *d* coefficient when the underlying assumptions of normal distributions, equivalent variances, and size are not satisfied. *See* Appx4692. When the assumptions are not met, the Cohen's *d* coefficient may

underestimate or overestimate the effect size. Either way, the *d* coefficient is an unreliable measure of the significance of an effect size in such case.

At bottom, Appellees (like Commerce below) are unable to identify any evidence – let alone substantial evidence – that the Cohen's *d* conditions are irrelevant to Commerce's differential pricing analysis. In fact, Professor Cohen's paper contradicts Commerce's position that the Cohen's *d* conditions cease to apply when the data sets to be compared consist of populations, as opposed to samples. Commerce's position is unreasonable and unsupported by substantial evidence.[8]

**B.    Marmen's U.S. Price Differences of Less than One Percent Are Not Significant in the "Real World"**

In its initial brief, Marmen demonstrated that its circumstances mirror the problem highlighted by the *Stupp* Court: Because the conditions of the Cohen's *d*

---

[8] Appellees also suggest that the "ratio test" and "meaningful difference test" components of Commerce's differential pricing analysis mitigate any concerns with its use of the Cohen's *d* test. *See* Gov. Br. at 69; Coalition Br. at 51-52. Commerce itself, however, has stated that "{t}he precise purpose for which Commerce relies on the Cohen's *d* test is to satisfy the statutory language to measure whether a difference in prices is significant." Appx4835; *see also id.* at Appx4840. If, however, the conditions required to make the Cohen's *d* coefficient meaningful are not satisfied, Commerce cannot reasonably rely on the Cohen's *d* test to measure significance. Consequently, Appellees' argument is inadequate and fails to support Commerce's improper use of the Cohen's *d* test (ignoring the conditions on which it is based). *See Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019) ("Commerce must provide an explanation that is adequate to enable the court to determine whether the choices are in fact reasonable, including as to calculation methodologies."); *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1326 n.6 (Fed. Cir. 2020) ("The record does not indicate that Commerce's use of the Cohen's *d* test or its thresholds is irrebuttable.").

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

test were not satisfied, Commerce falsely found "significant" differences in Marmen's U.S. pricing even though "{a}n objective examiner inspecting those export sales prices would be unlikely to conclude that they embody a 'pattern' of prices that 'differ significantly.'" Marmen Br. at 56-60 (quoting *Stupp*, 5 F.4th at 1359. Ironically, the Government's justification for disregarding the Cohen's *d* conditions – that "Commerce uses the Cohen's *d* test to measure the ***practical significance*** of differences in ***real-world pricing***, rather than ***statistical significance***{,}" Gov. Br. at 54 (emphasis added) – highlights the problem: Commerce's blind application of the Cohen's *d* test to Marmen's U.S. sales data falsely ascribes significance to price differences that are considered minor in the "real world."

In Marmen's case, Commerce concluded based on application of the Cohen's *d* test that U.S. price differences of less than 1% (ranging from [      ]% to [      ]% for five CONNUMs), *see* Appx3778, were "significant." Commerce did so because the resulting Cohen's *d* coefficient exceeded the "large" threshold defined by Professor Cohen. *See* Appx2464-2465. As Commerce recognized:

> For the 'large' 0.8 threshold, Dr. Cohen described the effect as the difference in IQ of a PhD graduate and a college freshman, the difference in IQ between a college graduate and a student with only a 50-50 chance of passing high school, or the difference in height between 13 and 18 year-old girls.

Appx4841 (citing Appx4742). It does not take a PhD to see that price differences of less than 1% objectively fail to meet this standard for "large." Yet, by disregarding the conditions for use of the Cohen's *d* coefficient,[9] Commerce denies what would be obvious to any reasonable person in the "real world": Marmen's U.S. sales do not exhibit a pattern of prices that differ significantly. This is the same problem highlighted by the *Stupp* Court.

## C.    Conclusion

For the reasons discussed above, Appellees have failed to demonstrate that substantial evidence supports Commerce's finding of a pattern of significant price differences with respect to Marmen's U.S. sales. Consequently, Commerce's application of the average-to-transaction method to Marmen's U.S. sales under 19 U.S.C. § 1677f-1(d)(1)(B) is unreasonable and should not be sustained. Nor should Commerce, as the Coalition requests, be allowed to go "back to the drawing board" in this case. *See* Coalition Br. at 53. Commerce should not be permitted a second chance to concoct a justification for treating U.S. price differences of less than one percent as "significant," the plain meaning of which is "of a noticeably or

---

[9] During the remand proceeding, Marmen submitted an analysis demonstrating that the Cohen's *d* conditions were ***not*** satisfied with respect to Marmen's U.S. sales data, *see* Appx3987-4663, but Commerce unreasonably rejected the analysis as "untimely filed, new factual information," *see* Appx4664-4665.

measurably *large* amount."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1159

(11th ed. 2003) (emphasis added).[10]

---

[10] The Government's additional request – that the Court reject *amici*'s arguments on the grounds that *amici* rely on literature and analyses that were not on the administrative record, *see* Gov. Br. at 70–73, is misguided.  First, the sources on which *amici* rely are not adjudicative facts that constitute the "facts of the particular case," such that they must either be on the record or subject to judicial notice; they instead reflect principles of statistics bearing on Commerce's differential pricing analysis.  *See* Fed. R. Evid. 201, cmt. (a) (articulating the well-established distinction between "adjudicative facts" and "legislative facts," the latter of which are not generally subject to limits appliable to "evidence").  This Court also has emphasized the importance of the statistics literature in evaluating Commerce's use of Cohen's *d*, *see, e.g.*, *Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367, 1381 (Fed. Cir. 2022), and has considered statistics literature not found on the administrative record, *see Stupp*, 5 F.4th at 1357–60.  The Government presents no reason why the Court should decline to consider the statistical literature or arguments based on the principles derived therefrom.  Second, federal courts routinely encourage *amici* to submit arguments, information, and data not offered by the parties.  *See, e.g.*, *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 976 F.3d 761, 762 (7th Cir. 2020); *New Mexico Oncology*, 994 F.3d at 1175 (provisionally granting leave to *amici* to file a brief even though the brief "rel{ied} on extra-record evidence"); *In re Halo Wireless, Inc.*, 684 F.3d 581, 596 (5th Cir. 2012) (denying a motion to appear as *amicus*, in part, because the *amicus* brief "contain{ed} no information or argument that the Appellees did not already provide to the Court").

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

For the foregoing reasons, and those established in Appellants' initial brief, Commerce's conclusions in the *Final AD Determination* regarding cost smoothing, Marmen Inc.'s cost reconciliation, and differential pricing, and the CIT's decisions sustaining Commerce's conclusions, are unsupported by substantial evidence on the record and otherwise not in accordance with law.  Therefore, Appellants respectfully request that the Court reverse the CIT's decisions on these issues, and remand to Commerce with instructions to issue a revised determination, consistent with the opinion of the Court.

Respectfully submitted,

/s/ Jay C. Campbell
Jay C. Campbell
Ron Kendler
Allison J.G. Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co.

January 30, 2024

(Form 19)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

### CAFC Court No. 2023-1877
### <u>Marmen Inc. v. US</u>

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑    the filing has been prepared using a proportionally-spaced typeface and includes 6,506 words.

☐    the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐    the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: January 30, 2024          Signature: _____/s/ Jay C. Campbell___

Name: _____Jay C. Campbell___

(Form 31)

## CERTIFICATE OF CONFIDENTIAL MATERIAL
### CAFC Court No. 2023-1877
### <u>Marmen Inc. v. US</u>

The foregoing document contains 29 unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: January 30, 2024          Signature:      /s/ Jay C. Campbell

                                Name:      Jay C. Campbell

## CERTIFICATE OF SERVICE

### Marmen Inc. v. US
### CAFC Court No. 2023-1877

I hereby certify that on January 30, 2024, the foregoing document filed on behalf of Marmen Inc., Marmen Énergie Inc., and Marmen Energy Co. was served upon the following parties via the Court's electronic delivery system.

Joshua E. Kurland
U.S. Department of Justice
Joshua.E.Kurland@usdoj.gov

Jesus N. Saenz
U.S. Department of Commerce
Jesus.Saenz@trade.gov

Alan H. Price
Wiley Rein LLP
APrice@wiley.law

Robert E. DeFrancesco, III
Wiley Rein LLP
RDeFrancesco@wiley.law

Date: January 30, 2024          /s/ Jay C. Campbell
                                Jay C. Campbell
                                WHITE & CASE LLP
                                701 Thirteenth Street, NW
                                Washington, DC 20005
                                (202) 626-3600